# EXHIBIT "1"
## (Part 1)



551 Madison Avenue, New York, New York 10022
Tel: 212.906.9400   Fax: 212.935.5935

**Appraisal of**

**150 West 85th Street**
**New York, New York 10024**



June 24, 2021

Mr. Maurice Reilly, III MAI
Flushing Bank
220 RXR Plaza
Uniondale, NY 11556

Re:     150 West 85th Street
        New York, New York 10024
        KTR No.: 21-1-00203

Dear Mr. Reilly:

In accordance with our agreement dated May 13, 2021, KTR Real Estate Advisors LLC ("KTR") has performed an appraisal of the above-referenced property. Its purpose is to determine the "As Is" Market Value of the Fee Simple Interest in the subject property as of May 25, 2021, the date the property was inspected.

The subject property, known as 150 West 85th Street, consists of a 6,564± square foot parcel of land improved with a six-story, elevator serviced, school building classified "W8" (Other Private School). It is located on the south side of West 85th Street, between Columbus and Amsterdam Avenue, in the Upper West Side section of Manhattan. Public records indicate that the property has a gross building area of 27,044± square feet constructed in 1928. The corner stone has the dates 1846-1926 with the initials UOTS inscribed. The NYC Department of Buildings (NYC DOB) oldest Certificate of Occupancy dates the building at 1928. The subject was redeveloped in 2016-2019.

According to the original plans approved by the BSA, the redevelopment of the subject was a "gut" renovation that reconfigured the former school into a six-story plus penthouse and basement, elevator-serviced building built-to-suit by the Manhattan Country School. According to the original plans approved by the BSA, the subject's gross building area was intended to be expanded to 39,539 square feet plus 4,261 square feet of cellar space. The approved plans by were scaled back. According to the amended plans, the subject has an above grade gross building area of 35,544 square feet inclusive of the 3,743 square feet on 6th floor and a small mechanical penthouse. The subject property was issued a final Certificate of Occupancy by the NYC DOB effective as of July 8, 2019. As of the date of inspection, the subject was 100% owner-occupied. It is identified on the New York County tax maps as Block 1215 Lot 53 and is more fully described, legally and physically, within the attached report.

Based on the analysis contained in the attached appraisal report the "As Is" Market Value of the Fee Simple Interest in the subject property, as of May 25, 2021, is:

**THIRTY EIGHT MILLION DOLLARS**
**($38,000,000)**



The attached report, in its entirety, including all assumptions and limiting conditions, which is an integral part of, and inseparable from, this transmittal letter, contains the data, information, analyses and calculations upon which the value conclusion indicated herein are based. The report was prepared in compliance with the Uniform Standards of Professional Appraisal Practice (USPAP) as set forth by the Appraisal Foundation and in accordance with the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute. In addition, the appraisal was written in conformance with FIRREA and OCC, and in compliance with the Interagency Appraisal and Evaluation Guidelines, dated December 2, 2010.

It has been a pleasure to be of service to you. Please do not hesitate to call with any questions you may have regarding our assumptions, observations or conclusion.

Very truly yours,

**KTR REAL ESTATE ADVISORS LLC**

By:   Thomas J. Tener, MAI
      Managing Member
      NY Certification #46000033225

By:   Matthew Vezza
      Associate

# TABLE OF CONTENTS

## INTRODUCTION

Title Page
Letter of Transmittal
Table of Contents .................................................................................................................... i
Certificate of Appraisal ......................................................................................................... ii
Basic Assumptions and Limiting Conditions........................................................................ iii
Pictures of the Subject Property ............................................................................................ v
Location Map .......................................................................................................................... vi

## APPRAISAL DATA

Summary of Important Conclusions ...................................................................................... 1
Premises of the Appraisal...................................................................................................... 2
Regional Analysis.................................................................................................................... 5
Neighborhood Analysis........................................................................................................... 15
Site Analysis ........................................................................................................................... 20
Zoning Analysis ...................................................................................................................... 23
Real Estate Assessment and Tax Analysis............................................................................ 31
Description of Improvements.................................................................................................. 32
School Market Rent Analysis................................................................................................. 34
Highest and Best Use ............................................................................................................. 39

## ANALYSIS OF DATA AND CONCLUSIONS

Valuation Process ................................................................................................................... 40
Income Capitalization Approach............................................................................................ 42
Sales Comparison Approach .................................................................................................. 48
Reconciliation and Final Estimate of Value.......................................................................... 56

## ADDENDA

Insurable Value
Floor Plans
BSA Resolution
Final Certificate of Occupancy
Photographs of Subject
Engagement Letter
Qualifications of the Appraisers

## CERTIFICATE OF APPRAISAL

We, Thomas J. Tener, MAI and Matthew Vezza certify that to the best of our knowledge and belief:

The statements of fact contained in this report are true and correct.

The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, unbiased professional analyses, opinions, and conclusions.

We have no present or prospective interest in the properties that are the subject of this report, and we have no personal interest or bias with respect to the parties involved.

Our compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event.

Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) and the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA).

Matthew Vezza has physically inspected the property that is the subject of this report. Thomas J. Tener, MAI has not made an inspection of the subject property.

No one provided significant professional assistance to the appraisers signing this certification.

This appraisal was not prepared in conjunction with a request for a specific value or a value within a given range or predicated upon loan approval.

The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

As of the date of this report, Thomas J. Tener, MAI has completed the continuing education program of the Appraisal Institute. Thomas J. Tener, MAI has been duly certified to transact business as a Certified General Appraiser (New York State Certification #46000033225).

We have extensive experience in the appraisal of similar properties.

We previously appraised the property on November 18, 2015 with a date of value of November 4, 2015 and on June 13, 2017 with a date of value of May 25, 2021. Other than these appraisals, we have not appraised or provided any other services relating to the subject property in the three year period immediately preceding acceptance of this assignment.

**KTR REAL ESTATE ADVISORS LLC**


By:  Thomas J. Tener, MAI
     Managing Member
     NY Certification #46000033225

By:  Matthew Vezza
     Associate

# BASIC ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal report is subject to the following assumptions and limiting conditions:

No responsibility is assumed for the legal description or for matters including legal or title considerations.  Title to the property is assumed to be good and marketable unless otherwise stated.

The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

Responsible ownership and competent property management are assumed.

The information furnished by others is believed to be reliable.  However, no warranty is given for its accuracy.  All engineering is assumed to be correct.  The plot plans and illustrative material in this report are included only to assist the reader in visualizing the property.

It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable.  No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal report.

It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless nonconformity has been stated, defined, and considered in the appraisal report.

It is assumed that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

It is assumed that the utilization of the land and improvements is within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

The distribution, if any, of the total valuation in this report between land and improvements applies only under the stated program of utilization.  The separate allocations for land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

Possession of this report, or a copy thereof, does not carry with it the right of publication.  The appraiser, by reason of this appraisal, is not required to give further consultation, testimony, or be in attendance in court with reference to the property in question unless arrangements have been previously made.

Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without prior written consent and approval of the appraisers.

The appraisers have inspected the subject property with the due diligence expected of a professional real estate appraiser.  The appraisers are not qualified to detect hazardous waste and/or toxic materials. Any comment by the appraisers that might suggest the possibility of the presence of such substances should not be taken as confirmation of the presence of hazardous waste and/or toxic materials.  Such determination would require investigation by a qualified expert in the field of environmental assessment.

The presence of substances such as asbestos, urea-formaldehyde foam insulation or other potentially hazardous materials may affect the value of the property.  The appraiser's value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value.

No responsibility is assumed for any environmental conditions, or for any expertise or engineering knowledge required to discover them. The appraiser's descriptions and resulting comments are the result of the routine observations made during the appraisal process.

The appraiser is authorized by the client to disclose all or any portion of this report and the related data to appropriate representatives of the Appraisal Institute, or other professional organizations of which the appraiser is a member or affiliate, if such disclosure is required to enable the appraiser to comply with bylaws and regulations of such organizations.

The American with Disabilities Act (ADA) became effective January 26, 1992. The appraisers have not made a specific compliance survey and analysis of the subject property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the subject property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this could have a negative effect upon the value of the property. Since the appraisers have no direct evidence relating to this issue, they did not consider possible non-compliance with the requirements of ADA in estimating the market rent of the subject property.

All values rendered within this report assume marketing times of 12 months or less unless otherwise indicated.

## HYPOTHETICAL CONDITIONS

Hypothetical Condition is defined in the 2020-2021 Uniform Standards of Professional Appraisal Practice as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of assignment results, but is used for the purpose of analysis. Comment: Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends, or about the integrity of data used in the analysis."

No hypothetical conditions have been used in this appraisal.

## EXTRAORDINARY ASSUMPTIONS

Extraordinary Assumption is defined in the 2020-2021 Uniform Standards of Professional Appraisal Practice as "an assignment specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. Comment: Uncertain information might include physical, legal, or economic characteristics of the subject property; or conditions external to the property, such as market conditions or trends, or about the integrity of data used in an analysis."

No extraordinary assumptions have been used in this appraisal.

## PHOTOGRAPH OF THE SUBJECT PROPERTY



# LOCATION MAP



## SUMMARY OF SALIENT FACTS AND CONCLUSIONS

| | |
|---|---|
| *Effective Date of Appraisal* | May 25, 2021 |
| *Date of Inspection* | May 25, 2021 |
| *Property Address* | 150 West 85th Street<br>New York, New York |
| *Property Location* | The subject is located on the south side of West 85th Street, between Columbus and Amsterdam Avenue, in the Upper West Side section of Manhattan. |
| *Block/Lot* | Block 1215 Lot 53 |
| *Census Tract* | 0169.00 |
| *Purpose of the Appraisal* | Its purpose is to determine the "As Is" Market Value of the Fee Simple Interest in the subject property as of May 25, 2021, the date the property was inspected. |
| *Site Size* | 6,564± square feet |
| *Gross Building Area* | 35,544 square feet |
| *Zoning* | R8B - Residential District. |
| *Improvements* | Public records indicate that the property has a gross building area of 27,044± square feet before the commencement of the completed renovations and expansion. The corner stone has the dates 1846-1926 with the initials UOTS inscribed. The NYC Department of Buildings oldest Certificate of Occupancy dates the building at 1928. The subject underwent a gut renovation and reconfiguration into a six-story plus basement; elevator serviced building built-to-suit the Manhattan Country School. According to the amended plans dated August 26, 2015, the subject contains an above grade gross building area of 35,544 square feet plus 4,261 square feet of cellar space. A final Certificate of occupancy was issued by the NYC DOB with an effective date of July 8, 2019. |

| *Assessed Values* | *Actual Land* | *Actual Total* | *Transitional Land* | *Transitional Total* |
|---|---|---|---|---|
| *2020/21 (Final)* | $1,764,000 | $3,995,100 | $1,764,000 | $3,688,110 |
| *2021/22 (Final)* | $1,764,000 | $3,242,700 | $1,764,000 | $3,669,840 |

| | |
|---|---|
| **Highest and Best Use** | |
| *As Vacant* | Residential Development. |
| *As Improved* | Continued Use. |

| | |
|---|---|
| **Approaches to Value** | |
| *Income Capitalization* | $38,200,000 |
| *Sales Comparison* | $37,500,000 |
| *Cost Approach* | N/A |
| *Appraised Value* | $38,000,000 |

**PREMISES OF THE APPRAISAL**

**Identification**

The subject property, located as 150 West 85th Street, consists of a 6,564± square foot parcel of land improved with a six-story, elevator serviced, school known as the Manhattan Country School.  It is on the south side of West 85th Street, between Columbus and Amsterdam Avenues, in the Upper West Side section of Manhattan. It is identified on the New York County tax maps as Block 1215 Lot 53.

**Purpose Of Appraisal**

The purpose of the appraisal is to estimate the Market Value of the Fee Simple Interest in the subject as of May 25, 2021, the date it was inspected.

**Intended Use of the Intended User**

This appraisal is intended to assist the client, Flushing Bank, in establishing the Market Value of the Fee Simple Interest in the subject property, in conjunction with potential financing and collateral evaluation for the existing loan.

**Scope of Work**

The following steps were taken in the preparation of this appraisal:

- Performed an inspection of the subject property and its environs.
- Analyzed relevant leases, sales, operating expenses and capitalization rates.
- Compiled and analyzed relevant property data.
- Reviewed market and economic data.
- Utilized the Income and Sales Comparison approaches to derive estimates of value.
- Reconciled the estimates of value into value conclusions.

To develop an opinion of value, KTR performed an appraisal as defined by the Uniform Standards of Professional Appraisal Practice. This appraisal includes presentation of the data, analyses and conclusions utilized in formulating the estimate of value.

**Sales History Of The Subject Property**

According to public records, the subject was purchased on January 23, 2015 for $28,000,000 by The New School from West 85th Street Owner LLC.   At the time of sale the subject was occupied by The Mannes College, The New School for Music, which occupied the subject until August 2015.  Current ownership purchased the building to redevelop it for owner occupancy.

The difference between the appraised value and the purchase price is primarily attributable to market appreciation, the increase in ZFA (Zoning Floor Area) granted by the Board of Standards and Appeals on July 14, 2015 and capital improvements. The reported cost of renovations was $10,670,462.   No transactions involving the subject

were noted within the past three years nor are we aware of any offerings or listings.

**Definition of Market Value**  The definition of Market Value used in this appraisal report is taken from the Appraisal Institute's The Dictionary of Real Estate Appraisal, Sixth Edition, Chicago, Illinois, Appraisal Institute, 2015, which states:

"The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;
2. Both parties are well informed or well advised, and acting in what they consider their best interest;
3. A reasonable time is allowed for exposure in the open market;
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto and
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

**Definition of Fee Simple Interest**  The subject of the appraisal is the Fee Simple Interest, which is defined in The Dictionary of Real Estate Appraisal, Sixth Edition, Appraisal Institute, Chicago, Illinois, 2015, as:

"Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by governmental powers of taxation, eminent domain, police power and escheat."

**Exposure Period**  According to the previously stated definition of Market Value, the property must be allowed a reasonable time to be exposed in the open market to achieve the appraised value. Exposure is defined by the Appraisal Institute, The Dictionary of Real Estate Appraisal, Sixth Edition, Chicago, Illinois, Appraisal Institute, 2015, as:

"The time a property remains on the market.

The estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. Comment: Exposure time is a retrospective opinion based on an analysis of past events assuming a competitive and open market."

Review of transfer records suggest that there has been adequate activity to confirm the presence of an investor market for most forms of income producing real estate. Inspection of the subject property revealed no factors that would reasonably suggest that it is not marketable. KTR

reviewed sales of school buildings in Manhattan/Harlem since January 1, 2018. According to CoStar, the average time to sale has ranged between 14 and 14.7 months during this period. If exposed to the market for a reasonable period of time prior to the effective date of appraisal, considered to be 12-15 months, the subject would transfer at an appropriate price; that is to say, the appraised value.

***Marketing Time***

An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Appraisal Standards Board of The Appraisal Foundation and Statement on Appraisal Standards No.6, "Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions" address the determination of reasonable exposure and marketing time.)

Based on the continued demand for schools offering in person education, it is anticipated that the subject would require a marketing time of 12 months.

