Richard J. McCord, Esq.
Robert D. Nosek, Esq.
CERTILMAN BALIN ADLER & HYMAN, LLP
Attorneys for U.S. Bank National Association,
As Trustee and Flushing Bank
90 Merrick Avenue
East Meadow, New York 11554
Telephone: (516) 296-7000
Facsimile: (516) 296-7111

**Hearing Date: May 20, 2025**
**Time:  10:00 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

In re:

MANHATTAN COUNTRY SCHOOL,
a/k/a MANHATTAN COUNTRY SCHOOL, INC.,

Debtor.
-----------------------------------------------------------------X

Chapter 11

Case No. 25-11009 (DSJ)

**OBJECTION OF FLUSHING BANK AND U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, TO EMERGENCY MOTION FOR THE ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO SECTION 364(d) OF THE BANKRUPTCY CODE (A) AUTHORIZING THE DEBTOR TO OBTAIN DEBTOR-IN-POSSESSION FINANCING (B) GRANTING SECURITY INTERESTS AND PRIORITY CLAIMS, (C) APPROVING AGREEMENT RELATING TO THE FOREGOING (D) GRANTING RELATED RELIEF, AND (E) SCHEDULING A FINAL HEARING ON THE MOTION PURSUANT TO BANKRUPTCY RULE 4001(C)**

**FLUSHING BANK** ("**Flushing**" or the "**Bondholder**") and **U.S. BANK NATIONAL ASSOCIATION, solely in its capacity as Trustee for the Series 2016 Bonds (defined below) and as directed by Flushing as beneficial owner of 100% of the Series 2016 Bonds,** (the "**Bond Trustee**", and collectively with Flushing, the "**Secured Creditors**"), by and through their attorneys, Certilman Balin Adler & Hyman, LLP, for their objection to the motion [ECF Doc. No. 2] (the "**Motion**") by Manhattan Country School a/k/a Manhattan Country School, Inc. (the "**Debtor**") seeking the entry of an Order pursuant to section 105 and section 364(d) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "**Bankruptcy Code**") and

**Error! Unknown document property name.**

8547050.13

Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") (a) authorizing the Debtor to obtain debtor-in-possession financing, (b) granting a superpriority security interest, (c) approving the agreements related to the foregoing, and (d) granting related relief, respectfully states as follows:

**Preliminary Statement**

1. The Debtor has not initiated this case in good faith, engaging in improper transfers of control and property days before its bankruptcy petition and failing to engage with its secured creditors before moving for extraordinary relief in the form of superpriority DIP financing. By its Motion, the Debtor seeks approval of priming liens seeking to leapfrog existing non-consenting secured creditors without even putting forth a budget and without any credible evidence of adequate protection.

2. The Debtor admits its improper conduct on the second page of the Motion when it brazenly states that "The Debtor acquired the Property from West 85th Owner LLC, an entity wholly owned and controlled by the Debtor, just prior to commencing this Bankruptcy Case." Mot. 2, n. 1. West 85th Street Owner LLC ("**West 85th Owner**"), the Debtor's wholly owned subsidiary, is the record holder of title in real property known as and located at 150 West 85th Street a/k/a 150/156 West 85th Street, New York, New York; Borough: Manhattan, Block: 1215, Lot: 53 (the "**Schoolhouse**").[1]

3. The Motion is "supported" by the Declaration of Kiran Kulkarni (the "**Kulkarni Declaration**"), a copy of which is annexed to the Motion, which Declaration lays bare the

---

[1] A copy of the current status of land records for New York County is annexed hereto as **Exhibit A**, along with a copy of the most recently recorded deed reflecting ownership of the Schoolhouse by West 85th Owner since 2015 annexed hereto as **Exhibit B**.

