UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:                                                  Case No.: 25-11009-dsj

Manhattan Country School,                               Chapter 11
a/k/a Manhattan Country School, Inc.,

                    Debtor.
------------------------------------------------------X

## DECLARATION OF KIRAN KULKARNI

Kiran Kulkarni, pursuant to 28 U.S.C. § 1746, hereby deposes and says:

1.      I am the Chairman of the Board of Trustees of Manhattan Country School a/k/a Manhattan Country School, Inc., (the "**Debtor**") a not for profit education corporation duly organized and existing under the laws of the State of New York, and as such I am familiar with the facts and circumstances herein. I am also the Chief Executive Officer of the Casa Laxmi Group, a not-for-profit organization which includes Casa Laxmi Foundation, Inc., a 501(c)(3) entity incorporated in Florida, USA.

2.      I offer this Declaration in support of Debtor's second motion (the "**Motion**") seeking the entry of an Order (a) authorizing the Debtor to obtain debtor-in-possession financing, (b) granting a superpriority security interest, (c) approving the agreements related to the foregoing, and (d) granting related relief.

3.      The Debtor has previously sought similar relief to the relief sought herein through its emergency motion dated May 16, 2025 (the "**Previous Motion**"). A hearing on the Previous Motion was held before the Court on May 20, 2025, and an Order denying the Previous Motion was entered on the same day. However, the within application requests interim financing of a lesser amount, and more importantly, submitted herewith is a recently obtained appraisal showing there is an equity cushion for Flushing Bank.

4.      As set forth in the Previous Motion, the Debtor is a not-for-profit corporation with its principal place of business at 150 West 85th Street, New York, New York (the "**Property**"). Since 1966 the Debtor has operated a K-8 school reflecting the vision of the Civil Rights Movement where students are taught in a community with no racial majority and broad economic diversity.

5.      At present, the Debtor has 79 employees and has 250 students currently enrolled in its program and if the relief sought herein is not granted the Debtor will have to immediately lay off all of its employees and close the doors of the school, merely three weeks away from the end of current school year, since at this time the Debtor has insufficient funds to meet its payroll obligations. The next payroll is due on May 30, 2025[1].

6.      As such it is critical that the Debtor obtain the financing necessary to meet its payroll needs and operational expenses for the next four weeks while the Debtor utilizes Chapter 11 to reorganize.

7.      In working with the Debtor's prior board of directors over the past three months I was involved in the Debtor's numerous attempts to obtain financing, both unsecured and secured as well as donations. None of these attempts were successful and the reason for this was simple – it was clear to everyone that we approached that the Debtor was not only insolvent but about to close its doors. The only reason it hadn't ceased operations already was because the Debtor had used loan funds obtained from certain members of the prior board of directors which, combined with the use of student deposits for the upcoming school year, allowed Debtor to make its payroll obligation and operational needs. Using student deposits from the upcoming school year to pay for operating expenses is a standard

---

[1] The Debtor was only able to meet last week's payroll because of the use of restricted donations made specifically for that purpose.

practice in this industry. The deposit amounts for the upcoming school year used to keep the Debtor operational during the past three months is $912,337 which was clearly insufficient to sustain operations.

8.     As I stated previously, the **only** financing that was available is the financing offered by the DIP Lender[2] which requires superpriority status and given the Debtor's current situation, the Debtor believes the terms are reasonable and provide the Debtor the ability to reorganize through Chapter 11.

9.     Currently, the Debtor's Property is encumbered by two secured mortgage liens, both of which are held by Flushing Bank and both of which would be primed by the financing sought herein – a first position mortgage with an approximate balance of $24 million, and a second position mortgage with an approximate balance of $3.5 million, for total balance of $27.5 million, and as the Court found at the hearing on the Previous Motion, the Debtor did not provide evidence establishing that Flushing Bank's lien position was adequately protected.

10.     Since then, the Debtor has obtained its own appraisal of the Property which ascribes a value of $35 million to the Property as of May 23, 2025, with similar marketing periods as the appraisal from the Previous Motion. While this value is less than the $38 million value from the prior appraisal, it is clear there is a substantial equity cushion (approximately $7.5 million) to ensure that Flushing Bank's lien positions are adequately protected. A copy of this appraisal is attached hereto as Exhibit "1".

11.     Based on the above the Debtor respectfully requests that this Court grant the Debtor's request for interim superpriority financing in the amount of $1,000,000.00 to fund

---

[2] All capitalized terms not specifically defined herein are to be given the meanings ascribed to them in the Debtor's Motion.

the Debtor's payroll and operational needs for the next four weeks, and subsequently, on a final basis grant the Debtor's request for an additional $7,000,000.00.

12.     The amount of $1,000,000 for the next four weeks is again based on aggressive cost cutting during this period. For example, Debtors payroll and benefit expense during March 2025 was approximately $635,000 and in July 2025 the same is expected to go down to $493,000. Further, the Debtor owns and operates a farm in Roxbury, NY which costs about $1,000,000 per year to operate And as I had previously stated, I have been engaged in negotiating a lease arrangement for the farm and expect to conclude the transaction with one of them which could eliminate this $1,000,000 expense to the Debtor while maintaining its partial use for Debtor's students. .

13.     The above monetary requirement for the next four weeks assumes that no payments will be made to Flushing Bank during this period. Considering the equity cushion in the Property, Debtor believes that payments are unnecessary and would otherwise prevent the Debtor from obtaining necessary funds from the DIP Lender to remain operational.

I declare under the penalty of perjury under the Laws of the United States of America that the foregoing is true and correct.

WHEREFORE, it is respectfully requested that the Debtor's Motion be granted in all respects.

Dated: May 29 2025
        Brampton, Ontario, Canada

_____
Kiran Kulkarni
Chairman, Board of Directors
Manhattan Country School a/k/a
Manhattan Country School, Inc.

# EXHIBIT "1"



# 150 West 85th Street

Between Amsterdam and Columbus Avenues
New York, New York County, NY 10024

Newmark Job No.: 25-0228314-1

**Restricted Appraisal Report Prepared For:**

Mr. Ruben Ortiz
Finance, HR & Enrollment Manager
Manhattan Country School
150 West 85th Street
New York, NY  10024

**Prepared By:**

**Newmark Valuation & Advisory**
125 Park Avenue
New York, NY 10017



May 23, 2025

Mr. Ruben Ortiz
*Finance, HR & Enrollment Manager*
Manhattan Country School
150 West 85th Street
New York, NY  10024

RE:     Restricted Appraisal of a Community Facility known as Manhattan Country School
        (MCS) located at 150 West 85th Street, New York, New York County, NY 10024,
        prepared by Newmark Valuation & Advisory, LLC (herein "Firm" or "Newmark")

Newmark Job No.:  25-0228314-1

Dear Mr. Ortiz:

The subject property is a 6-story, Class B community facility containing 38,838 square feet of
gross building area according to the tax assessor. The property is situated on a 6,575 square foot
parcel of land and is located on the south side of West 85th Street between Amsterdam and
Columbus Avenues in the Upper West Side neighborhood of Manhattan.

The building was built in 1927, renovated in 1984, and is currently owner occupied as a private
school. The building features 20 classrooms, a gymnasium, library, grand entry staircase, and a
three-story atrium. We are aware the property was listed for sale for approximately six months
but the listing was removed this past April. The original asking price was $39.9 million and was
later reduced to $32 million. There were many inquiries and several tours but the property did not
receive any formal offers. We understand that the property was on the market as a distressed
opportunity without a typical marketing period and therefore the most recent price offering is not
considered reflective of market.

Based on the analysis contained in the following report, the opinions of value for the subject are:

| Value Conclusions | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| Market Value | Fee Simple | 5/23/2025 | $35,000,000 |

*Compiled by Newmark*



Newmark Valuation & Advisory
125 Park Avenue
New York, NY 10017
www.nmrk.com/valuation

**Extraordinary Assumptions**

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.

1.   None

**Hypothetical Conditions**

A hypothetical condition is defined in USPAP as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purpose of analysis. The value conclusions are based on the following hypothetical conditions that may affect the assignment results.

1.   None

The appraisal was developed based on, and this report has been prepared in conformance with the Client's appraisal requirements, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.



# Certification

We certify that, to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4.  We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.  This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.

8.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the State of New York.

9.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

10. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

11. As of the date of this report, Douglas Larson, MRICS and Francesca T. Danese have completed the Standards and Ethics Education Requirements for Associate Members of the Appraisal Institute.

12. Douglas Larson, MRICS and Charles Looney made a personal inspection of the property that is the subject of this report. Francesca T. Danese has not personally inspected the subject.

13. No one provided significant real property appraisal assistance to the person(s) signing this certification.

14. The Firm operates as an independent economic entity. Although employees of other service lines or affiliates of the Firm may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest.

15. Within this report, "Newmark", "Newmark Valuation & Advisory", "Newmark, Inc.", and similar forms of reference refer only to the appraiser(s) who have signed this certification and any persons noted above as having provided significant real property appraisal assistance to the persons signing this report.



16. Douglas Larson, MRICS has not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment. Francesca T. Danese has not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment. Charles Looney has not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding the agreement to perform this assignment.

Douglas Larson, MRICS
*Executive Vice President*
Certified General Real Estate Appraiser
New York # 46-39300
Telephone: 212-372-2193
Email: Douglas.Larson@nmrk.com

Francesca T. Danese
*First Vice President*
Certified General Real Estate Appraiser
New York # 46-53845
Telephone: 973-494-3771
Email: Francesca.Danese@nmrk.com

Charles Looney
*Vice President*
Telephone: 212-372-2293
Email: charles.looney@nmrk.com

# Table of Contents

**Appraisal Transmittal and Certification**
Certification
Table of Contents
Subject Maps
Subject Photographs

**Executive Summary ................................15**

**Introduction...........................................17**

**Appraisal Methodology...........................20**

**Sales Comparison Approach ..................21**
    Sales Comparison Approach Conclusion ...24

**Income Capitalization Approach.............25**
    Office Market Rent Analysis ......................25
    Direct Capitalization ....................................27
    Direct Capitalization Summary ............29

**Reconciliation of Value...........................30**

**Assumptions and Limiting Conditions ..31**

**Addenda**
A.   Glossary of Terms
B.   Engagement Letter
C.   Comparable Data
D.   Appraiser Qualifications and Licenses





**Aerial Photo**



150 West 85th Street



**Location Map**





**Exterior View**



**Street View Facing West**



**Street View Facing East**



**Ground Floor View**



**View from Entrance**



**Typical Classroom**



**Typical Classroom**



**Roof**



**Kitchen Area**



**Boiler Room**



**View of Typical Floor**

# Executive Summary

## 150 West 85th Street

| | |
|---|---|
| Property Type: | Mixed Use: School |
| Street Address: | 150 West 85th Street |
| City, State & Zip: | New York, New York County, NY 10024 |
| Investment Class: | B |
| Gross Building Area (SF): | 38,838 |
| Year Built (Renovated): | 1927 (1984) |
| Current Occupancy: | 74.2% |
| Land Area: | 0.151 acres; 6,575 SF |
| Zoning: | R8B |
| Assessor's Parcel ID(s): | Block: 1215, Lot: 53 |
| Highest and Best Use - As Vacant: | A Residential Building Built To The Highest Density Permissible Once Market Conditions Permit |
| Highest and Best Use - As Improved: | Continued School Use |

