Richard J. McCord, Esq.
Robert D. Nosek, Esq.
CERTILMAN BALIN ADLER & HYMAN, LLP
Attorneys for U.S. Bank National Association,
As Trustee and Flushing Bank
90 Merrick Avenue
East Meadow, New York 11554
Telephone:  (516) 296-7000
Facsimile:  (516) 296-7111

**Hearing Date: May 30, 2025**
**Time:  2:00 p.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re:

MANHATTAN COUNTRY SCHOOL,
a/k/a MANHATTAN COUNTRY SCHOOL, INC.,

                                                    Debtor.
-------------------------------------------------------------X

Chapter 11

Case No. 25-11009 (DSJ)

**OBJECTION OF FLUSHING BANK AND U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE, TO EMERGENCY MOTION FOR THE ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO SECTION 364(d) OF THE BANKRUPTCY CODE (A) AUTHORIZING THE DEBTOR TO OBTAIN DEBTOR-IN-POSSESSION FINANCING (B) GRANTING SECURITY INTERESTS AND PRIORITY CLAIMS, (C) APPROVING AGREEMENT RELATING TO THE FOREGOING (D) GRANTING RELATED RELIEF, AND (E) SCHEDULING A FINAL HEARING ON THE MOTION PURSUANT TO BANKRUPTCY RULE 4001(C)**

       **FLUSHING BANK** ("**Flushing**" or the "**Bondholder**") and **U.S. BANK NATIONAL ASSOCIATION, solely in its capacity as Trustee for the Series 2016 Bonds (defined below) and as directed by Flushing as beneficial owner of 100% of the Series 2016 Bonds,** (the "**Bond Trustee",** and collectively with Flushing, the "**Secured Creditors**"), by and through their attorneys, Certilman Balin Adler & Hyman, LLP, for their objection to the motion [ECF Doc. No. 24] (the "**Renewed DIP Motion**") by Manhattan Country School a/k/a Manhattan Country School, Inc. (the "**Debtor**) seeking the entry of an Order pursuant to section 105 and section 364(d) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "**Bankruptcy Code**")

and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") (a) authorizing the Debtor to obtain debtor-in-possession financing on an interim basis up to $1,000,000.00, (b) granting a superpriority security interest, (c) approving the agreements related to the foregoing, and (d) granting related relief, respectfully state as follows:

1.  On May 20, 2025 (the "**May 20 Hearing**"), the Court conducted an emergency hearing on the Debtor's original motion (the "**Original DIP Motion**") seeking debtor in possession financing on a superpriority basis. The Secured Creditors filed an objection [ECF Doc. No. 12] (the "**Original Objection**") to the Original DIP Motion, which background and arguments against that relief is incorporated herein by reference in opposition to the Renewed DIP Motion as it seeks substantially similar relief, but does not address many of the points raised in opposition to the first go around.[1] A copy of the Original Objection is annexed hereto as **Exhibit A**, without exhibits. At the conclusion of the May 20 Hearing the Court denied the Original DIP Motion. *See* Order, ECF Doc. No. 14. A copy of the transcript from the May 20 Hearing is annexed hereto as **Exhibit B**.

2.  At approximately 3:30 p.m. on Thursday, May 29, 2025, the Debtor filed the Renewed DIP Motion, with the Court scheduling a hearing on that motion for 2:00 p.m., Friday, May 30, 2025. *See* Scheduling Order, ECF Doc. No. 26.

3.  This is not a new DIP financing proposal resulting from efforts to obtain better lending terms or more limited relief, but rather a redressed request for the same relief by an insider looking to gain from an unfortunate situation. In support of the Renewed DIP Motion, the Debtor has attached a new appraisal purporting to value the Schoolhouse at $35,000,000 (*see* Exhibit 1

---

[1] Capitalized terms not otherwise defined herein shall have the same definitions as assigned in the Original Objection.