## REGIONAL ANALYSIS

***Regional Overview***

New York City is part of the 23-county New York-Northern New Jersey-Long Island, NY-NJ-PA Metropolitan Statistical Area ("MSA"), which includes surrounding counties in the states of New York, New Jersey and Pennsylvania. The city proper encompasses 304.8 square miles and is divided into five boroughs: Manhattan, Queens, Brooklyn, Staten Island and the Bronx. Through the beginning of 2020, the New York City economy had fully recovered from the prior recession, with strong overall economics reflected in job and population growth with low unemployment. Since the first cases of Covid-19 arrived in New York in February 2020 and the government mandated shutdowns of "nonessential businesses" on March 22, 2020, unemployment spiked and many businesses have closed permanently. Following a phased reopening over the summer of 2020, many restrictions were extended or reinstated in response to a rise in cases in November. The shape and timing of the City's recovery from the current recession is still unknown, but a significant sign of a turnaround arrived in mid-December 2020 with the approval of multiple viable Covid-19 vaccines.

Although New York City continues to track large numbers of new Covid-19 cases, vaccinations are proceeding ahead of schedule. New Yorkers aged 30 and older became eligible for the vaccine starting March 30, 2021, and those 16 and over were eligible starting April 6, 2021. As of April 1, 2021, statewide, 31% of New Yorkers had received at least one vaccine dose and 17% were fully vaccinated, according to New York Times data. The substantial progress of the vaccine rollout through the 1st Quarter of 2021 is viewed by market participants as a cause for optimism. Despite the challenges facing New York City and its economy, it is generally speculated that the region's strong underlying fundamentals prevailing prior to the pandemic will aid its recovery.

***Population***

According to population data prepared by the United States Census Bureau and Esri BAO in Table I on the following page, the city's population grew at an average annual rate of 0.22% from the 2000 to the 2010 census and then increased at an estimated average annual rate of 0.40% between 2010 and 2020. The growth over the past decade prior to the pandemic was led by Brooklyn at 0.47% annually. Manhattan indicated the next highest growth, at 0.40% annually. Queens and the Bronx both illustrated an annual growth rate of 0.36%. Staten Island's population increased by 0.30% per year over this period. Through 2025, the populations of all boroughs are expected to increase at slightly slower rates, led by Brooklyn at 0.37% and followed by Manhattan at 0.32%. The Bronx is projected to grow by 0.29%. Queens is projected to grow by 0.29% per year. Staten Island's population is anticipated to increase 0.21% per year. The citywide population is projected to increase by an average of 0.29% per year through 2025 and the New York State population is expected to grow at a slower rate of 0.07%. It is noted that the preceding projections by Esri BAO are viewed with caution, as they may not reflect

the near-term and potentially long-term impact of population shifts caused by Covid-19.

**TABLE I**
**REGIONAL POPULATION**

| | 2000 Census | 2010 Census | Avg. Annual Growth 2000-2010 | 2020 Estimate | Avg. Annual Growth 2010-2020 | 2025 Projection | Avg. Annual Growth 2020-2025 |
|---|---|---|---|---|---|---|---|
| Bronx | 1,329,288 | 1,385,108 | 0.42% | 1,434,830 | 0.36% | 1,455,637 | 0.29% |
| Brooklyn | 2,463,899 | 2,504,700 | 0.17% | 2,623,311 | 0.47% | 2,672,464 | 0.37% |
| Manhattan | 1,537,133 | 1,585,873 | 0.32% | 1,650,033 | 0.40% | 1,676,284 | 0.32% |
| Queens | 2,225,391 | 2,230,722 | 0.02% | 2,311,794 | 0.36% | 2,335,047 | 0.20% |
| Staten Island | 443,069 | 468,730 | 0.58% | 482,675 | 0.30% | 487,784 | 0.21% |
| New York City* | 7,998,780 | 8,175,107 | 0.22% | 8,502,614 | 0.40% | 8,627,187 | 0.29% |
| NY-Newark-Jersey City, NY-NJ-PA Metro CBSA | 18,944,660 | 18,897,109 | -0.03% | 19,560,212 | 0.35% | 19,803,082 | 0.25% |
| New York State | 18,963,706 | 19,378,102 | 0.22% | 19,825,692 | 0.23% | 19,899,059 | 0.07% |

Source: US Census Bureau and Esri BAO; complied by KTR Real Estate Advisors LLC
*NYC figures as reported by Esri; slightly different from total of five boroughs

In 2020, the New York City population was estimated to be 8,502,614, with the borough of Brooklyn seeing the greatest increase between 2010 and 2020. According to Esri BAO data, the city's population is projected to expand at an average annual rate of 0.29% through 2025. However, this data does not take into account the fluctuations in population caused by the Covid-19 pandemic. According to cellphone data analyzed by the New York Times in a January 1, 2021 article, 420,000 people, or about 5% of the population, left the city between March 1 and May 1 "as the first wave of the Covid-19 pandemic hit New York." The article, entitled "New Yorkers Who Fled the Virus Are Returning Home, Warily," suggested, however, that the move-outs in many cases will not be permanent. By the first quarter 2021, there was strong evidence that much of the population outflow was already being countered by an influx of new residents. An April 1, 2021 study from Nancy Packes Data Services indicated that, at the current rates of inward and outward migration, New York City will return to positive inward migration during April 2021. "Inward migration began to increase well before the advent of any vaccine, based on job creation that began in June, when the pandemic was still raging. The job recovery began much sooner in the current crisis than it did after the Global Financial Crisis," according to Packes. Furthermore, it is surmised that many who have not yet returned to the city are likely waiting for schools to reopen, and "half of the departing households went to counties around the City, presumably where they had second residences," and their continued proximity suggests that these individuals have not given up on New York City – either planning to return as residents or at least to continue to work in

Manhattan. Ms. Packes concluded that "Given the hybrid work from home models that many companies have adopted, we believe most people working for companies with offices in the City will live in the City, even if they are farther out in the boroughs."

***Employment***

New York City's employment base reflects its distinction as a national and international center of business, commerce, finance, communications, business services, tourism and culture and a regional provider of healthcare services. The services and financial activities sectors have historically constituted the area's strongest employment sectors, together accounting for approximately 60% of the city's employment base, compared with approximately 35% nationwide. Additionally, the business services cluster is a key export industry for the city and the region: 34 of the top 100 law firms and 17 of the top 40 management consulting firms are based in New York City. While all industries pay a wage premium in the city, earnings in the financial activities sector are 3.4 times the U.S. norm. This wage premium is at risk as corporations consider the long-term viability of remote working and alternative, less expensive locations.

New York City's employment base historically has included a major presence in banking and finance but the healthcare, communications and education sectors also employ substantial numbers. Major individual employers in these industries include JPMorgan Chase & Co., Citigroup Inc., New York-Presbyterian Healthcare, Verizon Communications, Time Warner Inc., Columbia University and New York University, although disruptions in the financial markets since 2008 led to substantial layoffs by some of these entities.

Table II details the employment patterns in New York City from 2010 through March 2021. Over the decade following the Great Recession, job growth was positive through 2019. The job losses of the recession had been recovered and average employment was the highest in more than ten years. In the middle of March 2020, the first significant economic impact from Covid-19 was seen in the region as the government-ordered lockdowns of all but "non-essential" businesses began to take its toll on employment. The lowest monthly jobs total in 2020 was April at 3,748,500, reflecting a decrease of 901,600 jobs compared to the 2019 average, or 19.4%. As conditions improved and the government-imposed restrictions were eased in the region, some of these job losses have been recouped. The preliminary estimates for March 2021 indicate a loss of 560,100 jobs or 12.0% compared to the 2019 average, but an increase of 341,500 jobs or 9.1% from the pandemic nadir in April 2020.

**TABLE II**
**NEW YORK CITY HISTORICAL EMPLOYMENT**

| Average for Year | (2) Mar-21 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Logging, Mining & Construction | 132,300 | 138,000 | 161,300 | 158,900 | 152,500 | 147,300 | 139,400 | 129,300 | 122,300 | 116,200 | 112,400 |
| Manufacturing | 53,700 | 53,000 | 68,100 | 71,300 | 74,100 | 76,900 | 78,500 | 77,100 | 76,700 | 76,500 | 75,700 |
| Wholesale & Retail Trade | 401,000 | 407,300 | 489,300 | 492,900 | 494,600 | 446,000 | 446,000 | 493,800 | 481,500 | 467,800 | 453,200 |
| Transportation & Utilities | 120,500 | 127,000 | 147,100 | 142,600 | 138,600 | 135,200 | 132,300 | 126,200 | 122,900 | 122,200 | 121,700 |
| Information | 210,700 | 206,800 | 220,600 | 213,100 | 207,400 | 199,800 | 195,000 | 189,700 | 182,400 | 177,600 | 171,600 |
| Financial Activities | 459,500 | 469,800 | 485,100 | 477,000 | 469,400 | 466,200 | 459,200 | 448,900 | 437,000 | 438,000 | 438,200 |
| Services | 2,125,500 | 2,143,600 | 2,491,500 | 2,412,500 | 2,340,900 | 2,271,600 | 2,202,600 | 2,118,600 | 2,030,900 | 1,959,700 | 1,894,700 |
| Government | 586,800 | 588,000 | 587,100 | 584,700 | 584,700 | 583,700 | 579,500 | 573,300 | 570,600 | 570,600 | 573,300 |
| Total Employment (1) | 4,090,000 | 4,133,500 | 4,650,100 | 4,553,000 | 4,462,200 | 4,375,200 | 4,284,000 | 4,156,900 | 4,024,300 | 3,928,600 | 3,840,800 |
| Net Gain (Loss) From Prior Year | -43,500 | -516,600 | 97,100 | 90,800 | 87,000 | 91,200 | 127,100 | 132,600 | 95,700 | 87,800 | 89,600 |
| Net Gain (Loss) From Prior Year as a % | -1.1% | -11.1% | 2.1% | 2.0% | 2.0% | 2.1% | 3.1% | 3.3% | 2.4% | 2.3% | 2.4% |

| | Jobs | Percentage |
|---|---|---|
| Aggregate Job Growth (Loss) Since 2010 | 249,200 | 6.4882% |
| Average Annual Job Growth Since 2010 | 24,511 | 0.6382% |

(1) Totals may differ from sum due to rounding of figures. (2) Preliminary numbers.
Source: Bureau of Labor Statistics; compiled by KTR Real Estate Advisors, LLC

Nancy Packes Data Services' April 1, 2021 report on migration and job growth indicated that "jobs are rebounding quickly." The report includes predictions of when New York City jobs in various sectors will recover to pre-pandemic levels using a linear projection. According to Packes' analyses, finance will be the slowest industry to recover, and is expected to fully recover by June 2025. Information will recover the fastest and reportedly already recovered to pre-COVID job levels by December 2020, benefitting from the large number of jobs that can be performed remotely. Business services jobs are expected to recover by May 2022. Non-store retail will recover by February 2024, while brick-and-mortar retail will recover by September 2021 (with the latter recovery accelerated by "the initial easing up of lockdowns"). Leisure and hospitality jobs are a "wildcard," according to Packes, whose projections suggested recovery by August 2022 based on her linear projection model. The report notes that the recovery projections are "based on a linear trend but it is likely that recovery will speed up as vaccines become more available" such that sharper upticks in hiring could shorten the forecast recovery periods.

*Unemployment*

Table III details New York City's historic labor force and unemployment statistics. New York City's labor force grew every year between 2012 and 2014 and in 2017, and declined slightly, by less than 1% per year, in 2015, 2016, 2018 and 2019. Overall, the labor force grew by nearly 141,000 between 2011 and 2017, increasing by approximately 3.5% during this six-year period. The resurgence was attributed to a return to the labor force of people who previously abandoned job searches during the worst years of the Great Recession. Between 2017 and 2019, the labor force shrank slightly by a total of 1.1% to 4,070,496. In 2020, the labor force shrank more significantly due to the pandemic, with the 2020 annual figure of 3,909,835 reflecting a 3.95% decrease from 2019. The May 2020 figure of 3,640,749 was the lowest labor force level in more than a decade, and 12.5% lower than the peak in July 2017. Preliminary data as of March 2021 reflects a slight recovery in the labor force to 4,109,346 – showing a 12.9% gain from the May 2020 tally, and 1.0% higher than the 2019 total.

## TABLE III
## NYC HISTORICAL LABOR FORCE STATISTICS AND UNEMPLOYMENT RATES

| | Mar-21 (2) | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Labor Force | 4,109,346 | 3,909,835 | 4,070,496 | 4,076,639 | 4,116,177 | 4,087,556 | 4,089,053 | 4,091,078 | 4,065,235 | 4,021,038 | 3,975,190 |
| Employed Population | 3,647,215 | 3,428,907 | 3,913,047 | 3,908,758 | 3,930,206 | 3,877,385 | 3,860,683 | 3,801,857 | 3,707,286 | 3,642,138 | 3,612,336 |
| Unemployed Population | 462,131 | 480,928 | 157,449 | 167,881 | 185,971 | 210,171 | 228,370 | 289,221 | 357,949 | 378,900 | 362,854 |
| Unemployment Rate (1) | 11.2% | 12.3% | 3.9% | 4.1% | 4.5% | 5.1% | 5.6% | 7.1% | 8.8% | 9.4% | 9.1% |
| **Annual Change** | | | | | | | | | | | |
| Labor Force Annual % Change | 5.10% | -3.95% | -0.15% | -0.96% | 0.70% | -0.04% | -0.05% | 0.64% | 1.10% | 1.15% | |
| Unemployment Basis Points Change | (105) | 843 | (25) | (40) | (62) | (44) | (148) | (174) | (62) | 29 | |

(1) Not Seasonally Adjusted
(2) Preliminary Numbers
Source: Bureau of Labor Statistics; compiled by KTR Real Estate Advisors LLC

Prior to current crisis, the annual unemployment rate had been trending downward since 2012. By 2017, the unemployment rate dropped below pre-recession levels and continued this trend through 2019. The average annual unemployment rate in 2019 was 3.9%, and the monthly unemployment rate fell to a low of 3.0% in December 2019 – the lowest monthly unemployment rate reported over the past ten years. This period of job growth and low unemployment came to a halt in March 2020 as a result of the government mandated shutdowns that were implemented to curb the spread of Covid-19. By May 2020, unemployment spiked to 20.2%, an increase of 1,630 basis points over the 2019 rate. The region intermittently began to reopen over the course of 2020, although new restrictions were implemented over the winter due to a rise in cases in November. Since its peak in May 2020, the unemployment rate has fluctuated and remains well above pre-Covid levels, although the preliminary March 2021 unemployment rate of 11.2% is the lowest monthly rate recorded since the pandemic began. While the long-term impact of the Covid-19 pandemic is yet to be understood, it will undoubtedly continue to have a significant negative impact on the region's economic performance in the near future, although the recent downtrend in unemployment rate is a positive sign.

*Tourism*

Prior to the pandemic, the leisure and hospitality sector had enjoyed significant employment gains since 2011, with an increase of 124,900 jobs by 2019, according to the New York State Department of Labor. This has been one of the hardest hit sectors during the pandemic, with March 2021 preliminary jobs data still reflecting a 50% decline from the 2019 average.

The hotel construction boom that began prior to the Great Recession included numerous projects in non-traditional, "pioneering" neighborhoods for the development of more budget-oriented hotels. According to NYC & Company's Hotel Development in NYC Factsheet as of December 2020, 36% of the hotels opened since 2015 were located in the outer boroughs and 59% of the hotels in the development pipeline are in the outer boroughs.