2

**Error! Unknown document property name.**

8547050.13

Pg 3 of 17

problems with the Motion. The Kulkarni Declaration provides no support to justify the relief sought in the Motion but rather demonstrates why the relief sought is improper. First, it appears that Kiran Kulkarni, the Chief Executive Officer of the proposed lending group, has seized control of the Debtor's Board of Trustees. *See* Kulkarni Dec. 1; *see also* Debtor's Statement of Financial Affairs, Question 28. A copy of the Debtor's Statement of Financial Affairs is annexed hereto as **Exhibit "D."** Moreover, the Motion seeks emergency interim relief for the next four months, apparently in a bid to fund operations through the beginning of the next school year. Mot. 3. Yet Kulkarni admits that the Debtor's current school year ends in approximately four weeks. *Id.* Kulkarni also admits that the reason no other financing could be found is because "the Debtor was not only insolvent but about to close its doors." Mot. 5.

4. Shockingly, with an admission that the school was about to close, Kulkarni further admits that the Debtor used "student deposits for the upcoming school year." *Id.* Kulkarni states that total student deposits used by the Debtor in the three months prior to the Filing Date totaled "$912,337 which was clearly insufficient to sustain operations." *Id.* It stretches credulity to believe that parents, relatives and benefactors who willingly paid tuition deposits for the upcoming school year had a full appreciation of the fact that the school was on the verge of imminent closure and may not be operating in the fall. While it is not currently apparent whether Kulkarni was involved in the decision to use those monies during such a precarious time, it is reasonably to question his business judgment when he seeks to justify that use notwithstanding the insolvency of the Debtor. *Id.* ("Using student deposits from the upcoming school year to pay for operating expenses is a standard practice in this industry.").

5. For unexplained reasons, the Debtor rushes into the Court with the Motion to borrow money, but files no other "first day" motions, such as permission to use cash collateral,

**Error! Unknown document property name.**
8547050.13

continue insurance, pay employee wages and benefits, address utilities issues, and/or maintain cash management systems. Of particular note is the absence of a motion to use cash collateral. The Debtor's schedules reflect bank accounts holding $82,351.44 and accounts receivable of 90 days old or less totaling $105,765.00 as potential proceeds. The bank accounts and proceeds from accounts receivable are cash collateral over which the Secured Creditors hold perfected liens, yet the Debtor does not seek permission to use such amounts or provide adequate protection to the Secured Creditors for any such usage.

6. The Motion and Kulkarni Declaration also omit important information that should accompany any sustainable request for emergency financing that will prime existing secured debt. Requests for debtor in possession financing routinely are accompanied by a detailed budget so that the Court, the Office of the United States Trustee, the creditors and other parties in interest can see what the Debtor seeks to use the money to be borrowed for. None is provided here. Moreover, there is no description of the Debtor's revenue generation model, which upon information and belief, has not been working for years.

7. The emergency need for financing is also not supported. The Debtor's response to question number 1 on its Statement of Financial Affairs reflects that the Debtor's gross revenue for fiscal year 2023 totaled $6,387,913.00, for fiscal year 2024 totaled $6,281,262.00, and for fiscal year 2025, which still has a month and a half remaining, totaled $6,276,019.00. The foregoing is in addition to the Debtor's non-business revenue, which amounted to an additional $2,681,205.00 for fiscal year 2024, and through the Petition Date for the current fiscal year, $2,375,000.00. Kulkarni asserts in his Declaration that monthly costs will drop to under $500,000 per month starting in July 2025, with his assumption that the allegedly $1,000,000 of operating costs for the Farm Real Property can be transitioned to a lessee. If the foregoing cost-cutting measures are

4

accurate, there appears to be little to no need for such a large borrowing if the Debtor is still on track and anticipated to bring in business revenue above $6,000,000.00 and non-business revenue above $2,000,000.

8.   In addition, the scheduled value of the Farm Real Property, referenced below, would cover any borrowings needed for the debtor to complete this school year which ends in approximately four weeks.  The Motion and Declaration reflect a value for those properties at $1,692,000.00, which by the Debtor's, and Kulkarni's as signatory, own admission sufficiently collateralizes the majority of the amount sought on an interim basis.  Accordingly, there was no need to fraudulently convey the Schoolhouse to the Debtor on the eve of bankruptcy.  Likewise, there is also no immediate need to prime the liens and security interests of the existing non-consenting Secured Creditors.