### Analysis Details

| | |
|---|---|
| Valuation Dates: | |
| Market Value | May 23, 2025 |
| Inspection Date and Date of Photos: | May 23, 2025 |
| Report Date: | May 23, 2025 |
| Report Type: | Restricted Appraisal Report |
| Client: | Manhattan Country School |
| Intended Use: | Internal Business Decisions |
| Intended User: | Manhattan Country School |
| Appraisal Premise: | Market Value |
| Interest Appraised: | Fee Simple |
| Exposure Time (Marketing Period) Estimate: | 6 to 12 Months (6 to 12 Months) |

*Compiled by Newmark*

## Valuation Summary

| Sales Comparison Approach | | $/SF | $ Total |
|---|---|---|---|
| Number of Sales | | | 9 |
| Range of Sale Dates | | | April 2023 to April 2025 |
| Adjusted Range of Comparables ($/SF) | | | $689.66 to $1,557.03 |
| **Indicated Sales Comparison Approach Value** | As Is | $901.18 | $35,000,000 |
| **Income Capitalization Approach - Direct Capitalization Method** | | $/SF | $ Total |
| **Stabilized Income Estimate** | | | |
| Potential Gross Income | | $50.00 | $1,941,900 |
| Stabilized % Vacancy & Collection Loss | | -3.00% | ($58,257) |
| Effective Gross Income | | $48.50 | $1,883,643 |
| Operating Expenses | | $1.15 | $44,664 |
| Operating Expense Ratio | | | 2.4% |
| Net Operating Income | | $47.35 | $1,838,979 |
| Capitalization Rate | | | 5.25% |
| **Indicated Direct Capitalization Value** | As Is | $901.18 | $35,000,000 |
| **Market Value Conclusions** | **As Is** | **$901.18** | **$35,000,000** |
| **Exposure / Marketing Time** | | | |
| Concluded Exposure Time | 6 to 12 | Months or Less | |
| Concluded Marketing Time | 6 to 12 | Months or Less | |

*Compiled by Newmark*



## Extraordinary Assumptions and Hypothetical Conditions

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.

1.  None

A hypothetical condition is defined in USPAP as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. The value conclusions are based on the following hypothetical conditions that may affect the assignment results.

1.  None

*Compiled by Newmark*



# Introduction

## OWNERSHIP HISTORY

The current owner is West 85th Street Owner LLC. To the best of our knowledge, no sale or transfer of ownership has taken place within a three-year period prior to the effective date of the appraisal.

## PENDING TRANSACTIONS

To the best of our knowledge, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective date of appraisal.

We are aware the property was listed for sale for approximately six months but the listing was removed this past April. The original asking price was $39.9 million and was later reduced to $32 million. There were many inquiries and several tours but the property did not receive any formal offers. We understand that the property was on the market as a distressed opportunity without a typical marketing period and therefore the most recent price offering is not considered reflective of market.

## INTENDED USE AND USER

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to non-client, non-intended users does not extend reliance to any other party and Newmark will not be responsible for unauthorized use of the report, its conclusions or contents used partially or in its entirety.

- The intended use of the appraisal is for internal business decisions and no other use is permitted.
- The client is Manhattan Country School.
- The intended user is Manhattan Country School and no other user is permitted by any other party for any other purpose.

## DEFINITION OF VALUE

Market value is defined as:

"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition



is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

– Buyer and seller are typically motivated;

– Both parties are well informed or well advised, and acting in what they consider their own best interests;

– A reasonable time is allowed for exposure in the open market;

– Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

– The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

*(Source: Code of Federal Regulations, Title 12, Chapter I, Part 34.42[g]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472)*

## INTEREST APPRAISED

The appraisal is of the Fee Simple interest.[1]

♦ ***Fee Simple Estate:*** Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

## RESTRICTED APPRAISAL REPORT

This appraisal is presented in the form of a restricted appraisal report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(b) of USPAP. The use of this report is limited to the client and the intended user should note that the rationale for how the opinions and conclusions set forth in the report may not be understood properly without additional information in the appraiser's workfile.

## PURPOSE OF THE APPRAISAL

| Purpose of the Appraisal | | |
|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value |
| Market Value | Fee Simple | 5/23/2025 |

*Compiled by Newmark*

---

[1] The Dictionary of Real Estate, 6th Edition, Appraisal Institute



## SCOPE OF WORK

### Extent to Which the Property is Identified

&ndash; Physical characteristics

&ndash; Legal characteristics

&ndash; Economic characteristics

### Extent to Which the Property is Inspected

Newmark inspected the subject property on May 23, 2025 as per the defined scope of work. Douglas Larson, MRICS and Charles Looney made a personal inspection of the property that is the subject of this report.   Francesca T. Danese has not personally inspected the subject.

### Type and Extent of the Data Researched

&ndash; Exposure and marketing time;

&ndash; Neighborhood and land use trends;

&ndash; Demographic trends;

&ndash; Market trends relative to the subject property type;

&ndash; Physical characteristics of the site and applicable improvements;

&ndash; Flood zone status;

&ndash; Zoning requirements and compliance;

&ndash; Real estate tax data;

&ndash; Relevant applicable comparable data; and

&ndash; Investment rates

### Type and Extent of Analysis Applied

We analyzed the property and market data gathered through the use of appropriate, relevant, and accepted market-derived methods and procedures. Further, we employed the appropriate and relevant approaches to value, and correlated and reconciled the results into an estimate of market value, as demonstrated within the appraisal report. The applied scope of work is appropriate and sufficient to produce credible assignment results for the intended use of this report.



# Appraisal Methodology

## COST APPROACH

The cost approach is based on the proposition that the informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. This approach is particularly applicable when the property being appraised involves relatively new improvements that represent the highest and best use of the land, or when it is improved with relatively unique or specialized improvements for which there exist few sales or leases of comparable properties.

## SALES COMPARISON APPROACH

The sales comparison approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject. Valuation is typically accomplished using physical units of comparison such as price per square foot, price per unit, price per floor, etc., or economic units of comparison such as gross rent multiplier. Adjustments are applied to the property units of comparison derived from the comparable sale. The unit of comparison chosen for the subject is then used to yield a total value.

## INCOME CAPITALIZATION APPROACH

The income capitalization approach reflects the subject's income-producing capabilities. This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future. Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time. The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

| Application of Approaches to Value | |
| --- | --- |
| Approach | Comments |
| Cost Approach | The Cost Approach is not applicable and is not utilized in this appraisal. |
| Sales Comparison Approach | The Sales Comparison Approach is applicable and is utilized in this appraisal. |
| Income Capitalization Approach | The Income Capitalization Approach is applicable and is utilized in this appraisal. |

*Compiled by Newmark*

The cost approach was not used because the age of the improvements makes depreciation highly speculative. More significantly, however, market participants considering properties like the subject do not give consideration to the cost approach. The exclusion of this approach is not considered to impact the reliability of the appraisal.



# Sales Comparison Approach

## SALES COMPARISON ANALYSIS

The sales comparison approach value is derived by analyzing closed sales, listings, or pending sales of properties that are similar to the subject. The sales comparison approach includes the following steps.

– Research and verify information on properties in the competitive market that are similar to the subject and that have recently sold, are listed for sale, or are under contract.

– Select the most relevant units of comparison in the market and develop a comparative analysis.

– Examine and quantify via adjustments differences between the comparable sales and the subject property using all appropriate elements of comparison.

– Reconcile the various value indications to a value bracket and then a single value indication.



**Comparable Sales Summary**

| | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 | Sale 7 | Sale 8 | Sale 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| Address | 150 West 85th Street | 142 Pierrepont Street | 1 West 4th Street | 53-55 East 124th Street | 176 West 105th Street | 107 East 70th Street | 211-213 East 83rd Street | 507 Ocean Parkway | 109 East 73rd Street | 114-124 East 35th Street |
| Submarket, Market | Upper West Side, New York | Downtown Brooklyn, New York | Greenwich Village, New York | Harlem/North Manhattan, New York | Upper West Side, New York | Upper East Side, New York | Upper East Side, New York | South Brooklyn, New York | Upper East Side, New York | Murray Hill, New York |
| Land Size | 6,575 SF | 4,356 SF | 17,860 SF | 18,406 SF | 4,000 SF | 5,804 SF | 7,140 SF | 14,000 SF | 2,243 SF | 9,148 SF |
| Gross Building Area (SF) | 38,838 SF | 19,764 SF | 85,000 SF | 55,770 SF | 10,242 SF | 17,726 SF | 11,766 SF | 34,800 SF | 7,000 SF | 20,215 SF |
| Year Built/Renovated | 1927 / 1984 | 1930 | 1910 | 1927 | 1966 | 1960 | 1930 | 1930 | 1920 | 1915 |
| Stories | 6 | 4 | 5 | 5 | 3 | 5 | 4 | 5 | 6 | 5 |
| Investment Grade | Class B | Class C | Class C | Class B | Class B | Class C | Class C | Class B | Class B | Class B |
| Occupancy | 74% | Owner User | Owner User | Owner User | Owner User | Owner User | Owner User | Owner User | Owner User | Owner User |
| Buyer | -- | Saint Ann's School | New York University | Touro University | World Mission Society Church of God | Altneu Building LLC c/o The Altneu Synagogue | 213 Yorkville LLC | Mosdos Satmar Boro Park | The Buckley School | Republic of Serbia |
| Seller | -- | 181 Montague LLC c/o Jonathan Rose Companies | Hewbrew Union College Jewish Institute of Religion | New York College of Podiatric Medicine | Kehilat Romemu | Visting Nurse Services of New York c/o VNS Health | Roman Catholic Curch | Boruch Margulies | 109 East 73rd Street | New York Society of the New Church |
| Interest Conveyed | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Transaction Status | -- | Sale | Sale | Sale | Sale | Sale | Sale | Sale | Sale | Sale |
| Transaction Date | -- | April 2025 | January 2025 | January 2025 | August 2024 | March 2024 | July 2024 | October 2023 | June 2023 | April 2023 |
| Price | -- | $15,955,000 | $75,500,000 | $42,000,000 | $10,000,000 | $34,500,000 | $11,750,000 | $20,000,000 | $7,500,000 | $15,000,000 |
| Price per SF | -- | $807.28 | $888.24 | $753.09 | $976.37 | $1,946.29 | $998.64 | $574.71 | $1,071.43 | $742.02 |

*Compiled by Newmark*



Based on our comparative analysis, the following table summarizes the adjustments warranted to each comparable.