8578427.5

(the "**Debtor Appraisal**") to the Kulkarni Declaration). Yet, even if the Debtor were to establish that the 11th hour appraisal were credible, for all of the reasons discussed further below, it is inadequate to meet the Debtor's burden of establishing adequate protection or justifying the relief sought under the Bankruptcy Code. This new appraisal does not cure the defects in the Debtor's Original DIP Motion. Among other things, the new appraisal contains the same or similar conditional marketing requirements and other limitations that were before the Court previously, and the inadequacies of the Original DIP Motion remain.

4.  The Debtor still woefully fails to establish that the Secured Creditors are adequately protected or that the priming DIP financing sought is appropriate or supported under Section 364 of the Bankruptcy Code. Other than the tenuous new appraisal, there is nothing, or certainly little else, new that the Debtor offers in support of its Renewed DIP Motion. The Secured Creditors also note that it appears that the Debtor waited until the very last minute to seek the relief in the Renewed DIP Motion. The Appraisal is dated May 23, 2025, while the agreement between the Debtor and the appraiser for the Appraisal is dated May 21, 2025, with a final report to be provided no later than "5 pm May 25." *See* Appraisal, p. 44. Although the Secured Creditors do not know when the Debtor actually received the Appraisal, it does appear to have been at the end of last week or much earlier this week. Thus, it appears that the Debtor has had several days to bring this matter before the Court but chose to wait until the last minute.

5.  As with the Original DIP Motion, the Debtor continues to speak in unsupported generalities notwithstanding the still substantial sum the Debtor seeks to borrow. Kulkarni states in his Declaration dated May 29, 2025, that "the Debtor has insufficient funds to meet its payroll obligations." Kulkarni Dec. ¶ 5. At no point in the Renewed DIP Motion, the Kulkarni Declaration or any other document submitted as part of the Renewed Motion, does the Debtor reveal its actual,

specific funding needs, or present any ability whatsoever to pay back any money it seeks to borrow. There also continues to be no indication about how the Secured Creditors will be paid.

6. The Original DIP Motion sought interim financing of up to $2,000,000.00 for an interim period of four months. During the May 20 Hearing on that motion, the Court was advised that the Debtor only needed "$500,000 [ ] to get through three weeks from now and reach, essentially, the end of the school year." Tr. 24:25-25:2. Mr. Kulkarni recently spoke to the press and indicated that the Debtor's graduation day was June 12, 2025. *See* Bloomberg Article, May 22, 2025, a copy of which is annexed hereto as **Exhibit C**. June 12th is now only two weeks away. According to a parent at the school, the Debtor has advised the parents that the school year would be further shortened by a week. *See* Tiktinsky E-Mail, ECF Doc. No. 22, a copy of which is annexed hereto as **Exhibit D**. Now, Mr. Kulkarni states in his Declaration dated May 29, 2025 in support of the Renewed DIP Motion that the Debtor needs "$1,000,000 for the next four weeks[.]" Kulkarni Dec. ¶ 12.

7. The foregoing communications to the press and the Debtor's communications with the parent community and to this Court appear to be inconsistent. The Secured Creditors, unsecured creditors and other parties in interest and the Court have no clear understanding of what the Debtor really seeks to pay, for what defined periods, and in what amount.

8. It is shocking that even after the issue of a lack of a proposed budget for the Original DIP Motion was raised almost ten days ago (*see* Original Obj. ¶ 1, 6), the Debtor again fails to provide any specifics about its need for and anticipated uses of money it seeks to borrow.

9. With the Debtor attempting to finish out the next several weeks of the 2024-25 school year, it is demonstrative that the proposed DIP Lender continues to focus solely on gaining a priming lien on encumbered assets, particularly when the Debtor's value for the Farm Real

4

Property is completely unencumbered. Moreover, Kulkarni believes in the value of that property so much that he claims to be on the verge of "a lease arrangement for the farm and expect to conclude the transaction with one of them which could eliminate this $1,000,000 expense to the Debtor while maintaining its partial use for Debtor's students." Kulkarni Dec. ¶ 12. Taking him at his word, it appears that Kulkarni is turning the Farm Real Property into an income generating asset to which the DIP Lender would have a first priority claim to that rental income on top of the value of the land.