Tourism flourished in New York City over the last decade, prior to the pandemic. Data from NYC & Company indicated that 2019 was the tenth consecutive record-breaking year, with 66.6 million visitors, up from

65.1 million in 2018. The unexpected outbreak of the Covid-19 pandemic has had a significant negative effect on hotel performance, as tourism and travel essentially came to a halt in March 2020. A November 16, 2020 New York Times article cited a report from NYC & Company, the city's official tourism bureau, which indicated that "12 million people visited the city [in 2020] before the shutdown, but the total in the ensuing nine months may only reach 10 million, a figure that includes all of the nurses and other essential workers who arrived in response to the coronavirus crisis."

A March 18, 2021 Wall Street Journal article entitled "Tourists Trickle Back to New York City" indicates some preliminary positive signs for the tourism industry. During the week ending March 13, 2021, STR, a data firm that tracks the hospitality industry, pegged the city's hotel occupancy at 47%, the highest since June 2020, and up from 38% in January. (In contrast, a comparable week in March 2019 had an 87.1% occupancy rate.) NYC & Company data cited in the Wall Street Journal article indicated that 2020 tourism totaled 22.3 million, and forecasted that New York City will have 36.4 million visitors in 2021, although foreign tourism is expected to take longer to rebound - a big economic hit, given that the typical international visitor spends four times as much during a visit as a typical domestic visitor. "Setting the stage for a continued rise in tourism over the coming weeks is New York state's decision to end the requirement, as of April 1, that domestic travelers quarantine themselves upon arrival to the state." Broadway producers reportedly expect to be able to operate at full capacity by fall or winter, another factor that will spur tourism's rebound. Yankee Stadium welcomed in-person fans for opening day on April 1, 2021 at 20% capacity, with social distancing requirements in place, and temperature checks and proof of a negative Covid test or vaccination required for entry – another sign that some tourism and entertainment-related activities had resumed, but were by no means back to normal, as of the 1st Quarter of 2021.

*Transportation*

New York City's extensive multi-mode transportation network is integral to its role as a financial capital and regional employment center. These transit options include three major airports, a network of interstate highways, expressways and parkways, extensive public and private rail and bus service and water-based ferry service. John F. Kennedy International Airport functions as the principal international airport in the area; however, Newark Airport handles international and domestic flights and LaGuardia, though generally catering to domestic travelers, occasionally offers international flights. The commuter rail system, which includes the Long Island Railroad (LIRR), New Jersey Transit, PATH trains and Metro-North, are counted among the busiest in the country. The Metropolitan Transit Authority's subway system is the largest in the world in terms of track mileage and its bus system contains the largest fleet in North America. There is also long distance train service such as Amtrak from Penn Station and commuter/long distance bus service from both the Port Authority and the George Washington

Bus Terminal. All of these local and regional transportation services are considered efficient and of excellent quality.

Mass transit ridership plummeted in March 2020 following the stay-at-home order that was implemented to curtail the spread of Covid, and remains well below pre-pandemic levels. A May 29, 2020 Wall Street Journal article indicated that ridership fell by more than 90% in the initial weeks of the pandemic, causing the MTA to reduce subway and bus service to 75% of its normal capacity. On May 6, the MTA began the first regularly scheduled shutdowns of the entire subway system, in more than a century of operation, between one am and five AM daily, in order to allow for subway cars to be cleaned, a measure that is anticipated to remain in effect until the summer of 2021. By April 1, 2021, subway ridership was still down roughly 69% from the pre-pandemic equivalent day, and bus ridership was down roughly 60%. LIRR and Metro-North ridership were down approximately 75% and 81%, respectively Notably, bridge and tunnel traffic were down only 12% on that date, illustrating the shift to commuting by private vehicle in response to Covid-19 unease.

Reduced ridership has caused major declines in fare revenue, and the MTA has considered various measures to address a massive budget deficit, such as service cuts based on current commuting trends, fare hikes, and postponing improvements. A November 25, 2020 New York Times article entitled "What the M.T.A.'s 'Doomsday' Cuts Would Actually Look Like" indicated that ridership was not expected to reach 90% of pre-pandemic levels until at least 2024. "We have the immediate crisis of Covid but then we have the longer term crisis of how the M.T.A. will adapt and change over the next several decades," according to Nick Sifuentes of the Tri-State Transportation Campaign advocacy group. "A lot of the plans the M.T.A. had been laying to prepare them for the next generation of services are really at risk here."

On December 21, 2020 it was announced that the MTA was set to receive $4 billion in federal assistance as part of a nearly $1 trillion economic relief package passed by Congress a day earlier. According to a December 20, 2020 Spectrum NY1 article, MTA Chairman and CEO Pat Foye welcomed the news, saying that "the stimulus funding will allow the MTA 'to get through 2021 without devastating service cuts and layoffs to over 9,000 colleagues.'" A March 8, 2021 New York Times article quoted Shams Tarek, deputy communications director of the MTA, saying, "We are still in a severe fiscal crisis caused by the pandemic… But we're optimistic about the future, given the support we've received in Washington. We expect ridership to gradually return to the system – it's not a matter of if, but when – and we will continue to power New York's recovery." A March 11, 2021 press release from the MTA regarding President Biden's American Rescue Plan stated, "this significant $6.5 billion in critical federal funding will allow us to focus more on welcoming back riders instead of doomsday budget planning." This significant influx of capital should enable the city's mass transportation and highway systems to fully recover from the significant

challenges caused by the pandemic and government-mandated shutdowns of 2020.

**Housing Stability and Tenant Protection Act**

The Housing Stability and Tenant Protection Act of 2019 (HSTPA) was signed on June 14, 2019. These reforms to rent stabilization are considered highly pro-tenant and hinder typical mechanisms for deregulating rent stabilized units, with many real estate industry participants expressing concern about their negative impact on rent stabilized housing. According to the Third Quarter 2019 Property Sales Report published by a New York brokerage firm, overall rates for sales of multifamily properties in Manhattan (including free market and rent stabilized units) averaged 4.34%, 31 basis points above the trailing four-quarter average, suggesting that multifamily property values trended downward around the time of the enactment of the HSTPA. An article published by *Bloomberg* in August 2019[1] discussed the sale of an apartment building in Greenwich Village in which 23.1% of units were rent stabilized. The property was listed before the enactment of the HSTPA with an overall rate of approximately 2.9% and closed in August 2019, after the law was in place, with an overall rate of 4.2%. Although it cannot be confirmed whether the difference in actual price and asking price is entirely attributable to the change in rent regulation laws, it is another indication that rent regulated multifamily property values decreased at that time. In general, there have not been adequate sales to measure the impact of the HSTPA on the market; however, most participants expect it to be significant.

In reaction to HSTPA, a lawsuit was filed on July 15, 2019 by the Rent Stabilization Association (RSA), the Community Housing Improvement Program (CHIP) and seven private owners. The lawsuit challenges the new rent laws on the basis of violating the U.S. Constitution's Fifth Amendment, which includes a clause that bars the taking of private property without "just compensation" and the Fourteenth Amendment's due process clause; however, according to an article published by *The Real Deal*[2] announcing the lawsuit, tenant advocates considered the prospect of a "successful legal challenge [to be] slim at best." A January 26, 2021 Real Estate Weekly article indicated that the lawsuit was dismissed in September 2020, but is currently on appeal, now supported by amicus briefs from housing groups and think tanks filed in January 2021.

**Conclusion**

Through the beginning of 2020, the City's economy had experienced a sustained period of growth in the wake of the Great Recession, with most market indicators exceeding pre-recession levels by the end of 2015. By 2017, there were increasing signs that the market had begun to stabilize after tracking several years of steady and sometimes steep growth. Over the past year, the Covid-19 pandemic has had a devastating effect on the

---

[1] Carmiel, Oshrat. "NYC Walk-Up Building Sells at a Discount, Setting a Benchmark for New Rules." *Bloomberg*. 16 Aug. 2019.
[2] Brenzel, Kathryn and Georgia Kromrei. "RSA, CHIP File Lawsuit Challenging New York's New Rent Law."

regional and national economy. Following New York State's initial stay-at-home order in late March, many sectors of the economy were effectively put on hold in the second quarter 2020. Following a phased reopening in the summer, some economic activity resumed in the second half of the year, although some restrictions were reinstated in response to a rise in Covid cases in November. With the vaccine distribution well underway and ahead of schedule, the local economy is progressing toward reopening and recovery.

In the April 14, 2021 Beige Book, the Federal Reserve indicated that in the Second District (New York), economic activity "has accelerated sharply in the latest reporting period, growing at a strong pace, despite an upturn in reported COVID cases across the District." The labor market strengthened, reflecting an increase in hiring activity, hiring plans and wages. "Consumer spending has strengthened, with retail sales exceeding expectations." Within the hard-hit leisure and hospitality sector, there was a "significant upturn in activity for the first time since the onset of the pandemic. Looking to the months ahead, contacts in all these sectors expressed widespread optimism about business prospects." A sharp increase in leisure air travel was reported in March, with flight bookings being made longer in advance. "Most of the rebound in tourism has been from day-trippers and other domestic visitors, though tourism from Central and South America has reportedly increased." Restaurants and museums reported an uptrend in business, and "some hotels that had previously announced permanent closures have more recently announced plans to reopen."

The real estate market in the Second District reported that "New York City's co-op and condo market has picked up further since the last report." Apartment sales volume in 2021 is surpassing comparable 2020 levels and leasing activity in the rental market is "fairly brisk," albeit with mixed pricing trends. Apartment sales prices by this source are down nearly 10% in Manhattan but "edging up to record highs in the outer boroughs." Pricing in the rental market "has stabilized, though rents are still down 15-20 percent from early-2020 levels in Manhattan and down 8-10 percent in Brooklyn and Queens." The New York City office market has "continued to soften," and "the market for retail space has been fairly steady in recent weeks, though still quite slack, especially in New York City."

Overall, the region faces significant obstacles and concerns in restarting an economy that was effectively put on hold during the pandemic when stay-at-home orders were put in place to contain the spread of Covid-19. Beginning on March 22, 2020, while essential services and businesses such as healthcare and grocery stores continued to operate, many office workers began working from home and "non-essential" businesses requiring in-person contact suffered, including a wide swath of industries such as leisure and hospitality and real estate leasing and sales. Schools and offices have been hesitant to require people to return to in-person work or learning, which has further hindered the return of retail. As the

vaccine rollout progresses and New Yorkers' confidence rises regarding the safety of being in public spaces including mass transit, economic activity is anticipated to rise dramatically. Pent-up demand for in-person dining, entertainment and travel, as well as larger purchases that may have been delayed due to pandemic-related uncertainty, are expected to fuel a period of heightened activity.

An April 2, 2021 New York Times article indicated that "The city's outlook has improved as a result of the latest stimulus bill, financial analysts say, which included about $6 billion in direct aid to the city government, $6.5 billion to the Metropolitan Transit Authority and $4 billion to the city's public schools." The federal aid will help address "some of the city's biggest short-term problems," such as the major decline in revenue from property and sales taxes and MTA fares. "While it may take some time, 'the city is going to see a big revival,' [Mark Zandi, chief economist of Moody's Analytics] said. 'It's going to come roaring back.'" Overall, New York's diverse and strong economic core should provide a base for the region's post-Covid recovery and provide optimism for its long-term outlook.

## REGIONAL MAP



## NEIGHBORHOOD ANALYSIS

*Overview*

The subject property is located on the south side of West 85th Street between Columbus and Amsterdam Avenue in the Upper West Side section of Manhattan. The Upper West Side is bounded by 59th Street to the south and 110th Street to the north between Central Park West and the Hudson River. The area is predominantly residential, with mixed-use buildings with retail at grade along the avenues. There are also a number of notable institutional uses located in the neighborhood such as museums, schools and other cultural centers.

*Community District*

The subject property is located in Community District 7 in Manhattan, which consists of the entire Upper West Side from West 59th Street to West 110th Street; also known as Cathedral Parkway. It also includes the sub-neighborhood known as Lincoln Square, which is the area in the West 60's dominated by Lincoln Center. The population within the 1.9 square mile community district was recorded as 209,084 in 2010, representing a 0.7% increase over the 2000 population, according to the Community District Needs as published by the New York City Department of City Planning.

### MANHATTAN COMMUNITY DISTRICT NO. 7



*Land Use*

As indicated in the following table, Community District 7 is predominantly residential, with 23% of the land use devoted to 1-2 family and multi-family properties. Mixed-use residential/commercial comprise another 13% of land use in the district while open space/outdoor recreation account for 16% and 36% for vacant land uses.



# Manhattan Community District 7

See MN 7's profile online at communityprofiles.planning.nyc.gov

**Neighborhoods[1]:** Lincoln Square, Manhattan Valley, Upper West Side

## POPULATION & DENSITY

| 2000[2] | 2010[3] | 2000-2010 |
|---|---|---|
| 207,699 | 209,084 | +1% |

| 2013-2017 Estimate[3] | 195,455 |
|---|---|
| Square Miles | 1.9 |
| Population Density | 110,044/sq mi |

## COMMUNITY BOARD PERSPECTIVES

Top 3 pressing issues identified by Manhattan Community Board 7 in 2019:

1. Affordable housing
2. Schools
3. Social services

To learn more, please read Manhattan CD 7's Statement of Community District Needs and Community Board Budget Requests for Fiscal Year 2021.

Website: www.nyc.gov/mcb7
Email: office@cb7.org

### Land Use Category

| Land Use Category | # Lots | % Lot Area |
|---|---|---|
| 1 & 2 Family Bldgs | 470 | 1% |
| Multifamily Walk-up | 1,926 | 7% |
| Multifamily Elevator | 791 | 15% |
| Mixed Use | 782 | 11% |
| Commercial | 123 | 2% |
| Industrial | 4 | 0% |
| Transportation/Utility | 12 | 5% |
| Public/Institutional | 208 | 6% |
| Open Space | 36 | 16% |
| Parking | 19 | 0% |
| Vacant | 45 | 36% |
| Other | 1 | 0% |

LAND USE MAP

MN 9, MN 10, MN 11, MN 8, MN 6, MN 5

Map Source: PLUTO 19.v2

## A Snapshot of Key Community Indicators

### COMMUNITY ASSETS[5]

| | |
|---|---|
| Public Schools | 38 |
| Public Libraries | 5 |
| Hospitals and Clinics | 14 |
| Parks | 13 |

Click to visit the NYC Facilities Explorer

### RENT BURDEN[4, 6]

| Manhattan CD 7 | Manhattan |
|---|---|
| **33%** | 37% |
| of households spend 35% or more of their income on rent | NYC 45% |

### ACCESS TO PARKS[7]

| Manhattan CD 7 | |
|---|---|
| **100%** | Citywide Target 85% |
| of residents live within walking distance of a park or open space | |

### MEAN COMMUTE TO WORK[4, 8]

| Manhattan CD 7 | Manhattan |
|---|---|
| **32** minutes | 32 minutes |
| | NYC 41 minutes |

### LIMITED ENGLISH PROFICIENCY[4]

| Manhattan CD 7 | Manhattan |
|---|---|
| **9%** | 16% |
| of residents 5 years or older have limited English proficiency | NYC 23% |

### CRIME RATE[9]

| Manhattan CD 7 | Manhattan |
|---|---|
| **9.7** | 15.7 |
| major felonies were reported per 1,000 residents in 2017 | NYC 11.8 |

### EDUCATIONAL ATTAINMENT[4, 10]

| Manhattan CD 7 | Manhattan |
|---|---|
| **77%** | 61% |
| of residents 25 years or older have earned a bachelor's degree or higher | NYC 37% |

### UNEMPLOYMENT[4, 10]

| Manhattan CD 7 | Manhattan |
|---|---|
| **3.4%** | 4.2% |
| of the civilian labor force was unemployed on average from 2013 to 2017 | NYC 4.9% |

### NYCgov POVERTY MEASURE[11]

| Manhattan CD 7 | Manhattan |
|---|---|
| **9%** | 14% |
| of residents have incomes below the NYCgov poverty threshold. See the federal poverty rate here. | NYC 20% |

[1] Neighborhoods may be in multiple districts. Names and boundaries are not officially designated. [2] 2000 US Census; [3] 2010 US Census; [4] American Community Survey 2013-2017 5-Year Estimates, calculated for Public Use Microdata Areas (PUMAs). PUMAs are geographic approximations of community districts. [5] NYC Dept of City Planning Facilities Database (2019); [6] Differences of less than 3 percentage points are not statistically meaningful. [7] NYC Dept of Parks and Recreation (DPR) (2019). DPR considers walking distance to be 1/4 mile for parks less than 8 acres, and 1/2 mile for larger parks and pools. [8] Differences of less than 2 minutes are not statistically meaningful. [9] NYPD CompStat, Historic Complaint Data (2018); [10] Differences of less than 2 percentage points are not statistically meaningful. [11] 2013-2017 NYCgov Poverty Measure by PUMA. This metric from the Mayor's Office for Economic Opportunity accounts for NYC's high cost of housing, as well as other costs of living and anti-poverty benefits.