9.   Except for some inconsistent interest payments to the Trustee totaling $354,026.74 made during a forbearance period between December 2023 and July 2024, the Trustee has not received payments in more than two years with the Debtor and West 85th Owner ultimately defaulting on that forbearance agreement.  Total payments received by Flushing over the past five (5) years on the Credit Line Loan was only $336,981.52.  Thus, on an indebtedness in excess of $24,000,000.00, the Secured Creditors effectively involuntarily funded the Debtor's operational shortfalls during that lengthy period of time.

10.  The Debtor also fails to adequately address the status or value of property referred to as the "farm in Roxbury, NY" that the Debtor "owns and operates[.]"  Kulkarni Dec. 10.  The Debtor does include the farm's real property located at 3536 New Kingston Mountain Road, Roxbury, NY, which, upon information and belief, is actually comprised of two distinct non-contiguous parcels of real property (collectively, the "**Farm Real Property**").  One parcel is a

5

residence located at 3217 New Kingston Mountain Road, Roxbury, NY containing 3+ acres of land and the residential structure. The other parcel is the farm property containing 160 acres of land with a farmhouse and multiple other structures. The Debtor lists the Farm Real Property in its Schedule A/B with a value of $1,692,000.00, with no corresponding secured claim against that property listed on Schedule D. A copy of the Debtor's Schedules is annexed hereto as **Exhibit "C."** With respect to the personal property of the Debtor, both of the Secured Creditors have a lien on such assets, reflected in UCC financing statements which include the various personal property assets the Debtor schedules. The Debtor does not appear to acknowledge those perfected security interests in its Schedules.

11.     The Court should therefore not only deny the Motion as it seeks to impose a superpriority lien on real property it does not legitimately own and fails to adequately protect the Secured Creditors, but should also dismiss this case as a bad faith filing or immediately appoint a chapter 11 trustee or examiner. Such relief beyond denial of the Motion will be sought by separate motion, but the Secured Creditors believe strongly that this case should not move forward, at least not under the control of Kulkarni.

### Background

12.     On May 16, 2025 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtor operates a Kindergarten through 8th grade private school on the Schoolhouse premises and at a farm at the Farm Real Property, which is in a small town in Delaware County southwest of Albany, New York. As explained in detail below, the Schoolhouse, but not the Farm Real Property, is encumbered by several mortgages given by West 85th Owner to the Secured Creditors in connection with certain borrowings by West 85th Owner and the Debtor as guarantor and/or co-

6

**Error! Unknown document property name.**

8547050.13

borrower in 2016 and 2017.

13. The Motion seeks authority for the Debtor to borrow up to an initial $2,000,000.00 for the next four months on an interim basis from "Casa Laxmi SA or NSI SA, entities working in affiliation with the Casa Laxmi Foundation and the Nayan Shah Foundation" (the "**DIP Lender**"), and a further borrowing on a final basis of up to $6,000,000.00, for a total debtor in possession loan of up to $8,000,000.00 (the "**DIP Loan**"). Mot. ¶ 9. The DIP Loan is to be collateralized by superpriority liens and security interests in all of the Debtor's real and personal property. *Id.* at 9, 11. The Debtor attaches two documents that look more akin to term sheets than formal loan documents, and the terms of the proposed financing are not well established . *See* Mot. Ex. A.

**Existing Secured Obligations of the Debtor**

14. As of the Petition Date, the Debtor, as guarantor, was indebted to the Bond Trustee on the Series 2016 Bonds (defined below) in the secured principal amount of approximately $21,000,000, plus accrued interest and costs, and with its co-borrower, West 85th Owner, to Flushing on the Credit Line Loan (defined below) in the secured principal amount of $2,999,999.00, plus accrued interest and costs. The Debtor does not dispute that the Debtor borrowed the principal amounts loaned and that the Secured Creditors hold valid, perfected security interests in the assets of the Debtor and West 85th Owner.[2]

**The Bond Note Obligations**

15. Build NYC Resource Corporation (the "**Issuer**") issued its Revenue Bonds (Manhattan Country School Project), Series 2016 Bonds dated April 7, 2016, in the aggregate principal amount of $22,000,000.00 (the "**Series 2016 Bonds**") to finance a portion of the costs

---

[2] Documents evidencing the bond funding and the credit line loan are voluminous. The Secured Creditors attach the most relevant documents hereto with the other documents available upon request.