| Comparable Sales Adjustment Grid | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 | Sale 5 | Sale 6 | Sale 7 | Sale 8 | Sale 9 |
|---|---|---|---|---|---|---|---|---|---|---|
| Address | 150 West 85th Street | 142 Pierrepont Street | 1 West 4th Street | 53-55 East 124th Street | 176 West 105th Street | 107 East 70th Street | 211-213 East 83rd Street | 507 Ocean Parkway | 109 East 73rd Street | 114-124 East 35th Street |
| City | Upper West Side, New York | Downtown Brooklyn, New York | Greenwich Village, New York | Harlem/North Manhattan, New York | Upper West Side, New York | Upper East Side, New York | Upper East Side, New York | South Brooklyn, New York | Upper East Side, New York | Murray Hill, New York |
| Gross Building Area (SF) | 38,838 SF | 19,764 SF | 85,000 SF | 55,770 SF | 10,242 SF | 17,726 SF | 11,766 SF | 34,800 SF | 7,000 SF | 20,215 SF |
| Year Built (Renovated) | 1927 / 1984 | 1930 | 1910 | 1927 | 1966 | 1960 | 1930 | 1930 | 1920 | 1915 |
| Stories | 6 | 4 | 5 | 5 | 3 | 5 | 4 | 5 | 6 | 5 |
| Investment Grade | Class B | Class C | Class C | Class B | Class B | Class C | Class C | Class B | Class B | Class B |
| Interest Conveyed | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Transaction Date | -- | April 2025 | January 2025 | January 2025 | August 2024 | March 2024 | July 2024 | October 2023 | June 2023 | April 2023 |
| Occupancy | 74.24% | Owner User | Owner User | Owner User | Owner User | Owner User | Owner User | Owner User | Owner User | Owner User |
| Actual Sale Price | -- | $15,955,000 | $75,500,000 | $42,000,000 | $10,000,000 | $34,500,000 | $11,750,000 | $20,000,000 | $7,500,000 | $15,000,000 |
| Price per SF | -- | $807.28 | $888.24 | $753.09 | $976.37 | $1,946 | $998.64 | $574.71 | $1,071 | $742.02 |
| **Transaction Adjustments** | | | | | | | | | | |
| Property Rights | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Financing | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Conditions of Sale | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Market Conditions (Time) | 5/23/2025 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -10.0% | -10.0% |
| Subtotal (adjustments are multiplied) | | 0% | 0% | 0% | 0% | 0% | 0% | 0% | -10.0% | -10.0% |
| Transaction Adjusted Price per SF | | $807.28 | $888.24 | $753.09 | $976.37 | $1,946 | $998.64 | $574.71 | $964.29 | $667.82 |
| **Property Adjustments** | | | | | | | | | | |
| Location | | 0.0% | 0.0% | 10.0% | -10.0% | 0.0% | 0.0% | 15.0% | 0.0% | 15.0% |
| Size | | -10.0% | 0.0% | -5.0% | -10.0% | -10.0% | -10.0% | -5.0% | -10.0% | -10.0% |
| Year Built | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Quality | | 5.0% | 5.0% | 0.0% | 0.0% | -10.0% | 0.0% | 10.0% | 10.0% | 0.0% |
| Tenancy/Occupancy | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Economic Characteristics | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Subtotal (adjustments are summed) | | -5.0% | 5.0% | 5.0% | -20.0% | -20.0% | -10.0% | 20.0% | 0.0% | 5.0% |
| Gross Adjustment | | 15.0% | 5.0% | 15.0% | 20.0% | 20.0% | 10.0% | 30.0% | 30.0% | 35.0% |
| Overall Adjustment | | -5.0% | 5.0% | 5.0% | -20.0% | -20.0% | -10.0% | 20.0% | -10.0% | -5.5% |
| **Indicated Price per SF** | | **$766.91** | **$932.65** | **$790.75** | **$781.10** | **$1,557** | **$898.78** | **$689.66** | **$964.29** | **$701.21** |

*Compiled by Newmark*



## SALES COMPARISON APPROACH CONCLUSION

| Sales Comparison Approach Conclusion | | |
|---|---|---|
| **Reconciliation of Price per SF Indication** | | **Value Indication** |
| Adjusted Value Range - Low | | $689.66 |
| Adjusted Value Range - High | | $1,557 |
| Adjusted Value Range - Average | | $898.04 |
| Reconciled Market Value - Price per SF | Effective Date: 5/23/2025 | $900.00 |
| Gross Building Area | | 38,838 |
| Indicated Market Value | Effective Date: 5/23/2025 | $34,954,200 |
| **Rounded** | | **$35,000,000** |

*Compiled by Newmark*



# Income Capitalization Approach

The income capitalization approach reflects the subject's income-producing capabilities. This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future. Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time. The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

The direct capitalization method is normally more appropriate for properties with relatively stable operating histories and expectations. The DCF analysis is more appropriate for investment properties with multiple or long-term leases, particularly leases with cancellation clauses or renewal options, and especially in volatile markets.

In this analysis, we utilized only direct capitalization because investors and market participants typically rely more on this method.

## COMMUNITY FACILITY MARKET RENT ANALYSIS

Market rent is based on an analysis of comparable transactions as well as recent leasing activity at the subject and discussions with market participants. In estimating community facility market rent for the subject property, this analysis uses actual recent leases from comparable buildings. This analysis also researched asking rents from competitive properties and relied upon the market opinions of leasing brokers. The rent comparables summarized on the following page was chosen based upon similar location, age, quality, and utility.



| | | | | | Comparable Leases | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Community Facility Leases | | | | |
| # | Address | Tenant | Size | Base Rent | Tenant Improvements | Free Rent | Lease Term | Lease Type | Quarter Leased |
| 1 | 111 Broadway | New York City Charter Schools | 9,900 | $48.00 | $30.00 | 8.0 Mos. | 127.0 Mos. | Taxes & Opex Over A Base | 1Q 2025 |
| 2 | 21 Penn Plaza | NYU Grossman School of Medicine | 51,067 | $63.00 | $125.00 | 13.0 Mos. | 204.0 Mos. | Taxes & Opex Over A Base | Q4 2024 |
| 3 | 63 Madison Avenue | CUNY | 123,556 | $57.40 | $150.00 | 12.0 Mos. | 372.0 Mos. | Net; Exempt Taxes | Q4 2024 |
| 4 | 541 West 21st Street | Basis Independent School | 60,020 | $74.44 | $0.00 | 21.0 Mos. | 240.0 Mos. | Net; Exempt Taxes | Q4 2024 |
| 5 | 1293 Broadway | Yeshiva University | 155,000 | $47.00 | $200.00 | 0.0 Mos. | 372.0 Mos. | Net; Exempt Taxes | Q3 2024 |
| 6 | 488 Madison Avenue | Archdiocese of New York (ADNY) | 142,308 | $45.00 | $167.27 | 18.0 Mos. | 378.0 Mos. | Net; Exempt Taxes | Q1 2024 |
| 7 | 1180 Avenue of the Americas | Selfhelp Community Services | 46,000 | $53.00 | $175.00 | 18.0 Mos. | 378.0 Mos. | Net; Exempt Taxes | Q1 2024 |
| 8 | 110 William Street | DCAS | 640,744 | $45.00 | $212.00 | 18.0 Mos. | 248.0 Mos. | Net; Exempt Taxes | Q4 2023 |
| 9 | 815 Second Avenue | The Lyceum Kennedy International School | 21,950 | $59.00 | $39.63 | 15.0 Mos. | 191.0 Mos. | Taxes & Opex Over A Base | Q3 2023 |
| 10 | 5 Hanover Square | Ideal School Manhattan | 62,969 | $46.00 | $225.00 | 36.0 Mos. | 396.0 Mos. | Net; Exempt Taxes | Q3 2023 |
| 11 | 120 Broadway | New York City Housing Development Corporation | 112,000 | $50.00 | $150.00 | 20.0 Mos. | 360.0 Mos. | Taxes & Opex Over A Base | Q3 2023 |
| 12 | 240 Jay Street | Community High School | 35,000 | $50.00 | N/A | N/A | 360.0 Mos. | Net; Exempt Taxes | Q1 2023 |
| 13 | 124 East 14th Street | Civic Hall | 85,425 | $33.00 | $54.84 | 6.0 Mos. | 304.0 Mos. | Net; Exempt Taxes | Q2 2022 |
| 14 | 2045 Madison Avenue | Friends of Capital Prep Harlem Charter School | 76,005 | $36.19 | Confidential | Confidential | 372.0 Mos. | Net; Exempt Taxes | Q3 2022 |
| 15 | 3 Times Square | Touro College | 241,334 | $42.00 | $184.13 | 17.0 Mos. | 388.9 Mos. | Net; Exempt Taxes & Opex Over Base | Q2 2022 |
| 16 | 337 East 64th Street | Browning School | 46,000 | $50.00 | $0.00 | 12.0 Mos. | 384.0 Mos. | Net; Exempt Taxes | Q2 2022 |
| 17 | 600-602 Broadway | Codecademy | 12,200 | $82.00 | $10.00 | 3.0 Mos. | 63.0 Mos. | Net; Exempt Taxes | Q2 2022 |
| 18 | 627 Broadway | New York University | 102,000 | $67.50 | $0.00 | 0.0 Mos. | 120.0 Mos. | Net; Exempt Taxes | Q1 2022 |
| | **Totals / Average (Community Facility)** | | **122,657** | **$47.87** | **$152.00** | **14.1 mos.** | **310.3 mos.** | | |

*Compiled by Newmark*



150 West 85th Street

## Analysis of Comparable Leases

As indicated by comparable community facility leases, rents range from $33.00 to $82.00 per square foot, and average $47.87 per square foot. In general, we can expect market rent for the subject building to be within the range of the comparable leases presented on the previous page.

## Market Rent Conclusions

Based on the preceding analysis, the following is the concluded market lease terms for the subject:

| Concluded Market Lease Terms | | | | | | |
|---|---|---|---|---|---|---|
| MLA Category | Rentable SF | Market Rent | Measure | Rent Escalations | Reimbursement Method | Term (Mos.) |
| Community Facility (School) Space: | 38,838 | $50.00 | $/SF/Year | 3.00% / YR | Net; Exempt Taxes | 180 |

*Compiled by Newmark*

# GROSS INCOME ESTIMATE

## Potential Gross Rent

Figures presented below reflect the 12-month period following the effective date of the appraisal.

| Potential Gross Rent | | | |
|---|---|---|---|
| MLA Category | Rentable SF | Potential Net Rent At Market Annual | $/SF/Yr |
| Community Facility (School) Space: | 38,838 | $1,941,900 | $50.00 |

*Compiled by Newmark*

# DIRECT CAPITALIZATION

The following subsections represent different techniques for deriving an overall capitalization rate.

## Comparable Sales

| Comparable Going-In Capitalization Rates | | | | | | | |
|---|---|---|---|---|---|---|---|
| No. | Property Name | Property Type | Sale Date | Rentable Area | $/SF | Occ. % | OAR |
| 1 | 512 West 22nd Street | Class A Office | May-25 | 171,912 | $1,192.47 | 100.00% | 6.68% |
| 2 | 525 West 57th Street | Class B Office | Apr-25 | 308,469 | $470.06 | 80.00% | 3.64% |
| 3 | 165 Mercer Street | Class B Office | Feb-25 | 30,694 | $1,303.19 | 100.00% | 6.13% |
| 4 | 156 West 29th Street | Class C Office | May-24 | 7,410 | $850.20 | 100.00% | 3.43% |
| 5 | 30 West 61st Street | Class B Communiy Faciliy | Feb-24 | 52,076 | $290.92 | 100.00% | 7.75% |
| 6 | 22 West 23rd Street | Class C Office | Sep-23 | 13,125 | $739.81 | 100.00% | 6.10% |
| 7 | 150 West 36th Street | Class C Office | Aug-23 | 10,395 | $625.30 | 60.00% | 5.50% |
| 8 | 110 William Street | Class A Office | Jul-23 | 788,241 | $539.18 | 100.00% | 4.95% |
| 9 | 885 Third Avenue (Memorial Sloan Kettering Condominium) | Class A Office | Dec-22 | 414,317 | $846.13 | 100.00% | 4.44% |
| 10 | 321 East 61st Street | Class A Community Facility | Sep-22 | 52,076 | $1,676.18 | 100.00% | 3.52% |
| 11 | 218 West 147th Street | Class C Community Facility | Aug-22 | 22,922 | $636.23 | 100.00% | 5.40% |
| Range | | | | | | | 3.43% - 7.75% |
| Average | | | | | | | 5.25% |