10. The Debtor still fails to establish that the DIP Lender should receive a priming lien over the existing Secured Creditors.

11. Section 364(d)(1) provides that "the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

(A) The trustee is unable to obtain such credit otherwise; and

(B) There is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."

11 U.S.C. § 364(d)(1).

12. Granting a lien under Section 364(d)(1) on a priming basis senior to existing liens is an extraordinary remedy "and is allowed only as a last resort." *In re YL West 87th Holding I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010).

13. The debtor has the burden of establishing that the secured creditors are adequately protected when it seeks to prime existing liens on property of a debtor's estate. *See* 11 U.S.C. 364(d)(2); *Id.*; *see also Resolution Trust Corp. v. Swedeland Dev.'p Group, Inc. (In re Swedeland Dev'p Group, Inc.)*, 16 F.3d 552, 565 (3d Cir. 1994) ("A debtor has the burden to establish that

5

8578427.5

the holder of the lien to be subordinated has adequate protection.").

14.     "Adequate protection" for a creditor provides assurance "that the creditor receives the value for which he bargained prebankruptcy." *Swedeland Dev.'p,* 16 F.3d at 564 (internal quotation marks omitted) (quoting *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987)). The question for the Court to consider is "whether the interest of the secured creditor whose lien is being primed is being unjustifiably jeopardized." *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (internal quotation marks omitted).

**The Debtor Has Not Adequately Established That No Other Form of Financing Exists**

15.     In the first instance, Section 364(d) requires that the debtor in possession is unable to obtain financing from other sources on more favorable terms to seeking a superpriority lien. 11 U.S.C. § 365(d)(1)(A). As the Court is aware, several parents of students at the school have become vocal about what has been and is currently going on with the Debtor. For instance, a concerned parent advised the Court on May 27, 2025, that, among other things, "[a] parent group had developed an alternative plan for the school that secured enough funding to pay teachers for another year, contingent[.]" *See* Tiktinsky E-Mail. It is unknown whether such funding arrangement was still recently available and explored by the Debtor.

16.     Regardless, the Court should question Mr. Kulkarni's statement that "the **only** financing that was available is the financing offered by the DIP Lender which requires superpriority status." *See* Kulkarni Dec. ¶ 8 (emphasis in original). That statement is directly contradicted by another statement in his Declaration that "[t]he Debtor was only able to meet last week's payroll because of the use of restricted donations made specifically for that purpose." *Id.* at ¶ 5, n. 1. He also advised the press back on May 22, 2025 that "the school is also collecting 'soft loans,'" which [Kulkarni] defined as contributions from people who couldn't afford to donate

6

and need to be repaid in a year or two." It appears that the Debtor has had some success in obtaining alternative financing albeit on completely unknown terms given the lack of candor from the Debtor's management thus far in this case. There is no other evidence of efforts to obtain financing on other terms or from other lenders.

17. It is also troubling that the Debtor appears to have no independent voice or decision maker as to whether "the Debtor believes the terms are reasonable and provide the Debtor the ability to reorganize through Chapter 11." *Id.* Those are Mr. Kulkarni's words, offered on behalf of the Debtor while at the same time being the "Chief Executive Officer of the Casa Laxmi Group, a not-for-profit organization which includes [the DIP Lender]." As the Court noted during the May 20 Hearing, it was "proceeding on the assumption or pretty clear view that this is an insider financing that implicates the entire fairness test as well." 5/20/2025 Tr. 20:12-14. Notwithstanding the Court raising that concern ten days ago, the Debtor has failed to address that issue at all. It is clear that under Section 101(31)(B) of the Bankruptcy Code, Kulkarni and the rest of the current Board of Trustees are statutory insiders and the fairness of the proposed lending should be evaluated under a higher standard. *Cf. In re Innkeepers USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010) (discussing "heightened scrutiny" standard in denying assumption of plan support agreement).