Source: NYC Community District Needs, Complied By KTR

There are several notable institutional uses in the neighborhood. The American Museum of Natural History is located between Columbus Avenue and Central Park West from West 77th to West 81st Street. This is one of the largest and most celebrated museums of its kind and includes substantial scientific research facilities. Lincoln Center is located between Amsterdam Avenue and Broadway and Columbus Avenue between West 62nd Street and West 66th Street. Since it opened in the 1960's, the cultural center has been home to world-famous performance halls such as the Metropolitan Opera House and Avery Fisher Hall; in October 2012, it completed a $1.2 billion renovation. The New York Historical Society at 170 Central Park West was founded in 1804 and is the oldest museum in the City, featuring art and cultural exhibitions, libraries and research and education centers.

The Upper West Side is one of the most park-rich neighborhoods in Manhattan, sandwiched between Riverside Park and Central Park. Central Park, the centerpiece of Manhattan, is located six-tenths of a mile east of the subject and contains 840 acres. The park includes many famous destinations such as the Central Park Zoo and the Metropolitan Museum of Art; and the 55-acre Great Lawn at the center of the park. Located just west of the subject is Riverside Park, which, including Riverside Park South, runs continuously between West 62nd Street and St. Claire Place (roughly 129th Street) along the Hudson River. The subject is near the West 79th Street Boat Basin, which is one of 15 marinas belonging to the New York City Department of Parks & Recreation and also includes an outdoor restaurant known as the Boat Basin Café.

***Demographics***

According to ESRI Business Analyst Online, the subject's area is currently home to 59,478 (2020 estimate) people, a slight increase over the 2010 population of 58,802. The area is expected to experience a population nominal growth through 2025 when it is projected to be 59,611, an annual 0.04% increase. The number of households has increased at an even slower pace since 2010 with the 2020 estimate representing a 0.01% annual increase. This trend is projected to continue to nominally grow at 0.01% per annum through 2025. The projected median household income in 2025 represents an annual 2.87% increase over the 2020 estimate. The projected average income in 2025 represents a 2.35% annual increase over the 2020 estimate. The following tables illustrate the population, households and income trends from 2010 to 2025.

### DEMOGRAPHICS SUBJECT'S ZIP CODE

| | 2010 Census | 2020 Estimate | Annual % Change 2010-2020 | 2025 Projection | Annual % Change 2020-2025 |
|---|---|---|---|---|---|
| Population | 58,802 | 59,478 | 0.11% | 59,611 | 0.04% |
| Households | 30,545 | 30,585 | 0.01% | 30,607 | 0.01% |
| Median Household Income | N/A | $137,096 | - | $156,794 | 2.87% |
| Average Household Income | N/A | $202,877 | - | $226,729 | 2.35% |
| Per Capita Income | N/A | $104,402 | - | $116,490 | 2.32% |

Source: ESRI BAO

*Transportation*      The neighborhood is well served by public transportation including subway lines and bus routes.  Broadway is a major two-way thoroughfare, rendering the subject easily accessible by car.  In terms of mass transit, the #1 local train and #2 and #3 express trains serve the neighborhood along Broadway, the nearest subway station being at West 86th Street, two blocks to the northeast. The A, B and C trains, which run along Central Park West, serve the east side of the neighborhood.  In addition, local buses serve the neighborhood on all north-south streets except for West End Avenue.  The cross-town buses nearest the subject are located on West 79th Street and West 86th Street providing access to the Upper East Side.

*Conclusion*      Overall, the neighborhood is a well-established residential area with convenience stores and restaurants nearby.  The location and bounding arteries are well suited for residential and commercial use.  The property benefits from its proximity to a major transportation network and an established, upper income residential base.

## NEIGHBORHOOD MAP

## LAND USE MAP



### SITE ANALYSIS

**Address**            150 West 85th Street
                       New York, New York 10024

**Block/Lot**          1215/53

**Census Tract**       0169.00

**Site Size**          6,564± square feet

**Frontage**           Approximately 75 feet along the south side of West 85th Street.

**Topography/Shape**   The site is generally level and is "L" shaped.

**Utilities**          All utilities service the site.

**Site improvements**  Public records indicate that the property has a gross building area of
                       27,044± square feet before the commencement of the recently
                       completely renovations and expansion. The corner stone has the dates
                       1846-1926 with the initials UOTS inscribed. The NYC Department of
                       Buildings oldest Certificate of Occupancy dates the building at 1928.
                       The subject underwent a gut renovation and reconfiguration into a six-
                       story plus basement; elevator serviced building built-to-suit the
                       Manhattan Country School. According to the amended plans dated
                       August 26, 2015, the subject contains an above grade gross building area
                       of 35,544 square feet plus 4,261 square feet of cellar space. A final
                       Certificate of occupancy was issued by the NYC DOB with an effective
                       date of July 8, 2019.

**Vehicular Access**   Access to the site is via West 85th Street, a one-way street carrying traffic
                       in a westerly direction. All of the bounding streets are macadam paved
                       and improved with sidewalks, curbs and streetlights.

**On-site Parking**    None.

**Land Use Restrictions**  KTR is unaware of any land use restrictions other than those standard
                       restrictions pursuant to Board of Standards and Appeals, discussed in the
                       Zoning Analysis section of this report. It is recommended that interested
                       parties obtain current title documents to determine if any additional
                       restrictions exist.

**Subsoil Conditions** No adverse subsoil or drainage was evident at the time of inspection.

**Flood Hazard**       According to the Federal Emergency Management Agency's (FEMA)
                       Flood Insurance Rate Map (FIRM) map number 3604970086F, dated
                       September 5, 2007, the subject property is situated in a Flood Zone X,
                       characterized as an area determined to be outside the 0.2% annual chance
                       flood plain. Before Hurricane Sandy, FEMA had begun a coastal flood
                       study to update Flood Insurance Rate Maps (FIRMs) Flood Insurance

Study (FIS) reports for portions of New York and New Jersey using improved methods and data to better reflect coastal flood risk. After Sandy, FEMA released Advisory Base Flood Elevation (ABFE) maps for certain communities based on the partially completed flood study which were designed to help in rebuilding and recovery efforts. Preliminary FIRMs and FIS reports, which will follow the release of the preliminary work maps for communities receiving those products, are also now in the process of being released. On January 30, 2015 FEMA released the preliminary FIRM for the subject's neighborhood. The new map is numbered 3604970086G. The subject's flood zone has to Zone CX, an area that is determined to be outside the 100- and 500-year floodplains.

**SITE MAP**



**FEMA MAP**



# Comparison of Flood Hazard

Effective & Preliminary Flood Hazards



| Effective | | Preliminary | |
|---|---|---|---|
| POI Longitude/Latitude | -73.9746, 40.7865 | POI Longitude/Latitude | -73.9746, 40.7865 |
| Effective FIRM Panel | 3604970086F | Preliminary FIRM Panel | 3604970086G |
| Effective Date | 9/5/2007 | Preliminary Issue Date | 1/30/2015 |
| Flood Zone | X | Flood Zone | X |
| Static BFE* | Not Available | Estimated Static BFE* | Not Available |
| Flood Depth | Not Available | Estimated Flood Depth | Not Available |
| Vertical Datum | Not Available | Vertical Datum | Not Available |

* A **Base Flood Elevation** is the expected elevation of flood water during the 1% annual chance storm event. Structures below the estimated water surface elevation may experience flooding during a base flood event.

| Hazard Level | Flood Hazard Zone |
|---|---|
| High Flood Hazard | **AE, A, AH, AO, VE and V Zones.** Properties in these flood zones have a 1% chance of flooding each year. This represents a 26% chance of flooding over the life of a 30-year mortgage. |
| Moderate Flood Hazard | **Shaded Zone X.** Properties in the moderate flood risk areas also have a chance of flooding from storm events that have a less than 1% chance of occuring each year. Moderate flood risk indicates an area that may be provided flood risk reduction due to a flood control system or an area that is prone to flooding during a 0.2% annual chance storm event. These areas may have been indicated as areas of shallow flooding by your community. |
| | **Unshaded Zone X.** Properties on higher ground and away from local flooding sources have a reduced flood risk when compared to the Moderate and High flood risk categories. Structures in these areas may be affected by larger storm events, in excess of the 0.2% annual chance storm event. |
| Low Flood Hazard | **Insurance Note:** High Risk Areas are called 'Special Flood Hazard Areas' and flood insurance is mandatory for federally backed mortgage holders. Properties in Moderate and Low Flood Risk areas may purchase flood insurance at a lower-cost rate, known as Preferred Risk Policies. See your local insurance agent or visit https://www.fema.gov/national-flood-insurance-program for more information. |

**Disclaimer:** This report is for informational purposes only and is not authorized for official use. The positional accuracy may be compromised in some areas. Please contact your local floodplain administrator for more information or go to msc.fema.gov to view an official copy of the Flood Insurance Rate Maps.

Service Layer Credits: Source: Esri, Maxar, GeoEye, Earthstar Geographics, CNES/Airbus DS, USDA, USGS, AeroGRID, IGN, and the GIS User Community

1/18/2021 9:19:19 PM

## ZONING ANALYSIS

***Introduction***

The subject property is a 6,564 square foot parcel that is located within an R8, Residential district. According to the New York City Planning Department, "R8B contextual districts usually present the same unified blocks of "brownstone" rowhouses as R5B and R6B districts but the higher floor area ratio (FAR) of 4.0 creates a taller building that is commonly found on the narrow side streets of the Upper West Side and the Upper East Side in Manhattan. The mandatory Quality Housing bulk regulations encourage new six-story apartment buildings, with a setback at the top story, that fit in well with the rows of 19th century houses."

***Permitted Uses***

Most residential and community facility uses are permitted in R8B districts.

***Density/Height Factor***

The following is taken directly from the New York City Department of Planning. "The base height of a new building before a setback is 55 to 60 feet. The maximum building height is 75 feet. Many buildings are set back from the street with stoops in shallow front yards. To maintain the traditional streetscape, curb cuts are prohibited for zoning lot frontages less than 40 feet. The street wall of a new building, on any lot up to 50 feet wide, must be as deep as one adjacent street wall but no deeper than the other. On lots with at least 50 feet of frontage, the street wall must be no closer to the street line than the street wall of an adjacent building. Street walls need not be set back beyond 15 feet. Buildings must have interior amenities for residents pursuant to the Quality Housing Program."

### Summary of Bulk Regulations for R8B Districts

| | |
|---|---|
| Maximum Floor Area Ratio: | 4 |
| Maximum Lot Coverage: | 80% - Corner Lot |
| | 70% - Interior Lot |
| Minimum Lot Size: | 1,700 square feet |
| Minimum Width: | 18 feet |
| Front Yard Setback: | None |
| Minimum Rear Yard: | 30 feet (depth in feet) |
| Maximum Streetwall Height: | 60 feet |
| Minimum Lot Area Per DU: | 169 square feet |
| Maximum DUs per acre: | 258 |
| Required Parking: | 50% of dwelling units |
| Quality Housing Program: | Mandatory |

Applying the maximum FAR suggests an as-of-right maximum buildable bulk of 26,256 square feet (6,564 x 4.0 = 26,256). According to the New York City Department of Finance, the subject property currently contains an above grade gross building area of 27,044 square feet which exceeds the maximum unbonused bulk under current zoning regulations. Ownership applied for a variance to increase the existing gross building

to 39,539 square feet which equates to 6.03 FAR (the maximum permitted FAR is 4.0). The appraisers were furnished with a copy of the Resolution adopted by the Board of Standards and Appeals, dated July 14, 2015, which granted a variance to increase the gross building area to 39,539 square feet.

| FLOOR AREA CALCULATIONS | |
|---|---|
| Community Facility 150 West 85th Street (School) | Zoning Sq. Ft. |
| Cellar | 0 |
| 1st Floor | 6,145 |
| 2nd Floor | 6,015 |
| 2nd Floor Mezzanine | 2,627 |
| 3rd Floor | 6,121 |
| 4th Floor | 5,460 |
| 5th Floor | 5,699 |
| 6th Floor | 5,432 |
| Penthouse (Former Roof) | 2,040 |
| Total | 39,539 |

Calculations approved by BSA; Compiled by KTR

A copy of the *BSA Resolution* appears at the end of this section. The following is taken directly from the *BSA Resolution*.

"Therefore it is Resolved, that the Board of Standards and Appeals issues Appeals issues a Type II determination prepared in accordance with Article 8 of the New York State Environmental Conservation Law and 6 NYCRR Pan 617 and § 6-07(b) of the Rules of Procedure for City Environmental Quality Review and Executive Order No. 91 of 1977, as amended, and makes each and every one of the required findings under ZR § 72-2 1 and grants a variance to permit, On a site within an R8B zoning district, the proposed enlargement of an existing building which does not comply with zoning regulations for floor area, height and setback and rear yard contrary to ZR §§ 24-11 , 24·S22, 23·633, and 24·33, on condition that any and all work shall substantially conform to drawings as they apply to the objections above noted, filed with this application marked. "Received July 9, 2015"- nineteen (19) sheets; and on further condition:

THAT the site shall be limited to a maximum FAR area of 39,539 sq. ft. (6.03 FAR) and the total height of the building shall be limited to 8S '-3 11," , exclusive of bulkheads, parapets and play area enclosure, as illustrated on the BSA-approved plans;

THAT the penthouse shall be set back 11'-1" from the street wall; and

THAT any change in the use, occupancy, or operator of the School shall require the Board's approval;

THAT all DOB and related agency application(s) filed in connection with the authorized use and/or bulk will be signed off by DOB and all other, relevant agencies by July 14, 2019;

THAT this approval is limited to the relief granted by the Board in response to specifically cited DOB/other jurisdiction objection(s);

THAT the approved plans shall be considered approved only for the portions related to the specific relief granted; and

THAT DOB must ensure compliance with all other applicable provisions of the Zoning Resolution, the Administrative Code. and any other relevant laws under its jurisdiction irrespective of plan(s)/configuration(s) not related to the relief granted.

Adopted by the Board of Standards and Appeals, July 14, 2015."