7

**Error! Unknown document property name.**

8547050.13

of the West 85th Owner's acquisition, construction and renovation of the improvements located at the Schoolhouse for the operations of the Debtor's school programs.

16. The Series 2016 Bonds were issued pursuant to, and subject to the terms, covenants and conditions of, that certain Indenture of Trust, dated as of April 1, 2016 (as the same has been or may in the future be amended, restated, supplemented or otherwise modified from time to time, the "**Original Indenture**"), by and between the Issuer and the Bond Trustee.

17. Contemporaneously with the execution of the Original Indenture, the Issuer agreed to loan the proceeds of the Series 2016 Bonds to West 85th Owner (the "**Issuer Loan**") pursuant to a certain Loan Agreement, dated as of April 1, 2016 (as the same has been or may in the future be amended, restated, supplemented or otherwise modified from time to time, the "**Issuer Loan Agreement**"), by and between the Issuer and West 85th Owner and which Loan is evidenced by the West 85th Owner's Note dated as of April 1, 2016, in the principal amount of $22,000,000.00 (the "**Issuer Note**").

18. The Series 2016 Bonds and the Issuer Note are further secured in part by a certain Mortgage and Security Agreement (Acquisition Loan) in the secured principal amount of $14,676,616.00 and a Mortgage and Security Agreement (Building Loan) in the secured principal amount of $7,323,384.00, each dated as of April 1, 2016 (as the same may be amended, restated, supplemented, or otherwise modified from time to time, collectively, the "**Trustee Mortgage**"), from the West 85th Owner to the Issuer and Trustee, with respect to the Mortgaged Premises.

19. The obligations of the West 85th Owner under the Issuer Loan Agreement have been guaranteed by the Debtor, pursuant to its Guaranty Agreement dated as of April 1, 2016 (the "**Guaranty**"; the Series 2016 Bonds, the Issuer Loan Agreement, the Issuer Note, the Trustee Mortgage, the Guaranty and any and all documents, instruments and agreements related to the

8

foregoing and any and all amendments, modifications or supplements to any of the foregoing being individually each a "**Bond Document**" and, collectively, the "**Bond Documents**"). A copy of the Guaranty is annexed hereto as **Exhibit "E."**

20. The Series 2016 Bonds were purchased by Flushing. In order to induce Flushing to purchase the Series 2016 Bonds, the West 85th Owner, the Debtor and Flushing entered into that certain Bond Purchase and Continuing Covenants Agreement (the "**Bond Purchase Agreement**"), dated as of April 7, 2016.

21. At the request of West 85th Owner and with the consent of Flushing, on or about June 1, 2020, the Issuer and the Trustee entered into a Supplement to the Indenture (the "**Supplemental Indenture of Trust**") pursuant to which the amortization and payment schedules to the Bond were revised and amended to grant West 85th Owner a six (6) month payment forbearance.

22. At the request of West 85th Owner and with the consent of Flushing, on or about December 30, 2020, the Issuer and the Trustee entered into a Second Supplement to the Indenture (the "**Second Supplemental Indenture of Trust**"; the Original Indenture, the Supplemental Indenture of Trust and the Second Supplemental Indenture of Trust being collective the "**Indenture**") pursuant to which the amortization and payment schedules to the Bond were revised and amended to grant West 85th Owner a twelve (12) month reduction in the payments otherwise payable.

23. On or about September 1, 2022, Flushing, West 85th Owner and the Debtor entered into a Forbearance Agreement with respect to the Bond Purchase Agreement ("**September 2022 Forbearance Agreement**") wherein, among other things, (i) West 85th Owner and the Debtor acknowledged that they had defaulted under the Bond Documents and the Bond Purchase

9

Agreement and that as of July 1, 2022, the principal amount owed on the Bond Note was $21,083,477.98, together with accrued interest, attorneys' fees, costs and expenses; (ii) Flushing would forbear until 9:00 a.m., January 2, 2023 from exercising its rights to direct the Trustee to accelerate the total debt due under the Bond Documents; and (iii) reaffirm the Debtor's Guaranty.