*Compiled by Newmark*



## Investor Surveys

| Investor Surveys - Capitalization Rates | | | | |
|---|---|---|---|---|
| Source | Period | Low | High | Average |
| PwC - Manhattan Office Market | Q1 2025 | 5.20% | 10.00% | 6.83% |
| Situs RERC - Office - CBD | Q1 2025 | 6.50% | 8.30% | 7.40% |
| Newmark V&A Market Survey - Class A | Q1 2025 | - | - | 6.00% |
| Newmark V&A Market Survey - Class B | Q1 2025 | - | - | 6.50% |
| Broker Opinions | | 4.75% | 5.75% | |
| Comparable Sales | | 3.43% | 7.75% | 5.23% |

*Compiled by Newmark*

### Investor Surveys - Capitalization Rates



Legend:
- PwC - Manhattan Office Market
- Situs RERC - Office - CBD
- Broker Opinion Range
- Comparable Sales (In-Place)
- Comparable Sales (Adjusted)

| Capitalization Rate Conclusion | |
|---|---|
| Source | Indication |
| Comparable Sales | 5.56% - 8.76% |
| Investor Surveys | 5.20% - 10.00% |
| Market Participants | 4.75% - 5.75% |
| Concluded Going-In Capitalization Rate | 5.25% |

*Compiled by Newmark*

## Direct Capitalization Summary

Net operating income is divided by the capitalization rate to derive the stabilized value of the subject. Valuation of the subject by direct capitalization is shown in the table immediately following.

| Income Capitalization Approach | | | |
|---|---|---|---|
| **Summary of Stabilized Net Operating Income** | | | |
| Item Description | % of Income | $ / SF | Total $ |
| | | | |
| **Income** | | 38,838 SF | |
| Potential Base Rent | | $50.00 | $1,941,900 |
| Lost Absorption / Turnover Rent | | $0.00 | $0 |
| Free Rent | | $0.00 | $0 |
| Scheduled Base Rent | | $50.00 | $1,941,900 |
| Expense Recoveries | | $0.00 | $0 |
| Total Tenant Revenue | | $50.00 | $1,941,900 |
| Other Income | | $0.00 | $0 |
| Potential Gross Commercial Income | | $50.00 | $1,941,900 |
| Vacancy Allowance | -3.00% | ($1.50) | ($58,257) |
| **Effective Gross Income** | | **$48.50** | **$1,883,643** |
| | | | |
| **Operating Expenses** | | 38,838 SF | |
| Management Fee | | $0.65 | $25,245 |
| Misc. Reserves | 1.03% | $0.50 | $19,419 |
| Total Operating Expenses | 2.37% | $1.15 | $44,664 |
| **Net Operating Income** | | **$47.35** | **$1,838,979** |
| **Direct Capitalization Method** | | | |
| Value Indication | | $ / SF | Total $ |
| **Market Value** | | | |
| Stabilized Net Operating Income | | $47.35 | $1,838,979 |
| Overall Capitalization Rate | | | 5.25% |
| Indicated Value | Effective Date: 5/23/2025 | | $35,028,177 |
| **Rounded** | | **$901.18** | **$35,000,000** |

| Valuation Matrix | |
|---|---|
| OAR | Value |
| 4.75% | $38,715,354 |
| 5.00% | $36,779,586 |
| **5.25%** | **$35,028,177** |
| 5.50% | $33,435,987 |
| 5.75% | $31,982,249 |

*Compiled by Newmark*



# Reconciliation of Value

The values indicated by our analyses are as follows:

| Market Value Indications | |
|---|---|
| **Market Value Premise**<br>**As of Date:** | **As Is**<br>**May 23, 2025** |
| Cost Approach: | Not Used |
| Sales Comparison Approach: | $35,000,000 |
| Income Capitalization Approach: | $35,000,000 |
| Market Value Conclusion | $35,000,000 |
| $/SF | $901.18 |

*Compiled by Newmark*

| Value Conclusions | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| Market Value | Fee Simple | 5/23/2025 | $35,000,000 |

*Compiled by Newmark*

## Extraordinary Assumptions and Hypothetical Conditions

An extraordinary assumption is defined in USPAP as an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions. The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results.

1.   None

A hypothetical condition is defined in USPAP as a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.  The value conclusions are based on the following hypothetical conditions that may affect the assignment results.

1.   None

*Compiled by Newmark*



# Assumptions and Limiting Conditions

The Appraisal contained in this Report (herein "Report") is subject to the following assumptions and limiting conditions:

1. Unless otherwise stated in this report, title to the property which is the subject of this report (herein "Property") is assumed to be good and marketable and free and clear of all liens and encumbrances and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. No responsibility is assumed for the legal description, zoning, condition of title or any matters which are legal in nature or otherwise require expertise other than that of a professional real estate appraiser. This report shall not constitute a survey of the Property.

2. Unless otherwise stated in this report, it is assumed: that the improvements on the Property are structurally sound, seismically safe and code conforming; that all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are in good working order with no major deferred maintenance or repair required; that the roof and exterior are in good condition and free from intrusion by the elements; that the Property and improvements conform to all applicable local, state, and federal laws, codes, ordinances and regulations including environmental laws and regulations. No responsibility is assumed for soil or subsoil conditions or engineering or structural matters. The Property is appraised assuming that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimates contained in this report is based, unless otherwise stated. The physical condition of the Property reflected in this report is solely based on a visual inspection as typically conducted by a professional appraiser not someone with engineering expertise. Responsible ownership and competent property management are assumed.

3. Unless otherwise stated in this report, this report did not take into consideration the existence of asbestos, PCB transformers or other toxic, hazardous, or contaminated substances or underground storage tanks, or the cost of encapsulation, removal or remediation thereof. Real estate appraisers are not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater or other potentially hazardous materials and substances may adversely affect the value of the Property. Unless otherwise stated in this report, the opinion of value is predicated on the assumption that there is no such material or substances at, on or in the Property.



4.  All statements of fact contained in this report as a basis of the analyses, opinions, and conclusions herein are true and correct to the best of the appraiser's actual knowledge and belief. The appraiser is entitled to and relies upon the accuracy of information and material furnished by the owner of the Property or owner's representatives and on information and data provided by sources upon which members of the appraisal profession typically rely and that are deemed to be reliable by such members. Such information and data obtained from third party sources are assumed to be reliable and have not been independently verified. No warranty is made as to the accuracy of any of such information and data. Any material error in any of the said information or data could have a substantial impact on the conclusions of this Report. The appraiser reserves the right to amend conclusions reported if made aware of any such error.

5.  The opinion of value stated in this report is only as of the date of value stated in this report. An appraisal is inherently subjective and the conclusions stated apply only as of said date of value, and no representation is made as to the effect of subsequent events. This report speaks only as of the date hereof.

6.  Any projected cash flows included in the analysis are forecasts of estimated future operating characteristics and are predicated on the information and assumptions contained within this report. Any projections of income, expenses and economic conditions utilized in this report are not predictions of the future. Rather, they are estimates of market expectations of future income and expenses. The achievement of any financial projections will be affected by fluctuating economic conditions and is dependent upon other future occurrences that cannot be assured. Actual results may vary from the projections considered herein. There is no warranty or assurances that these forecasts will occur. Projections may be affected by circumstances beyond anyone's knowledge or control. Any income and expense estimates contained in this report are used only for the purpose of estimating value and do not constitute predictions of future operating results.

7.  The analyses contained in this report may necessarily incorporate numerous estimates and assumptions regarding Property performance, general and local business and economic conditions, the absence of material changes in the competitive environment and other matters. Some estimates or assumptions, however, inevitably will not materialize, and unanticipated events and circumstances may occur; therefore, actual results achieved during the period covered by the analysis will vary from estimates, and the variations may be material.

8.  All prospective value opinions presented in this report are estimates and forecasts which are prospective in nature and are subject to considerable risk and uncertainty. In addition to the contingencies noted in the preceding paragraphs, several events may occur that could substantially alter the outcome of the estimates such as, but not limited to changes



in the economy, interest rates, capitalization rates, behavior of consumers, investors and lenders, fire and other physical destruction, changes in title or conveyances of easements and deed restrictions, etc.  In making prospective estimates and forecasts, it is assumed that conditions reasonably foreseeable at the present time are consistent or similar with the future.

9.  The allocations of value for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used.  This report shall be considered only in its entirety.  No part of this report shall be utilized separately or out of context.

10. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or any reference to the Appraisal Institute) shall be disseminated through advertising media, public relations media, news media or any other means of communication (including without limitation prospectuses, private offering memoranda and other offering material provided to prospective investors) without the prior written consent of the Firm. Possession of this report, or a copy hereof, does not carry with it the right of publication.

11. Client and any other Intended User identified herein should consider this report and the opinion of value contained herein as only one factor together with its own independent considerations and underwriting guidelines in making any decision or investment or taking any action regarding the Property.  Client agrees that Firm shall not be responsible in any way for any decision of Client or any Intended User related to the Property or for the advice or services provided by any other advisors or contractors.  The use of this report and the appraisal contained herein by anyone other than an Intended User identified herein, or for a use other than the Intended Use identified herein, is strictly prohibited. No party other than an Intended User identified herein may rely on this report and the appraisal contained herein.

12. Unless otherwise stated in the agreement  to prepare this report, the appraiser shall not be required to participate in or prepare for or attend any judicial, arbitration, or administrative proceedings.

13. The Americans with Disabilities Act (ADA) became effective January 26, 1992. No survey or analysis of the Property has been made in connection with this report to determine whether the physical aspects of the improvements meet the ADA accessibility guidelines. No expertise in ADA issues is claimed, and the report renders no opinion regarding the Property's compliance with ADA regulations. Inasmuch as compliance matches each owner's financial ability with the cost to cure the non-conforming physical characteristics of a property, a specific study of both the owner's financial ability and the cost to cure any deficiencies would be needed for the Department of Justice to determine compliance.



14. Acceptance and/or use of this report constitutes full acceptance of these Assumptions and Limiting Conditions and any others contained in this report, including any Extraordinary Assumptions and Hypothetical Conditions, and is subject to the terms and conditions contained in the agreement to prepare this report and full acceptance of any limitation of liability or claims contained therein.



# Addendum A

# Glossary of Terms



The following definitions are derived from The Dictionary of Real Estate Appraisal, 6th ed. (Chicago: Appraisal Institute, 2015).

- ♦ **Absorption Period:** The actual or expected period required from the time a property, group of properties, or commodity is initially offered for lease, purchase, or use by its eventual users until all portions have been sold or stabilized occupancy has been achieved.

- ♦ **Absorption Rate:** 1) Broadly, the rate at which vacant space in a property or group of properties for sale or lease has been or is expected to be successfully sold or leased over a specified period of time. 2) In subdivision analysis, the rate of sales of lots or units in a subdivision.

- ♦ **Ad Valorem Tax:** A tax levied in proportion to the value of the thing(s) being taxed. Exclusive of exemptions, use-value assessment provisions, and the like, the property tax is an ad valorem tax. (International Association of Assessing Officers [IAAO])

- ♦ **Assessed Value:** The value of a property according to the tax rolls in ad valorem taxation; may be higher or lower than market value, or based on an assessment ratio that is a percentage of market value.

- ♦ **Cash Equivalency:** An analytical process in which the sale price of a transaction with nonmarket financing or financing with unusual conditions or incentives is converted into a price expressed in terms of cash or its equivalent.

- ♦ **Contract Rent:** The actual rental income specified in a lease.