18. Mr. Kulkarni appears to be prioritizing an unnecessary and risky superpriority lien over the Schoolhouse even though the Debtor has unencumbered real property, the Farm Real Property, that the Secured Creditors have no objection to the DIP Lender receiving a first priority lien against. Moreover, refusal to take a junior lien under Section 364(c) of the Bankruptcy Code raises the question whether Mr. Kulkarni really believes that an equity cushion actually exists.

19. Regardless, enough questions exist concerning the availability of alternative

financing, at least in the short term, to deny the Debtor's request to give the DIP Lender a superpriority lien under Section 364(d)(4) of the Bankruptcy Code.

**Debtor Has Still Not Established That the Secured
Creditors Are or Can Be Adequately Protected**

20. In addition to the apparent delay in bringing the Debtor Appraisal to the Court, such appraisal appears to be deficient as evidence for this Court to consider. The Debtor Appraisal is clearly labeled and explained as a Restricted Appraisal. *See* Debtor Appraisal, ¶¶ 1, 15, 18 According to applicable Uniform Standards of Professional Appraisal Practice ("USPAP") guidelines, "restricted appraisal reports, i.e., appraisals in which 'the intended user of the report is restricted to the client only,' are not permitted…for 'litigation matters'" *Hardy v. United States*, 141 Fed. Cl. 1, 10 (2018). Courts have been skeptical of restricted appraisal reports and either do not allow them into evidence (*see., e.g.*, *Gordon v. New England Cent. R.R., Inc.*, No. 2:17-CV-00154, 2019 WL 4069389, at *6 (D. Vt. Aug. 27, 2019), or view them cautiously and accord them less weight. *In re Strange*, 664 B.R. 143, 160–61 (Bankr. W.D. Tex. 2024). By their nature, restricted-use appraisals may "not be fully understood without additional evidence contained in [the author's] work file." *Omaha Country Club v. Douglas Cty. Bd. of Equalization*, 645 N.W.2d 821, 828 (Neb. 2002). Courts exclude such reports from evidence on that basis because they lack "a complete statement of all opinions the witness will express and the basis and reasons for them" which is required under Federal Rule of Civil Procedure 26(a)(2)(B). *Strange*, 664 B.R. at 160-61 (quoting *Gordon*, 2019 WL 4069389, at *6). Accordingly, this appraisal was not prepared for the purpose of being utilized by this Court to determine whether an equity cushion exists. As such, the Court should not allow the Debtor Appraisal into evidence, and it should be stricken on that basis alone.

21. The Debtor still fails to address the fraudulent manner in which it purported took title to the Schoolhouse. In any event, the possible existence of an equity cushion is sufficiently questionable to support denial of the Debtor's request to give the DIP Lender a superpriority lien on the Schoolhouse. That is particularly true when the collateral is in an illiquid form with substantial carrying and maintenance costs. *See In re Powers Aero Marine Servs. Inc.*, 42 B.R. 540, 545-47 (Bankr. S.D.Tex. 1984); *see also In re Balco Equities Ltd., Inc.*, 312 B.R. 734, 751-52 (Bankr. S.D. N.Y. 2004*); In re CPJFK, LLC*, 496 B.R. 290 (Bankr. E.D.N.Y. 2011) (finding that insufficient operating revenues to cover operational costs combined with a doubtful equity cushion established lack of ability to reorganize). For instance, the court *Powers Aero Marine* granted stay relief to a secured creditor notwithstanding a significant amount of equity for that debtor because of the high costs of maintaining the collateral, a yacht. A similar outcome occurred in *Balco Equities*, also involving vessels. There the ability to provide adequate protection was found lacking because, among other things, there was "no ready market for the purchase of the vessels," "the size of the equity cushion is uncertain," those debtors had "no means of paying for the constant maintenance required to sustain seagoing vessels," and "its insurance levels…are insufficient to cover the value asserted by the Debtors[.]"

22. The *CPJFK* case involved a hotel where the reality of operational revenue shortfalls and uncertain timing of being able to liquidate the real property caused that court to question whether an equity cushion actually existed. *CPJFK*, 496 B.R. at 305. Such is the state of this case.