The plans approved by the BSA were scaled back as they originally had 5,460 square feet on the 4th floor and the current plans only indicate 5,187 square feet; 5,699 square feet on the 5th floor and the current plans indicate 5,706 square feet; 5,432 square feet on the 6th floor and the current plans only indicate 3,743 square feet. The amended zoning floor calculations in the amended plans indicate an above grade gross building area of 35,544 square feet (plus 4,621 square feet of cellar space) and exclusive of 79 square foot mechanical penthouse with a total zoning floor area of 35,457 square feet. According to the architect, no additional BSA approval was required for these amended plans, as the amended plans reflected less gross building area and ZFA than was approved in the variance.

| FLOOR AREA CALCULATIONS | | | | |
|---|---|---|---|---|
| Community Facility 150 West 85th Street (School) | Original Floor Area Calculations | | Revised Floor Area Calculations | |
| | Gross Floor Area | Zoning Sq. Ft. | Gross Floor Area | Zoning Sq. Ft. |
| Cellar | 4,261 | 0 | 4,261 | 0 |
| 1st Floor | 6,145 | 6,145 | 6,145 | 6,145 |
| 2nd Floor | 6,015 | 6,015 | 6,015 | 6,015 |
| 2nd Floor Mezzanine | 2,627 | 2,627 | 2,627 | 2,540 |
| 3rd Floor | 6,121 | 6,121 | 6,121 | 6,121 |
| 4th Floor | 5,460 | 5,460 | 5,187 | 5,187 |
| 5th Floor | 5,699 | 5,699 | 5,706 | 5,706 |
| 6th Floor | 5,432 | 5,432 | 3,743 | 3,743 |
| Roof/Penthouse* | 2,040 | 2,040 | 79 | 0 |
| Total | 43,800 | 39,539 | 39,884 | 35,457 |

Source: NYC Department of Buildings and Original Calculations approved by BSA; Compiled by KTR

**Parking**

In R8B districts, off-street parking is required for 40% of the units, and can be waived if 15 or fewer spaces are required. Parking is not required in Manhattan south of 96th Street.

*Conclusions*

Based on the preceding, it appears that the subject's improvements represent a legal and conforming use. As previously discussed, the improvements appear to be legal per the BSA Resolution granting a variance its non-complying density. It is noted that the appraisers are not experts in zoning matters and therefore, further review of the subject's compliance with current zoning regulations is recommended.

**ZONING MAP**



# ZONING MAP (ZOLA NYC)



## BSA RESOLUTION – JULY 14, 2015

**1-15-BZ**

**APPLICANT** – Law Office of Fredrick A. Becker, for Manhattan Country School (contract vendee).

**SUBJECT** – Application January 2, 2015 – Variance (§72-21) proposed enlargement of an existing school structure to be used by the Manhattan Country School which will exceed permitted floor area and exceeds the maximum height. R8B zoning district.

**PREMISES AFFECTED** – 150 West 85th Street, southerly side of West 85th Street between Columbus Avenue and Amsterdam Avenue, Block 1215, Lot 53, Borough of Manhattan.

**COMMUNITY BOARD #7M**

**ACTION OF THE BOARD** – Application granted on condition.

**THE VOTE TO GRANT** –

Affirmative: Chair Perlmutter, Vice-Chair Hinkson, Commissioner Ottley-Brown and Commissioner Montanez..............................................................4

Negative:.....................................................................0

**THE RESOLUTION** –

WHEREAS, the decision of the Department of Buildings ("DOB"), dated March 26, 2015, acting on Department of Buildings Application No. 122142216, reads in pertinent part:

1. Proposed enlargement is not permitted – it creates new or increase existing degree of non-compliances ... contrary to requirements of ZR 54-31:

   a. Increase of existing degree of zoning non-compliance for zoning floor area is proposed from 5.8 to 6.3 (contrary to ZR 24-11 – the maximum floor area ratio for a community facility use shall not exceed 4.0)

   b. Creating of new zoning non-compliance for the maximum building height is proposed (contrary to ZR 24-522(b) and ZR 23-633 – the maximum building height shall not exceed 75 feet)

   c. The exterior stair is not permitted obstruction in the required rear yard (ZR 24-33); and

WHEREAS, this is an application under ZR § 72-21, to permit, on a site located within an R8B zoning district, the proposed enlargement of an existing building which does not comply with zoning regulations for floor area, height and setback and rear yard, contrary to ZR §§ 24-11, 24-522, 23-633, and 24-33; and

WHEREAS, a public hearing was held on this application on April 28, 2015, after due notice by publication in the *City Record*, with continued hearings on June 2, 2015, and then to decision on July 14, 2015; and

WHEREAS, the premises and surrounding area had site and neighborhood examinations by Vice-Chair Hinkson, Commissioner Montanez, and Commissioner Ottley-Brown; and

WHEREAS, Community Board 7, Manhattan, recommended disapproval of the application; and

WHEREAS, certain members of the community, including members of the West 85th Street Block Association, testified at the hearing and provided testimony in opposition to the application (collectively, the "Opposition"), citing the following primary concerns: (1) the proposed increase in the height of the building; (2) the impact of the bulk of the proposed building on light and air; (3) the noise and traffic associated with the applicant's use of the subject site; (4) the persistence of refuse and its attendant nuisances (odor, rodents, etc.) on the public sidewalks along West 85th Street and neighbors' anticipation of increased refuse; and (5) the impact of the construction associated with the proposed enlargement; and

WHEREAS, this application is brought on behalf of the West 85th Street Owner LLC (the "Applicant"), and the subject building will be occupied by the Manhattan Country School (the "School"), a non-profit educational institution founded in 1966; and

WHEREAS, the Applicant represents that the School offers classes from pre-Kindergarten through 8th grade and is recognized as a model of both progressive education and socioeconomic and racial diversity; and

WHEREAS, the Applicant states that the School currently operates in a five-story townhouse located at 7 East 96th Street, in Manhattan, an individually designated New York City landmark which, as such, is under the jurisdiction of the New York City Landmarks Preservation Commission; and

WHEREAS, the Applicant notes that the School's existing facility contains approximately 18,000 sq. ft. of floor area and cannot accommodate more than one classroom per grade or support specialized classrooms for art and science and, as such, it is inadequate to meet the School's programmatic needs; and

WHEREAS, the subject site is located within an R8B zoning district, with approximately 75 feet of frontage along the south side of West 85th Street, between Columbus Avenue and Amsterdam Avenue, and has approximately 6,564 sq. ft. of lot area; and

WHEREAS, the site is currently occupied by a four-story, three mezzanine building with a height equivalent to a seven-story building; it was initially constructed as a club house with four floors, three of which were double-height, and was enlarged in the 1980s to accommodate the Mannes College of Music; and

WHEREAS, the Applicant states that previous enlargement of the building included the splitting of two of the double-height floors, resulting in floor heights which are insufficient for a school; and

WHEREAS, the Applicant proposes to renovate the subject building to accommodate the School's programmatic needs; and

**1-15-BZ**

WHEREAS, specifically, the Applicant proposes to divide the double-height interior spaces into single-height spaces; create a 20'-6" by 23' cut out for an interior courtyard starting at the fourth floor of the building with skylights to the third floor; expand the sixth floor of the building and construct a penthouse; and extend the egress stair in the rear yard of the building; and

WHEREAS, the proposed enlargement will consist of 4,452 sq. ft. (5,394 sq. ft. will be added to the building but 942 sq. ft. of floor area will be removed); and

WHEREAS, the proposed building will have a total floor area of 39,539 sq. ft. (6.03 FAR) (the maximum permitted FAR is 4.0); a height of 85'-3 ½" (a maximum building height of 75'-0" is permitted) and no setback (a 15'-0" setback is required at 60 feet thus the degree of noncompliance with this requirement will be increased); and an exterior stair which is not a permitted obstruction into the rear yard of the building; and

WHEREAS, because the proposed enlargement does not comply with the applicable bulk regulations in the subject zoning district, the applicant seeks the requested variance; and

WHEREAS, the Applicant states that the variance is necessary to meet the School's programmatic need to provide classroom space sufficient to fulfill the School's curriculum; provide adequate light and air to classrooms; create a communal space necessary to advance the School's mission; and provide for specialized spaces for the School's Science, Technology, Engineering, Art and Math program (the "STEAM program"), which will enable the School to remain with similar institutions; and

WHEREAS, the Applicant asserts that an as-of-right alteration of the building would not satisfy the School's programmatic needs; and

WHEREAS, specifically, the applicant states that the as-of-right configuration results in a building with 35,346 sq. ft. of floor area with inadequate classroom space, insufficient light and air and no pre-kindergarten or kindergarten classrooms; and

WHEREAS, the Applicant considered a lesser variance in which the floor area of the building was increased without enlarging the envelope of the building (the "Lesser Variance") and notes that the Lesser Variance does not meet the School's programmatic needs to have adequate light and air in the classrooms or a communal space in which students can participate in group activities; and

WHEREAS, thus, the Applicant contends that the requested waivers are both modest and essential to the School's ability to meet its programmatic needs; and

WHEREAS, the Board acknowledges that the School, as an educational institution, is entitled to significant deference under the law of the State of New York as to zoning and as to its ability to rely upon programmatic needs in support of the subject variance application; and

WHEREAS, specifically, as held in *Cornell Univ. v Bagnardi*, 68 NY2d 583 (1986), an educational institution's application is to be permitted unless it can be shown to have an adverse effect upon the health, safety, or welfare of the community, and general concerns about traffic, and disruption of the residential character of a neighborhood are insufficient grounds for the denial of an application; and

WHEREAS, based upon the above, the Board finds that the programmatic needs of the School along with the existing constraints of the site create unnecessary hardship and practical difficulty in developing the site in compliance with the applicable zoning regulations; and

WHEREAS, since the School is a non-profit institution and the variance is needed to further its non-profit mission, the finding set forth at ZR § 72-21(b) does not have to be made in order to grant the variance requested in this application; and

WHEREAS, the applicant represents that, pursuant to ZR § 72-21(c), the variance, if granted, will not alter the essential character of the neighborhood, will not substantially impair the appropriate use or development of adjacent property, and will not be detrimental to the public welfare; and

WHEREAS, the Applicant states that the use of the proposed building is permitted as-of-right in the subject zoning district and that the site has been used for community facility and school use since 1928;

WHEREAS, the Applicant notes that the proposed rooftop addition is set back from the street and has a sloping roof and states that, in response to opposition from neighbors, has been reduced to a height of 13'-6"; and

WHEREAS, the Applicant states that the rooftop enclosure for the play area at the rear of the proposed building's roof will be constructed of a wire mesh that will impede neither light nor air, and that such enclosure shall not be lighted at night; and

WHEREAS, accordingly, the Applicant asserts that the proposal will have no negative impacts on the surrounding neighborhood; and

WHEREAS, the Board agrees with the applicant that the proposal will not alter the essential character of the surrounding neighborhood nor impair the use or development of adjacent properties, nor will it be detrimental to the public welfare; and

WHEREAS, the Applicant states that, per ZR § 72-21(d), the hardship was not self-created; and

WHEREAS, the Board finds that the hardship herein was not created by the School or the Applicant; and

WHEREAS, the Applicant represents that, consistent with ZR § 72-21(e), the requested waivers are the minimum necessary to accommodate the School's current and projected programmatic needs; and

WHEREAS, the Board notes that the Lesser Variance, in which the floor are of the existing building is

**1-15-BZ**

increased without enlarging the envelope of the existing building, would not provide adequate light and air to the School's classrooms and would not meet the School's programmatic need for a courtyard space in which students can gather and work in groups; and

WHEREAS, the Board finds that the requested relief is the minimum necessary to allow the School to fulfill its programmatic needs; and

WHEREAS, therefore, the Board has determined that the evidence in the record supports the findings required to be made under ZR § 72-21; and

WHEREAS, the project is classified as a Type II action pursuant to 6 NYCRR Part 617.5; and

WHEREAS, the Board has conducted a review of the proposed Type II action noted in the CEQR Checklist dated January 2, 2015; and

*Therefore it is Resolved*, that the Board of Standards and Appeals issues Appeals issues a Type II determination prepared in accordance with Article 8 of the New York State Environmental Conservation Law and 6 NYCRR Part 617 and § 6-07(b) of the Rules of Procedure for City Environmental Quality Review and Executive Order No. 91 of 1977, as amended, and makes each and every one of the required findings under ZR § 72-21 and grants a variance to permit, on a site within an R8B zoning district, the proposed enlargement of an existing building which does not comply with zoning regulations for floor area, height and setback and rear yard contrary to ZR §§ 24-11, 24-522, 23-633, and 24-33, *on condition* that any and all work shall substantially conform to drawings as they apply to the objections above noted, filed with this application marked "Received July 9, 2015"– nineteen (19) sheets; and *on further condition*:

THAT the site shall be limited to a maximum floor area of 39,539 sq. ft. (6.03 FAR) and the total height of the building shall be limited to 85'-3 ½", exclusive of bulkheads, parapets and play area enclosure, as illustrated on the BSA-approved plans;

THAT the penthouse shall be set back 11'-1" from the street wall; and

THAT any change in the use, occupancy, or operator of the School shall require the Board's approval;

THAT all DOB and related agency application(s) filed in connection with the authorized use and/or bulk will be signed off by DOB and all other relevant agencies by July 14, 2019;

THAT this approval is limited to the relief granted by the Board in response to specifically cited DOB/other jurisdiction objection(s);

THAT the approved plans shall be considered approved only for the portions related to the specific relief granted; and

THAT DOB must ensure compliance with all other applicable provisions of the Zoning Resolution, the Administrative Code, and any other relevant laws under its jurisdiction irrespective of plan(s)/configuration(s) not related to the relief granted.

Adopted by the Board of Standards and Appeals, July 14, 2015.

A true copy of resolution adopted by the Board of Standards and Appeals, July14, 2015.
Printed in Bulletin Nos. 28-30, Vol. 100.

  Copies Sent
    To Applicant
      Fire Com'r.
        Borough Com'r.

**CERTIFIED RESOLUTION**

Margery Perlmutter, R.A., Esq.
Chair/Commissioner of the Board

## REAL ESTATE ASSESSMENT AND TAX ANALYSIS

*Introduction*

The subject property is identified on the New York Tax Maps as Block 1215 Lot 53. The subject has a Class IV property designation, the typical category for commercial buildings. The land and improvement assessments are presented herein. The following assessments and taxes were confirmed with the New York City Tax Assessor's Office. The fiscal tax year in New York City is from July 1 to June 30. The subject's assessments for the 2020/21 and 2021/22 tax years are illustrated in the following schedule.

| Tax Year | Actual Land | Actual Total | Transitional Land | Transitional Total |
|---|---|---|---|---|
| 2021/22 | $1,764,000 | $3,242,700 | $1,764,000 | $3,669,840 |
| 2020/21 | $1,764,000 | $3,995,100 | $1,764,000 | $3,688,110 |

Source: New York City Assessor's Office; Compiled by KTR

New York City policy is to calculate the real estate tax burden at the lower of the actual or transitional assessment. For the 2021/22 tax year, the subject's tax liability would be based upon the actual assessment. In order to determine if the subject property's current assessed value and tax liability are appropriate, a survey of similar class "W8" school buildings in the influencing market was conducted.