24. On or about October 1, 2023, Flushing, West 85th Owner and the Debtor entered into another Forbearance Agreement with respect to the Bond Purchase Agreement ("**October 2023 Bonds Forbearance Agreement**") wherein, among other things, (i) West 85th Owner and the Debtor acknowledged that they had defaulted under the Bond Documents and the Bond Purchase Agreement and that as of July 1, 2022, the principal amount owed on the Bond Note was $21,083,477.98, together with accrued interest, attorneys' fees, costs and expenses; (ii) Flushing would forbear until 9:00 a.m., July 1, 2024 from exercising its rights to direct the Trustee to accelerate the total debt due under the Bond Documents; (iii) commencing on October 1, 2023 and for every month thereafter through March 1, 2024, West 85th Owner and the Debtor were required to pay $66,626.35 per month to the Trustee, and from April 1, 2024, and every month thereafter, pay to the Trustee the sum of $59,004.46 per month, subject to an initial deduction of $45,731.36 of outstanding fees and expenses of the Trustee and the Trustee's counsel; and (iv) reaffirm the Debtor's Guaranty. A copy of the October 2023 Bonds Forbearance Agreement is annexed hereto as **Exhibit "F."**

**Flushing Bank Credit Loan**

25. On or about June 23, 2017, the Debtor and West 85th Owner borrowed money from Flushing under a credit line loan (the "**Credit Line Loan**") and issued a Credit Line Promissory Note to Flushing in the principal amount of Two Million Five Hundred Thousand and 00/100 ($2,500,000.00) ("**Note One**").

10

26. On or about June 23, 2017, for the purpose of further securing payment of the indebtedness to Flushing under the said Note One, the West 85th Owner, as mortgagor, executed, acknowledged and delivered to Flushing, as mortgagee, a certain Credit Line Mortgage and Security Agreement, wherein and whereby, the West 85th Owner, as mortgagor, mortgaged to Flushing, as mortgagee, the Mortgaged Premises, as more particularly described in said mortgage ("**Mortgage One**"). The Mortgage One was duly recorded on July 27, 2017 in the Office of the City Register of New York County, CRFN: 2017000276247.

27. On or about February 6, 2019, for the purpose of evidencing an increased credit line indebtedness to Flushing, the Debtor and West 85th Owner issued a restated note in the increased amount of Two Million Nine Hundred Ninety-Nine Thousand Nine Hundred Ninety-Nine and 00/100 ($2,999,999.00) (the "**Restated Note**").

28. On or about February 6, 2019, for the purpose of further securing payment of the increased indebtedness to Flushing in the principal sum of $499,999.00 dollars with interest and other sums due thereunder, and to consolidate said sum with Mortgage One to form a single lien on the Mortgaged Premises securing the Restated Note in the principal sum of Two Million Nine Hundred Ninety-Nine Thousand Nine Hundred Ninety-Nine and 00/100 ($2,999,999.00) Dollars, as more fully set forth in said instrument, the Real Estate Debtor, as mortgagor, executed, acknowledged and delivered to Flushing, as mortgagee, a certain Credit Line Mortgage, Consolidation and Modification Agreement wherein and whereby, the West 85th Owner, as mortgagor, mortgaged to Flushing, as mortgagee, the Mortgaged Premises, which Mortgaged Premises are more particularly described in said mortgage, and which description appears in Schedule A (the "**Consolidated Mortgage**"). The Consolidated Mortgage was duly recorded on February 19, 2019 in the Office of the City Register of New York County, CRFN: 2019000054792.

29. On or about June 23, 2017, the West 85th Owner duly executed and delivered to Flushing an Assignment of Leases and Rents (the "**2017 Assignment of Leases**") which 2017 Assignment of Leases was duly recorded on July 27, 2017, in the office of the City Register of New York County in CRFN: 2017000276248.

30. On or about February 6, 2019, the West 85th Owner duly executed and delivered to Flushing an Assignment of Leases and Rents (the "**2019 Assignment of Leases**") which Assignment of Leases was duly recorded on February 19, 2019, in the office of the City Register of New York County in CRFN: 2019000054793.