- ♦ **Disposition Value:** The most probable price that a specified interest in property should bring under the following conditions: 1) Consummation of a sale within a specified time, which is shorter than the typical exposure time for such a property in that market. 2) The property is subjected to market conditions prevailing as of the date of valuation. **3)** Both the buyer and seller are acting prudently and knowledgeably. 4) The seller is under compulsion to sell. 5) The buyer is typically motivated. 6) Both parties are acting in what they consider to be their best interests. 7) An adequate marketing effort will be made during the exposure time. 8) Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto. 9) The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. This definition can also be modified to provide for valuation with specified financing terms.

- ♦ **Effective Rent:** Total base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions; the rent that is effectively paid by a tenant net of financial concessions provided by a landlord.



- **Excess Land:** Land that is not needed to serve or support the existing use. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land has the potential to be sold separately and is valued separately. See also **surplus land.**

- **Excess Rent:** The amount by which contract rent exceeds market rent at the time of the appraisal; created by a lease favorable to the landlord (lessor) and may reflect unusual management, unknowledgeable or unusually motivated parties, a lease execution in an earlier, stronger rental market, or an agreement of the parties.

- **Exposure Time:** 1) The time a property remains on the market. 2) [The] estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.

- **Extraordinary Assumption:** An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions. See also **hypothetical condition.**

- **Fee Simple Estate:** Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

- **Floor Area Ratio (FAR):** The relationship between the above-ground floor area of a building, as described by the zoning or building code, and the area of the plot on which it stands; in planning and zoning, often expressed as a decimal, e.g., a ratio of 2.0 indicates that the permissible floor area of a building is twice the total land area.

- **Frictional Vacancy:** The amount of vacant space needed in a market for its orderly operation. Frictional vacancy allows for move-ins and move-outs.

- **Full Service Lease:** See **gross lease.**

- **General Vacancy:** A method of calculating any remaining vacancy and collection loss considerations when using discounted cash flow (DCF) analysis, where turnover vacancy has been used as part of the income estimate. The combined effects of turnover vacancy and general vacancy relate to total vacancy and collection loss.

- **Going-Concern Premise:** One of the premises under which the total assets of a business can be valued; the assumption that a company is expected to continue operating well into the future (usually indefinitely).

- **Going Concern Value:** An outdated label for the market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold



in aggregate; more accurately termed the market value of the going concern or market value of the total assets of the business.

♦ **Gross Building Area (GBA):** 1) Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved. 2) Gross leasable area plus all common areas. 3) For residential space, the total area of all floor levels measured from the exterior of the walls and including the superstructure and substructure basement; typically does not include garage space.

♦ **Gross Lease:** A lease in which the landlord receives stipulated rent and is obligated to pay all of the property's operating and fixed expenses; also called full-service lease.

♦ **Hypothetical Condition:** 1) A condition that is presumed to be true when it is known to be false. (Appraisal Institute: The Standards of Valuation Practice [SVP]) 2) A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. See also **extraordinary assumption.**

♦ **Intended Users:** 1) The party or parties the valuer intends will use the report. (SVP) 2) The client and any other party as identified, by name or type, as users of the appraisal or appraisal review report by the appraiser, based on communication with the client at the time of the assignment. (USPAP, 2020-2021 ed.)

♦ **Investment Value:** 1) The value of a property to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market.
**2)** The value of an asset to the owner or a prospective owner for individual investment or operational objectives. (International Valuation Standards [IVS])

♦ **Land-to-Building Ratio:** The proportion of land area to gross building area; one of the factors determining comparability of properties.

♦ **Lease:** A contract in which the rights to use and occupy land, space, or structures are transferred by the owner to another for a specified period of time in return for a specified rent.

♦ **Leased Fee Interest:** The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires.

♦ **Leasehold Interest:** The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease.



♦ **Lessee:**  One who has the right to occupancy and use of the property of another for a period of time according to a lease agreement.

♦ **Lessor:**  One who conveys the rights of occupancy and use to others under a lease agreement.

♦ **Liquidation Value:**  The most probable price that a specified interest in property should bring under the following conditions:  1) Consummation of a sale within a short time period. 2) The property is subjected to market conditions prevailing as of the date of valuation.  3) Both the buyer and seller are acting prudently and knowledgeably. 4) The seller is under extreme compulsion to sell.  5) The buyer is typically motivated. 6) Both parties are acting in what they consider to be their best interests.  7) A normal marketing effort is not possible due to the brief exposure time.
8) Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto.  9) The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.  This definition can also be modified to provide for valuation with specified financing terms.

♦ **Market Rent:** The most probable rent that a property should bring in a competitive and open market reflecting the conditions and restrictions of a specified lease agreement, including the rental adjustment and revaluation, permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (TIs).

♦ **Market Value:**  A type of value that is the major focus of most real property appraisal assignments. Both economic and legal definitions of market value have been developed and refined, such as the following.  1) The most widely accepted components of market value are incorporated in the following definition: The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.  2) Market value is described, not defined, in the Uniform Standards of Professional Appraisal Practice (USPAP) as follows: A type of value, stated as an opinion, that presumes the transfer of a property (i.e., a right of ownership or a bundle of such rights), as of a certain date, under specific conditions set forth in the definition of the term identified by the appraiser as applicable in an appraisal. [2]

---

[2] The actual definition of value used for this appraisal is contained within the body of the report. The definition of market value given above is general in viewpoint and is only provided for amplification.

**NEWMARK**

- ***Market Value of the Going Concern:*** The market value of an established and operating business including the real property, personal property, financial assets, and the intangible assets of the business.

- ***Marketing Time:*** An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal.

- ***Modified Gross Lease:*** A lease in which the landlord receives stipulated rent and is obligated to pay some, but not all, of the property's operating and fixed expenses. Since assignment of expenses varies among modified gross leases, expense responsibility must always be specified. In some markets, a modified gross lease may be called a double net lease, net net lease, partial net lease, or semi-gross lease.

- ***Net Lease:*** A lease in which the landlord passes on all expenses to the tenant. See also ***gross lease; modified gross lease.***

- ***Net Net Net Lease:*** An alternative term for a type of net lease. In some markets, a net net net lease is defined as a lease in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management; also called NNN lease, triple net lease, or fully net lease.

- ***Occupancy Rate:*** 1) The relationship or ratio between the potential income from the currently rented units in a property and the income that would be received if all the units were occupied.
  2) The ratio of occupied space to total rentable space in a building.

- ***Overage Rent:*** The percentage rent paid over and above the guaranteed minimum rent or base rent; calculated as a percentage of sales in excess of a specified breakpoint sales volume.

- ***Percentage Rent:*** Rental income received in accordance with the terms of a percentage lease; typically derived from retail store and restaurant tenants and based on a certain percentage of their gross sales.

- ***Prospective Opinion of Value:*** A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy.



♦ **Rentable Area:** For office or retail buildings, the tenant's pro rata portion of the entire office floor, excluding elements of the building that penetrate through the floor to the areas below. The rentable area of a floor is computed by measuring to the inside finished surface of the dominant portion of the permanent building walls, excluding any major vertical penetrations of the floor. Alternatively, the amount of space on which the rent is based; calculated according to local practice.

♦ **Retrospective Value Opinion:** A value opinion effective as of a specified historical date. The term retrospective does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion."

♦ **Shell Rent:** The typical rent paid for retail, office, or industrial tenant space based on minimal "shell" interior finishes (called vanilla finish or white wall finish in some areas). Usually the landlord delivers the main building shell space or some minimum level of interior build-out, and the tenant completes the interior finish, which can include wall, ceiling, and floor finishes, mechanical systems, interior electricity, and plumbing. Typically these are long-term leases with tenants paying all or most property expenses.

♦ **Surplus Land:** Land that is not currently needed to support the existing use but cannot be separated from the property and sold off for another use. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. See also **excess land.**

♦ **Turnover Vacancy:** A method of calculating vacancy allowance that is estimated or considered as part of the potential income estimate when using discounted cash flow (DCF) analysis. As units or suites turn over and are available for re-leasing, the periodic vacancy time frame (vacancy window) to release the space is considered.

♦ **Usable Area:** 1) For office buildings, the actual occupiable area of a floor or an office space; computed by measuring from the finished surface of the office side of corridor and other permanent walls, to the center of partitions that separate the office from adjoining usable areas, and to the inside finished surface of the dominant portion of the permanent outer building walls. Sometimes called net building area or net floor area. See also floor area. 2) The area that is actually used by the tenants measured from the inside of the exterior walls to the inside of walls separating the space from hallways and common areas.

♦ **Use Value:** The value of a property assuming a specific use, which may or may not be the property's highest and best use on the effective date of the appraisal. Use value may or may not be equal to market value but is different conceptually. See also **value in use.**



♦ ***Value In Use:*** The value of a property assuming a specific use, which may or may not be the property's highest and best use on the effective date of the appraisal. Value in use may or may not be equal to market value but is different conceptually. See also ***use value.***

♦ ***Value Indication:*** A valuer's conclusion of value resulting from the application of an approach to value, e.g., the value indication by the sales comparison approach.



**Addendum B**

**Engagement Letter**



May 21, 2025

Mr. Ruben Ortiz
Finance, HR & Enrollment Manager
MANHATTAN COUNTRY SCHOOL
150 West 85th Street
New York, NY 10024

Phone: 212.348.0952 ext 251
Email: rortiz@manhattancountryschool.org

Re:     Appraisal of the property described as:
         A 6-story, community facility building comprising 39,805 square feet located at 150 West 85th Street,
         New York, NY, 10024. ("**Property**")

Dear Mr. Ortiz:

Newmark Valuation & Advisory, LLC ("**Firm**") agrees to provide Manhattan Country School ("**Client**") an appraisal of the above-referenced Property in accordance with, and subject to, the terms and conditions set forth below and in the attached Schedules (collectively, "**Agreement**").

| | |
|---|---|
| APPRAISAL FEE: | $19,980.00 (inclusive of expenses). |
| ADDITIONAL HOURLY FEES: | None |
| RETAINER: | $19,980 (100.0%) |
| REPORT DELIVERABLES: | The appraisal, draft and/or final, shall be delivered in electronic format (typically, pdf). One original hard copy of the final appraisal will be provided to Client upon request. |
| COMMENCEMENT AND DELIVERY DATE: | Delivery is as follows:<br><br>Draft appraisal report: Friday, May 23rd   Final Report noi latyer that5 pm May 25<br><br>The appraisal process will commence upon receipt by the Firm of (i) this Agreement, signed by Client, (ii) the retainer, and (iii) information and materials identified in Schedule "B."   The appraisal process will conclude |



upon delivery of the final appraisal report, unless terminated sooner by the Firm or Client or as provided herein.

REPORT TYPE: Restricted Appraisal Report

VALUATION PREMISE: Market Value

INTEREST IN THE PROPERTY APPRAISED: Fee Simple

DATE(S) OF VALUE: Current as of: the Date of Inspection

INTENDED USER(S): Intended users of the appraisal include only Manhattan Country School and its ("**Intended User(s)**"), and no other party is permitted to use or rely on the appraisal. The identification of Intended User(s) of the appraisal is to determine the type and extent of research, analysis and reporting appropriate for the assignment. Designation of a party other than Client as an Intended User is not intended to confer upon such party any rights under this Agreement.

*lawyers and adcvisors*

INTENDED USE: The intended use of the appraisal is solely for internal business decisions and for ("**Intended Use**") and no other use.

*submission to the court*

RELIANCE LANGUAGE: None

GUIDELINES: The analyses, opinions and conclusions are to be developed based on, and the appraisal will be prepared in conformance with the Uniform Standards of Professional Appraisal Practice (USPAP) as published by the Appraisal Foundation.

SCOPE OF WORK: The appraiser will use and properly apply all applicable and appropriate approaches to value sufficient to produce credible assignment results. The scope of the analysis will be appropriate for the appraisal problem.