23. Here, the appraisal obtained by the Debtor and annexed to the Motion values the Schoolhouse at $35,000,000.00. However, the Debtor Appraisal contains caveats, including that the valuation includes an "exposure/marketing time of "6 to 12 Months or Less" to realize that

value from a sale. *See* 2025 Appraisal p. 15. Such necessary marketing period actually materially diminishes any purported equity cushion With the Debtor not making any payments toward the Secured Creditors' debts, substantial interest will continue to accrue thereby materially reducing any alleged equity cushion that the Debtor Appraisal purports to show. The average interest accrual on the Credit Line Loan is approximately $42,000 per month. Interest also continues to accrue on the principal owed on the Series 2016 Bonds at the default rate of 6.25% (approximately $110,107.18 per month) which does not include the additional interest on previously unpaid interest which also continues to accrue monthly.[2] As such, the approximate monthly interest accruals for the Secured Creditors is a combined approximately $152,000 per month.

24. As it is, Flushing is currently owed no less than $3,842,665.32 in principal and accrued interest, plus attorneys' fees and other costs and other amounts owed under the Credit Line Loan. The Bond Trustee is currently owed $21,083,477.98 in principal, plus accrued interest and fees of no less than $3,908,862.92, plus attorneys' fees and other costs and other amounts owed on the Series 2016 Bonds. Accordingly, the total amount of debt held by the Secured Creditors is no less than $28,835,006.22. That is an alleged equity cushion of approximately 17.61%.

25. The Debtor has not met its burden that such an equity cushion has been established. Yet, even if there was credible evidence that such an equity cushion exists, courts do not look at purported equity cushions in a vacuum. *See, e.g.*, *Suntrust Bank v. Den-Mark Const., Inc.*, 406 B.R. 683, 701-702 (E.D.N.C. 2009) (reversing bankruptcy court's finding that 11% equity cushion provided adequate protection because court did not consider risks of debtor's prospects for reorganization). The Bankruptcy Court in the *Suntrust Bank* case "found that an 11% equity

---

[2] Each of the Secured Creditors submit their respective claim amounts and interest accrual calculations in estimated amounts at this time and reserve all of their respective rights to amend or adjust all such amounts as appropriate or necessary going forward.

cushion is adequate protection when combined with (1) improvements to SunTrust's collateral resulting in an increase in value thereof, (2) a reduction in SunTrust's debt (thus an equity cushion increase) resulting from the elimination of the letters of credit and (3) a $12,000.00 monthly interest payment. *Id.* at 700. However, the District Court noted that "Congress did not contemplate that a secured creditor could find its position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects." *Id.* at 702 (quoting *Swedeland*, 16 F.3d at 567). That court then went on to find that the debtor's reorganization plan was inherently risky as it depended on future funding, and that while the secured creditor was to receive a monthly adequate protection payment it was insufficient and "additional protection is nonetheless required." *Id.*

26. Here, the Debtor expressly states that it will not be paying the Secured Creditors during this case. Accordingly, any equity will continue to erode during any six to twelve month marketing period without any interest payments and result in a further decrease in equity of between $912,000.00 and $1,824,000.00. Such an outcome would negatively impact the purported equity cushion and further reduce to between 15% and 12.4%.

27. The Debtor also continues to not provide **any** projections of a going-forward revenue model that demonstrates that a reorganization is in prospect. Thus, there is no evidence before the Court that whatever plans Kulkarni and Casa Laxmi have for the Schoolhouse going forward, it would involve revenue sufficient to repay any monies loaned under the proposed debtor in possession financing or restart payments to the Secured Creditors. There is also no evidence before the Court that any going forward plans would increase the value of the Schoolhouse. Accordingly, like the Court in *Suntrust* this Court should find that any equity cushion, standing

8578427.5

alone, is insufficient to provide adequate protection to the Secured Creditors and deny the Renewed DIP Motion in its entirety.