### ASSESSED VALUE COMPARABLES

| Address | Building Class | Block/Lot | Year Built | Size (S/F) | Assessment | Per (Sq. Ft.) |
|---|---|---|---|---|---|---|
| 12-16 East 89th Street | W8 | 1500/62 | 1920/2011/2019 | 81,254 | $8,295,750 | $102.10 |
| 325 West 85th Street | W8 | 1247/23 | 1920 | 27,592 | $3,008,250 | $109.03 |
| 314 West 91st Street | W8 | 1251/32 | 1915 | 16,481 | $1,831,950 | $111.16 |
| **Subject Property** | **W8** | **1215/53** | **1927/1984/2016** | **27,044** | **$3,242,700** | **$119.90** |
| 18 West 86th Street | W8 | 1199/44 | 1910/1984 | 15,000 | $1,835,550 | $122.37 |
| 925 9th Avenue | W8 | 1068/10 | 1891/1998/2013 | 13,900 | $1,717,650 | $123.57 |

Source: New York City Assessor's Office; Compiled by KTR

As illustrated in the preceding table, the subject's assessed value is within the range of $102.10 to $123.57 per square foot. As such, the subject's assessed value is considered reasonable based on the Department of finance building area.

*Tax Rates*

The tax rate for Class IV properties has remained relatively stable over the past decade ranging from 10.514% to 10.574% over the last four years before increasing by 1.49% to 10.694% in 2020/21. The 2021/22 tax rate has not yet been announced. Based on the recent trend, it is assumed that the Class IV tax rate will remain flat for the 2021/22 tax year. The following table presents the Tax Class IV rates over the past several years.

*Real Estate Taxes*

Applying the current Class IV tax rate to the transitional assessment suggests a real estate tax liability of $346,774. According to the Department of Finance, the subject is fully tax exempt as it is classified as an Educational Facility.

# DESCRIPTION OF THE IMPROVEMENTS

**General Description**

The following is a brief description of the improvements based upon a site visit conducted on May 25, 2021. The site is currently improved with a six story school building, known as the Manhattan County School. Public records indicate that the property currently has a gross building area of 27,044± square feet. This gross building area does not reflect the current building area. The NYC Department of Buildings oldest Certificate of Occupancy dates the building at 1928. The corner stone has the dates 1846-1926 with the initials UOTS inscribed. UOTS claims to be the first independent national women's organization in the United States.

The subject underwent a gut renovation and reconfiguration into a six-story plus basement; elevator serviced building built-to-suit the Manhattan Country School. According to the amended plans dated August 26, 2015, the subject contains an above grade gross building area of 35,544 square feet plus 4,261 square feet of cellar space. A final Certificate of Occupancy was issued by the NYC DOB with an effective date of July 8, 2019.

## STRUCTUAL SYSTEM
**Foundation/Structure**

Reinforced concrete. Structural steel has been installed above the 5th floor and 6th floor in anticipation of further expansion. However, the plans have been revised to exclude the expansion of the sixth floor and penthouse.

**Exterior Walls**

The façade consists of brick and masonry. Windows are set in aluminum frames.

**Entrance**

The main entrance is on the north side of West 85th Street leading directly to the lobby providing access to the elevator, stairwell and ground floor.

## UTILITES AND MECHANICALS
**HVAC/Hot Water/Heating**

Steam heat and hot water is supplied by a dual gas/oil-fired burner and boiler located in the basement. Steam distribution from the boiler through the steam header is basically split into two zones of steam distribution. One steam supply services the northwest sector of the building the other steam supply services the southeast sector of the building. Air conditioning is generated via a chilled water distribution system. In addition, there HVAC units located on the roof of the building.

**Electricity**

The capacity of the subject's electric service was not ascertained during our inspection. It is assumed to be adequate for the current use.

**Sprinkler System**

The building is fully sprinklered.

*Elevators/Stairwell*    The subject contains one passenger elevator finished with panel walls and metal panel ceilings with recessed lighting. The passenger elevator has a capacity of 2,500 pounds. It serves the basement through fifth floor. However, it does not serve the fourth floor. There is one scissor stairwell servicing the entire building. In addition, there are multiple interior stairwells that service various sections of the building.

*INTERIOR LAYOUT*    The subject's interior layout and square footages are illustrated in the table below.

| Floor | Sq. Ft. | Description |
|---|---|---|
| Cellar | 4,261 | Kitchen, Wood Shop, Maintenance Office, Boiler Room, Mechanical/Utility Rooms, Storage |
| 1st Floor | 6,145 | Lobby, Accessory/Admib. Offices, Classrooms |
| 2nd Floor | 6,015 | Auditorium/Stage, Classrooms, Lunch Room |
| 2nd Floor Mezz. | 2,627 | Offices, Staff Lounge, Storage |
| 3rd Floor | 6,121 | Classrooms, Library, Accessory Offices, Bathrooms |
| 4th Floor | 5,187 | Classrooms, Courtyard |
| 5th Floor | 5,706 | Classrooms, Accessory Offices |
| 6th Floor | 3,743 | Storage Rooms, Classrooms, Kiln & Boiler Room |
| Roof | 79 | Roof, Truss for Future PH |
| Total | 39,884 | |

*Physical Deterioration*    The subject represents a recently gut renovated and is essentially a "new" school building and should exhibit no major items of deferred maintenance. As the subject property is a newly renovated building, nominal physical deterioration was evident.

*Functional Obsolescence*    Functional obsolescence is a loss in value resulting from deficiencies, other than physical deterioration, that impair utility. Functional obsolescence can be curable or incurable. When it is incurable it cannot be corrected by economically feasible means. When the renovations are complete each of the floors' layouts will be consistent with or superior to that found in competing facilities. The structural steel installed above the existing 5th and 6th floor is no longer necessary as the plans have been amended. This support has no function unless the plans are eventually revised to include additional space. The steal supports represent a functional obsolescence with no contributory value.

*Economic Obsolescence*    Economic obsolescence is defined as a loss in value or usefulness of a property caused by factors external to it; such as increased cost of raw materials, labor or utilities, reduced demand, increased competition, environmental or other regulations, inflation or high interest rates. None of the aforementioned factors render the subject property economically obsolete.

**SCHOOL MARKET RENT ANALYSIS**

**Introduction**

According to the original plans approved by the BSA, the proposed redevelopment of the subject indicated a "gut" renovation to reconfigure the former school into a six-story plus penthouse and basement, elevator-serviced building built-to-suit the Manhattan Country School. The subject property upon completion will have an above grade gross building area of 35,544 square feet (plus of 4,621 square feet of cellar space). As of the date of inspection, the subject was 100% owner-occupied by Manhattan Country School. A final Certificate of occupancy was issued by the NYC DOB with an effective date of July 8, 2019. No rent attributable to the mechanical space on the roof has been applied.

**Comparable Leases**

In order to estimate current market rent, an analysis of comparable leases in the competitive market has been conducted. The survey revealed 16 recent leases of education related users in various Manhattan neighborhoods.

**Base Rents**

The comparable leases indicate base rents ranging from $46.39 to $98.64 per square foot, with an average of $65.32 per square foot. The high end of the range represents a built-to-suit homeless shelter in Washington Heights. The low end of the range represents a lease extension for a NYC High School located in the Financial District.

Analysis of the comparables has been performed, giving weight only to those most similar to the subject based on various factors. Those most similar in terms of size and configuration are Comparable No. 2, No. 5 through 10 which illustrate a range of $55.00 to $83.36 per square foot with average of $63.41 per square foot. Based on these metrics of physical property characteristics and the subject's desirable Upper West Side location, a market rent of $60 per square foot is concluded.

**Rent Steps**

Leases with typical longer terms (more than 10 years) frequently have increases, most commonly structured as annual increases of 2.5% to 3% or a larger increase every few years (up to 7.5% every three years, based on the survey). Four of the comparables illustrated steps of a set dollar amount every few years, ranging from a $3 per square foot bump every five years for a longer term lease to a $5 per square foot increase in the sixth year of a ten-year lease. A 3% annual increase is considered most appropriate to the subject.

**Expense Recovery**

Leases for full buildings, such as the subject, are generally structured on a triple net basis whereby tenants are responsible for a pro rata share of real estate taxes and operating expenses. Some of the comparables were semi-net whereby the landlord is responsible for base year real estate taxes while the tenant is responsible for increases in real estate taxes over base as well as a pro rata share of operating expenses. The subject's property would likely lease on a net basis. As the facility is fully tax exempt, the structure of real estate tax recoveries is moot.

***Market Rent Conclusions***   There has been adequate leasing activity within the influencing market to formulate an opinion of market rent for the subject. The subject property was recently gut renovated and is essentially a "new" school building in excellent condition. Based on the subject's condition and location, a market rent of $60 per square foot is concluded. The subject would rent based on its above grade gross building area of 35,544 square feet. No rent attributable to the mechanical space on the roof has been applied.

Applying the concluded market rent of $60.00 per square foot results in an annual rent of $2,132,640 per year increasing by 3.0% per year.

| Floor | Gross Area | Market Rent Conclusion | Annual Rent |
|---|---|---|---|
| 1st-6th Floors | 35,544 | $60.00 | $2,132,640 |

Based upon the survey, rent terms for the subject are summarized as follows:

### SUMMARY OF MARKET SCHOOL RENT ASSUMPTIONS

| | |
|---|---|
| Base Rent: | $60.00 per square foot |
| Lease Terms: | 15 years |
| Rent Step-ups: | 3.0% annual increases |
| Expenses: | Triple-net |
| Real Estate Taxes: | Triple-net |
| Free Rent: | 3 months – new tenants |
| | None – renewal tenants |
| Tenant Work Letter: | Built-to-suit |

## COMPARABLE SCHOOL RENT MAP – NORTH OF 57th STREET



## COMPARABLE SCHOOL RENT MAP – SOUTH OF 57ᵗʰ STREET



## COMPARABLE SCHOOL/COMMUNITY FACILITY LEASES

| No. | Tenant | Address | Location | Net Rentable Area (Square Feet) | Location in Building | Year Built | Lease Date | Term (Years) | Base Rent PSF | Rent Steps | Free Rent/Work Letter | Lease Type | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | HBLP USA, Inc. | 284/286 Audubon Avenue | Washington Heights | 29,900 | Entire Bldg | 1923 | Oct-19 | 9 | $98.64 | 3% Yrs 4 & 7 | Built-to-Suit | NN | Tenant pays all utilities, real estate tax increases over the 2017/18 base year, reimburses landlord for insurance, and all non-structural repairs and maintenance. Landlord pays insurance and real estate taxes prior to reimbursement and reserves. Landlord is building the space to suit as a concession. Rentable area does not include basement. |
| 2 | Millennium High School | 75 Broad Street | Financial District | 79,000 | Portion of Lobby [1-13 Fl] | 1928/2004 | Sep-18 | 15 | $46.39 | Fixed per annum | None | MG pro rata RE tax increases over base | Lease Extension - School; modified gross lease - Real Estate taxes over base |
| 3 | NYC Administrative Offices | 333 7th Avenue | Midtown South | 88,000 | Fl 4, 7, 8 & 12 | 1956/2003/2011 | Sep-18 | 10 | $51.00 | Fixed per annum | Unknown | MG pro rata RE tax increases over base | Lease renewal and extension. Tenant cannot terminate lease. |
| 4 | NYC Administrative Offices | 110 William Street | Financial District | 84,874 | P14, E15-16 | 1956/2003/2011 | Sep-18 | 15 | $50.00 | $50/6 every 5 Yrs | 8 mos / 1 LL work | MG pro rata RE tax increases over base | Modified gross lease - Real Estate taxes over base |
| 5 | NYC Public School District 2 Pre-K through 6th | 606 West 57th Street | Hell's Kitchen | 79,000 | Portion of Grade, 3, 4 & 5 | 2018 | Mar-18 | 15 | $60.50 | Fixed per annum | 8 mos / $418/sf | NN | Tenant pays all utilities, real estate tax increases over base year, reimburses landlord for insurance, and all non-structural repairs and maintenance. Landlord pays insurance and real estate taxes prior to reimbursement and reserves |
| 6 | NYC Public School District 2 Pre-K Center at 252 East 57 | 252 East 57th Street | Sutton Place | 17,305 | Portion of Grade & 2nd Fl | 2017 | Dec-17 | 10 | $83.36 | 2.0% per annum | Unknown | NN | Tenant pays all utilities, real estate tax increases over base year, reimburses landlord for insurance, and all non-structural repairs and maintenance. Landlord pays insurance and real estate taxes prior to reimbursement and reserves |
| 7 | Confidential | | Upper East Side | 15,000 | Upper Floors | 1932/1985 | Dec-17 | 10 | $65.00 | Fixed per annum | 4 mos / $40/sf | MG pro rata RE tax increases over base | School; modified gross lease - Real Estate taxes over base |
| 8 | The Drummer's Collective Inc. | 26 Broadway | Lower Manhattan | 14,608 | 1st Floor | 1923 | Mar-16 | 16 | $62.64 | 3.5% per annum | 10 mos / $50/sf/TI's | Net | Net effective rent is $62.64/sf |
| 9 | Children's Rescue Fund | 4 East 28th Street | NoMad | 69,289 | Entire Bldg | 1904/1906/2014 | Jul-16 | 3 | $71.01 | 3.0% per annum | Not Disclosed | Net | Tenant pays 90% of real estate taxes, repairs and maintenance, insurance and all utilities. Landlord is responsible for reserves. No concessions or escalations were disclosed. Rentable area does not include basement. |
| 10 | Confidential | York Avenue & 74th St | Upper East Side | 16,195 | Entire Bldg | 1930/1996 | Jan-16 | 10 | $55.00 | 3.0% per annum | As-Is/Imm | Net | Net effective rent is $55/sf |

Source: Lease Survey; Compiled by KTR

KTR Real Estate Advisors LLC

## HIGHEST AND BEST USE

***Introduction***     Highest and Best Use is defined by the Appraisal Institute in The Dictionary of Real Estate Appraisal, Sixth Edition, Chicago, Illinois, Appraisal Institute, 2015, which states:

That reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility and maximum productivity. There are typically two Highest and Best Use scenarios: the Highest and Best Use of the property as vacant and the Highest and Best Use of the site as if improved.

## HIGHEST AND BEST USE AS IF VACANT

***Definition***     According to The Dictionary of Real Estate Appraisal, the Highest and Best Use as if Vacant is defined as "Among all reasonable, alternative uses, the use that yields the highest present land value, after payments are made for labor, capital and coordination. The use of a property based on the assumption that the parcel of land is vacant or can be made vacant by demolishing any improvements."

The maximum value of a property is typically realized when a reasonable degree of homogeneity is present; thus, conformity in use is usually a highly desirable aspect of real property, since it creates and/or maintains value. The subject property is located along a thoroughfare that is comprised primarily of residential properties. The subject is currently zoned residential. It received a variance to expand the building to its current bulk. No variance would apply if vacant. Based on the principal of conformity and the subject's zoning, the highest and best use of the property, if vacant, would be residential development.

## HIGHEST AND BEST USE AS IMPROVED

***Definition***     According to The Dictionary of Real Estate Appraisal, the Highest and Best Use as improved is defined as "The use that should be made of a property as it exists. An existing property should be renovated or retained, as is, so long as it continues to contribute to the total value of the property or until the return from a new improvement would more than offset the cost of demolishing the existing building and constructing a new one."

The subject represents a legal and conforming use. It received a variance to expand its existing gross building area beyond that permitted by current zoning. The subject represents a newly renovated and expanded, new school building (specialty use) that cannot be converted to residential use. There is demand for specialty use buildings from the numerous schools in the City. Based upon the fact that the potential income associated with the existing improvements affords a fair return to the land with residual income to the improvements and it would be unreasonable to demolish an improvement that maintains value; the highest and best use of the subject, as improved, is for its current use.