31. Flushing is the owner and holder of the Restated Note, Consolidated Mortgage, and related loan documents (collectively "**Credit Line Loan Documents**").

32. The Consolidated Mortgage has second priority on the Mortgaged Property behind the Trustee Mortgage.

33. On or about June 1, 2020, with regard to the Credit Line Loan, Flushing and West 85th Owner and the Debtor entered into a Note Modification and Deferment Agreement (the "**June 2020 Deferment Agreement**") wherein, among other things, because of the Novel Coronavirus (COVID-19) outbreak, certain interest payments on the Restated Note would be deferred (the "**Deferred Amount**"), with the recommencement of regularly scheduled payments of interest accruing after November 30, 2020 to occur as of January 1, 2021, and the Deferred Amount to be paid in full on July 1, 2022.

**Forbearance Agreements**

34. On or about September 1, 2022, with regard to the Credit Line Loan, Flushing and West 85th Owner and the Debtor entered into a Forbearance Agreement (the "**September 2022 Forbearance Agreement**") wherein, among other things, (a) West 85th Owner and the Debtor

12

**Error! Unknown document property name.**

8547050.13

acknowledged being in default of their obligations under the Credit Line Loan Documents and that as of July 1, 2022, the principal amount owed on the Credit Line Note was $2,999,999.00, together with accrued interest, attorneys' fees, costs and expenses; (b) Flushing would forbear until 9:00 a.m., January 2, 2023 from exercising its rights to accelerate the total debt due under the Credit Line Loan Documents; and (c) the Debtor was to provide additional monthly financial reporting and additional business and financial information in addition to all reporting required under the Credit Line Loan Documents.

35. On or about January 2, 2023, Flushing and West 85th Owner and the Debtor entered into a Forbearance Agreement (the "**January 2023 Forbearance Agreement**") wherein, among other things, (a) West 85th Owner and the Debtor acknowledged being in default of their obligations under the Credit Line Loan Documents and that as of July 1, 2022, the principal amount owed on the Credit Line Note was $2,999,999.00, together with accrued interest, attorneys' fees, costs and expenses; (b) Flushing would forbear until 9:00 a.m., April 3, 2023 from exercising its rights to accelerate the total debt due under the Credit Line Loan Documents; and (c) the Debtor was to continue to provide additional monthly financial reporting and additional business and financial information in addition to all reporting required under the Credit Line Loan Documents.

36. On or about October 1, 2023, Flushing and West 85th Owner and the Debtor entered into a Forbearance Agreement for the Credit Line Loan (the "**October 2023 CLL Forbearance Agreement**") wherein, among other things, (i) West 85th Owner and the Debtor acknowledged that they had defaulted under the Credit Line Loan Documents and that as of July 1, 2022, the principal amount owed on the Credit Line Loan Note was $2,999,999.00, together with accrued interest, attorneys' fees, costs and expenses; (ii) Flushing would forbear until 9:00 a.m., July 1, 2024 from exercising its rights to accelerate the total debt due under the Credit Line Loan

Documents; (iii) pay on or before December 31, 2023 the sum of $48,291.67 and thereafter commencing on January 1, 2024 make monthly interest payments at the non-default rate set forth in the Credit Line Note; and (vi) the Debtor was to continue to provide additional monthly financial reporting and additional business and financial information in addition to all reporting required under the Credit Line Loan Documents. A copy of the October 2023 CLL Forbearance Agreement is annexed hereto as **Exhibit "G."**

37. Thereafter, West 85th Owner and the Debtor defaulted on their obligations under the June 2020 Deferment Agreement, October 2023 CLL Forbearance Agreement, and the Restated Note and Consolidated Mortgage.

**Foreclosure Proceedings**

38. As a result, on or about October 7, 2024, Flushing filed a complaint (the "**Foreclosure Complaint**") against the Debtor and West 85th Owner in the Supreme Court of the State of New York, County of New York (the "**State Court**"), Index No. 850377/2024. A copy of the Foreclosure Complaint is annexed hereto as **Exhibit "H."** A fully briefed motion for summary judgment (the "**Summary Judgment Motion**") on the relief sought in the Foreclosure Complaint and to appoint a referee to compute amounts owed has been pending before and awaiting ruling by the State Court since March 27, 2025.