APPRAISAL REPORT SIGNATORY: Charles Looney

ASSUMPTIONS/ LIMITING CONDITIONS: The appraisal will be subject to Firm's standard Assumptions and Limiting Conditions, which will be incorporated into the appraisal report. In addition, the appraisal may be subject to, and the appraisal report may contain, Extraordinary Assumptions and Hypothetical Conditions.

ACCEPTANCE: This shall constitute a binding agreement only if countersigned by the Client, or by an officer, director or other representative of Client who, by

signing and accepting this Agreement, represents and warrants that he/she is authorized by Client to do so.

PAYMENT:

Client will be invoiced the appraisal fee (and any expenses) which will be earned in full upon initial delivery of the appraisal report (draft or final), with such appraisal fee (and expenses) payable within 30 days of invoicing.

Payment of the fee is not contingent upon any predetermined value or on an action or event resulting from the analysis, opinions, conclusions or use of the appraisal.

CHANGES TO THE AGREEMENT:

Any significant changes to the assignment as outlined in this Agreement, such as the identity of the Client, Intended User, or Intended Use, will require the preparation and execution of a new agreement.

CANCELLATION OF ASSIGNMENT:

Client may cancel this Agreement at any time prior to the Firm's delivery of the appraisal upon written notification to the Firm. Client shall pay Firm for all work completed on the assignment prior to Firm's receipt of such written cancellation notice, unless otherwise agreed upon by Firm and Client in writing. The Firm may withdraw without penalty or liability from the assignment(s) contemplated by the Agreement before completion or reporting if the Firm determines, in the Firm's sole discretion, that incomplete information was provided to the Firm prior to the engagement, that Client or other parties have not or cannot provide documentation or information necessary to the Firm's analysis or reporting, that conditions of the Property render the original scope of work inappropriate, that a conflict of interest has arisen, or that Client has not complied with its payment obligations under this Agreement. The Firm shall notify Client of such withdrawal in writing.

NO THIRD-PARTY BENEFICIARIES:

Nothing in the Agreement shall create a contractual relationship or any legal duty between Firm or Client and any third party, nor any cause of action, right, or claim in favor of any third party and against Firm or Client. In addition, this Agreement is not intended to, and shall not be construed to, render any person or entity a third-party beneficiary of this Agreement. Client acknowledges and agrees that the appraisal report shall reflect the foregoing. In addition, the appraisal report shall state that no party other than an Intended User identified in the Agreement is entitled to rely upon the appraisal.

This Agreement may be rescinded by the Firm unless signed and returned to the undersigned within 10 days from the date hereof.

If this Agreement correctly sets forth the Client's understanding of the services to be rendered, and if the terms are satisfactory, please execute and return the Agreement together with any required retainer.

Respectfully,

_____
Charles Looney
*Vice President*
charles.looney@nmrk.com
O: 212.372.2293
C: 646.599.7898

Agreed:
MANHATTAN COUNTRY SCHOOL

SIGNATURE: _____

PRINT NAME: _____
Kiran Kulkarni

TITLE: _____
Trustee

DATE: _____
May 23, 2025



Schedule "A"

# TERMS AND CONDITIONS

**ATTACHED TO AND A PART OF THE AGREEMENT DATED MAY 21, 2025 TO PROVIDE APPRAISAL SERVICES FOR MANHATTAN COUNTRY SCHOOL**

1. These Terms and Conditions are attached to and incorporated into the above referenced Agreement as though fully set forth in full therein. Capitalized terms if not defined herein shall have the same meaning as defined in the Agreement.

2. With respect to any appraisal report, use of or reliance on the appraisal by any party, regardless of whether the use or reliance is authorized or known by the Firm, constitutes acceptance of these Terms and Conditions as well as acceptance of all other appraisal statements, limiting conditions and assumptions stated in the Agreement and appraisal report.

3. It is assumed that there are no matters affecting the Property that would require the expertise of other professionals, such as engineers or an environmental consultant, for Firm to provide the appraisal. If such additional expertise is required, it shall be provided by other parties retained by Client at Client's sole cost and expense.

4. Client acknowledges that the Firm is being retained as an independent contractor to provide the services described herein and nothing in this Agreement shall be deemed to create any other relationship between Firm and Client, including but not limited to an agency relationship. The parties neither intend nor have any expectation that any such relationship will arise as a matter of law or as a result of this Agreement. This assignment shall be deemed concluded and the services hereunder completed upon delivery of the appraisal described herein to Client.

5. All statements of fact contained in the appraisal report as a basis of the appraiser's analyses, opinions, and conclusions will be true and correct to the best of the appraiser's actual knowledge and belief. The appraiser is entitled to, and shall rely upon the accuracy of information and material furnished to the Firm by Client. Appraiser is also entitled to, and shall, rely on information provided by sources upon which members of the appraisal profession typically rely and that are deemed to be reliable by members of that profession without independent verification.

6. The Firm and the appraiser shall have no responsibility for legal matters, or questions or issues involving survey or title, soil or subsoil conditions, engineering, zoning, buildability, environmental contamination, structural matters, construction defects, material or methodology, or other similar technical matters with regarding the Property. Furthermore, the appraisal will not constitute a survey of the Property.

7. The appraisal and the data and information gathered in its preparation (other than the confidential data and information provided by Client) is and will remain, the property of the Firm. The Firm shall not violate the confidential nature of the appraiser-client relationship by improperly disclosing any confidential information furnished by Client to the Firm. Notwithstanding the foregoing, the Firm and the appraiser are authorized by Client to disclose all or any portion of the appraisal and appraisal report and the related data and information, including confidential data and information provided by Client, to appropriate representatives of the Appraisal Institute if such disclosure is required to comply with the Standards, Bylaws and Regulations of the Appraisal Institute, as well as, such disclosure as required  by law and regulations, including compliance with a subpoena and licensing authority regulatory inquiries. The Firm is also authorized to include both confidential and non-confidential data assembled in the course of preparing the appraisal and which may be incorporated into the appraisal report in a database controlled by the Firm for the aggregation of such data and information to produce analytics and other metrics or products.

8. Unless specifically noted in the appraisal report, the appraisal will not take into consideration the possibility or probability of the existence of asbestos, PCB transformers, other toxic, hazardous, or contaminated substances



and/or underground storage tanks (hazardous material) at on or in the Property, or the cost of encapsulation, removal or remediation thereof.

9. Client shall indemnify, defend (by counsel to be selected by Firm), protect, and hold Firm and Firm's appraisers, agents, employees, affiliates, representatives, successors and assigns (each, a "**Firm Party**"), free and harmless from any and all claims, liabilities, losses, penalties, fines, forfeitures, amounts paid in settlement, judgments, and all reasonable attorneys' fees and related litigation costs, fees and expenses incurred by the any of such indemnitees, which result from (i) any failure by Client or Client's agents or representatives to provide Firm with complete and accurate information regarding the Property; (ii) any material breach by Client of the provisions of the Agreement; (iii) if delivery of the appraisal to a third party is permitted by the Firm, Client providing an incomplete copy of the appraisal to such third party; or (iv) arising from Client or Client's agents or representatives providing a copy of the appraisal to a party not authorized by the Firm to receive such copy.

10. In preparing the appraisal, it is possible that the appraiser will discover conflicting information. In that event, appraiser will utilize information and data considered to be the most authoritative and for critical information will document the source. Information and data referred to may include, but is not limited to, legal descriptions; physical street addresses; assessor parcel numbers; property history; dimensions and areas of the site/land; dimensions and areas of the building improvements; physical unit counts; rent rolls; leases; lease abstracts; income and expense data; and any other related data. Any material discrepancy and/or error in any of the above data could have a substantial impact on the conclusions reported, and the Firm therefore reserves the right to amend conclusions reported if the Firm is made aware of any such discrepancy and/or error.

11. The appraisal may not be used, included or referenced, in whole or in part, in any offering or other materials without the prior written consent of the Firm, which consent may be conditioned upon the receipt by the Firm of an indemnity agreement, in form and content, satisfactory to Firm and provided by an indemnitor satisfactory to Firm. Client agrees to pay the fees of the Firm's legal counsel for review of any materials which is the subject of the requested consent. Except as agreed by the Firm expressly in writing, the Firm disclaims liability to any party other than Client.

12. The Firm shall not provide a copy of the appraisal to, or disclose the results of the appraisal to, any party other than Client, unless Client authorizes same, except as provided in the Confidentiality Section of the ETHICS RULE of the Uniform Standards of Professional Appraisal Practice (USPAP) or as otherwise required by law or regulations.

13. Client and any other identified Intended User should consider the appraisal as only one factor together with its own independent considerations and underwriting guidelines in making any decision or investment or taking any action regarding the Property. Client agrees that Firm shall not be responsible in any way for any decision of Client or any Intended User related to the Property or for the advice or services provided by any other advisors or contractors.

14. Unless otherwise stated in this Agreement, Client agrees that the services pursuant to this Agreement shall not include participation in or preparation for, or attendance at, any legal, judicial, administrative, or arbitration proceeding relating to this assignment. In the event the Firm or any Firm Party is required, whether through the service of a subpoena or otherwise, to produce documents or participate in or prepare for any discovery, testimony or attendance, relating to the appraisal or this assignment, where the Firm or Firm Party is not a party to the action or proceedings involved, Client agrees to reimburse expenses incurred by the Firm or Firm Party, including attorney's fees, in responding to such subpoena or other legal process and compensate the Firm therefor based upon the appraiser's prevailing hourly or daily rate for providing services as an expert consultant or witness.

15. **LIMITATION ON LIABILITY** NEITHER PARTY'S AGGREGATE LIABILITY RELATED TO THIS AGREEMENT (WHETHER UNDER CONTRACT, TORT OR OTHERWISE) WILL EXCEED THE AMOUNT OF FEES PAID FOR THE APPRAISAL ASSIGNMENT, AND NEITHER PARTY WILL BE LIABLE FOR ANY CONSEQUENTIAL,



SPECIAL, INCIDENTAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES RELATED TO THIS AGREEMENT (WHETHER UNDER CONTRACT, TORT OR OTHERWISE).

16. **WAIVER OF CONSEQUENTIAL DAMAGES** IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, LOST PROFITS, LOSS OF REVENUE, LOSS OF USE OR INTERRUPTION OF BUSINESS) ARISING OUT OF OR RELATED TO THIS AGREEMENT, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

17. Except as expressly provided herein, Firm makes no representations or warranties to Client or to any other person or entity with respect to the appraisal and the services to be provided by Firm under this Agreement. To the maximum extent permitted under applicable law, in no event will the Firm or any Firm Party be liable to Client or any third party (regardless of whether such party's claimed use or reliance on the appraisal was authorized by the Firm or a Firm Party) for any claimed damages exceeding the damages in Paragraph 15. Legal claims or causes of action relating to the appraisal are not assignable, except: (i) as the result of a merger, consolidation, sale or purchase of a legal entity, (ii) with regard to the collection of a bona fide existing debt for services but then only to the extent of the total compensation for the appraisal plus reasonable interest, or (iii) in the case of an appraisal performed in connection with the origination of a mortgage loan, as part of the transfer or sale of the mortgage before an event of default on the mortgage or note or its legal equivalent.

18. Federal banking regulations require banks and other lending institutions to engage appraisers where FIRREA compliant appraisals must be used in connection with mortgage loans or other transactions involving federally regulated lending institutions. In view of that requirement, the appraisal may not be accepted by a federally regulated financial institution.