28. The Appraisal also attempts to downplay the Debtor's recent attempts to sell the Schoolhouse. In October 2024, the Debtor engaged with a real estate consultant and exclusive broker in an attempt to transition from the Schoolhouse to another more economical property in order to keep the school operating and fulfilling its mission. The Appraisal admits that the Schoolhouse was on the market for six months, with an original asking price of $39.9 million which was reduced to $32 million. *See* Appraisal p. 17. According to the Appraisal, "there were many inquiries and several tours but the property did not receive any formal offers." *Id.* Missing from that acknowledgment is whether any informal offers or pricing was discussed. Moreover, the Appraisal attempts to marginalize that recent sale attempt by stating that "[w]e understand that the property was on the market as a distressed opportunity without a typical marketing period." *Id.* However, the Appraisal itself reflects a marketing time of "6 to 12 Months or Less" (*see id.* at p. 15) in order to realize the appraised value of $35,000,000. That appears to be in line with the actual marketing done within the past seven months prior to the Petition Date. No further data or information is provided by the appraiser to support that apparent material inconsistency.

29. On the other hand, Flushing was approached earlier this year with a proposed transaction that would result in Flushing's sale of the Series 2016 Bonds for $18,000,000.00, with Flushing retaining the Credit Line Loan debt and the right to continue with the Foreclosure Action. Such a proposed pricing of the secured debt supports a finding that the appraised value is not necessarily the true market value for the Schoolhouse, thereby diminishing the viability and validity of any asserted equity cushion.

30. The Debtor has not made any offer to pay any amount post-petition as adequate protection or otherwise. Mr. Kulkarni has been in the press recently and appears to be soliciting donations and short term, unsecured loans in an effort to carry the school at least through the end of the current school year. *See* Exhibit C. Even though the DIP Lender supposedly has access to up to $8,000,000.00 to loan to the Debtor, well in excess of the amount necessary to fund the Debtor's school operations for the balance of the current school year, the DIP Lender apparently refuses to lend any money at all. That is notwithstanding the Debtor having unencumbered real property with the Farm Real Property. The Secured Creditors also do not oppose the Debtor granting a junior mortgage against the Schoolhouse. Yet, the DIP Lender, run by Mr. Kulkarni, refuses to lend any amount of money without a priming lien on the Schoolhouse, notwithstanding that its mission includes furthering educational opportunities. The ability of the DIP Lender actually to make loans is also unknown.

31. As Chairman of the school, he appears to be actively soliciting and collecting donations and short term loans (*see* Exhibit C, Bloomberg Article), most likely unsecured, in order to get to the end of the school year, but with no assurance to those donating or lending that the Debtor's operations will survive the summer. That dichotomy seems to evidence an unstated but real belief that the Schoolhouse is not worth as much as the Debtor is arguing that it is, and that all of the risk should be borne by the Secured Creditors. The Court should not approve such shifting of the risks.

32. The Debtor Appraisal also does not appear to take into account certain use restrictions that limit the Schoolhouse to that purpose, i.e., a school, until such time as the appropriate governmental unit changes such use restriction.

33. Based on all of the foregoing, the Debtor has not met its burden to establish that the

13

Secured Creditors are adequately protected in the event the Court was to grant a superpriority lien to the DIP Lender.

**The Debtor's and Casa Laxmi's Good Faith Remain in
Doubt, Including the Unauthorized Use of Cash Collateral and
<u>Absence of First Day Motions</u>**

34. The Secured Creditors continue to be troubled by the actions, and inactions, of the Debtor's current management. This case is two weeks old and, other than the two DIP motions seeking a superpriority lien when unencumbered property is available, the Debtor has not filed a single other motion or application. There has been no first day motions to use cash collateral notwithstanding the Debtor disclosing in its schedules that such cash collateral allegedly existed on day one of this case. There has been no motion to address utilities services, the continuation of insurance, authorization to pay pre-petition wages and benefits, the continuation of the Debtor's cash management system, the establishment of a bar date, or applications to retain professionals under Section 327(a) of the Bankruptcy Code. Each of those motions or applications are routinely made in chapter 11 cases in this District at the beginning of a case. Yet none have been filed to date.