## THE VALUATION PROCESS

*Overview*

There are three traditional approaches that can be employed in establishing the market value of the subject property. These approaches and their applicability to the valuation of the subject property are summarized as follows:

*The Cost Approach*

The application of the Cost Approach is based on the principle of substitution. This principle may be stated as follows: no one is justified in paying more for a property than that amount by which he or she can obtain, by purchase of a site and construction of a building, without undue delay, a property of equal desirability and utility. In the case of a new building, no deficiencies in the building should exist.

The subject property is a specialty use (school) building that was recently gut renovated and expanded. Although the property was recently gut renovated, it was originally built in 1928 (possibly as early as 1864) and represents an over-improvement relative to current zoning. Due to these factors, the Cost Approach has not been developed. Elements of the Cost Approach have been utilized in the development of an insurable value estimate.

*The Income Approach*

The theory of the Income Capitalization Approach is based on the premise that a value indication for a property is derived by converting anticipated benefits into property value. Anticipated benefits include the present value of the net income and the present value of the net proceeds resulting from its eventual disposition.

There are two methods of accomplishing this (1) direct capitalization of the first year's income by an overall capitalization rate and (2) a discounted cash flow analysis in which the annual cash flows and reversionary value are discounted to a present worth for the remainder of a property's productive life or over a reasonable holding period. As the subject of the appraisal is recently gut renovated school building that could be leased at market levels, the Income Approach is pertinent. The analysis will utilize direct capitalization.

*The Sales Comparison Approach*

The Sales Comparison Approach is an estimate of value based upon a process of comparing recent sales of similar properties in the surrounding or competing area. Inherent in and central to this approach is the principle of substitution.

Its application consists of comparing the subject property to similar properties of the same general type, which have been sold recently or currently are available for sale in competing areas. This comparative process involves judgment as to the similarity of the subject property and the comparable sales. The value estimated through this approach represents the probable price at which a willing seller would sell the subject property to a willing and knowledgeable buyer as of the date of value.

The reliability of this technique is dependent upon the availability of comparable sales data, verification of the sales data, the degree of comparability and extent of adjustment necessary for differences and the absence of atypical conditions affecting the sale. Research revealed adequate activity to form an opinion of the subject's market value via this approach.

*Reconciliation*

The valuation procedure is concluded via a review of the approaches to value employed. The reliability of the market data utilized and the overall applicability of each approach are re-examined. Based on such, the value indications are reconciled and a final estimate is concluded.

## INCOME CAPITALIZATION APPROACH

*Introduction*

The Income Approach is based on the theory that value is the present worth of future benefits. The future benefits of ownership consist of the present worth of the net income which will accrue to the owner of the property, plus the present worth of the net proceeds resulting from its eventual disposition. The two most commonly used techniques of converting net income into value in the Income Approach are Direct Capitalization and the Discounted Cash Flow Analysis.

KTR has utilized Direct Capitalization in this valuation. Direct Capitalization is a method utilized to convert a single year's estimate of net income into an indication of value.

The basic steps in processing the Income Approach by the Direct method are as follows:

**Potential Gross Income** from all sources that a competent owner could legally generate is calculated.

**Vacancy & Credit Loss** factor is estimated and deducted to arrive at Effective Gross Income.

**Operating Expenses & Real Estate Taxes** are estimated and deducted to arrive at the stabilized Net Operating Income.

**Overall Capitalization Rate** is developed via sales within the market

**Stabilized Valuation** is processed by dividing the Net Operating Income by the Overall Capitalization Rate.

*Potential Gross Income*

The potential gross income is the total income attributable at 100 percent occupancy before operating expenses are deducted. Gross income is typically comprised of (a) projected market rent (b) real estate taxes and operating expense recoveries, if any and (c) other income. The subject is owner occupied; as such, market rent was applied. As previously developed in the *Market Rent Analysis*, the concluded market rent of $60.00 per square foot has been applied to the subject property which equates to $2,132,640 annually, on a net lease basis.

| Floor | Gross Area | Market Rent Conclusion | Annual Rent |
|-------|-----------|-----------------------|-------------|
| 1st-6th Floors | 35,544 | $60.00 | $2,132,640 |

*Vacancy & Collection Loss*

Since real estate is a long-term investment, the possibility exists for occasional rent loss due to actual vacancy, turnover and slow or nonpayment of rent by tenants. Thus, when making an investment in a property of the subject type, a prudent investor usually makes an allowance for potential vacancy and collection losses. As such, a

combined vacancy and credit loss of 5.0% has been utilized. If priced correctly the subject would fully lease.

**Effective Gross Income**

Effective Gross Income (EGI) is the anticipated income from all operations of the subject property adjusted for vacancy and credit loss. The subject property's EGI for the appraised fiscal year equals $2,026,008.

**Operating Expense Summary**

The subject is owner occupied and historical operating expenses are not available for analysis. Leasing assumptions are based upon a triple net basis, which is typical to the market. Under this form of agreement, the tenant is responsible for all real estate taxes, operating expenses and utilities. The landlord is responsible for a supplemental insurance policy, structural repairs and a management fee.

**Real Estate Taxes**

As developed in the *Assessment and Tax Analysis* section of this report, real estate taxes would be $346,774 but is currently exempt. The lease structure is on a triple net basis; therefore, the tenant would be responsible for real estate taxes. It is noted that the subject is exempt from real estate taxes as it is classified as an Educational Facility and would likely be leased to a similar exempt school entity.

**Insurance (Excess Liability)**

Although, the subject property is analyzed on a triple net basis, ownership will likely incur an insurance expense for excess liability insurance. This expense category covers the cost of annual premiums for excess liability beyond the tenant's liability policy. This is typically a minimal cost as the tenant insures the property for property damage, loss and general liability with the owner as an additional insured. Based on the subject's condition and age, a minimal insurance expense of $0.25 per square foot or an annual expense of $8,900 (rounded) has been processed.

**Management**

Typical management fees in this market are 2.0% to 5.0% of effective gross income. For single tenant net leased properties, it is generally lower than this range. This expense category includes accounting, administrative and legal costs. Based upon experience in the market, net leased to a properties require minimal management. The extent of such management duties is generally assumed by ownership. In this instance, a management fee of 2.0% of effective gross income will be applied.

**Reserves**

An allowance must be made for the cost of replacing building components with useful lives shorter than the economic life of the subject. According to the First Quarter 2021 *PwC Investor Survey*, reserves in the National Net Lease Market ranged from $0.00 to $0.25 per square foot; one of the five investor categories reported reserves at $0.25 per square foot, while the remaining four did not report reserves. As the subject property is a newly renovated building and appeared to be in excellent condition and as such, an expense of $0.25 per square foot is considered reasonable and has been processed.

### STABILIZED OPERATING PROFORMA

| INCOME | | | | |
|---|---|---|---|---|
| Potential Gross Income | | $ | 2,132,640 | |
| Vacancy and Collection Loss | 5.00% | | ($106,632) | |
| Effective Gross Income | | $ | 2,026,008 | |
| | | | | |
| **EXPENSES** | | PSF | Amount | % of EGI |
| Management | $ | 0.57 | $ 20,260 | 1.00% |
| Insurance | $ | 0.25 | $ 8,900 | 0.44% |
| Reserves | $ | 0.25 | $ 8,900 | 0.44% |
| Total Expenses | $ | 1.07 | $ 38,060 | 1.88% |
| | | | | |
| Net Operating Income | | $ | 1,987,948 | |

**Valuation by the Direct Capitalization Method**

In Direct Capitalization, the net operating income is converted into an estimate of value through the use of an Overall Rate (OAR).

**Derivation of OAR**

Overall Rates can be estimated with various techniques, depending upon the quality and quantity of data available. We have utilized the investor's survey as well as derivation from comparable sales.

**Investor Surveys**

The *PwC Real Estate Investor Survey* does not have statistics for school properties, the asset class most similar to the subject would be the National Net Lease Market. According to the *PwC Real Estate Investor Survey* for the First Quarter of 2021, Overall Rates for the National Net Lease Market reported by survey participants presently range from 5.00 to 8.00 percent averaging 6.18 percent. It is noted that New York City net leased properties tend to trade at rates lower than the national market.

**Derivation from Sales**

Deriving capitalization rates from sales of comparable properties is the preferred technique when sufficient data is available. Data on each property's sale price, income, expenses and market conditions at the time of sale are needed. The indicated OAR is calculated by dividing the forecasted net operating income by the sale price. In the prior 2017 appraisal, overall rates of NNN leased sales ranged from 3.10 and 4.69 percent with an average of 3.82 percent. A survey of net lease transactions in Manhattan revealed four closed sales. The sales indicate overall rates between 4.46 and 5.30 percent with an average of 4.94 percent. The subject would likely trade slightly above the average of surveyed sales. Specialty use property would trade at higher overall rates than these retail properties due to the somewhat limited market. No sales of leased schools in Manhattan were identified in the last two years. KTR expanded its search to include community facility, schools and specialty use properties in the Outer Boroughs, the overall rates in including the net leased retail properties ranged between 4.0 and 6.47 percent with an average of 5.17 percent. The comparable are outlined as follows:

## COMPARABLE CAPITALIZATION RATES

| Address | Tenant | GBA | Date of Sale | Consideration | OAR |
|---|---|---|---|---|---|
| 73-09 Myrtle Ave, Glendale, NY | Multi-tenanted - CF/Medical | 7,000 | March 8, 2021 | $ 2,250,000 | 4.00% |
| 4900-4916 Broadway | Rite Aid | 9,200 | March 4, 2021 | $ 10,500,000 | 4.46% |
| 351 & 353 Bowery | 7-Eleven | 2,264 | January 29, 2020 | $ 6,915,000 | 4.75% |
| 100 Livingston Street, Brooklyn, NY | Multi-tenanted - CF/Medical | 12,681 | January 16, 2020 | $ 10,500,000 | 5.49% |
| 8746 20th Ave, Brooklyn, NY | Multi-tenanted - Office/Medical | 16,000 | December 17, 2019 | $ 4,520,000 | 6.00% |
| 425 Coney Island Ave, Brooklyn, NY | Staten Island Hospital | 19,500 | December 16, 2019 | $ 16,000,000 | 4.80% |
| 1781-1785 Flatbush Ave, Brooklyn, NY | Multi-tenanted - CF/Medical | 17,494 | November 16, 2019 | $ 3,700,000 | 5.40% |
| 49 West 64th Street (Retail Condo) | Atlantic Grill | 11,888 | July 24, 2019 | $ 14,500,000 | 5.24% |
| 351 & 353 Bowery | 7-Eleven | 2,264 | October 23, 2019 | $ 4,600,000 | 5.30% |
| 162 Montague Street | Multi-tenanted | 7,155 | July 2, 2019 | $ 36,700,000 | 4.00% |
| 1012 Bay Ridge Ave, Brooklyn, NY | The Learning Experience | 11,044 | April 10, 2019 | $ 5,800,000 | 6.29% |
| 1623 Kings Hwy, Brooklyn, NY | Multi-tenanted - CF/Retail | 21,960 | March 28, 2019 | $ 18,000,000 | 5.50% |
| 1501-1523 Pitkin Ave, Brooklyn, NY | Ascend Charter School | 164,775 | December 27, 2017 | $ 53,000,000 | 5.90% |
| 2045 Linden Boulevard, Brooklyn, NY | Nathanael Greene School | 42,112 | August 30, 2017 | $ 10,975,000 | 6.47% |
| 245 East 149th Street, Bronx, NY | City of NY (Dept. of Education) | 32,360 | Listing | $ 13,320,000 | 5.00% |
| 1820 Madison Avenue, NY, NY | Madison Avenue Radiology | 7,990 | Listing | N/A | 4.18% |

The survey included overall rates of school properties with rates ranging from 5.0% to 6.47% with an average of 5.79%, all of which are located in inferior locations. The subject should command an overall rate below this average but above the net lease retail average. It is noted that there is strong demand for school uses in Manhattan. Considerate of its notably desirable location, an overall rate of 5.0% is considered reasonable and has been concluded.

**Valuation**

Value is calculated by dividing the stabilized net operating income by the concluded overall rate; thus, the value of the Fee Simple Interest in the subject property is calculated as follows:

$$\$1,987,948 \div 5.0\% = \$39,758,958$$

**"As Is" Deductions**
**Lease Up**

The aforementioned value is reflective of the subject as if it were fully occupied; as such, deductions are required for certain rent losses concessions. As discussed in the *Market Rent Analysis* section of this report, it is anticipated that the future tenants will receive three months free rent. This equates to a deduction of $533,160. In addition, a deduction for leasing commissions needs to be considered.

**Leasing Commissions**

Full commissions, applied to space leased to new tenants is based upon a brokerage fee calculated on the following percentage of annual contract rent: Year 1, 5.0%; Year 2, 4.0%; Years 3-5, 3.5%; Years 6-10, 2.5% and 2.0% thereafter. Based on such, this adjustment equates to $1,071,735.

Applying such, a deduction of $1,604,895 from the stabilized value results in a market value of $38,154,064. The calculations are illustrated in the following table.

## SUMMARY OF ADJUSTMENTS

| | | |
|---|---:|---:|
| Stablized Value via Income Approach | | $39,758,958 |
| Free Rent @ Three Months | $533,160 | |
| Leasing Commissions | $1,071,735 | |
| Total Deductions | $1,604,895 | |
| **"As Is" Market Value** | | **$38,154,064** |
| **"As Is" Market Value (Rounded)** | | **$38,200,000** |

Based on such, the "As Is" Value of the Fee Simple Interest in the subject, free and clear of financing, as determined via the Income Approach, as of May 25, 2021, is rounded to:

**THIRTY-EIGHT MILLION TWO HUNDRED THOUSAND DOLLARS**
**($38,200,000)**

## SALES COMPARISON APPROACH

***Introduction***

The Sales Comparison Approach is an estimate of value derived from a comparison of similar properties. This method directly reflects the actions of buyers and sellers in the marketplace. Substitution is the underlying principle affecting the choice of buyers and sellers and implies that a prudent person will not pay more to buy a property than it would cost to buy a comparable substitute property. The price a typical purchaser pays is usually the result of a comparison process of various alternatives.

The subject property, known as 150 West 85th Street, is a recently renovated should building with an above-grade gross building area of 35,544 square feet and 4,621 square feet of cellar space. It is owner occupied by the Manhattan Country School.

The comparative process involves judgment as to the similarity between the subject property and the comparable sale property with regard to a variety of factors affecting value. The following adjustments have been considered:

***Property Rights:*** If a partial interest has been conveyed, the indicated sale price is adjusted to reflect 100% ownership interest. According to public records, full interest has been transferred in all the comparable sales; therefore, no adjustment for ownership interest is required.

***Financing:*** The comparable sales were either all cash or were financed by primary lenders at market rates. Considerate of such, no adjustment for any unusual or atypical financing is required.

***Conditions of Sale:*** Adjustments for conditions of sale usually reflect the motivations of the buyer and the seller. No adjustment has been applied to the sales.

***Expenditures after Purchase:*** None of the comparable sales reported any anticipated expenditures after sale. The subject's most recent sale in 2015 is also analyzed. As previously discussed, the subject property requires an expenditures after purchase deferred maintenance. The developers hard and soft costs total $10,670,462 or $300.20 per square foot.

***Market Conditions:*** Sale No. 1 occurred during the COVID-19 pandemic warranting no adjustment for market conditions. Sale No. 2 & No. 3 occurred prior to the COVID-19 pandemic under superior market conditions. As such, a moderate downward adjustment for market conditions was applied to them.