**Relief Sought**

39. The Debtor seeks to obtain post-petition debtor in possession financing in an amount up to $8,000,000.00, with up to $2,000,000.00 borrowed on an interim basis, collateralized with a superpriority lien above the Trustee Mortgage and the Consolidated Mortgage under Section 364(d)(1) of the Bankruptcy Code.

40. Section 364(d)(1) provides that "the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

    (A) The trustee is unable to obtain such credit otherwise; and

    (B) There is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."

11 U.S.C. § 364(d)(1).

41. Granting a lien under Section 364(d)(1) on a priming basis senior to existing liens is an extraordinary remedy "and is allowed only as a last resort." *In re YL West 87th Holding I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010).

42. The debtor has the burden of establishing that the secured creditors are adequately protected when it seeks to prime existing liens on property of a debtor's estate. *See* 11 U.S.C. 364(d)(2); *Id.*; *see also Resolution Trust Corp. v. Swedeland Dev.'p Group, Inc. (In re Swedeland Dev'p Group, Inc.)*, 16 F.3d 552, 565 (3d Cir. 1994) ("A debtor has the burden to establish that the holder of the lien to be subordinated has adequate protection.").

43. The Court should deny outright such requested priming lien because the Debtor has failed to establish that the Secured Creditors are adequately protected. The Real Property is not really property of the Debtor's bankruptcy estate. As such any purported equity cushion does not really belong to the Debtor and cannot justify providing the Secured Creditors with adequate protection for the Debtor's obligations. At best, the Debtor allegedly obtained title to the Schoolhouse property through a fraudulent conveyance on the eve of filing orchestrated by one of the leaders of the proposed DIP Lender, Kulkarni.

44. Furthermore, none of the funding from the DIP Loan is being loaned to the West 85th Owner or being utilized by the Debtor to pay the West 85th Owner for the use and occupancy of the Schoolhouse. All of the loan is devoted to undisclosed non-real estate post-petition operating costs of the Debtor, with a specific exclusion of any payment to or on behalf of the West 85th Owner for use of the school facility or otherwise.

45. Separately, upon information and belief, the Debtor holds title to the Farm Real Property, with that property not currently encumbered by either the Trustee Mortgage or the Consolidated Mortgage. The Debtor scheduled the value of the Farm Real Property at $1,692,000.00, the Debtor did not schedule any secured claims against that property and, upon information and belief, the Delaware County land records do not reflect any encumbrances upon that property.

46. Because of the apparent attempt to seize control of the Debtor's Board of Trustee, failure to be up front with the Court and the Debtor's creditors in the submissions to the Court to date, improper usage of next year's student tuition deposits and similar bad faith acts, including attempting to forestall the Foreclosure Action by improperly and without authorization transferring title to the Schoolhouse just as the Summary Judgment Motion is being considered by the State Court, any liens granted by the Court against the Schoolhouse should be subordinate to the Trustee Mortgage and the Consolidated Mortgage, not priming them.

47. There is simply no reasonable rationale for granting the DIP Lender a priming lien superior to the Trustee Mortgage and the Consolidated Mortgage under any of the circumstances presented to the Court.

## CONCLUSION

**WHEREFORE**, Flushing and the Bond Trustee, as directed by Flushing as Bondholder,

16

respectfully request the Court deny the Debtor's Motion in its entirety and grant to the Bond Trustee and Flushing such other, further and different relief as the Court may deem just, proper and equitable.

Dated: East Meadow, New York
       May 19, 2025

                          **CERTILMAN BALIN ADLER & HYMAN, LLP**
                          Attorneys for Flushing Bank and U.S. Bank National Association, not in its individual capacity but solely as Bond Trustee

                          By:     /s/Richard J. McCord
                                **RICHARD J. MCCORD, ESQ.**
                                Robert D. Nosek, Esq.
                                90 Merrick Avenue
                                East Meadow, New York 11554
                                (516) 296-7000