19. In the event Client fails to make payments of any fees or sums when due and payable under this Agreement; then from the date due and payable until paid, the amount due and payable shall bear interest at the maximum rate permitted under the laws of the state in which the Property is located. If the Firm is required to undertake collection efforts including institution of legal action against Client relating to the Agreement, the Firm shall be entitled to recover attorney's fees, litigation expenses, and costs from Client.

20. To the extent permitted under applicable law, any legal action or lawsuit or other proceeding by Client or any Intended User of the appraisal against Firm or a Firm Party whether based in contract, tort, warranty, indemnity or otherwise, relating to the appraisal shall be commenced within two (2) years from the date of delivery of the appraisal to the claimant in such action or proceeding, unless the applicable law provides for a shorter period, and any such claimant waives the right to a jury in any such legal action or lawsuit or other proceeding. Notwithstanding the state of domicile or residency of either party to this Agreement, this Agreement shall be governed and construed under the laws of the state in which the Property is located, and venue for any action or proceeding arising out of this Agreement shall be deemed proper only in the court of competent jurisdiction located in the state in which the Property is located.

21. Throughout the performance of services under this Agreement, the Firm shall maintain at its sole cost and expense the following insurance:

    (a) Workers' Compensation, so as to provide statutory benefits as required by the laws of each state within the United States in which the Firm's services are being provided, and Employer's Liability insurance with limits of liability of $1,000,000 each accident, $1,000,000 disease each employee and $1,000,000 disease policy limit covering all employees of the Firm engaged in the performance of such services.

    (b) Fidelity insurance or bond with a limit of $1,000,000 to insure the Firm against loss of its or Client's assets caused from the dishonest acts of the Firm's employees.



(c)   Professional Liability insurance with a limit of liability of $1,000,000 each claim and $1,000,000 aggregate, which limits may be provided by a combination of primary and excess policies.

(d)   Commercial General Liability insurance providing coverage against damages due to bodily injury (including death), property damage and personal and advertising injury arising in connection with the Firm's services provided under this Agreement, which insurance coverage shall: (i) be occurrence-based; (ii) provide limits of liability in an amount of $2,000,000 each occurrence and $5,000,000 aggregate (including excess and/or umbrella limits), (iii) include at least those coverages generally included in the most current ISO Commercial General Liability insurance policy form (or its equivalent); and (iv) include Client, and such other persons or entities as Client has identified in writing, as additional insureds solely with regard to claims arising out of this Agreement.

(e)   Commercial automobile liability for owned, hired and non-owned motor vehicles, with a $1,000,000 combined single limit.



Schedule "B"

# PROPERTY INFORMATION LIST

ATTACHED TO AND A PART OF THE AGREEMENT DATED MAY 21, 2025 TO PROVIDE APPRAISAL SERVICES FOR MANHATTAN COUNTRY SCHOOL

The following information is requested to be delivered to the Firm so we can provide the proposed services and prepare the Appraisal within the agreed upon time frame. Please forward the physical data such as the site plan, previous engineering reports and/or property reports describing the physical attributes of the Property and all financial information such as rent roll and income and expense statements first as these items are the most time sensitive and should be received immediately to meet the time requirements of this assignment. If, at this time, you are certain you will not be providing any specific items noted below, please cross out the item and mark "NA" next to the item so that we will be notified that the information is not available and will not be forthcoming.

1. ==Please indicate whether Newmark is sales broker, leasing broker, mortgage broker or property manager for the subject property==.

2. Site plan, if available. (Preferably, an AS BUILT PLAN showing an outline of building/s drawn to scale. Please do not send reductions so original scale may be used for measurement purposes.

3. Building plans, if available.

4. Prior engineering report or physical descriptions from prior appraisals or asset management report, if available.

5. Leasing brochures and/or other marketing materials, if available.

6. If the Property has been offered for sale within the last two years, a copy of the offering memorandum or investment book.

7. Past feasibility or market studies and economic impact studies as well as any relevant information collected from third party sources.

8. Agreements of Sale/Options to Buy (current or during last three years), if any.

9. Income and expense statements for the past three years plus year-to-date income and expense statements.

10. Operating budget for current and next year, if available.

11. Current property insurance binder or last property insurance billing statement.

12. Management contracts.

13. Copy of most recent real estate tax bill. Please advise if there has been a notice or inquiry by either the County Assessment Board or the School Board regarding the property assessment. Is there any pending litigation or negotiations with these parties that could result in an assessment increase or decrease?

14. Title report, Legal Description, or copy of deed. Provide a written statement of five-year history of legal property owner. Please advise, if there any deed restrictions or encumbrances, easements or cross easements.

15. Personal property inventory, if available.

16. Occupancy rates for the last three years, if not revealed in the financial statements.

17. Ground leases, if any.



18. Approximate actual construction costs, if built during the past three years.

19. Environmental audits and studies disclosing any wetlands, hazardous wastes or other environmental conditions such as asbestos or radon.

20. List of any known major repairs and improvements needed.

21. Three-year history of capital improvements.

22. Name of contact person for the on-site physical inspection.

## FOR APARTMENT PROPERTY

23. Unit mix showing rentable area and asking rent by unit type

24. Scaled apartment unit plans showing layouts and measurements so that rentable area can be confirmed, if available.

25. Rent roll showing tenant name, apartment number, dates of leases and the type of apartment, asking/market rents for each apartment, and contractual rent for each apartment unit. (It would be greatly appreciated if you can provide the rent roll in Excel.)

26. Terms of leases and/rent roll for leased commercial space or roof top rentals. Copies of commercial leases are desirable. If any commercial leases provide for pass through of operating expenses over a base year stop, please provide the dollar amount of the base year stop.

## FOR INDUSTRIAL, OFFICE, RETAIL PROPERTY

27. Rent Roll (please sign and date) and copies of leases, including addenda and all amendments. Please indicate which leases may have early termination provisions, expansion and/or purchase options. Please identify any tenants who have initiated discussions to renew, terminate or renegotiate/modify their lease(s), or who have given notice to terminate. Proposed terms for such re-negotiations should be revealed.

28. Provide letters of intent to lease or other any outstanding lease proposals that have a reasonable likelihood of being finalized into executed leases.

29. Prior Argus files, if any.

30. List of outstanding leasing commissions brokers and terms of future payments.

31. Financial information such as Annual Statements or credit report/ratings on any major tenant in the building.

32. CAM and real estate tax reimbursement worksheets or listing of base year operating expenses, if applicable.

33. Three-year history of tenant retail sales, if available.

## FOR LODGING PROPERTY

34. Terms of leases if any and/rent roll for leased commercial space or roof top rentals.

35. ADR and Occupancy rates for the last three years, if not revealed in the financial statements.

36. Business Plan and Marketing Strategy, if any for the upcoming fiscal year.

37. Terms of franchise agreement and management agreement, if any.



## FOR RESIDENTIAL SUBDIVISION PROPERTY

38. Building plans for the proposed single family, townhouse, age-restricted, and condominium residences. Please do not send reductions so original scale may be used for measurement purposes.

39. Market Surveys and Feasibility Analyses, if any, for the proposed development program.

40. Marketing materials for the proposed single family, townhouse, age-restricted, and condominium residences.



# Addendum C

# Comparable Data



## Comparable Improved Sale 1

### Location Information

| | |
|---|---|
| Address | 142 Pierrepont Street |
| Submarket, Market | Downtown Brooklyn, New York |



### Physical Property Summary

| | |
|---|---|
| Property Type | Community Facility |
| Rentable Area | 19,764 SF |
| Land SF | 4,356 SF |
| Land Acres | 0.10 Acres |
| No. of Stories | 4 |
| Building Class | Class C |

### Financial Data

| | |
|---|---|
| Occupancy | Owner User |
| NOI/SF | -- |
| In-Place Cap Rate | -- |
| Adjusted Cap Rate | -- |
| Terminal Cap Rate | -- |
| Discount Rate | -- |
| Holding Period | -- |

### Sale Data

| | |
|---|---|
| Transaction Type | Sale |
| Interest Conveyed | Fee Simple |
| Days on the Market | |
| Buyer | Saint Ann's School |
| Seller | 181 Montague LLC c/o Jonathan Rose Companies |
| Transaction Date | 4/30/2025 |
| Price | $15,955,000 |
| Price Per SF | $807 |

### Comments

This is the sale of a 4-story, Class C school located on Pierrepont Street between Clinton Street and Cadman Plaza West in Downtown Brooklyn. The buyer purchased the property for occupancy.

## Comparable Improved Sale 2

### Location Information

| | |
|---|---|
| Address | 1 West 4th Street |
| Submarket, Market | Greenwich Village, New York |

### Physical Property Summary

| | |
|---|---|
| Property Type | Community Facility |
| Rentable Area | 85,000 SF |
| Land SF | 17,860 SF |
| Land Acres | 0.41 Acres |
| No. of Stories | 5 |
| Building Class | Class C |



### Financial Data

| | |
|---|---|
| Occupancy | Owner User |
| NOI/SF | -- |
| In-Place Cap Rate | -- |
| Adjusted Cap Rate | -- |
| Terminal Cap Rate | -- |
| Discount Rate | -- |
| Holding Period | -- |

### Sale Data

| | |
|---|---|
| Transaction Type | Sale |
| Interest Conveyed | Fee Simple |
| Days on the Market | |
| Buyer | New York University |
| Seller | Hewbrew Union College Jewish Institute of |
| Transaction Date | 1/30/2025 |
| Price | $75,500,000 |
| Price Per SF | $888 |

### Comments

This is the sale of a 5-story, Class C school located on the northern blockfront of West 4th Street between Mercer Street and Broadway in Greenwich Village. New York University purchased the building for occupancy; however, the seller, Hebrew Union College will remain in the building until 2027.

## Comparable Improved Sale 3

### Location Information

| | |
|---|---|
| Address | 53-55 East 124th Street |
| Submarket, Market | Harlem/North Manhattan, New York |

### Physical Property Summary

| | |
|---|---|
| Property Type | Community Facility |
| Rentable Area | 85,000 SF |
| Land SF | 18,406 SF |
| Land Acres | 0.42 Acres |
| No. of Stories | 5 |
| Building Class | Class B |



### Financial Data

| | |
|---|---|
| Occupancy | Owner User |
| NOI/SF | -- |
| In-Place Cap Rate | -- |
| Adjusted Cap Rate | -- |
| Terminal Cap Rate | -- |
| Discount Rate | -- |
| Holding Period | -- |

### Sale Data

| | |
|---|---|
| Transaction Type | Sale |
| Interest Conveyed | Fee Simple |
| Days on the Market | |
| Buyer | Touro University |
| Seller | New York College of Podiatric Medicine |
| Transaction Date | 1/1/2025 |
| Price | $42,000,000 |
| Price Per SF | $753 |

### Comments

This is the sale of a 5-story, Class B school located on East 124th Street between Madison and Park Avenues in Harlem/North Manahttan, NY. The buyer purchased the property for occupancy.

## Comparable Improved Sale 4

### Location Information

| | |
|---|---|
| Address | 176 West 105th Street |
| Submarket, Market | Upper West Side, New York |

### Physical Property Summary

| | |
|---|---|
| Property Type | Community Facility |
| Rentable Area | 10,242 SF |
| Land SF | 4,000 SF |
| Land Acres | 0.09 Acres |
| No. of Stories | 3 |
| Building Class | Class B |



### Financial Data

| | |
|---|---|
| Occupancy | Owner User |
| NOI/SF | -- |
| In-Place Cap Rate | -- |
| Adjusted Cap Rate | -- |
| Terminal Cap Rate | -- |
| Discount Rate | -- |
| Holding Period | -- |

### Sale Data

| | |
|---|---|
| Transaction Type | Sale |
| Interest Conveyed | Fee Simple |
| Days on the Market | |
| Buyer | World Mission Society Church of God |
| Seller | Kehilat Romemu |
| Transaction Date | 8/16/2024 |
| Price | $10,000,000 |
| Price Per SF | $976 |

### Comments

This is the sale of a 3-story, Class B religious facility located at 176 West 105th Street, within the Upper West Side submarket. The property was purchased for occupancy.