35. With regard to the lack of a wage motion, between May 1 and May 15, 2025, upon information and belief, the Debtor transferred more than $134,770.00 to ADP and more than $38,500.00 to the Debtor's union. Subsequent to the Petition Date, the Debtor transferred an additional approximately $225,000.00 to ADP on May 23, 2025. To the extent any of that amount was for wages or benefits accrued and owed prior to the Petition Date, the Debtor made such payment without advance notice to anyone in this case and without authorization of this Court.

36. There is also a particular concern to the Secured Creditors about the use of cash collateral. The Debtor asserted having almost $200,000 of bank account balances and accounts

14

receivable just under two weeks ago. *See* Debtor's Schedule A/B. The Debtor is now asserting that it has no money to pay the current payroll. *See* Kulkarni Dec. ¶ 5 (stating that "the Debtor has insufficient funds to meet its payroll obligations.") It appears that the Debtor has used the cash collateral of the Secured Creditors without consent or the authorization of this Court.

37. Questions about the DIP Lender have also been raised by at least two parents. One parent raised an allegation that the DIP Lender may not be in compliance with corporate governance laws. *See* Tiktinsky E-Mail (stating that "[Casa Laxmi] are not even registered as a foreign corporation in New York and have only two board members when New York requires three.").

38. Both parents question Kulkarni's ability to run the Debtor's operations and feel like he and Casa Laxmi said one thing about funding operations prior to taking control of the Debtor's Board of Trustees, and are now saying something else with control in their hands. *See* Tiktinsky E-Mail; Lindahl E-Mail. A copy of the Lindahl E-Mail is annexed hereto as **Exhibit E**.

39. The Court should therefore not only deny the Motion as it seeks to impose a superpriority lien on real property it does not legitimately own and fails to adequately protect the Secured Creditors, but should also dismiss this case as a bad faith filing or immediately appoint a chapter 11 trustee or examiner. Such relief beyond denial of the Motion will be sought by separate motion, but the Secured Creditors believe strongly that this case should not move forward, at least not under the control of Kulkarni. Several parents seem to hold the same position.

40. The Court should deny outright such requested priming lien because the Debtor has again failed to establish that the Secured Creditors are adequately protected. The Real Property is not really property of the Debtor's bankruptcy estate. As such any purported equity cushion does not really belong to the Debtor and cannot justify providing the Secured Creditors with adequate

protection for the Debtor's obligations. At best, the Debtor allegedly obtained title to the Schoolhouse property through a fraudulent conveyance on the eve of filing orchestrated by one of the leaders of the proposed DIP Lender, Kulkarni. Furthermore, the appraised alleged equity cushion has countervailing evidence that such purported cushion is insufficient to give the Secured Creditors adequate protection. The unfruitful recent six month marketing efforts and the offer to Flushing to purchase the bond debt at a substantial discount weigh against the current alleged value in the Appraisal. The Debtor has also not convincingly established that alternative financing on better terms is unavailable

41. Moreover, considering the apparent lack of support from concerned parents, there is substantial doubt that enough students would return to the school to make it viable in any event. Thus, there is simply no reasonable rationale for granting the DIP Lender a priming lien superior to the Trustee Mortgage and the Consolidated Mortgage under any of the circumstances presented to the Court.

## **CONCLUSION**

**WHEREFORE**, Flushing and the Bond Trustee, as directed by Flushing as Bondholder, respectfully request the Court deny the Debtor's Renewed DIP Motion in its entirety and grant to the Bond Trustee and Flushing such other, further and different relief as the Court may deem just, proper and equitable.

Dated: East Meadow, New York
       May 30, 2025

                                    **CERTILMAN BALIN ADLER & HYMAN, LLP**
                                    Attorneys for Flushing Bank and U.S. Bank National Association, not in its individual capacity but solely as Bond Trustee

                                    By:     /s/Richard J. McCord
                                            **RICHARD J. MCCORD, ESQ.**

16

8578427.5

Robert D. Nosek, Esq.
90 Merrick Avenue
East Meadow, New York 11554
(516) 296-7000

8578427.5