***Location:*** This adjustment considers relative demand for various locations within the subject's influencing market. Adjustments for location have been made on an individual basis.

***Quality of Construction:*** This adjustment considers the relative quality of construction for each property. Adjustments were made on an individual basis.

***Age/Condition:*** Adjustments have been applied on an individual basis.

***Physical Characteristics:*** A physical characteristics adjustment is

required to account for variations, such as on-site parking, playgrounds and gyms. Adjustments have been made on an individual basis. Also included in this element of comparison is an adjustment for size.

The following is a brief description of the comparable sales considered pertinent in the valuation of the subject property.

## COMPARABLE SALES MAP



*Most Recent Sale of Subject Property*

| | |
|---|---|
| Location: | 150 West 85th Street |
| Borough/Neighborhood: | Manhattan/Upper West Side |
| Block/Lot: | 1215/53 |
| Date of Sale: | January 23, 2015 |
| Grantor: | The New School |
| Grantee: | West 85th Street Owner LLC |
| Consideration: | $28,000,000 |
| Size (Sq. Ft.): | 35,544 (27,044 square feet per NYC Department of Finance) |
| Number of Stories: | 6 |
| Year Built: | 1928/1983/2016 |
| Price per Square Foot: | $787.76 |
| Expenditures After Purchase: | $300.20 |

**Analysis:** This sale represents the January 23, 2015 arm's length sale of the Fee Simple Interest in the subject property. No adjustments are warranted for property rights, financing or conditions of sale. A significant upward adjustment for expenditures after sale was processed for costs to gut renovate and reconfigure the subject which equate to $10,670,462 or $300.20 per square foot. A net neutral adjustment has been applied for market conditions. The subject property was gut renovated to reconfigure the former school into a six-story plus basement, elevator-serviced building which was built-to-suit the Manhattan Country School. No adjustment is required for age/condition. No adjustment has been applied for physical characteristics. Overall, a net neutral adjustment was applied to the market adjusted price suggesting a unit value indication of $1,087.96 per square foot.

*Comparable Sale No. 1*

| | | |
|---|---|---|
| Location: | 510 East 74th Street | |
| Borough/Neighborhood: | Manhattan/Upper East Side | |
| Block/Lot: | 1485/45 | |
| Date of Sale: | November 24, 2020 | |
| Grantor: | Haug Realty Corp. | |
| Grantee: | NY Society Relief Ruptured & Crippled | |
| Consideration: | $28,000,000 | |
| Size (Sq. Ft.): | 14,142 | |
| Number of Stories: | 4 | |
| Year Built: | 1930,/1996/Renov. | |
| Price per Square Foot: | $1,979.92 | |



**Analysis:**   Comparable No. 1 is the November 24, 2020, arm's length sale of the Fee Simple Interest four-story school building with an area of 14,142 square feet. It is located along the south side of East 74th Street between First York Avenue and FDR Drive in the Upper East Side section of Manhattan. No adjustments are warranted for property rights, financing or conditions of sale. This sale occurred during to the Covid-19 pandemic requiring no adjustment market conditions. The comparable's location considered similar warranting no adjustment for location. No adjustment for construction quality is warranted. This comparable was built in 1930 and subsequently renovated and appeared to be in very good condition at the time of sale; therefore, no adjustment was applied for age/condition. The school is significantly smaller than the subject warranting a moderate downward adjustment. Overall, a downward adjustment was applied to the market adjusted price resulting in a unit value indication of $1,781.93 per square foot.

## *Comparable Sale No. 2*



| | |
|---|---|
| Location: | 3 East 89th Street |
| Borough/Neighborhood: | Manhattan/Upper East Side |
| Block/Lot: | 1501/5 |
| Date of Sale: | June 4, 2019 |
| Grantor: | National Academy of Design |
| Grantee: | 3 East 89 Holdings |
| Consideration: | $22,300,000 |
| Size (Sq. Ft.): | 15,512 |
| Number of Stories: | 3 |
| Year Built: | 1915/Renov. |
| Price per Square Foot: | $1,437.60 |

**Analysis:**   Comparable No. 2 is the June 4, 2019, arm's length sale of the Fee Simple Interest of a three-story school building with an area of 15,512 square feet. It is located along the north side of East 89th Street between Fifth and Madison Avenue in the Upper East Side section of Manhattan. No adjustments are warranted for property rights, financing or conditions of sale. This sale occurred prior to the Covid-19 pandemic requiring a downward adjustment for market conditions. The comparable's location considered superior warranting a downward adjustment for location. No adjustment for construction quality is warranted. This comparable was built in 1913 and subsequently renovated and was in very good condition at the time of sale; therefore, no adjustment was applied for age/condition. This comparable is significantly smaller than the subject warranting a downward adjustment for physical characteristics is warranted. Overall, a significant adjustment was applied to the market adjusted price resulting in a unit value indication of $1,092.57 per square foot.

*Comparable Sale No. 3*

| | | |
|---|---|---|
| Location: | 351 East 74th Street |  |
| Borough/Neighborhood: | Manhattan/Upper East Side | |
| Block/Lot: | 1449/20 | |
| Date of Sale: | February 20, 2019 | |
| Grantor: | Bohemian Brethren Presbyterian Church | |
| Grantee: | The Rector Church Wardens and Vestrymen of the Church | |
| Consideration: | $22,562,500 | |
| Size (Sq. Ft.): | 31,484 | |
| Number of Stories: | 4 | |
| Year Built: | 1910 | |
| Price per Square Foot: | $716.63 | |

**Analysis:**     Comparable No. 3 is the February 20, 2019, arm's length sale of the Fee Simple Interest of a five-story church building with an area of 31,484 square feet. Prior to the sale, the building has been leased to Epiphany Community Nursery School. The school abruptly closed in January 2020 amid financial difficulties. The NOY from the last full year of income suggested an implied OAR of 1.76%. It is located along the north side of East 74th Street between First and Second Avenue in the Upper East Side section of Manhattan. No adjustments are warranted for property rights, financing or conditions of sale. This sale occurred prior to the Covid-19 pandemic requiring a downward adjustment for market conditions. The comparable's location considered similar requiring no adjustment for location. No adjustment for construction quality is warranted. This comparable was built in 1900 and an appeared to be in average condition at the time of sale; as such, a significant upward adjustment was applied for age/condition. No adjustment required for physical characteristics. Overall, an upward adjustment was applied to the market adjusted price resulting in a unit value indication of $782.92 per square foot.

## ANALYSIS OF COMPARABLE SALES

| Sale No. | Subject Property | 1 | 2 | 3 |
|---|---|---|---|---|
| **PROPERTY INFORMATION** | | | | |
| Address | 150 West 85th Street | 510 East 74th Street | 3 East 89th Street | 351 East 74th Street |
| City | New York | New York | New York | New York |
| State | NY | NY | NY | NY |
| Sub-Market | Upper West Side | Upper East Side | Upper East Side | Upper East Side |
| Block/Lot | 1215/ 53 | 1485/ 45 | 1501/ 5 | 1449/ 20 |
| Gross Building Area (Sq. Ft.) | 35,544 | 14,142 | 15,512 | 31,484 |
| Year Built/Renovated | 1928/1983/2016 | 1930/1996 | 1915/Renov. | 1910 |
| Construction Quality | Good | Good | Good | Good |
| Condition of Improvements | Excellent | Very Good | Very Good | Average |
| **TRANSACTION INFORMATION** | | | | |
| Date of Sale | January 23, 2015 | November 24, 2020 | June 4, 2019 | February 20, 2019 |
| Property Rights Conveyed | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Grantor | The New School | Haug Realty Corp | National Academy of Design | Bohemian Brethren Presbyterian Church |
| Grantee | West 85th Street Owner LLC | NY Society Relief Ruptured & Crippled | 3 East 89 Holdings | The Rector Church Wardens and Vestrymen of the Church |
| Property Record No. | 2015013000378002 | 2020120701111003 | 2019060700957001 | 2019022500094001 |
| Sale Price | $28,000,000 | $28,000,000 | $22,300,000 | $22,562,500 |
| Sale Price Per PSF | $787.76 | $1,979.92 | $1,437.60 | $716.63 |

| | Subject Property Qual. | Subject Property Quant. | 1 Qual. | 1 Quant. | 2 Qual. | 2 Quant. | 3 Qual. | 3 Quant. |
|---|---|---|---|---|---|---|---|---|
| **TRANSACTIONAL ADJUSTMENTS** | | | | | | | | |
| Unadjusted Unit Price | | $787.76 | | $1,979.92 | | $1,437.60 | | $716.63 |
| Real Property Rights Adj. | Same | $0.00 | Same | $0.00 | Same | $0.00 | Same | $0.00 |
| Adjusted Price | | $787.76 | | $1,979.92 | | $1,437.60 | | $716.63 |
| Financing Adjustment | None | $0.00 | None | $0.00 | None | $0.00 | None | $0.00 |
| Adjusted Price | | $787.76 | | $1,979.92 | | $1,437.60 | | $716.63 |
| Conditions of Sale Adj. | Arms-Length | $0.00 | Arms-Length | $0.00 | Arms-Length | $0.00 | Arms-Length | $0.00 |
| Adjusted Price | | $787.76 | | $1,979.92 | | $1,437.60 | | $716.63 |
| Expenditures After Purchase | None | $300.00 | None | $0.00 | None | $0.00 | None | $0.00 |
| Adjusted Price | | $1,087.96 | | $1,979.92 | | $1,437.60 | | $716.63 |
| Market Conditions | Similar | 0.0% | Similar | 0.0% | Superior | -5.0% | Superior | -5.0% |
| Transactional Adjusted Price PSF | | $1,087.96 | | $1,979.92 | | $1,365.72 | | $680.80 |
| **PROPERTY ADJ.** | | | | | | | | |
| Location | Similar | 0% | Similar | 0% | Superior | -10% | Similar | 0% |
| Construction Quality | Similar | 0% | Similar | 0% | Similar | 0% | Similar | 0% |
| Age & Condition | Similar | 0% | Similar | 0% | Similar | 0% | Inferior | 15% |
| Physical Characteristic | Similar | 0% | Smaller | -10% | Smaller | -10% | Similar | 0% |
| Overall Property Adjustment | | 0% | | -10% | | -20% | | 15% |
| **Indication Price Per Sq. Ft.** | | **$1,087.96** | | **$1,781.93** | | **$1,092.57** | | **$782.92** |

***Analysis of Sales***

The sales exhibit an unadjusted range of $716.63 to $1,979.92 per square foot. After making the aforementioned adjustments, the comparable sales indicate a range of $782.92 to $1,781.93 per square foot with the subject's adjusted purchase price indicating $1,088 per square foot. The comparable sales average $1,186.34 per square foot, within $100 of the subject's adjusted sale price. The upper end of the range reflected by the Hospital for Special Surgery's acquisition of 510 East 74th Street. They acquired the adjacent property in a separate transaction. Due to the proximity of this sale to the HSS's campus, buyer motivation likely attributed to the elevated sale prices. This sale is given limited consideration. Based on the analysis of the comparables, a unit value of $1,100 per square foot is concluded. Based upon the subject property's current above grade gross building area of 35,544 square feet, a value indication of $39,098,400 is concluded ($1,100 per square foot x 35,544 square feet).

35,544 square feet @ $1,100 per square foot = $39,098,400

***"As Is" Adjustments***
***Deduction for Lease Up***

The aforementioned value is reflective of the subject as if it were fully occupied; as such, deductions are required for certain rent losses and concessions. As discussed in the *Market Rent Analysis* section of this report, it is anticipated that the future tenants will receive three months free rent. This equates to a deduction of $533,160. In addition, a deduction for leasing commissions needs to be considered.

***Leasing Commissions***

Full commissions, applied to space leased to new tenants is based upon a brokerage fee calculated on the following percentage of annual contract rent: Year 1, 5.0%; Year 2, 4.0%; Years 3-5, 3.5%; Years 6-10, 2.5% and 2.0% thereafter. Based on such, this adjustment equates to $1,071,735.

Applying such, a deduction of $1,604,895 from the stabilized value results in a market value of $37,493,505. The calculations are illustrated in the table below:

### SUMMARY OF ADJUSTMENTS

| | | |
|---|---:|---:|
| Prospective Value Upon Completion | | $39,098,400 |
| Free Rent @ Three Months | $533,160 | |
| Leasing Commissions | $1,071,735 | |
| Total Deductions | $1,604,895 | |
| **"As Is" Market Value** | | **$37,493,505** |
| **"As Is" Market Value (Rounded)** | | **$37,500,000** |

Based on such, the "As Is" Market Value of the Fee Simple Interest in the subject, free and clear of financing, as determined via the Sales Comparison Approach, as of May 25, 2021, is rounded to:

**THIRTY SEVEN MILLION FIVE HUNDRED THOUSAND DOLLARS**
**($37,500,000)**

## RECONCILIATION AND FINAL ESTIMATE OF VALUE

*Review*

The purpose of this assignment was to estimate the "As Is" Market Value of the Fee Simple Interest in the subject property, as of May 25, 2021, the date the property was inspected. The indicated Market Value estimates are summarized as follows:

| | |
|---|---|
| *Income Approach* | $38,200,000 |
| *Sales Comparison Approach* | $37,500,000 |
| *Cost Approach* | Not Performed |

*The Income Approach*

The Income Capitalization Approach is a process in which the anticipated flow of future benefits is discounted to a present worth through a capitalization process. The Income Capitalization Approach is widely applied in appraising income-producing properties. As the subject is expected to generate a revenue stream, this valuation approach is directly applicable. The Income Capitalization Approach is usually the primary value indicator for income producing properties. Although the subject was purchased for owner occupancy, the value conclusion derived by this approach has been substantial weight.

*The Sales Comparison Approach*

The Sales Comparison Approach is an estimate of value based upon a process of comparing recent sales of similar properties in the surrounding or competing area to the subject property. Inherent in this approach is the principle of substitution. The application of this approach consists of comparing the subject property to similar properties of the same general type, which have been sold recently or currently are available for sale in competing areas. The estimated value through this approach represents the probable price at which a willing seller would sell the subject property to a willing and knowledgeable buyer as of the date of value. While there was adequate sales activity of similar buildings within the influencing market to develop an opinion a reliable indication of value, none of the comparable sales truly reflected the subject's renovated condition and utility. While generally supportive of the Income Approach, the Sales Comparison Approach is given secondary weight.

*The Cost Approach*

The application of the Cost Approach is based on the principle of substitution. This principle may be stated as follows: no one is justified in paying more for a property than that amount by which he or she can obtain, by purchase of a site and construction of a building, without undue delay, a property of equal desirability and utility. In the case of a new building, no deficiencies in the building should exist.

In the case of income-producing real estate, the cost of construction plays a minor and relatively insignificant role in determining value. The Cost Approach is typically only a reliable indicator of value for (a) new properties (b) special use properties and (c) where the cost of reproducing the improvements is easily and accurately quantifiable and there is no economic obsolescence.

Although the property was recently gut renovated, it was originally built in 1928 and represents an over-improvement relative to current zoning. Due to these factors, the Cost Approach has not been developed. Elements of the Cost Approach have been utilized in the development of an insurable value estimate.

***"As Is" Value***

Based on the investigation and analysis contained herein, the "As Is" Market Value of the Fee Simple Interest in the subject property, as of May 25, 2021, is:

**THIRTY EIGHT MILLION DOLLARS**
**($38,000,000)**