## Comparable Improved Sale 5

### Location Information

| | |
|---|---|
| Address | 107 East 70th Street |
| Submarket, Market | Upper East Side, New York |



### Physical Property Summary

| | |
|---|---|
| Property Type | Office |
| Rentable Area | 17,726 SF |
| Land SF | 5,804 SF |
| Land Acres | 0.13 Acres |
| No. of Stories | 5 |
| Building Class | Class C |

### Financial Data

| | |
|---|---|
| Occupancy | Owner User |
| NOI/SF | $1,946.29 |
| In-Place Cap Rate | -- |
| Adjusted Cap Rate | -- |
| Terminal Cap Rate | -- |
| Discount Rate | -- |
| Holding Period | -- |

### Sale Data

| | |
|---|---|
| Transaction Type | Sale |
| Interest Conveyed | Fee Simple |
| Days on the Market | |
| Buyer | Altneu Building LLC c/o The Altneu Synagogue |
| Seller | Visting Nurse Services of New York c/o VNS |
| Transaction Date | 3/29/2024 |
| Price | $34,500,000 |
| Price Per SF | $1,946 |

### Comments

This is the sale of a 5-story, Class C commercial building located at 107 East 70th Street, within the Upper East Side neighborhood. The property was purchased for occupancy.

## Comparable Improved Sale 6

### Location Information

| | |
|---|---|
| Address | 211-213 East 83rd Street |
| Submarket, Market | Upper East Side, New York |



### Physical Property Summary

| | |
|---|---|
| Property Type | Community Facility |
| Rentable Area | 11,766 SF |
| Land SF | 7,140 SF |
| Land Acres | 0.16 Acres |
| No. of Stories | 4 |
| Building Class | Class C |

### Financial Data

| | |
|---|---|
| Occupancy | Owner User |
| NOI/SF | -- |
| In-Place Cap Rate | -- |
| Adjusted Cap Rate | -- |
| Terminal Cap Rate | -- |
| Discount Rate | -- |
| Holding Period | -- |

### Sale Data

| | |
|---|---|
| Transaction Type | Sale |
| Interest Conveyed | Fee Simple |
| Days on the Market | |
| Buyer | 213 Yorkville LLC |
| Seller | Roman Catholic Curch |
| Transaction Date | 7/12/2024 |
| Price | $11,750,000 |
| Price Per SF | $999 |

### Comments

This is the sale of a 4-story, Class C religious school facility located at 211-213 East 83rd Street, within the Upper East Side neighborhood. The property was purchased for occupancy.



## Comparable Improved Sale 7

### Location Information

| | |
|---|---|
| Address | 507 Ocean Parkway |
| Submarket, Market | South Brooklyn, New York |



### Physical Property Summary

| | |
|---|---|
| Property Type | Community Facility |
| Rentable Area | 34,800 SF |
| Land SF | 14,000 SF |
| Land Acres | 0.32 Acres |
| No. of Stories | 5 |
| Building Class | Class B |

### Financial Data

| | |
|---|---|
| Occupancy | Owner User |
| NOI/SF | -- |
| In-Place Cap Rate | -- |
| Adjusted Cap Rate | -- |
| Terminal Cap Rate | -- |
| Discount Rate | -- |
| Holding Period | -- |

### Sale Data

| | |
|---|---|
| Transaction Type | Sale |
| Interest Conveyed | Fee Simple |
| Days on the Market | |
| Buyer | Mosdos Satmar Boro Park |
| Seller | Boruch Margulies |
| Transaction Date | 10/26/2023 |
| Price | $20,000,000 |
| Price Per SF | $575 |

### Comments

This is the sale of a 5-story, Class B religious school facility located at 507 Ocean Parkway, within the South Brooklyn submarket. The property was purchased for occupancy by its tenant, the Mosdos Satmar Boro Bank institution.

## Comparable Improved Sale 8

### Location Information

| | |
|---|---|
| Address | 109 East 73rd Street |
| Submarket, Market | Upper East Side, New York |

### Physical Property Summary

| | |
|---|---|
| Property Type | Community Facility |
| Rentable Area | 7,000 SF |
| Land SF | 2,243 SF |
| Land Acres | 0.05 Acres |
| No. of Stories | 6 |
| Building Class | Class B |



### Financial Data

| | |
|---|---|
| Occupancy | Owner User |
| NOI/SF | -- |
| In-Place Cap Rate | -- |
| Adjusted Cap Rate | -- |
| Terminal Cap Rate | -- |
| Discount Rate | -- |
| Holding Period | -- |

### Sale Data

| | |
|---|---|
| Transaction Type | Sale |
| Interest Conveyed | Fee Simple |
| Days on the Market | |
| Buyer | The Buckley School |
| Seller | 109 East 73rd Street |
| Transaction Date | 6/8/2023 |
| Price | $7,500,000 |
| Price Per SF | $1,071 |

### Comments

This is the sale of a 6-story reisdential building located at 109 East 73rd Street in the Upper East Side neighborhood of Manhattan. The buyer purchased the property to expand the school.



## Comparable Office Improved Sale 9

### Location Information

| | |
|---|---|
| Address | 114-124 East 35th Street |
| Submarket, Market | Murray Hill, New York |

### Physical Property Summary

| | |
|---|---|
| Property Type | Office |
| Rentable Area | 20,215 SF |
| Land SF | 9,148 SF |
| Land Acres | 0.21 Acres |
| No. of Stories | 5 |
| Building Class | Upper East Side, New York |



### Financial Data

| | |
|---|---|
| Occupancy | Owner User |
| NOI/SF | -- |
| In-Place Cap Rate | -- |
| Adjusted Cap Rate | -- |
| Terminal Cap Rate | -- |
| Discount Rate | -- |
| Holding Period | -- |

### Sale Data

| | |
|---|---|
| Transaction Type | Sale |
| Interest Conveyed | Fee Simple |
| Days on the Market | |
| Buyer | Republic of Serbia |
| Seller | New York Society of the New Church |
| Transaction Date | 4/3/2023 |
| Price | $15,000,000 |
| Price Per SF | $742 |

### Comments

This is the sale of a 5-story, Class B religious facility located at 114-124 East 35th Street in Murary Hill. The buyer purchased the property for occupancy.



**Addendum D**

**Appraiser Qualifications and Licenses**





# Douglas H. Larson

MRICS

*Executive Vice President*
*Specialty Practice Leader – Office*

t 212-372-2193
m 917-365-0054
douglas.larson@nmrk.com

**YEARS OF EXPERIENCE**

## 25+

**AREAS OF SPECIALTY**

Office

Life Science

Industrial

Multifamily

Complex Mixed-Use Assets

Property Tax Appeals

Arbitration Witness

Douglas Larson MRICS, joined Newmark Valuation & Advisory in 2017 and currently serves as an Executive Vice President in the company's New York headquarters. Douglas brings to his position over two decades of financial advisement, underwriting, asset management and valuation expertise. He has appraised several major urban office and retail properties on behalf of clients within the financial, investment banking, private wealth, and insurance industries. Douglas has successfully completed appraisals and consulting assignments for mortgage loan purposes, arbitrations, allocations, estates, and the acquisition, disposition and marketing of real estate.

Douglas is also the national Practice Leader for the Valuation & Advisory's Office Specialty Practice. He oversees a team of experts whose innovative, consulting-driven approach provides best-in-class valuation and consulting services for all properties belonging to the office asset class.

Prior to joining Newmark, Douglas served for 24 years as an Executive Director with Cushman & Wakefield's Valuation & Advisory group in New York where he managed the New York office building valuation team that provided valuation, underwriting and due diligence expertise to support the financing of major office and retail construction projects throughout the city. Clients included private equity firms, hedge funds, banks and other institutional investors. He also provided a number of consulting services, including preparation of appraisals; customized financial analyses; advising acquisition and disposition strategies; preparing market and location studies; and analyzing capital structures to identify short and long-term risks.

Douglas has performed valuation and analysis on a wide variety of property types, including Class A office buildings, high-street retail development projects, shopping centers, apartment buildings, manufacturing plants, warehouses and mixed-use projects. He has extensive experience with New York City office buildings and urban mixed-use properties. He has recently appraised over 500 major office buildings in Manhattan.

## Licenses and Designations

— Associate Member, Appraisal Institute Metropolitan New York Chapter

— Member, Royal Institution of Chartered Surveyors (MRICS)

— Certified general real estate appraiser, State of New York #46-39300

## Education

Douglas earned a Bachelor of Science degree from Arizona State University in business administration and economics.







# Francesca T. Danese

*First Vice President*

t  212-372-2484
m 973-494-3771
francesca.danese@nmrk.com

**YEARS OF EXPERIENCE**
## 15+

**AREAS OF SPECIALTY**

Office

Retail

Mixed-Use Assets

Financial Modeling

Feasibility Studies

Due Diligence

Rent Arbitration

Francesca T. Danese joined Newmark Valuation & Advisory in 2017, and currently serves as First Vice President. She specializes in the valuation of various property types throughout Manhattan and New York City.

Francesca has completed valuations for acquisition and asset management purposes, portfolio valuation, financial analyses, market rent studies, and other advisory services. Her experience includes trophy office buildings, retail condominiums, retail centers, vacant land, multifamily residential properties, industrial buildings, retail and multifamily portfolios, and existing and proposed developments located throughout New York City.

Francesca worked for nearly nine years in Integra Realty Resources' New York office prior to its 2017 acquisition by Newmark.

**Professional Affiliations**
– Practicing Affiliate, Appraisal Institute

**Education**
Francesca earned a Bachelor of Science degree in entrepreneurial studies from Fairleigh Dickenson University. More recently, she successfully completed numerous real estate and related courses offered by the Appraisal Institute.

**NEWMARK**







# Charles R. Looney

*Vice President*

t (1) 212-372-2293
m (1) 352-208-7372
charles.looney@nmrk.com

**YEARS OF EXPERIENCE**

## 10

**AREAS OF SPECIALTY**

Office

Complex Mixed-Use Assets

Retail Malls

Feasibility Studies

Financial Modeling

Due Diligence

Rent Arbitration

Charles R. Looney joined Newmark Valuation & Advisory in 2017 and currently serves as a vice president. Based in the company's New York headquarters, Charles specializes in the valuation of various property types throughout Manhattan and New York City.

Prior to joining Newmark, Charles spent more than three years as an associate appraiser at Cushman & Wakefield, where he contributed to the valuation of property types that included trophy office buildings, retail condominiums, retail centers, vacant land, transferable development rights, historic and preservation easements, and existing and proposed investment properties located throughout New York City.

Since joining Newmark, Charles has been involved in the valuations of the most iconic and marquis deals transacted in New York City. Year in and year out he's performed appraisals of many of the top ten largest loans recorded annually accounting for over $2.0 trillion in commitments since 2018.

**Professional Affiliations**

– Practicing Affiliate, Appraisal Institute Metropolitan New York Chapter

**Education**

Charles holds a Bachelor of Science degree from the Marist College School of Science.



NEWMARK