**Hearing Date: October 27, 2026 at 11:00 a.m. (Eastern Time)**
**Objection Deadline: October 20, 2026 at 4:00 p.m. (Eastern Time)**

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Brian F. Moore
Anthony L. Greene
Brian Kreutter

*Attorneys for Albert Togut,*
*Not Individually But Solely in His Capacity*
*as Chapter 7 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| MANHATTAN COUNTRY SCHOOL *et al.*,[1] | : | Case No. 25-11009 (DSJ) |
| Debtors. | : | (Jointly Administered) |

**NOTICE OF HEARING ON TRUSTEE'S APPLICATION FOR ENTRY OF (I) AN ORDER APPROVING (A) BIDDING PROCEDURES FOR THE SALE OF THE FARM PROPERTY, (B) DESIGNATION OF STALKING HORSE BIDDER, (C) BID PROTECTIONS IN FAVOR OF THE STALKING HORSE BIDDER, (D) DATE AND TIME FOR AN AUCTION AND A HEARING FOR APPROVAL OF THE SALE, AND (E) THE FORM AND MANNER OF NOTICE THEREOF; AND (II) AN ORDER APPROVING (A) THE SALE OF THE FARM PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, AND (B) PAYMENT OF BROKER COMMISSION**

**PLEASE TAKE NOTICE** that the Court will consider the attached *Trustee's Application for Entry of: (I) an Order Approving (A) Bidding Procedures for the Sale of the Farm Property, (B) Designation of Stalking Horse Bidder, (C) Bid Protections in Favor of the Stalking Horse Bidder, (D) Date and Time for an Auction and a Hearing for Approval of the Sale, and (E) the Form and Manner of Notice Thereof; and (II) an Order Approving (A) the Sale of the Farm Property Free and Clear of Liens, Claims, Encumbrances and Other Interests, and*

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are (i) Manhattan Country School (6971) (Case No. 25-11009 (DSJ)); and (ii) West 85th Street Owner LLC (6971) (Case No. 25-11922 (DSJ)).

*(B) Payment of Broker Commission* (the "Application")[2] of Albert Togut, not individually but solely in his capacity as the Chapter 7 Trustee (the "Trustee") of the estate of Manhattan Country School, at a hearing before the Honorable David S. Jones, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408 on **October 27, 2026, at 10:00 a.m. (prevailing Eastern Time)** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that the Hearing will be held via Zoom for Government. Those wishing to participate in the Hearing must register for an appearance utilizing the Electronic Appearance portal located at the Court's website: https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl. Appearances must be entered no later than **October 26, 2026, at 4:00 p.m. (prevailing Eastern Time).**

**PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to the Application must also be filed with the Court electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Court's case filing system and by all other parties in interest, with paper copies delivered directly to Bankruptcy Judge Jones' Chambers and be served by email upon: (i) Togut, Segal & Segal LLP, attorneys for the Trustee, One Penn Plaza, Suite 3335, New York, New York 10119, Attn: Brian F. Moore, Esq. (bmoore@teamtogut.com), Anthony L. Greene, Esq. (agreene@teamtogut.com) and Brian Kreutter, Esq. (bkreutter@teamtogut.com); (ii) the United States Trustee for the Southern District of New York, One Bowling Green, Room 534, New York, NY 10004-1408, Attn: Mark Bruh, Esq. (mark.bruh@usdoj.gov); and (iii) any other parties required to be served under

---

2 Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Application.

any applicable Bankruptcy Rule or Local Rule, so as to be received no later than **October 20, 2026, at 4:00 p.m.** (prevailing Eastern Time) (the "Objection Deadline"). Objections not timely served and filed may not be considered by the Court.

**PLEASE TAKE FURTHER NOTICE** if no objections are received prior to the Objection Deadline, the Court may cancel the Hearing and enter the proposed order attached to the Application without holding the Hearing.

Dated: New York, New York
October 2, 2026

ALBERT TOGUT, not individually but
solely in his capacity as Chapter 7 Trustee,
By His Attorneys,

TOGUT, SEGAL & SEGAL LLP

By:
*/s/ Brian F. Moore*
BRIAN F. MOORE
ANTHONY L. GREENE
BRIAN KREUTTER
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
bmoore@teamtogut.com
agreene@teamtogut.com
bkreutter@teamtogut.com

One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Brian F. Moore
Anthony L. Greene
Brian Kreutter

*Attorneys for Albert Togut,*
*Not Individually But Solely in His Capacity*
*as Chapter 7 Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| MANHATTAN COUNTRY SCHOOL *et al.*,[1] | : | Case No. 25-11009 (DSJ) |
| Debtors. | : | (Jointly Administered) |

**TRUSTEE'S APPLICATION FOR ENTRY OF:**
**(I) AN ORDER APPROVING (A) BIDDING PROCEDURES FOR THE SALE OF THE FARM PROPERTY, (B) DESIGNATION OF STALKING HORSE BIDDER, (C) BID PROTECTIONS IN FAVOR OF THE STALKING HORSE BIDDER, (D) DATE AND TIME FOR AN AUCTION AND A HEARING FOR APPROVAL OF THE SALE, AND (E) THE FORM AND MANNER OF NOTICE THEREOF; AND (II) AN ORDER APPROVING (A) THE SALE OF THE FARM PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AND (B) PAYMENT OF BROKER COMMISSION**

**TO THE HONORABLE DAVID S. JONES,**
**UNITED STATES BANKRUPTCY JUDGE:**

Albert Togut, not individually but solely in his capacity as the Chapter 7 Trustee (the "Trustee") of the estate of Manhattan Country School ("MCS"), one of the above-captioned debtors (together with West 85th Street Owner LLC ("Owner LLC"), the "Debtors"), by his attorneys, Togut, Segal & Segal LLP (the "Togut Firm"), hereby submits this application (the "Application") pursuant to sections 105(a), 330 and 363 of

1 The Debtors in these cases, along with the last four digits of their federal tax identification numbers are (i) Manhattan Country School (6971) (Case No. 25-11009 (DSJ)); and (ii) West 85th Street Owner LLC (6971) (Case No. 25-11922 (DSJ)).

title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and the Amended Guidelines for the Conduct of Asset Sales Established and Adopted by the United States Bankruptcy Court for the Southern District of New York pursuant to General Order M-383 (the "Sale Guidelines") for entry of (i) an order, substantially in the form annexed hereto as **Exhibit A** (the "Bidding Procedures Order"), approving (a) bidding procedures, substantially in the form annexed as Exhibit 1 to the proposed Bidding Procedures Order (the "Bidding Procedures"),[2] for the sale of MCS's real property known as 3217 New Kingston Mountain Road and 3536 New Kingston Mountain Road, Roxbury, New York 12474, together with the personal property, vehicles and other assets described in the Stalking Horse APA (as defined below) (collectively, the "Farm Property") pursuant to Bankruptcy Code sections 363(b), (f) and (m) (the "Sale"); (b) the proposed form asset purchase agreement with Wade Crowe and Angela Crowe, husband and wife, or their permitted assignee (the "Stalking Horse Bidder"), annexed hereto as **Exhibit B** (the "Stalking Horse APA"), and designation of the Stalking Horse Bidder as the "stalking horse bidder" for the Sale of the Farm Property; (c) bid protections in favor of the Stalking Horse Bidder; (d) the date, place, and time for an auction (the "Auction") and a hearing (the "Sale Hearing") to approve the Sale of the Farm Property to the Successful Bidder (defined below), and (e) the form and manner of notice thereof; and (ii) an order substantially in the form attached hereto as Exhibit C, as it may be modified and filed prior to the Sale Hearing (the "Sale

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures or, alternatively, the Stalking Horse APA (as hereinafter defined).

Order"), approving (a) the sale of the Farm Property free and clear of liens, claims, encumbrances, and other interests; and (b) the payment of the Broker Commission (defined below).

In support of this Application, the Trustee submits the declaration of Christine O'Shaughnessy, a licensed real estate sales associate with Coldwell Banker Timberland Properties, annexed hereto as **Exhibit D** (the "O'Shaughnessy Declaration"), and respectfully states:

## JURISDICTION AND VENUE

1. The Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction to consider this Application and the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Application is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The predicates for the relief requested herein are Bankruptcy Code sections 105(a), 330 and 363, Bankruptcy Rules 2002 and 6004, and Local Rule 6004-1.

## BACKGROUND

### I. The Chapter 7 Cases

3. On May 16, 2025 (the "Petition Date"), MCS filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code in this Court.

4. On June 13, 2025, MCS filed a motion to convert the Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code (this "Chapter 7 Case"), which the Court approved by an order dated June 18, 2025 [Docket No. 49].

5. On June 18, 2025, Mr. Togut was appointed as the Chapter 7 Interim Trustee of MCS [Docket No. 50]. Mr. Togut is duly qualified and is acting as the Trustee of MCS herein.

6. On September 3, 2025, following consultation with the Debtors' secured creditors and the United States Trustee (the "U.S. Trustee"), the Trustee filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in this Court for Owner LLC, a wholly owned subsidiary of MCS, to facilitate his efforts to administer the Debtors' estates. *See In re West 85th Street Owner LLC*, Case No. 25-11922 (DSJ) (Bankr. S.D.N.Y. 2025) (the "Owner Chapter 7 Case" and, together with the Chapter 7 Case, the "Chapter 7 Cases").

7. On September 4, 2025, Mr. Togut was appointed as the Chapter 7 Interim Trustee of Owner LLC. Mr. Togut is duly qualified and is acting as the Trustee of Owner LLC herein.

8. On September 12, 2025, the Court entered an order directing the joint administration of the Chapter 7 Cases for procedural purposes only [Docket No. 84].

9. On September 15, 2025, the Court entered an order authorizing certain notice procedures in the Chapter 7 Cases [Docket No. 87] (the "Notice Procedures Order").

10. No committee of unsecured creditors has been appointed in the Chapter 7 Cases.

## II. The Sale of the Schoolhouse

11. Prior to the Petition Date, MCS operated a private school at 150 West 85th Street, New York, New York (the "Schoolhouse"), which was owned by Owner LLC and encumbered by the liens of Flushing Bank (the "Lender") and U.S. Bank National Association, solely in its capacity as trustee for the Series 2016 Bonds ("U.S. Bank" and, together with the Lender, the "Secured Creditors").

12. On July 15, 2025, the Court "so ordered" a stipulation among the Trustee and the Secured Creditors in aid of the sale of the Schoolhouse [Docket No. 69] (the "First Stipulation").

13. On May 19, 2026, the Trustee filed an application [Docket No. 124] seeking approval of bidding procedures for the sale of the Schoolhouse and the designation of Geneva School of Manhattan ("Geneva") as stalking horse bidder, which the Court approved by order dated May 28, 2026 [Docket No. 126] (the "Schoolhouse Bidding Procedures Order").

14. On June 23, 2026, the Trustee conducted an auction for the Schoolhouse in accordance with the Schoolhouse Bidding Procedures Order and designated Geneva's bid of $33,200,000 as the successful bid and the bid of 150 West 85th LLC of $33,100,000 as the second highest bid.

15. By order dated July 2, 2026 [Docket No. 138] (the "Schoolhouse Sale Order"), the Court approved the sale of the Schoolhouse to Geneva for a purchase price of $33,200,000, and the sale closed on July 31, 2026.

16. The proceeds of the sale of the Schoolhouse are held in escrow pending distribution in accordance with the Schoolhouse Sale Order, the First Stipulation, and a second stipulation among the Trustee and the Secured Creditors that was entered by the Court on September 18, 2026 [Docket No. 153] (the "Second Stipulation"), pursuant to which, among other things, the Secured Creditors will receive the net sale proceeds in partial satisfaction of their secured claims. The Farm Property is the principal remaining asset of MCS's estate.

## III. The Farm Property, Retention of Coldwell and Marketing of the Farm Property

17. MCS is the record owner of the Farm Property, which consists of two parcels of land comprising approximately 165 acres located at 3217 New Kingston

Mountain Road (Tax Map Section 200, Block 1, Lot 81) and 3536 New Kingston Mountain Road (Tax Map Section 200, Block 1, Lot 78) in the Town of Roxbury, Delaware County, New York 12474, together with a farmhouse and other structures, the farm equipment, fixtures and other tangible personal property located there (the "Personal Property"), two motor vehicles (the "Vehicles"), and the subsurface oil, gas and mineral rights beneath the land.

18. Prior to the Petition Date, MCS used the Farm Property as a working farm and educational facility for its students. The Farm Property has not been used for that purpose since MCS ceased operations.

**19.** The Farm Property is not encumbered by the liens of the Secured Creditors, and the Trustee is not aware of any mortgage or other consensual lien of record against the Farm Property.

20. On August 1, 2025, the Court authorized the Trustee to employ John McDaniel (the "Caretaker") as caretaker of the Farm Property at a rate of $500 per month [Docket No. 76] (the "Caretaker Order"). The Caretaker has maintained the Farm Property during the Chapter 7 Case.

21. On September 23, 2025, the Trustee filed an application [Docket No. 98] (the "Coldwell Retention Application") seeking approval of the retention of Coldwell Banker Timberland Properties ("Coldwell" or the "Broker") as real estate broker to market and assist in the sale of the Farm Property, *nunc pro tunc* to September 19, 2025.

22. Pursuant to the terms of the exclusive listing agreement between the Trustee and Coldwell dated September 19, 2025, annexed to the Coldwell Retention Application as Exhibit B (the "Listing Agreement"), if the Farm Property is sold and no real estate agent other than Coldwell is involved, the commission is fixed in the amount

equal to three and one-half percent (3.5%). If an outside broker is used, the total commission to be paid is four and one-half percent (4.5%) of the purchase price.

23. On October 17, 2025, the Court entered an order authorizing the retention of Coldwell [Docket No. 109] (the "Coldwell Retention Order") which, among other things, approved the Listing Agreement and authorized the Trustee to extend its term for up to two additional six-month terms by notice of presentment.

24. On April 28, 2026, the Court entered an order extending the term of the Listing Agreement through September 19, 2026 [Docket No. 121].

25. The Trustee has noticed a proposed order extending the term of the Listing Agreement to March 19, 2027 [Docket No. 150], which will be presented to the Court on October 2, 2026.

26. As discussed in further detail in the Coldwell Retention Application and the O'Shaughnessy Declaration, Coldwell is a licensed real estate brokerage firm that specializes in transactions in the Catskills and surrounding regions, with brokers in seven office locations in New York, and Ms. O'Shaughnessy has substantial experience in the sale of real property in Delaware County, including in Roxbury, where the Farm Property is located. *See* O'Shaughnessy Decl. ¶¶ 4-5.

**27.** Coldwell began marketing the Farm Property in October 2025. Its marketing efforts included listing the Farm Property on major real estate and media platforms, including Zillow, Realtor.com, Trulia, Homes.com, HomeFinder, YouTube, Facebook, Instagram, and Google, among others. *See id.* ¶¶ 9-10.

28. Professional photography, including aerial drone photography, was completed to showcase the property. Additional marketing efforts have included direct mail campaigns, direct outreach to prospective buyers, newspaper advertising,

banners in the *Mountain Eagle*, as well as promotion through Ms. O'Shaughnessy's professional Facebook and Instagram accounts. *See id.* ¶ 11.

29. The property has been marketed in both residential and commercial categories to maximize exposure to the broadest possible pool of prospective purchasers. *See id.* ¶ 12.

30. The residential listing has received more than 12,000 visitors to date, while the commercial listing has received an additional more than 400 visitors. Leads from Crexi, an online digital marketplace for commercial real estate, total more than 450 to date. *See id.* ¶ 13. To date, the Farm Property has been shown approximately 14 times to prospective buyers. *See id.* ¶ 14.

31. The Farm Property has received five offers in total. Offers have been received between March 6, 2026, and August 11, 2026, including an offer that proposed a lower purchase price and higher bid protections. *See id.* ¶ 15.

## IV. <u>The Stalking Horse APA and Bid Protections</u>

32. As a result of these marketing efforts, the Trustee received a written offer from the Stalking Horse Bidder to purchase the Farm Property. After considering the Stalking Horse Bidder's offer and the other offers received for the Farm Property, the Trustee and the Stalking Horse Bidder negotiated the Stalking Horse APA, which, as more fully described herein, provides for the sale of the Farm Property for an all-cash purchase price of $990,000 (the "<u>Purchase Price</u>"), subject to higher or better offers and Court approval.

**A. Summary of Stalking Horse APA**

33. The following is a summary of the material terms of the Stalking Horse APA:[3]

(a) Purchaser: Wade Crowe and Angela Crowe, husband and wife, or their permitted assignee designated in accordance with section 17.01 of the Stalking Horse APA. *See* Stalking Horse APA preamble and § 17.01.

(b) Purchased Assets: The Farm Property, consisting of the two parcels of land and the buildings and improvements located there, the Personal Property, the Vehicles (for an allocated price of $100 each), and MCS's subsurface oil, gas and mineral rights. Cash, insurance policies, claims and causes of action, books and records, and the personal property of the Caretaker and other third parties are excluded. *See id.* §§ 1.01, 1.03.

(c) Purchase Price: $990,000.00, which includes the amounts allocated to the Vehicles. *See id.* § 2.01.

(d) Deposit: $99,000.00 (10% of the Purchase Price), which has been delivered to Phillips Nizer LLP, as escrowee, to be held in escrow and applied to the Purchase Price at closing (the "Deposit"). *See id.* § 2.03 and Schedule C.

(e) Title: The Trustee will convey, and the Stalking Horse Bidder will accept, all right, title and interest of the Trustee and MCS in and to the Farm Property, including fee simple title to the real property by bargain and sale deed without covenants, subject only to the permitted exceptions set forth in Schedule B to the Stalking Horse APA (the "Permitted Exceptions"), free and clear of all liens, claims, encumbrances and interests other than the Permitted Exceptions to the fullest extent permitted by sections 363(b) and 363(f) of the Bankruptcy Code. *See id.* §§ 1.02, 10.02.

(f) Closing Conditions: The obligations of the Trustee and the Stalking Horse Bidder to close are subject to entry of the Sale Order. The Stalking Horse Bidder's obligations are not subject to any financing, due diligence, appraisal, inspection, zoning or permitting contingency. *See id.* §§ 5.07, 18.1.

(g) Closing Date: The closing of title shall take place thirty (30) days following the date that the Sale Order is entered, time being of the

[3] The summary of the Stalking Horse APA is provided for the convenience of the Court and parties in interest. In the event of any inconsistency between the summary in this Application and the terms of the Stalking Horse APA, the terms of the Stalking Horse APA shall govern.

essence as to the Stalking Horse Bidder, at the offices of Phillips Nizer LLP or as a remote closing in escrow with the title company (the occurrence of the consummation of the Stalking Horse APA, the "Closing" and such date, the "Closing Date"). The Trustee may adjourn the Closing for up to sixty (60) days in the aggregate to resolve title objections. *See id.* § 3.01, § 13.01 and Schedule D.[4]

(h) Caretaker: The Stalking Horse Bidder does not assume the employment of the Caretaker, which remains subject to the Caretaker Order and the Sale Order. *See id.* § 16.03.

(i) As Is, Where Is: The Stalking Horse Bidder has inspected the Farm Property, is fully familiar with the physical condition and state of repair thereof, and shall accept the Farm Property "as is," "where is" and in its present condition, without any representations or warranties of any kind whatsoever except as expressly set forth in the Stalking Horse APA, and takes title subject to any violations of law affecting the Farm Property. *See id.* §§ 5.01, 5.02, 7.01.

(j) Apportionments: Real estate taxes and similar charges are apportioned as of the Closing Date. The Stalking Horse Bidder is solely responsible for any taxes assessed under Section 520 of the New York Real Property Tax Law attributable to the loss of any exemption from real property taxation by reason of the transfer of the Farm Property. *See id.* § 12.01(a).

(k) Remedies: If the Stalking Horse Bidder defaults, the Trustee's sole remedy is to retain the Deposit as liquidated damages. If the Trustee defaults, the Stalking Horse Bidder's sole remedies are specific performance or the return of the Deposit. *See id.* § 13.04.

(l) Irrevocability: The Stalking Horse Bidder's bid is irrevocable through the earlier of the Closing and forty-five (45) days after entry of the Sale Order, and if designated as the Second Highest Bid (defined below), through the earlier of the closing of the sale to the Successful Bidder and sixty (60) days after entry of the Sale Order, subject to extension as provided in the Stalking Horse APA. *See id.* § 18.7.

(m) Fiduciary Out: Nothing in the Stalking Horse APA requires the Trustee to take any action inconsistent with his fiduciary duties, and the Trustee may solicit, negotiate and accept alternative bids and may terminate the Stalking Horse APA if the Court declines to enter the Bidding Procedures Order or the Sale Order, if the Sale

[4] The Stalking Horse APA provides that the Trustee may terminate the Stalking Horse APA if the Sale Order has not been entered on or before December 31, 2026, or such later date, not more than sixty (60) days thereafter, as the Trustee may designate by written notice to the Stalking Horse Bidder (the "Outside Date"). *See* Stalking Horse APA § 18.9(c).

Order is not entered by the Outside Date, or if the Trustee determines in good faith not to proceed with the Sale to the Stalking Horse Bidder. *See id.* § 18.9.

(n) Good Faith: The Stalking Horse Bidder has represented that it is not an "insider" of MCS, has not colluded with any other bidder, and has negotiated the Stalking Horse APA in good faith and at arm's length within the meaning of sections 363(m) and 363(n) of the Bankruptcy Code. *See id.* § 5.08.

**B. Stalking Horse Bid Protections**

34. The Stalking Horse APA provides that if the Court approves the Sale of the Farm Property to a purchaser other than the Stalking Horse Bidder and that purchaser closes on the Sale, the Stalking Horse Bidder will be entitled to (i) a break-up fee equal to two percent (2%) of the Purchase Price (i.e., $19,800) (the "Breakup Fee"); and (ii) reimbursement of the Stalking Horse Bidder's reasonable and documented out-of-pocket costs and expenses incurred in connection with the negotiation, diligence, execution and performance of the Stalking Horse APA, including reasonable and documented legal fees, title and survey review costs, environmental review costs and other third-party diligence expenses, not to exceed $35,000 (the "Expense Reimbursement" and, together with the Breakup Fee, the "Bid Protections"). *See* Stalking Horse APA §§ 18.2(a), 18.6.[5] The Bid Protections total $54,800 in the aggregate. The Stalking Horse APA further provides that the first overbid must be at least $75,000 over the Purchase Price and that each subsequent overbid must be at least $25,000 over the then-highest bid. *See id.* § 18.2(b).

[5] The Bid Protections are payable only from the proceeds of a closed sale of the Farm Property to a purchaser other than the Stalking Horse Bidder. The Stalking Horse Bidder is not entitled to the Bid Protections if the Sale Order is not entered and the Farm Property is not sold to another purchaser, or if the Stalking Horse Bidder is the Successful Bidder at a purchase price in excess of the Purchase Price. *See* Stalking Horse APA § 18.6.

## RELIEF REQUESTED

35. By this Application, the Trustee seeks entry of: (i) the Bidding Procedures Order approving (a) the Bidding Procedures, (b) the Stalking Horse APA and designation of the Stalking Horse Bidder as the "stalking horse bidder" for the Sale of the Farm Property, (c) the Bid Protections, including the Breakup Fee and Expense Reimbursement, (d) the date, place, and time of the Auction and the Sale Hearing, and (e) the form and manner of notice thereof; and, following entry of the Bidding Procedures Order, (ii) the Sale Order, substantially in the form to be filed prior to the Sale Hearing, approving (a) the Sale of the Farm Property as described herein and provided for in the Stalking Horse APA or, alternatively, in the sale contract with the Successful Bidder, and (b) the payment of the Broker Commission.

### I. The Proposed Bidding Procedures and Auction

36. To advance the sale process, including the potential sale of the Farm Property to the Stalking Horse Bidder, the Trustee is now seeking approval of the Bidding Procedures, which are designed to maximize value for the MCS estate, while ensuring an orderly sale process. The Bidding Procedures describe, among other things, the procedures for interested parties to access due diligence, the manner in which bids become Qualified Bids (as defined in the Bidding Procedures), the receipt and negotiation of bids received, the conduct of any Auction, the selection and approval of any ultimately Successful Bidder, and the deadlines with respect to the foregoing. The Trustee believes that the Bidding Procedures afford the Trustee a sufficient opportunity to maximize the value of the Farm Property for MCS's estate.

37. The Sale of the Farm Property under the proposed Bidding Procedures will be without representations or warranties other than those specifically set forth in the sale contract with the Successful Bidder.

38. To assist the Court and parties in interest, certain key dates and deadlines of the Bidding Procedures which have been proposed by the Trustee (and are subject to approval by the Court) are summarized below:

| Event | Date |
|---|---|
| Deadline to submit Qualified Bids | November 12, 2026 at 12:00 p.m. (ET) |
| Deadline for the Trustee to file notice canceling the Auction and designating the Stalking Horse APA as the Successful Bid, if no Qualified Bid is received | November 13, 2026 at 5:00 p.m. (ET) |
| Deadline for the Trustee to notify bidders of (i) status as Qualified Bidders and (ii) selection of Starting Auction Bid | November 13, 2026 at 5:00 p.m. (ET) |
| Auction (if any) to be held if the Trustee receives more than one Qualified Bid | November 17, 2026 at 2:00 p.m. (ET) |
| Deadline for the Trustee to file notice of Auction results and designation of the Successful Bid and the Second Highest Bid | November 18, 2026 at 11:59 p.m. (ET) |
| Deadline to file objections to Sale | November 20, 2026 at 4:00 p.m. (ET) |
| Sale Hearing | November 24, 2026 at 10:00 a.m. (ET) |

39. The Trustee proposes to fix **November 12, 2026 at 12:00 p.m. (ET)** as the Bid Deadline. In the event that a Qualified Bid (as defined in the Bidding Procedures) is received on or before the Bid Deadline, the Trustee proposes to hold an Auction on **November 17, 2026 at 2:00 p.m. (ET).**[6] The Bidding Procedures contain the terms and procedures that will govern the submission of bids for the Farm Property. The Auction will only be held if a Qualified Bid (as defined herein) is received for the Farm Property pursuant to the Bidding Procedures before the Bid Deadline.[7]

---

[6] The Trustee reserves the right to extend the deadlines set forth in the Bidding Procedures Order and/or adjourn, continue or cancel the Auction and/or the Sale Hearing for any reason, including in the event the Trustee determines that a more favorable transaction is available that can be consummated without significant delay, without further order of the Court, by filing a notice with the Court and serving such notice on all Potential Bidders (as defined herein).

[7] Notwithstanding the procedures for submitting a Qualified Bid, the Trustee may, in the exercise of his business judgment, entertain bids that do not conform to one or more of the requirements set forth herein and in the Bidding Procedures.

40. At the Auction, and subject to the Bidding Procedures, all Qualified Bidders will be allowed to bid to purchase the Farm Property. The Trustee, in consultation with his professionals, will determine the highest or best bid for the Farm Property, with the goal of maximizing the net value to the MCS estate. In evaluating bids, the Trustee intends to consider the following factors, among others and without limitation: (a) the amount and form of consideration offered; (b) the changes to the Stalking Horse APA, if any, required by the bidder; and (c) the bidder's ability to timely consummate the Sale.

41. At the Sale Hearing, the Trustee will seek approval of the Sale to the Successful Bidder.

42. The Bidding Procedures provide, in pertinent part:[8]

(a) Qualified Bidders. To participate in the bidding process, a bidder (a "Potential Bidder") must first deliver to the Trustee a Qualified Bid (as defined below) for the Farm Property.

(b) Qualified Bid. A Qualified Bid[9] for the Farm Property must be irrevocable through the earlier of the Closing Date and thirty (30) days after the entry of the Sale Order; provided, however, that (a) if such Qualified Bid becomes the Successful Bid, such bid shall be irrevocable through the Closing Date or such earlier date as such sale contract may be terminated in accordance with its terms, and (b) if the Qualified Bid becomes the Second Highest Bid (defined below), such bid shall remain irrevocable through the earlier of: (i) the closing of the sale with the Successful Bidder; and (ii) sixty (60) days after the entry of the Sale Order approving the Successful Bid, unless the Successful Bidder fails to close and the Trustee shall have given notice to the Second Highest Bidder that he has decided to consummate the transaction contemplated by the Second Highest Bid, in which case the Second Highest Bid shall remain open through the closing of the sale with such Second Highest Bidder;

[8] To the extent that there are any inconsistencies between the description of the Bidding Procedures contained herein and the actual Bidding Procedures, the terms of the Bidding Procedures shall control.

[9] For the avoidance of doubt, the Stalking Horse APA constitutes a Qualified Bid.

In addition, the Qualified Bid must satisfy the following:

i. the bid must be for the Farm Property and must be made on the same (or better) terms and conditions as those set forth in the Stalking Horse APA, and must include an agreement substantially similar to such Stalking Horse APA, marked to show any changes thereto;

ii. includes a bid for a price at least $75,000 greater than the Purchase Price set forth in the Stalking Horse APA (i.e., at least $1,065,000, which amount exceeds the Purchase Price plus the Bid Protections) and under terms which the Trustee believes to be higher or better than the terms set forth in the Stalking Horse APA;

iii. is accompanied by a deposit (the "Deposit") in an amount equal to at least 10% of the purchase price proposed by the Potential Bidder, in the form of a wire transfer, certified or cashier's check made payable to: "Phillips Nizer LLP, as Escrow Agent for Albert Togut, as Chapter 7 Trustee"; provided, that, the Trustee, in his reasonable discretion, may waive the requirement to provide a Deposit in the event a request is made for such waiver by any Potential Bidder that is a governmental unit (as defined in section 101(27) of the Bankruptcy Code);

iv. is accompanied by sufficient information to demonstrate, in the Trustee's discretion, that the Potential Bidder has the financial ability to timely consummate the proposed transaction, including, but not limited to, current bank account statements, current audited financial statements, commitments or other proof of available and non-contingent financing, and such other forms of financial disclosure and credit quality in support of such Potential Bidder (including financial information from any entities that will finance or guarantee the obligations of such Potential Bidder), which the Trustee requests;

v. is firm and unconditional and not subject to any contingencies that are not also provided in the Stalking Horse APA including, without limitation, further due diligence review or receipt of debt or equity financing;

vi. expressly acknowledges that no offer or bid for the Farm Property shall be deemed accepted by, or binding upon, the Debtor's estate unless and until such offer or bid is accepted in writing by the Trustee and approved by order of the Bankruptcy Court;

vii. expressly acknowledges that the Farm Property is being sold "AS IS", "WHERE IS" IN ITS CURRENT CONDITION, WITHOUT ANY REPRESENTATIONS, COVENANTS, GUARANTEES OR WARRANTIES OF ANY KIND OR NATURE WHATSOEVER, and free and clear of any liens, claims or encumbrances of whatever kind or nature, with such liens, if any, to attach to the proceeds of sale, and is subject to among other things (a) any state of facts that an accurate survey may show; (b) any covenants, restrictions and easements of record; (c) any state of facts a physical inspection may show; (d) any building or zoning ordinances or any other applicable municipal regulations and violations thereof; and (e) environmental conditions;

viii. states that the Potential Bidder (a) has had an opportunity to conduct due diligence regarding the Farm Property prior to making its offer and does not require further due diligence, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Farm Property in making its bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Farm Property, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures;

ix. states that the Potential Bidder has obtained all necessary approvals to make its bid and to enter into and consummate the transaction set forth in the bidder's sale contract;

x. states that the Potential Bidder is not a partner, officer, director, stockholder, agent, employee, insider, or affiliate of the Debtors, the Debtors' principal(s), the Broker or any relative of any of the foregoing; provided, that, to the extent that the Potential Bidder is a partner, officer, director, stockholder, agent, employee, insider, or affiliate of the Debtors, the Debtors' principal(s), or any relative of any of the foregoing, or that any of the foregoing have any pecuniary interest whatsoever in the Potential Bidder, such affiliation, connection, or interest must be disclosed and be subject to further inquiry by the Trustee, the creditors, or any party in interest; and

xi. expressly states that the Potential Bidder has not engaged in any bad faith or collusion in connection with the Auction or Sale.

(c) Bid Deadline. All bids for the Farm Property must be received by the Trustee by **12:00 p.m. (ET) on November 12, 2026.**

(d) The Auction. If a Qualified Bid or Bids for the Farm Property is received by the Bid Deadline, the Auction will be held commencing **at 2:00 p.m. (ET) on November 17, 2026** and continued, if the Trustee deems necessary, from time to time, to such date(s) and time(s) as the Trustee shall determine. Only Qualified Bidders will be eligible to participate at the Auction. The Trustee will determine the highest and best Qualified Bid received prior to the Bid Deadline, and such Qualified Bid will be the starting bid at the Auction (the "Starting Auction Bid").

(e) Auction Rules. At the Auction, the minimum initial overbid will be at least $25,000 greater than the Starting Auction Bid unless otherwise determined by the Trustee. The Trustee will, from time to time, advise all participants in the Auction as to the determination of the highest or best bid or bids currently offered. Subject to the Stalking Horse APA, the Trustee may adopt other rules for the Auction that, in his reasonable judgment, will promote the goals of the Auction. All such rules will provide that: (a) the Auction procedures must be fair and open, and (b) all bids shall be made known to all other participating Qualified Bidders, and the Trustee will advise all participants in the Auction of such other rules before they are implemented.

(f) Successful Bid. At the conclusion of the Auction, the Trustee will select, subject to Court approval, a bid as the highest and best for the Farm Property. The Qualified Bidder submitting the Successful Bid for the Farm Property will be the "Successful Bidder." The Trustee will also select an alternate bid for the Farm Property, which will become the Successful Bid should the Successful Bidder fail to close the Sale (the "Second Highest Bid"). If no Auction is held, the Stalking Horse APA will be considered the Successful Bid. In determining whether a Qualified Bid is the Successful Bid, the Trustee may also consider the potential costs of satisfying the conditions of any bid.

(g) Sale Hearing. The Sale Hearing will be held shortly following the Auction at a date and time established by the Court and set forth in the Bidding Procedures Order. The Trustee proposes **November 24, 2026 at 10:00 a.m. (ET)** for the Sale Hearing. At the Sale Hearing, the Trustee will seek entry of the Sale Order approving the Sale of the Farm Property to the Successful Bidder.

## II. The Extraordinary Provisions of the Stalking Horse APA

43. Pursuant to the Sale Guidelines, the Trustee is required to highlight any "extraordinary provisions" in the Stalking Horse APA or the proposed Sale Order. The extraordinary provisions are as follows:

(a) "Sale Free and Clear." The Farm Property shall be transferred to the purchaser free and clear of all encumbrances, other than the Permitted Exceptions, to the fullest extent permitted by Bankruptcy Code section 363.

(b) "Successor Liability." Under the Sale Order, the purchaser shall not be liable for any Claims against any of the Debtors or any of their respective predecessors or affiliates, and the purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability, de facto merger or joint venture, mere continuation or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between any of the Debtors and any non-debtor subsidiary, liabilities relating to or arising from any environmental laws, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Farm Property prior to Closing.

(c) "Bid Protections." The Stalking Horse APA provides for the Breakup Fee and the Expense Reimbursement described above, which are payable only from the proceeds of a closed sale of the Farm Property to a purchaser other than the Stalking Horse Bidder.

(d) "Deposit." The Stalking Horse Bidder has delivered a Deposit equal to ten percent (10%) of the Purchase Price, which the Trustee is entitled to retain as liquidated damages if the Stalking Horse Bidder defaults, and each Potential Bidder must deliver a deposit of at least ten percent (10%) of its proposed purchase price.

(e) "Closing Deadline." The Closing is to occur thirty (30) days after entry of the Sale Order, time being of the essence as to the Stalking Horse Bidder, and the Trustee may terminate the Stalking Horse APA if the Sale Order is not entered by the Outside Date.

(f) “Relief from Bankruptcy Rule 6004(h).” The Trustee requests that any Sale Order provide for a waiver of the automatic 14-day stay imposed by Bankruptcy Rule 6004(h).

## III. Notice of Bidding Procedures, Auction, and Sale

44. The Trustee will serve a copy of this Application, with exhibits, by first class mail and/or e-mail, upon the following parties (the “Notice Parties”): (a) counsel for the Stalking Horse Bidder, Barclay Damon LLP, 1270 Avenue of the Americas, Suite 2310, New York, New York 10020, Attn: Janice B. Grubin, Esq. (jgrubin@barclaydamon.com) and Allen J. Underwood II, Esq. (aunderwood@barclaydamon.com); (b) co-counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attn: Brian S. Lennon, Esq. (blennon@willkie.com); (c) co-counsel to the Debtors, Lester Korinman Kamran & Masini, P.C., 600 Old Country Road, Suite 330, Garden City, New York 11530, Attn: Roy J. Lester, Esq. (rlester@lesterfirm.com); (d) counsel for the Lender, Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, NY 11554, Attn: Richard J. McCord, Esq. (rmccord@certilmanbalin.com); (e) counsel for U.S. Bank, Shipman & Goodwin LLP, One Constitution Plaza, Hartford, CT 06103, Attn: Kathleen M. LaManna, Esq. (klamanna@goodwin.com) and Anthony R. Scarcella, Esq. (ascarcella@goodwin.com); (f) the U.S. Trustee, One Bowling Green, Room 534, New York, NY 10004, Attn: Mark Bruh, Esq. (mark.bruh@usdoj.gov); (g) all parties that have recorded liens against or have an interest in the Farm Property; (h) all of the Debtors’ known creditors and other parties entitled to notice under the Notice Procedures Order; (i) all parties that have filed a notice of appearance in the Chapter 7 Cases; (j) the Internal Revenue Service, Centralized Insolvency Operations, P.O. Box 7346, Philadelphia, PA 19101-7346; (k) the New York State Department of Taxation and Finance, Bankruptcy/Special Procedures, P.O. Box 5300, Albany, New York 12205-0300;

(l) the Delaware County Treasurer's Office, 111 Main Street- Suite 3, Delhi, New York 13753; (m) Town of Roxbury, Attn: Tax Collector/Assessor, P.O. Box 189, 56 Hillcrest Drive, Roxbury, New York 12474; (n) the United States Attorney for the Southern District of New York, Attn: Tax and Bankruptcy Unit, 86 Chambers Street, 3rd Floor, New York, New York 10007; (o) the New York State Attorney General, Charities Bureau, 28 Liberty Street, New York, New York 10005; and (p) the Caretaker of the Farm Property. The Trustee submits that no other or further notice of the proposed Bidding Procedures Order is necessary and respectfully requests that, if satisfactory to the Court, the Bidding Procedures Order should be approved and entered by the Court.

45. Within one (1) business day after entry of the Bidding Procedures Order, the Trustee will cause copies of the Bidding Procedures Order, as entered by the Court, together with the exhibits thereto, including the Bidding Procedures and the notice of the Auction and Sale Hearing, attached to the Bidding Procedures Order as Exhibit 2 (the "Notice of Auction and Sale Hearing"), to be served on the Notice Parties, as well as on all of the parties that have expressed an interest in purchasing the Farm Property to Coldwell. The Trustee submits that no other or further notice of the Bidding Procedures Order, the Bidding Procedures, the Bid Deadline, the Auction and the Sale Hearing is necessary.

**IV. Objections to the Sale**

46. The Trustee proposes that objections, if any, to the Sale, must be filed with this Court and served so as to be actually received no later than **4:00 p.m. (ET) on November 20, 2026 (the "Objection Deadline")** by: (a) counsel to the Trustee, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York 10119, Attn: Anthony L. Greene, Esq. (agreene@teamtogut.com); (b) counsel for the Stalking Horse Bidder, Barclay Damon LLP, 1270 Avenue of the Americas, Suite 2310, New York, New

York 10020, Attn: Janice B. Grubin, Esq. (jgrubin@barclaydamon.com) and Allen J. Underwood II, Esq. (aunderwood@barclaydamon.com); (c) co-counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attn: Brian S. Lennon, Esq. (blennon@willkie.com); (d) co-counsel to the Debtors, Lester Korinman Kamran & Masini, P.C., 600 Old Country Road, Suite 330, Garden City, New York 11530, Attn: Roy J. Lester, Esq. (rlester@lesterfirm.com); (e) counsel for the Lender, Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, NY 11554, Attn: Richard J. McCord, Esq. (rmccord@certilmanbalin.com); (f) counsel for U.S. Bank, Shipman & Goodwin LLP, One Constitution Plaza, Hartford, CT 06103, Attn: Kathleen M. LaManna, Esq. (klamanna@goodwin.com) and Anthony R. Scarcella, Esq. (ascarcella@goodwin.com); (g) the U.S. Trustee, One Bowling Green, Room 534, New York, NY 10004, Attn: Mark Bruh, Esq. (mark.bruh@usdoj.gov); and (h) all parties that have filed a notice of appearance in the Chapter 7 Cases.

47. Objections, if any, shall state the party's interest in the Chapter 7 Cases and shall also set forth the specific grounds, legal and/or factual, for the objection.

48. The Trustee further requests that the Bidding Procedures Order provide that the failure of any objecting person or entity to timely file an objection to the Sale shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale or to any portion of the agreement with the Successful Bidder to the extent it is based on a ground that should have been known prior to the Objection Deadline.

## BASIS FOR RELIEF

### I. The Bidding Procedures Should be Approved and the Bidding Procedures Order Entered

49. The Bidding Procedures, which are standard for the sale of assets in similar cases and are substantially the same as the procedures approved by the Court

for the sale of the Schoolhouse, will ensure that the Trustee receives the greatest benefit available from the Sale of the Farm Property. Further, the Bidding Procedures are fair and open, and do not unfairly favor any potential purchaser. Finally, the Trustee submits that the Bidding Procedures set out a timeframe that will allow potential purchasers sufficient time to conduct due diligence and submit informed bids, while still providing for the prompt sale of the Farm Property, which continues to generate carrying costs for the MCS estate, including the cost of the Caretaker, insurance and maintenance, and which the Trustee has been marketing for approximately one year. *See* O'Shaughnessy Decl. ¶ 19.

50. The Trustee respectfully submits that the Bidding Procedures are reasonably designed to ensure that MCS's estate receives the highest or best purchase price for the Farm Property and, therefore, warrant Court approval.

**A. The Sale Schedule and Notice are Reasonable and Should be Approved**

51. Bankruptcy Rule 6004(a) provides that notice of a proposed sale of property of the estate, other than in the ordinary course of business, shall be given to all known creditors and parties-in-interest pursuant to Bankruptcy Rule 2002(a)(2), (c)(1), (i) and (k).

52. Bankruptcy Rule 2002(a) requires that "the clerk, or some other person as the court may direct," give "the debtor, the trustee, all creditors and indenture trustees at least 21 days' notice by mail of: (2) a proposed use, sale, or lease of property of the estate other than in the ordinary course of business—unless the court, for cause, shortens the time or orders another method of giving notice[.]" Fed. R. Bankr. P. 2002(a). Bankruptcy Rule 2002(c) requires that this notice include "the time and place of

any public sale, the terms and conditions of any private sale and the time fixed for filing objections." Fed. R. Bankr. P. 2002(c).

53. Bankruptcy Rule 6004(c) requires that an application pursuant to section 363(f) of the Bankruptcy Code for authority to sell property free and clear of liens or other interests "shall be served on the parties who have liens or other interest in the property to be sold." Fed. R. Bankr. P. 6004(c). The Trustee intends to provide notice of the Bidding Procedures and the proposed Sale to any parties holding liens and interests in the Farm Property so that they have an opportunity to review the terms of the Sale and the relief requested. Accordingly, the Trustee submits that Rule 6004(c) is satisfied.

54. As described above, the Trustee is proposing that the Bid Deadline be set forty-two (42) days following the filing of this Application, with the Auction to be held five days thereafter. The Trustee also proposes that the Sale Hearing take place on November 24, 2026, twenty-eight (28) days following the hearing on this Application. This timeline is similar to the timeline the Court approved for the sale of the Schoolhouse. The Trustee submits that this timeline is appropriate because the Farm Property has been listed and actively marketed by Coldwell for approximately one year, the parties that have expressed interest in the Farm Property have had ample opportunity to inspect it and conduct diligence, and the Stalking Horse APA requires the Trustee to seek entry of the Sale Order by the Outside Date.

55. The Bidding Procedures Order and Notice of Auction and Sale Hearing set forth all the information a potential bidder and any other party in interest should require concerning the bidding process for the Farm Property, including: the property of the MCS estate that is being sold by the Trustee; the terms of the Sale; notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the time, date, and location of the Auction; and the

time, date, and location of the Sale Hearing. The Bidding Procedures Order and Notice of Auction and Sale Hearing will be served on all of the Notice Parties, all of the Debtors' known creditors, and all of the parties that inspected or otherwise expressed an interest to Coldwell in acquiring the Farm Property.

56. The Trustee respectfully submits that all of these notice procedures satisfy the requirements of Bankruptcy Rules 2002 and 6004, and Local Rules 6004-1 and 6004-2, and respectfully requests that the Court approve them.[10]

**B. The Bid Protections Should Be Approved**

57. The Trustee seeks authority to provide "stalking horse" bid protections to the Stalking Horse Bidder in the form of the Breakup Fee of $19,800, equal to 2% of the Purchase Price, and the Expense Reimbursement of the Stalking Horse Bidder's reasonable and documented out-of-pocket costs of up to $35,000. The use of bid protections, such as break-up fees and expense reimbursements, is a normal and in many cases necessary component of sales under the Bankruptcy Code. *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.*, 147 B.R. 650, 659-60 (S.D.N.Y. 1992) ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . [due to the] duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value.").

58. Bidder protections, such as the Bid Protections, are granted "when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer." *In re Metaldyne Corp.*, 409

[10] To the extent any of the proposed deadlines do not satisfy the applicable requirements of the Bankruptcy Rules, the Local Rules, or the Sale Guidelines, the Trustee respectfully submits that, based on the foregoing, cause exists to modify such requirements given the circumstances of these Chapter 7 Cases and the nature of the Farm Property.

B.R. 661, 670 (Bankr. S.D.N.Y. 2009). In this District, courts evaluate break-up fees based on a three-part test: (1) whether the relationship of the parties who negotiated the breakup fee is tainted by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the fee is unreasonable relative to the proposed purchase price. *See id.*; *see also In re Integrated Res., Inc.*, 147 B.R. at 659. The Sale Guidelines provide that "[t]he propriety of any break-up or topping fees and other bidding protections . . . will be determined on a case-by-case basis," and that where a sale contemplates a break-up fee or expense reimbursement, "the initial bidding increment must be more than sufficient to pay the maximum amount payable thereunder." Sale Guidelines § I.B.4(b)-(c).

59. The Trustee submits that the standard for approval of the Bid Protections is met. The Stalking Horse Bidder and the Debtors are not related or affiliated parties, and the Bid Protections were negotiated at arm's length, without any self-dealing or manipulation. The Bid Protections are meant solely to compensate the Stalking Horse Bidder for the costs it has incurred in negotiating the Stalking Horse APA and conducting diligence on the Farm Property, and to induce the Stalking Horse Bidder to provide a floor for bidding and to hold its bid open while the Trustee tests it at the Auction. *See In re Marrose Corp.*, Case Nos. 89-B-12171 (CB) to 89-B-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. Feb. 15, 1992) ("agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

60. The Bid Protections will not chill bidding. The Bid Protections total $54,800 in the aggregate, and are payable only if the Farm Property is sold to another purchaser and that sale closes. The Expense Reimbursement is a reimbursement of actual, documented out-of-pocket costs, subject to a cap, and not a fixed fee. The

transaction costs of a real property sale of this kind, including legal fees for the negotiation of the Stalking Horse APA, title and survey review, and environmental diligence, are largely fixed and do not scale with the purchase price, and a cap of $35,000 reflects those costs for a sale of an approximately 165-acre farm with multiple structures, farm equipment and vehicles. The Breakup Fee of $19,800 is two percent of the Purchase Price, a percentage within the range regularly approved in this District. *See, e.g.*, *In re the D&M Capital Group, LLC*, No. 19-11711 (SCC) (Bankr. S.D.N.Y. Feb. 2, 2021) [Docket No. 174] (approving a 3% break-up fee); *In re Metaldyne Corp.*, 409 B.R. at 670 (approving break-up fee of less than 3%); *In re Adelphia Bus. Solutions, Inc.*, No. 02-11389 (REG) (Bankr. S.D.N.Y. Dec. 16, 2002) (approving a termination fee of 2.5% on a $10.7 million sale). The Court approved bid protections of $540,000 in favor of the stalking horse bidder for the Schoolhouse, which was then sold at auction for $13,200,000 more than the stalking horse purchase price.

61. Consistent with the Sale Guidelines, the Bidding Procedures require that the initial overbid be at least $75,000 over the Purchase Price, an amount that exceeds the aggregate Bid Protections by more than $20,000, so that the MCS estate will realize a net increase in value from any overbid, with subsequent overbids in increments of $25,000. The Trustee believes the Bid Protections will establish a floor for bidding that may ultimately increase the net purchase price received by the Trustee in exchange for the Farm Property.

62. Accordingly, the Trustee respectfully submits that the Bid Protections will not deter or chill bidding, are reasonable, and will enable the Trustee to maximize the value of the MCS estate to ensure that the estate receives the highest or best purchase price for the Farm Property and, therefore, warrant Court approval.

## II. The Sale Order Should Be Entered

### A. The Sale of the Farm Property is a Sound Exercise of the Trustee's Business Judgment

63. Bankruptcy Code section 363(b) governs transactions outside the ordinary course of business involving property of a debtor's estate and provides, in relevant part, that, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363(b).

64. A Chapter 7 trustee's sale or use of property of the estate outside the ordinary course of business should be approved by the Court if the Trustee can demonstrate a sound business justification for the proposed transaction. *See In re Chrysler LLC*, 576 F.3d 108, 117-18 (2d Cir. 2009) (citing *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) ("In this Circuit, the sale of an asset of the estates under § 363(b) is permissible if the 'judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'")); *In re Gen. Motors Corp.*, 407 B.R. 463, 491 (Bankr. S.D.N.Y. 2009).

65. Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [debtor] to show that a sound business purpose justifies such actions.' If the [debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (internal citations and quotations omitted) ("Under Section 363,

the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'"); *see also In re Integrated Res., Inc.*, 147 B.R. at 656 (applying business judgment rule to bidding procedures and incentives and noting that "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence").

66. The Farm Property is the principal remaining asset of MCS's estate and is the primary source of funds to pay the administrative expenses of the Chapter 7 Case and allowed unsecured claims. The Farm Property is not encumbered by the liens of the Secured Creditors, so the net proceeds of the Sale will be available for distribution to creditors of MCS's estate. The Farm Property generates no income for the MCS estate and requires continued expenditures for its Caretaker, insurance and maintenance. The Trustee, in consultation with his professionals, has determined in his business judgment that selling the Farm Property is in the best interests of the MCS estate because there is no other viable alternative to realize its value for creditors.

67. Consequently, the Trustee has determined in his business judgment that selling the Farm Property pursuant to the Stalking Horse APA, or such higher or better offer which may be received, is in the best interests of the MCS estate.

68. Moreover, the Trustee submits that the Purchase Price is fair and reasonable in light of the current real estate market in Delaware County, sales of comparable properties in the area, the marketing of the Farm Property by Coldwell over approximately one year, and the offers received for the Farm Property to date. *See* O'Shaughnessy Decl. ¶¶ 17-18. Finally, any concern that the Trustee may be able to sell the Farm Property on better overall terms than those provided for in the Stalking Horse APA should be allayed by the fact that the Stalking Horse APA will be tested through the Bidding Procedures and at the Auction.

69. Based upon the foregoing, the Trustee respectfully submits that the Sale of the Farm Property offers the greatest benefit to MCS's estate, and is a sound exercise of his business judgment.

### B. The Farm Property Should be Sold Free and Clear of any Interests to the Extent Permitted by Section 363(f) of the Bankruptcy Code

70. Pursuant to section 363(f) of the Bankruptcy Code, a trustee may sell property under Bankruptcy Code section 363(b) free and clear of any interests if one of the following conditions is satisfied: (a) applicable nonbankruptcy law permits the sale of the property free and clear of such interest; (b) the entity holding the lien, claim or interest consents to the sale; (c) the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest. *See* 11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *In re Smart World Tech., LLC*, 423 F.3d 166, 169 n.3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests. It thus allows Purchaser . . . to acquire assets [from a debtor] without any accompanying liabilities.").

71. The Trustee is not aware of any mortgage or other consensual lien against the Farm Property. To the extent any liens, claims or interests exist, the Trustee respectfully submits that cause exists to authorize the Sale of the Farm Property free and clear of all such interests and liens, other than the Permitted Exceptions, as described herein and as provided in the Stalking Horse APA, because more than one of the conditions contained in Bankruptcy Code section 363(f) are satisfied, with any such liens to attach to the Sale proceeds.

*i. Section 363(f)(2) Is Satisfied: Holders of Liens and Interests Implied Consent to the Sale*

72. All parties in interest will be given sufficient opportunity to object to the relief requested by the Trustee, and any such entity that does not object to the Sale should be deemed to have consented. *See Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same). Courts in this District have applied the same principle. *See In re Enron Corp.*, 2003 WL 21755006 at *2 (AJG) (Bankr. S.D.N.Y. 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).

*ii. Section 363(f)(5) Is Satisfied: Any Party Holding a Lien Can Be Compelled to Accept Monetary Satisfaction of a Lien*

73. The Sale satisfies Bankruptcy Code section 363(f)(5) because (a) any entity holding a lien against the Farm Property could be compelled to accept a monetary satisfaction of its lien, and (b) the Trustee proposes that any lien against the Farm Property will attach to the net proceeds of the Sale, subject to all claims and defenses that the MCS estate may possess regarding such liens, with the same priority, validity and extent they had on the Petition Date.

74. Entities that hold liens against real property can be compelled to accept a monetary satisfaction of their liens through a foreclosure sale. *See In re Urban Commons 2 West LLC*, 668 B.R. 42, 49-50 (Bankr. S.D.N.Y. 2025) (finding "the availability of a foreclosure proceeding under state law satisfies Bankruptcy Code § 363(f)(5)"); *see also In re BAMC Development Holding, LLC*, No. 8:22-BK-1487-CPM, 2025 WL 770521, at *19 (Bankr. M.D. Fla. Mar. 11, 2025) ("The existence of judicial and nonjudicial foreclosure and enforcement actions under state law, among other proceedings, have been held to satisfy § 363(f)(5).") (quoting *In re Hamilton Road Realty, LLC*, No. 8-19-72596, 2021 WL 1620046, at *5 (Bankr. E.D.N.Y. Apr. 26, 2021)); *In re Boston Generating*, 440 B.R. 302, 333 (Bankr. S.D.N.Y. 2010) (same).

75. As a result, the Trustee respectfully submits the Sale of the Farm Property free and clear of all liens satisfies section 363(f)(5) of the Bankruptcy Code. Based upon all of the foregoing, sufficient cause exists for the sale of the Farm Property free and clear of all liens, with any liens to attach to the proceeds of the Sale.

**C. The Stalking Horse Bidder Should be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser**

76. Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from the estate notwithstanding that the sale conducted under section 363(b) may later be reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) … provides that good faith transfers of property will not be affected by

the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

77. While the Bankruptcy Code does not define "good faith," courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that where there is a lack of such integrity, a good-faith finding may not be made. *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)) ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *In the Matter of Andy Frain Services, Inc.*, 798 F.2d 1113 (7th Cir. 1986) (same); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

78. Here, the Stalking Horse Bidder and Trustee have satisfied the requirements of Section 363(m). The Stalking Horse APA is the result of arm's-length, good-faith negotiations between the Trustee and the Stalking Horse Bidder, and each of them has been represented by their respective professionals. The Stalking Horse Bidder has represented that it is not an insider of the Debtors and has not colluded with any other bidder. *See* Stalking Horse APA § 5.08. The Trustee submits that the Stalking Horse Bidder is a "good-faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code and should be entitled to its protection. Accordingly, the Trustee requests that the Court make a finding that the Stalking Horse Bidder is entitled to the protections of section 363(m) of the Bankruptcy Code.

79. To the extent that the Stalking Horse Bidder is not the Successful Bidder at the Auction, the Trustee will seek a finding from the Court at the Sale Hearing that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**D. The Broker Commission Should be Allowed and Paid**

80. Pursuant to the Coldwell Retention Order, Coldwell is entitled to the Broker Commission, which consists of three and one-half percent (3.5%) of the gross sale price of the Farm Property if no broker other than Coldwell is involved in the Sale, and up to four and one-half percent (4.5%) of the gross sale price if the purchaser is represented by an outside broker (an "Outside Broker"), in which case the additional amount is payable to the Outside Broker.

81. The Coldwell Retention Order also provides that Coldwell shall not receive any payment for its services until a sale of the Farm Property is approved by the Court and Coldwell files a fee application which is approved by the Court, and that such application may be included in the Trustee's motion for approval of the sale of the Farm Property. *See* Coldwell Retention Order at p. 3.

82. Here, Coldwell procured the Stalking Horse Bidder, who is represented by an Outside Broker, Margaret Leasure of Howard Hanna Real Estate Services, which entitles Coldwell and the Outside Broker to an aggregate Broker Commission of four and one-half percent (4.5%) of the Purchase Price, or $44,550. *See* O'Shaughnessy Decl. ¶ 15.[11] The Listing Agreement provides that if the Farm Property is sold to a successful bidder at auction, the Broker Commission shall be calculated based upon the highest

[11] The amount of the Broker Commission may increase if the total sale price increases as a result of the Auction.

and best bid submitted by the successful bidder in the auction that closes. *See* Listing Agreement ¶ 11.

83. Because the Broker Commission was a material term of the Listing Agreement, which was approved by the Court in the Coldwell Retention Order, and pursuant to its terms, the Trustee is "authorized to compensate Coldwell, and the Outside Broker, if any, pursuant to the commission fee arrangement set forth in the Coldwell Listing Agreement," *see* Coldwell Retention Order at p. 3, the Trustee respectfully submits that the Broker Commission should be approved and the Trustee should be authorized to pay the Broker Commission to Coldwell (and to the Outside Broker, if any) from the proceeds of the Sale at Closing.

**WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)**

84. The Trustee respectfully requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise," Fed. R. Bankr. P. 6004(h). The Stalking Horse APA requires the Trustee to request this waiver. *See* Stalking Horse APA § 18.1.

85. In light of the notice of the Sale that will be provided to parties in interest, the fact that any liens against the Farm Property will attach to the proceeds of the Sale, and the carrying costs the MCS estate continue to incur with respect to the Farm Property, the Trustee submits that no party will be prejudiced by a waiver of the stay imposed by Bankruptcy Rule 6004(h) and that such waiver will permit the Sale to close promptly and limit the MCS estate's carrying costs.

## NO PRIOR REQUEST

86. No prior application for the relief requested herein has been made to this or any other Court.

## CONCLUSION

**WHEREFORE** the Trustee respectfully requests entry of the orders authorizing the relief requested herein and such other and further relief as is just and proper.

Dated: New York, New York
October 2, 2026

ALBERT TOGUT, not individually but
solely in his capacity as Chapter 7 Trustee,
By His Attorneys,

TOGUT, SEGAL & SEGAL LLP

By:
*/s/ Brian F. Moore*

BRIAN F. MOORE
ANTHONY L. GREENE
BRIAN KREUTTER
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

# Exhibit A

# Proposed Bidding Procedures Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| MANHATTAN COUNTRY SCHOOL *et al.*,[1] | : | Case No. 25-11009 (DSJ) |
| Debtors. | : | (Jointly Administered) |

**ORDER APPROVING (A) BIDDING PROCEDURES FOR THE SALE OF THE FARM PROPERTY, (B) DESIGNATION OF STALKING HORSE BIDDER, (C) BID PROTECTIONS IN FAVOR OF THE STALKING HORSE BIDDER, (D) DATE AND TIME FOR AN AUCTION AND A HEARING FOR APPROVAL OF THE SALE, AND (E) THE FORM AND MANNER OF NOTICE THEREOF**

Upon the application [Docket No. 158] (the "Application")[2] of Albert Togut, not individually but solely in his capacity as the Chapter 7 trustee (the "Trustee") of the estate of Manhattan Country School ("MCS"), one of the above-captioned debtors (together with West 85th Street Owner LLC, the "Debtors"), by his attorneys, Togut, Segal & Segal LLP, for entry of an order pursuant to sections 105(a), 330, and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and the Amended Guidelines for the Conduct of Asset Sales Established and Adopted by the United States Bankruptcy Court for the Southern District of New York pursuant to General Order M-383 (the "Sale Guidelines") (a) approving the proposed bidding procedures, annexed hereto as **Exhibit 1** (the "Bidding Procedures") for the Trustee's

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are (i) Manhattan Country School (6971) (Case No. 25-11009 (DSJ)); and (ii) West 85th Street Owner LLC (6971) (Case No. 25-11922 (DSJ)).

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Application or the Bidding Procedures.

proposed sale (the "Sale") of MCS's real property located at 3217 New Kingston Mountain Road and 3536 New Kingston Mountain Road, Roxbury, New York 12474, together with the personal property, vehicles and other assets described in the Stalking Horse APA (as defined below) (collectively, the "Farm Property"), (b) approving the proposed form asset purchase agreement with Wade Crowe and Angela Crowe, husband and wife, or their permitted assignee (the "Stalking Horse Bidder"), annexed to the Application as Exhibit B (the "Stalking Horse APA"), and designating the Stalking Horse Bidder as the "stalking horse bidder" for the Sale of the Farm Property, (c) approving the Bid Protections in favor of the Stalking Horse Bidder, (d) scheduling an auction (the "Auction") and a hearing (the "Sale Hearing") to consider approval of the Sale of the Farm Property to the Successful Bidder, and (e) approving the form and manner of notice of the Auction and the Sale Hearing; and this Court having considered the Application and the O'Shaughnessy Declaration; and based on the Application, it appearing that the relief requested in the Application is in the best interests of MCS's estate and all parties in interest; and the Court having held a hearing to consider the Application on October 27, 2026 (the "Hearing"); and upon the record of the Hearing; and after due deliberation thereon and good cause appearing therefor, it is hereby:

**FOUND AND DETERMINED THAT:**[3]

A. Jurisdiction. This Court has jurisdiction over the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of the Application and the relief requested therein is a core proceeding pursuant to 28 U.S.C.

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact, when appropriate. *See* Fed. R. Bankr. P. 7052.

§§ 157(b)(2)(A), (N) and (O). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B. Notice of the Application. Good and sufficient notice of the relief sought in the Application has been given, and no further notice is required. A reasonable opportunity to object or be heard regarding the relief requested in the Application has been afforded to all interested persons and entities, including the Notice Parties.

C. Notice of the Auction and Sale Hearing. The proposed notice of the Bidding Procedures, the Auction, the Sale Hearing, the proposed Sale, as set forth in the Application, including the Notice of Auction and Sale Hearing, the form of which is attached hereto as **Exhibit 2**, is good, appropriate, sufficient, and is reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Auction, the Sale Hearing, and the Sale, and no other or further notice of the Sale, the Auction or the Bidding Procedures, other than as set forth herein and in the Application, is required.

D. Designation of Stalking Horse Bid. The Stalking Horse APA represents the highest or best offer the Trustee received during the sale process for the Farm Property and the Trustee's designation of the Stalking Horse APA as a "stalking horse bid" is a sound exercise of his business judgment. Without the Stalking Horse APA, the Trustee would likely realize a lower price for the Farm Property. The contributions of the Stalking Horse Bidder to the process appear to have provided a substantial benefit to the Trustee, the MCS estate, and the creditors in this Chapter 7 Case. The Stalking Horse APA will enable the Trustee to secure a fair and adequate baseline price for the Farm Property at the Auction (if any), and accordingly, will provide a clear benefit to the MCS estate, MCS's creditors, and all other parties in interest.

E. Designation of Stalking Horse Bidder. The Stalking Horse Bidder shall act as the "stalking horse bidder" pursuant to the Stalking Horse APA, which shall be subject to higher or better offers in accordance with the Bidding Procedures. The Stalking Horse Bidder is not an "insider" or "affiliate" of the Debtors or the Trustee, as those terms are defined in section 101 of the Bankruptcy Code, and neither Wade Crowe nor Angela Crowe is a current or former officer, director, trustee, employee or insider of the Debtors. Designation of the Stalking Horse Bidder as a "stalking horse bidder" and the Stalking Horse APA as a "stalking horse" purchase agreement is in the best interests of the MCS estate and creditors, and it reflects a sound exercise of the Trustee's business judgment.

F. Stalking Horse Bid Protections. The Bid Protections (as defined in the Application) (i) have been negotiated by the Stalking Horse Bidder and the Trustee and their respective advisors at arm's-length and in good faith, (ii) are necessary to ensure that the Stalking Horse Bidder will continue to pursue its Stalking Horse APA and the sale transaction contemplated thereby, and (iii) are reasonable in amount, and the minimum initial overbid required under the Bidding Procedures exceeds the aggregate amount of the Bid Protections. The Bid Protections are a material inducement for, and condition of, the Stalking Horse Bidder's execution of the Stalking Horse APA. Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidder is unwilling to remain obligated to consummate the Sale or otherwise be bound under the Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

G. The Trustee has articulated good and sufficient cause for this Court to grant the relief requested in the Application, including this Court's (a) approval of the

Bidding Procedures, attached hereto as **Exhibit 1**; (b) designation of the Stalking Horse Bidder and approval of the Bid Protections; and (c) approval of the Notice of Auction and Sale Hearing.

H. The Trustee has articulated good and sufficient cause for, and the best interests of MCS's estate will be served by, this Court scheduling a subsequent hearing to consider whether to grant the remainder of the relief requested in the Application, including approval of the proposed Sale free and clear of, among other things, all liens, claims, encumbrances, and interests, other than permitted exceptions (collectively, "Liens"), with such Liens to attach to the proceeds of the Farm Property.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The Application is GRANTED to the extent provided in this Order.

2. Except as specified below, all objections to entry of this Order or to the relief provided herein and requested in the Application that have not been withdrawn, waived, resolved, or settled are hereby denied and overruled in their entirety.

**THE BIDDING PROCEDURES**

3. The Bidding Procedures, as set forth in **Exhibit 1** hereto and incorporated herein by reference as if fully set forth herein, are hereby approved in all respects and shall govern all bids and bid proceedings relating to the Farm Property. The procedures and requirements set forth in the Bidding Procedures, including those associated with submitting a "Qualified Bid" are fair, reasonable, and appropriate, and are designed to maximize recoveries for the benefit of the MCS estate, creditors, and other parties in interest.

4. The deadline for submitting bids for the Farm Property shall be **November 12, 2026, at 12:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"),

unless otherwise extended by the Trustee. In the event the Bid Deadline is extended, the Trustee may adjourn the dates for the Auction and the Sale Hearing, with notice to the Stalking Horse Bidder, all parties with an interest in the Farm Property, and all known Potential Bidders. Any party that does not submit a Qualified Bid by the Bid Deadline in accordance with the Bidding Procedures will not be allowed to (a) submit any offer after the Bid Deadline or (b) participate in the Auction.

5. Except as may be limited by the Stalking Horse APA, the Trustee is authorized to extend the deadlines set forth in this Order and/or adjourn, continue or suspend the Auction and/or the Sale Hearing for any reason, without further order of this Court, by filing a notice with this Court and serving such notice on all Notice Parties and Potential Bidders.

6. The Trustee is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

7. All Potential Bidders submitting bids determined by the Trustee to be Qualified Bids in accordance with the Bidding Procedures are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the Sale or transfer of the Farm Property.

8. Absent further order of the Court, no Qualified Bidder (other than the Stalking Horse Bidder solely as provided herein) shall be entitled to any expense reimbursement, break-up fee, termination fee, or other similar fee or payment in connection with the Sale of the Farm Property, and by submitting a bid, such Qualified Bidder is deemed to have waived its right to request or to file with the Court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code, or otherwise.

**STALKING HORSE BID PROTECTIONS**

9. The Stalking Horse APA shall be subject to higher or better Qualified Bids, in accordance with the Bidding Procedures.

10. The Bid Protections are approved in their entirety. The Breakup Fee and the Expense Reimbursement (each, as defined in the Application) shall be payable in accordance with, and subject to the terms of, the Stalking Horse APA and the Bidding Procedures, solely from the proceeds of a closed Sale of the Farm Property to a Successful Bidder other than the Stalking Horse Bidder.

11. In the event the Stalking Horse Bidder is not the Successful Bidder and the Sale of the Farm Property to the Successful Bidder closes, the Trustee is authorized to pay the Breakup Fee and Expense Reimbursement by wire transfer of immediately available funds in accordance with the Stalking Horse APA and without further order of the Court. Upon receiving the purchase price from the Successful Bidder (other than the Stalking Horse Bidder), the Trustee shall set aside an amount in cash for payment of the Breakup Fee and Expense Reimbursement, pursuant to the terms of the Stalking Horse APA.

**THE AUCTION**

12. The Auction shall commence on **November 17, 2026, at 2:00 p.m. (prevailing Eastern Time)** at the law offices of Phillips Nizer LLP, 485 Lexington Avenue, 14th Floor, New York, NY 10017, or such later time or other place, within New York City or conducted virtually, as decided by the Trustee. The Trustee shall notify all Qualified Bidders of such later time or place; provided, however, in the event that no Qualified Bids other than the one submitted by the Stalking Horse Bidder are received by the Bid Deadline, or the Trustee determines that no such Qualified Bid is higher or better than the Stalking Horse APA, the Trustee shall not be required to conduct an

Auction, and in such event the Trustee shall file a notice of cancellation of the Auction on the electronic docket that is maintained for the jointly-administered cases by November 13, 2026, at 5:00 p.m. (prevailing Eastern Time), and serve such notice on all of the Notice Parties and proceed with the approval of the Sale of the Farm Property to the Stalking Horse Bidder.

**SALE HEARING**

13. The Sale Hearing shall be held before the Honorable David S. Jones, United States Bankruptcy Judge of the Bankruptcy Court, on **November 24, 2026 at 10:00 a.m. (prevailing Eastern Time)** at the United States Bankruptcy Court, One Bowling Green, New York, New York 10004, at which time this Court shall consider: (a) approval of the Sale to the Successful Bidder free and clear of all Liens; (b) entry of the proposed Sale Order, substantially in the form attached to the Application as Exhibit C; (c) any other issues or objections that are timely interposed by any parties; and (d) the granting of such other or further relief as this Court may deem just or proper.

14. Except as may be limited by the Stalking Horse APA, the Sale Hearing may be adjourned by the Trustee, after consultation with the Successful Bidder, as applicable, from time to time without further order of this Court, by filing a notice on the electronic docket that is maintained for the jointly-administered cases, and serving such notice on the Notice Parties and all Qualified Bidders.

15. The Successful Bidder (which may be the Stalking Horse Bidder) shall appear at the Sale Hearing (if any) and be prepared, if necessary, to have a representative testify in support of its sale contract and the Successful Bidder's ability to close in a timely manner.

## NOTICE

16. The Notice of Auction and Sale Hearing, substantially in the form attached hereto as **Exhibit 2**, is hereby approved.

17. Within one (1) business day after the entry of this Order, the Trustee shall cause this Bidding Procedures Order, together with the exhibits hereto, including the Bidding Procedures and the Notice of Auction and Sale Hearing, to be served on all of the Notice Parties, all of the Debtors' known creditors, and all of the parties that have recorded Liens against the Farm Property. The Trustee may serve only the Notice of Auction and Sale Hearing and the Bidding Procedures on parties which the Trustee and the Broker have identified as having an interest in acquiring the Farm Property.

18. The notice as set forth in the preceding paragraph shall constitute good and sufficient notice of the Auction, the Sale Hearing, the proposed Sale Order, and no other or further notice of the Auction, the Sale Hearing, and/or the proposed Sale Order shall be necessary or required.

19. Notwithstanding the applicability of Local Rule 6004-1(h) or any other provision of the Bankruptcy Rules or Local Rules stating to the contrary, the requirement for publication notice is hereby waived.

## OBJECTIONS TO THE SALE

20. Objections, if any, to the Sale of the Farm Property pursuant to the Application shall be filed with this Court and served so as to be **actually received** no later than **4:00 p.m. (prevailing Eastern Time) on November 20, 2026** (the "Objection Deadline"), by: (a) counsel to the Trustee, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York 10119, Attn: Anthony L. Greene, Esq. (agreene@teamtogut.com); (b) counsel for the Stalking Horse Bidder, Barclay Damon LLP, 1270 Avenue of the Americas, Suite 2310, New York, New York 10020, Attn: Janice

B. Grubin, Esq. (jgrubin@barclaydamon.com) and Allen J. Underwood II, Esq. (aunderwood@barclaydamon.com); (c) co-counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attn: Brian S. Lennon, Esq. (blennon@willkie.com); (d) co-counsel to the Debtors, Lester Korinman Kamran & Masini, P.C., 600 Old Country Road, Suite 330, Garden City, New York 11530, Attn: Roy J. Lester, Esq. (rlester@lesterfirm.com); (e) counsel for the Lender, Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, NY 11554, Attn: Richard J. McCord, Esq. (rmccord@certilmanbalin.com); (f) counsel for U.S. Bank National Association, Shipman & Goodwin LLP, One Constitution Plaza, Hartford, CT 06103, Attn: Kathleen M. LaManna, Esq. (klamanna@goodwin.com) and Anthony R. Scarcella, Esq. (ascarcella@goodwin.com); (g) the U.S. Trustee, One Bowling Green, Room 534, New York, NY 10004, Attn: Mark Bruh, Esq. (mark.bruh@usdoj.gov); and (h) all parties that have filed a notice of appearance in the Chapter 7 Cases, and shall also set forth the specific grounds, legal and/or factual, for the objection. Only timely filed and served responses, objections, and other pleadings may be considered by this Court at the Sale Hearing.

21. The failure of any person or entity to file an objection to the Sale on or before the Objection Deadline shall forever bar any such objection to the Sale, or to the consummation of the Sale contemplated by the Stalking Horse APA or agreement with the Successful Bidder(s), if any, including the transfer of the Farm Property free and clear of Liens. Failure to object shall constitute consent for the purposes of section 363(f) of the Bankruptcy Code.

22. The deadline to file any replies to any objections to the Sale is **November 23, 2026 at 12:00 p.m. (prevailing Eastern Time)** or the Trustee may address any objections on the record at the Sale Hearing.

## ADDITIONAL PROVISIONS

23. Notwithstanding the applicability of Bankruptcy Rule 6004(h) or any other provision of the Bankruptcy Rules or Local Rules stating to the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and any applicable stay of the effectiveness and enforceability of this Order is hereby waived.

24. The Trustee is authorized and empowered to take such steps, incur and pay such costs and expenses, and do such things as may be reasonably necessary to fulfill the notice requirements established by this Order.

25. Entry of this Order shall in no way impair the ability of the Court, United States Trustee, or the Trustee to implement or enforce other orders of the Court entered in the Chapter 7 Cases, and all such orders shall continue in full force and effect.

26. This Court shall retain exclusive jurisdiction over any matter or dispute arising from or relating to the implementation, interpretation, or enforcement of this Order.

DATED: New York, New York
_____________, 2026

_______________________________
HONORABLE DAVID S. JONES
UNITED STATES BANKRUPTCY JUDGE

# Exhibit 1

## Bidding Procedures

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Brian F. Moore
Anthony L. Greene
Brian Kreutter

Attorneys for Albert Togut,
Not Individually But Solely in His Capacity
as Chapter 7 Trustee

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| MANHATTAN COUNTRY SCHOOL *et al.*,[1] | : | Case No. 25-11009 (DSJ) |
| Debtors. | : | (Jointly Administered) |

**BIDDING PROCEDURES**

The following bidding procedures (the "Bidding Procedures") shall govern the sale by Albert Togut, not individually but solely in his capacity as Chapter 7 trustee (the "Trustee") of the estate (the "Estate") of Manhattan Country School (the "Debtor"), one of the above-captioned debtors in the above-captioned jointly-administered cases (the "Chapter 7 Cases"), of the Debtor's real property located at 3217 New Kingston Mountain Road and 3536 New Kingston Mountain Road, Roxbury, New York 12474, together with the personal property, vehicles and other assets described in the Stalking Horse APA (as defined below) (collectively, the "Farm Property") pursuant to the form asset purchase agreement for the Farm Property attached as Exhibit B (the "Stalking Horse APA") to the *Trustee's Application for Entry of: (I) an Order Approving (A)*

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are (i) Manhattan Country School (6971) (Case No. 25-11009 (DSJ)); and (ii) West 85th Street Owner LLC (6971) (Case No. 25-11922 (DSJ)).

*Bidding Procedures for the Sale of the Farm Property, (B) Designation of Stalking Horse Bidder, (C) Bid Protections in Favor of the Stalking Horse Bidder, (D) Date and Time for an Auction and a Hearing for Approval of the Sale, and (E) the Form and Manner of Notice Thereof; and (II) an Order Approving (A) the Sale of the Farm Property Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (B) Payment of Broker Commission* [Docket No. 158] (the "Application"),[2] subject to higher and better offers as provided in the Bidding Procedures. On [________], 2026, the Bankruptcy Court entered an order approving the Application, including these Bidding Procedures [Docket No. ___] (the "Bidding Procedures Order").

The Bidding Procedures Order authorizes the Trustee to enter into the Stalking Horse APA with Wade Crowe and Angela Crowe, husband and wife, or their permitted assignee (the "Stalking Horse Bidder") and designates the Stalking Horse Bidder as the stalking horse bidder for the sale of the Farm Property for a purchase price of $990,000 (the "Purchase Price") pursuant to the Stalking Horse APA, subject to higher and better bids received through a bidding process and auction (the "Auction"), if any, to be conducted pursuant to these Bidding Procedures.

The Stalking Horse APA includes certain bid protections in favor of the Stalking Horse Bidder (the "Bid Protections") consisting of (i) a break-up fee equal to two percent (2%) of the Purchase Price (i.e., $19,800) (the "Breakup Fee") and (ii) reimbursement of the Stalking Horse Bidder's reasonable and documented out-of-pocket costs and expenses, not to exceed $35,000 (the "Expense Reimbursement"), which are payable only from the proceeds of a closed sale of the Farm Property to a purchaser other than the Stalking Horse Bidder.

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Application.

## DUE DILIGENCE

Parties interested in conducting due diligence regarding the Farm Property (each a "Potential Bidder") should contact the Trustee's retained real estate broker, Coldwell Banker Timberland Properties (the "Broker"), Attn: Christine O'Shaughnessy (email: christine@timberlandproperties.net).

The Trustee shall allow Potential Bidders to conduct due diligence regarding the Farm Property; provided, however, that the Trustee is not obligated to furnish any due diligence information after the Bid Deadline (as defined below).

## QUALIFIED BID REQUIREMENTS

To be considered, any bid submitted by a Potential Bidder for the Farm Property must be in writing and identify the Potential Bidder by its legal name (including any equity holders or other financial backers, if the Potential Bidder is an entity formed for the purpose of submitting bids or consummating a sale transaction), and any other party that will be participating in connection with the bid or the sale transaction. The bid must also include language:

a. stating that the bid is irrevocable through the earlier of the Closing Date and thirty (30) days after the entry of the Sale Order; provided, however, that (a) if a Qualified Bid (defined below) becomes the Successful Bid (as defined below), such bid shall be irrevocable through the Closing Date or such earlier date as such sale contract may be terminated in accordance with its terms, and (b) if the Qualified Bid becomes the Second Highest Bid (defined below), such bid shall remain irrevocable through the earlier of: (i) the closing of the sale with the Successful Bidder; and (ii) sixty (60) days after the entry of the Sale Order approving the Successful Bid, unless the Successful Bidder fails to close and the Trustee shall have given notice to the Second Highest Bidder that he has decided to consummate the transaction contemplated by the Second Highest Bid, in which case the Second Highest Bid shall remain open through the closing of the sale with such Second Highest Bidder;

b. be submitted in writing to (i) the Trustee's Broker, Attn: Christine O'Shaughnessy (email: christine@timberlandproperties.net), (ii) counsel to the Trustee, Togut, Segal & Segal LLP, Attn: Anthony L. Greene, Esq. (email: agreene@teamtogut.com), and (iii) special real estate counsel for the Trustee, Phillips Nizer LLP, Attn: Marc Landis (email: mlandis@phillipsnizer.com) so as to be received no later than **12:00 p.m. (ET) on November 12, 2026** (the "Bid Deadline") or such other date established by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in the Bidding Procedures Order.

In addition to the foregoing, a "Qualified Bidder" is a Potential Bidder that delivers a binding bid ("Qualified Bid") that satisfies the following:

a. the bid must be for the Farm Property and must be made on the same (or better) terms and conditions as those set forth in the Stalking Horse APA, and must include an agreement substantially similar to such Stalking Horse APA, marked to show any changes thereto;

b. includes a bid for a price at least $75,000 greater than the Purchase Price set forth in the Stalking Horse APA (i.e., at least $1,065,000, which amount exceeds the Purchase Price plus the Bid Protections) and under terms which the Trustee believes to be higher or better than the terms set forth in the Stalking Horse APA;

c. is accompanied by a deposit (the "Deposit") in an amount equal to at least 10% of the purchase price proposed by the Potential Bidder, in the form of a wire transfer, certified or cashier's check made payable to: "Phillips Nizer LLP, as Escrow Agent for Albert Togut, as Chapter 7 Trustee"; provided, that, the Trustee, in his reasonable discretion, may waive the requirement to provide a Deposit in the event a request is made for such waiver by any Potential Bidder that is a governmental unit (as defined in section 101(27) of the Bankruptcy Code);

d. is accompanied by sufficient information to demonstrate, in the Trustee's discretion, that the Potential Bidder has the financial ability to timely consummate the proposed transaction, including, but not limited to, current bank account statements, current audited financial statements, commitments or other proof of available and non-contingent financing, and such other forms of financial disclosure and credit quality in support of such Potential Bidder (including

financial information from any entities that will finance or guarantee the obligations of such Potential Bidder), which the Trustee requests;

e. is firm and unconditional and not subject to any contingencies that are not also provided in the Stalking Horse APA including, without limitation, further due diligence review or receipt of debt or equity financing;

f. expressly acknowledges that no offer or bid for the Farm Property shall be deemed accepted by, or binding upon, the Debtor's estate unless and until such offer or bid is accepted in writing by the Trustee and approved by order of the Bankruptcy Court;

g. expressly acknowledges that the Farm Property is being sold "AS IS", "WHERE IS" IN ITS CURRENT CONDITION, WITHOUT ANY REPRESENTATIONS, COVENANTS, GUARANTEES OR WARRANTIES OF ANY KIND OR NATURE WHATSOEVER, and free and clear of any liens, claims or encumbrances of whatever kind or nature, with such liens, if any, to attach to the proceeds of sale, and is subject to among other things (a) any state of facts that an accurate survey may show; (b) any covenants, restrictions and easements of record; (c) any state of facts a physical inspection may show; (d) any building or zoning ordinances or any other applicable municipal regulations and violations thereof; and (e) environmental conditions;

h. states that the Potential Bidder (a) has had an opportunity to conduct due diligence regarding the Farm Property prior to making its offer and does not require further due diligence, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Farm Property in making its bid, and (c) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Farm Property, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures;

i. states that the Potential Bidder has obtained all necessary approvals to make its bid and to enter into and consummate the transaction set forth in the bidder's sale contract;

j. states that the Potential Bidder is not a partner, officer, director, stockholder, agent, employee, insider, or affiliate of the Debtors, the Debtors' principal(s), the Broker or any

relative of any of the foregoing; provided, that, to the extent that the Potential Bidder is a partner, officer, director, stockholder, agent, employee, insider, or affiliate of the Debtors, the Debtors' principal(s), or any relative of any of the foregoing, or that any of the foregoing have any pecuniary interest whatsoever in the Potential Bidder, such affiliation, connection, or interest must be disclosed and be subject to further inquiry by the Trustee, the creditors, or any party in interest; and

k. expressly states that the Potential Bidder has not engaged in any bad faith or collusion in connection with the Auction or Sale.

Except with respect to the Stalking Horse Bidder, a bid shall not entitle any Potential Bidder to any break-up fee, termination fee, transaction fee, expense reimbursement, or any similar type of payment or reimbursement and, by submitting a bid, the Potential Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its bid or participation in any Auction. Each Potential Bidder presenting a bid will bear its own costs and expenses (including legal fees) in connection with any proposed sale.

Following entry of the Bidding Procedures Order, the Trustee, after consultation with his professionals, may reject any bid that is on terms that are more burdensome or conditional than the terms of the Stalking Horse APA; requires any indemnification of the Potential Bidder other than as set forth in the Stalking Horse APA; includes non-cash consideration; entitles the Potential Bidder to any break-up fee, termination fee, or similar type of payment; is not in conformity with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules of the Bankruptcy Court or an order of the Bankruptcy Court; is from a person or an entity that the Trustee concludes does not demonstrate that the party making the bid has the financial ability to consummate the transaction or fulfill financial commitments under its proposal; or is contrary to the best interests of the Debtor's estate. In

addition, notwithstanding anything contained herein to the contrary, the Trustee shall have the right to entertain bids that do not conform to one or more of the requirements set forth herein and deem any such bids as a Qualified Bid, so long as said bid or bids are received in advance of the Bid Deadline.

The Trustee reserves the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a bid that is not initially deemed a Qualified Bid. If a timely bid is received and, in the Trustee's judgment it is not clear whether the bid is a Qualified Bid, the Trustee and his professionals may consult with the Potential Bidder and seek additional information in an effort to establish whether or not the bid is a Qualified Bid.

The Trustee may communicate prior to the Auction with any Potential Bidder and may request any additional information reasonably required by the Trustee in connection with his evaluation of whether such timely filed Potential Bidder's bid is a Qualified Bid.

Without the written consent of the Trustee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid during the period that such Qualified Bid remains binding as specified herein; provided, that, any Qualified Bid may be improved at the Auction as set forth herein.

**By 5:00 p.m. (ET) on November 13, 2026**, the Trustee shall inform each Potential Bidder who has submitted a bid whether it is a Qualified Bidder.

**SALE WITHOUT HOLDING AN AUCTION**

If (i) no Qualified Bids have been submitted (other than that submitted by the Stalking Horse Bidder) by the Bid Deadline or (ii) the aggregate value of the highest Qualified Bid by its terms submitted by the Bid Deadline for the Farm Property is for a

price and under terms which the Trustee believes to not be higher or better than the Purchase Price in the Stalking Horse APA, the Trustee will report the same to the Bankruptcy Court and proceed with a hearing to approve the sale of the Farm Property (the "Sale Hearing") based on the Stalking Horse APA without holding an auction.

**AUCTION**

If the value of the highest or best Qualified Bid submitted (other than that submitted by the Stalking Horse Bidder) on or before the Bid Deadline for the Farm Property (as determined by the Trustee) is for a price and under terms that the Trustee believes to be higher or better than the Purchase Price set forth in the Stalking Horse APA, an Auction for the Farm Property will take place on **November 17, 2026 at 2:00 p.m. (ET)** at the law offices of Phillips Nizer LLP, 485 Lexington Avenue, 14th Floor, New York, NY 10017 (which may also be conducted virtually); provided, however, that the Trustee may change the location of the Auction by providing notice of such change to each Qualified Bidder. Subject to the terms of the Stalking Horse APA, the Trustee may extend the deadlines set forth in the Bidding Procedures Order and/or adjourn, continue or cancel the Auction and/or the Sale Hearing for any reason, including in the event the Trustee determines that a more favorable transaction is available that can be consummated without significant delay, without further order of the Bankruptcy Court, by filing a notice with the Bankruptcy Court and serving such notice on all Potential Bidders.

Only a Qualified Bidder that has submitted a timely Qualified Bid will be eligible to participate at the Auction. The Trustee and his professionals will evaluate all Qualified Bids received and, after consultation with his professionals, will select the Qualified Bid that reflects the highest or best offer for the Farm Property as the "Starting

Auction Bid"; provided, however, that the Starting Auction Bid shall provide for a purchase price at least $75,000 greater than the Purchase Price in the Stalking Horse APA (*i.e.*, at least $1,065,000) and otherwise satisfies the requirements for a Qualified Bid set forth in these Bidding Procedures. In considering which Qualified Bid shall be the Starting Auction Bid for the Farm Property, the Trustee will consider, among other things, the Qualified Bid, the changes to the Stalking Horse APA required by the Qualified Bid, and the Qualified Bidder's ability to timely consummate the purchase of the Farm Property.

The following rules shall apply at the Auction as to all bids by Qualified Bidders after the Starting Auction Bid: the minimum initial overbid(s) must be, in the aggregate, at least $25,000 greater than the Starting Auction Bid, and each subsequent overbid must be at least $25,000 greater than the then-highest bid, unless otherwise determined by the Trustee. From time to time, the Trustee, in an open forum, may advise Qualified Bidders participating in the Auction of his determination as to the terms of the then highest or otherwise best bid for the Farm Property. The Trustee shall also consider the potential costs of satisfying the conditions of any bid.

Each Qualified Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction.

Subject to the Stalking Horse APA, the Trustee, after consultation with his professionals, may adopt other rules for the Auction at the Auction that, in his reasonable judgment, will better promote the goals of the Auction. All such rules will provide that: (a) the procedures must be fair and open, with no participating Qualified Bidder disadvantaged in any material way as compared to any other Qualified Bidder; (b) the Auction will be conducted openly and all Qualified Bidders will be permitted to

attend and participate; and (c) the bidding at the Auction will be documented, recorded, or videotaped. Nothing herein shall prohibit the Trustee from meeting privately with any Qualified Bidder to negotiate the terms of a bid or overbid.

During the Auction, the Trustee will review each bid or overbid submitted by a Qualified Bidder to identify, after consultation with his professionals, the bid or overbid that constitutes the highest or otherwise best bid for the Farm Property. The Trustee may consider, among other things, (a) the amount of consideration offered under the Qualified Bid; (b) the changes to the Stalking Horse APA required by the Qualified Bid; and (c) the Qualified Bidder's ability to timely consummate the purchase of the Farm Property. The bid that is selected by the Trustee as the highest or otherwise best bid for the Farm Property will be considered the "Successful Bid" and such bidder the "Successful Bidder" for the Farm Property. The Trustee may also, after consultation with his professionals, determine which Qualified Bid is the next highest or best bid from the Auction (the "Second Highest Bid" and such bidder, the "Second Highest Bidder").

Within one (1) business day of the Auction, the Trustee shall file with the Bankruptcy Court notice of the Successful Bid and the Successful Bidder, as well as the Second Highest Bid and Second Highest Bidder (if any), and the amount and other material terms of the respective bids.

The Successful Bid may not be assigned to any party without the consent of the Trustee, except as permitted by the Stalking Horse APA.

Unless otherwise required pursuant to the Trustee's fiduciary duties, any bid submitted after the conclusion of the Auction shall not be considered for any purpose unless an order of the Bankruptcy Court is entered directing that such bid be

considered, and neither the Trustee nor any other person or entity shall have any obligation to seek such an order from the Bankruptcy Court.

**THE SALE HEARING AND RETURN OF DEPOSITS**

The Sale Hearing will be held on **November 24, 2026 at 10:00 a.m. (ET).** At the Sale Hearing, the Trustee will seek entry of a Sale Order, among other things, authorizing and approving the sale of the Farm Property to the Successful Bidder pursuant to the terms and conditions set forth in the Successful Bid.

Subject to the Stalking Horse APA and the terms of the Successful Bid, the Sale Hearing may be adjourned or rescheduled at the Trustee's discretion, and the Trustee will notify all relevant parties of such adjournment or rescheduling in an appropriate manner, including by an announcement of the adjourned date at the Sale Hearing.

No offer shall be deemed finally accepted by the Trustee unless and until it is approved by the Bankruptcy Court.

In the event the Successful Bidder fails to consummate the purchase of the Farm Property because of a breach or failure to perform on the part of such bidder, the Second Highest Bid will be deemed to be the Successful Bid, and the Trustee will be authorized, but not required, without further order of the Court, to consummate the transaction with the Second Highest Bidder with respect to the Farm Property. In this event, the Successful Bidder's Deposit shall be forfeited to the Trustee on behalf of the Debtor's estate, provided that the Trustee reserves the right to seek all available damages from the defaulting bidder.

All Deposits, other than the Deposit of the Successful Bidder and the Second Highest Bidder for the Farm Property, will be returned within seven (7)

business days following entry of the Sale Order. The Deposit of the Successful Bidder shall be applied against the Purchase Price of such Successful Bidder upon the consummation of the sale proposed in the Successful Bid. The Deposit of the Second Highest Bidder will be returned as soon as practicable following the earlier of (a) three (3) business days after the closing of the sale with the Successful Bidder pursuant to the Successful Bid and (b) sixty (60) days after entry of the Sale Order, unless the Trustee has elected to regard the Second Highest Bid as the highest or best bid for the Farm Property, as described above. Upon the return of any Deposit, such Potential Bidder's bid shall be deemed revoked and no longer enforceable. The Trustee will not be required to maintain any Deposit in an interest-bearing account, but any interest earned on any Deposit will be remitted to the appropriate Qualified Bidder if the Deposit is returned to the Qualified Bidder pursuant to the above. The Trustee shall not have any liability with respect to any Deposit. The Deposit of the Stalking Horse Bidder shall be held and returned in accordance with the Stalking Horse APA.

**FIDUCIARY OUT**

Notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures shall require the Trustee to take any action or to refrain from taking any action related to any sale transaction or with respect to these Bidding Procedures, to the extent the Trustee reasonably determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or his fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in these Bidding Procedures or the Bidding Procedures Order, through the date of the Auction (if held),

nothing in these Bidding Procedures shall diminish the right of the Trustee or his professionals to: (a) consider, respond to, and facilitate alternate proposals for sales or other transactions involving the Farm Property (each an "Alternate Proposal"); (b) provide access to non-public information concerning the Farm Property to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity with respect to Alternate Proposals; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals; and (e) enter into or continue discussions or negotiations with any person or entity regarding any Alternate Proposal.

Except as otherwise provided in the Stalking Horse APA, the Bidding Procedures, or the Bidding Procedures Order, the Trustee reserves the right, as he may reasonably determine to be in the best interests of the Debtor's estate and in the exercise of his fiduciary duties, to: (a) determine which Potential Bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal with respect to the Sale; (d) reject any bid that is (1) not in conformity with the requirements of the Bidding Procedures, the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules, or (2) contrary to the best interests of the Debtor's estate and creditors; (e) waive terms and conditions of the Bidding Procedures otherwise applicable to bidders in his reasonable business judgment, except that all bids must be for cash; (f) impose additional terms and conditions with respect to Potential Bidders; (g) modify the deadlines set forth in the Bidding Procedures and the Bidding Procedures Order, subject to any ruling or order of the Court or to accommodate the Court's calendar; (h) continue, adjourn, or cancel the Auction and/or the Sale Hearing

in open court or by filing a notice with the Court; and (i) modify the Bidding Procedures and implement additional procedural rules that the Trustee determines, in his reasonable business judgment, will better promote the goals of the bidding process. Nothing in the Bidding Procedures or the Bidding Procedures Order shall prejudice the substantive rights of any party, including with respect to the Trustee's evaluation of any bid.

If the Trustee is unable to deliver title to the Farm Property in accordance with these Bidding Procedures or the Sale Order for any reason whatsoever, the prospective purchaser will have no recourse against the Trustee, the Broker, or any other of his professionals; provided, that, a Qualified Bidder shall be entitled to a return of its Deposit.

**NOTICE**

The Trustee is providing notice of the Bidding Procedures, the date of an Auction concerning the Farm Property, and the date for the Sale Hearing, together with a copy of the Stalking Horse APA, to, among others, all of the parties that have recorded liens against the Farm Property, and all parties which the Trustee has identified as having an interest in acquiring the Farm Property.

**JURISDICTION**

The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute relating to the sale of the Farm Property, the Bidding Procedures, the Sale Hearing, the Auction, the Stalking Horse APA, and/or any other matter that in any way relates to the foregoing, and by participating in the Auction, all bidders consent to such jurisdiction.

ALBERT TOGUT, not individually but
solely in his capacity as Chapter 7 Trustee,
By His Attorneys,

TOGUT, SEGAL & SEGAL LLP

By:
*/s/*
BRIAN F. MOORE
ANTHONY L. GREENE
BRIAN KREUTTER
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

# Exhibit 2

## Notice of Auction and Sale Hearing

| | |
|---|---|
| **BID DEADLINE:** | **November 12, 2026 at 12:00 p.m. (prevailing Eastern Time)** |
| **AUCTION DATE:** | **November 17, 2026 at 2:00 p.m. (prevailing Eastern Time)** |
| **OBJECTION DEADLINE:** | **November 20, 2026 at 4:00 p.m. (prevailing Eastern Time)** |
| **SALE HEARING:** | **November 24, 2026 at 10:00 a.m. (prevailing Eastern Time)** |

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Brian F. Moore
Anthony L. Greene
Brian Kreutter

Attorneys for Albert Togut,
Not Individually But Solely in His Capacity
as Chapter 7 Trustee

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 7 |
| MANHATTAN COUNTRY SCHOOL *et al.*,[1] | Case No. 25-11009 (DSJ) |
| Debtors. | (Jointly Administered) |

**NOTICE OF SALE BY AUCTION AND HEARING TO CONSIDER APPROVAL OF TRUSTEE'S SALE OF FARM PROPERTY**

**NOTICE IS HEREBY GIVEN**, that:

1. On October 2, 2026, Albert Togut, not individually but solely in his capacity as Chapter 7 Trustee (the "Trustee") of the estate of Manhattan Country School ("MCS"), one of the above-captioned debtors (together with West 85th Street Owner LLC, the "Debtors"), by his attorneys, Togut, Segal & Segal LLP, filed an application [Docket No. 158] (the "Application")[2] with the United States Bankruptcy Court for the

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are (i) Manhattan Country School (6971) (Case No. 25-11009 (DSJ)); and (ii) West 85th Street Owner LLC (6971) (Case No. 25-11922 (DSJ)).

[2] Capitalized terms which are not defined herein shall have the meanings ascribed to them in the Application.

Southern District of New York (the "Bankruptcy Court") in the above-captioned jointly-administered Chapter 7 cases (the "Chapter 7 Cases") requesting, among other things, (a) approval of bidding procedures (the "Bidding Procedures") in connection with the Trustee's sale of MCS's real property located at 3217 New Kingston Mountain Road and 3536 New Kingston Mountain Road, Roxbury, New York 12474, comprising approximately 165 acres with a farmhouse and other structures, together with the personal property, vehicles and other assets described in the Stalking Horse APA (as defined below) (collectively, the "Farm Property"), as described in the Application, in accordance with a form of asset purchase agreement (the "Sale Contract") substantially in the form of the form asset purchase agreement with Wade Crowe and Angela Crowe, husband and wife, or their permitted assignee (the "Stalking Horse Bidder") attached to the Application as Exhibit B (the "Stalking Horse APA"), to the successful bidder(s) for the Farm Property (a "Purchaser" or "Successful Bidder") at an auction for same (the "Auction") if necessary, (b) approving bid protections (the "Bid Protections") for the Stalking Horse Bidder, (c) the scheduling of a bid deadline, auction date, and sale hearing (the "Bidding Schedule"), (d) approving the form and manner of notice thereof, and (e) following the Auction, approving the sale of the Farm Property free and clear of liens, claims, encumbrances and interests.

2. On [__________], 2026, the Bankruptcy Court entered an order (the "Bidding Procedures Order") [Docket No. ___] approving, among other things, the Bidding Procedures, and establishing a bidding and sale approval schedule.

3. A copy of each of the Application, the Bidding Procedures, and the Bidding Procedures Order may be obtained by: (a) accessing the Bankruptcy Court's website at www.nysb.uscourts.gov; (b) contacting the Office of the Clerk of the Bankruptcy Court; or (c) contacting Anthony L. Greene, Esq., at Togut, Segal & Segal

LLP, attorneys for the Trustee, at (212) 594-5000. Note that a PACER password is needed to access documents on the Bankruptcy Court's website.

**4.** All interested parties are invited to make offers for the Farm Property in accordance with the terms of the Bidding Procedures and Bidding Procedures Order. The Stalking Horse Bidder has agreed to purchase the Farm Property for $990,000, subject to higher or better offers, and any competing bid must be for at least $1,065,000. The deadline to submit bids for the Farm Property (the "Bid Deadline") is **November 12, 2026, at 12:00 p.m. (prevailing Eastern Time).**

5. All requests for information concerning the sale of the Farm Property should be directed by written request to the Trustee's retained real estate broker, Coldwell Banker Timberland Properties, Attn: Christine O'Shaughnessy (email: christine@timberlandproperties.net).

6. Pursuant to the Bidding Procedures Order, the Trustee may conduct an auction (the "Auction") for the sale of the Farm Property on **November 17, 2026, at 2:00 p.m. (prevailing Eastern Time)** at the law offices of Phillips Nizer LLP, 485 Lexington Avenue, 14th Floor, New York, NY 10017 (which may also be conducted virtually), provided that the Trustee may change the location of the Auction by providing notice of such change to each Qualified Bidder.[3]

7. The Bidding Procedures Order further provides that a Sale Hearing will be held on **November 24, 2026, at 10:00 a.m. (prevailing Eastern Time)** before the Honorable David S. Jones, United States Bankruptcy Judge of the Bankruptcy Court,

---

[3] The Trustee may extend the deadlines set forth in the Bidding Procedures Order and/or adjourn, continue or cancel the Auction and/or the Sale Hearing for any reason, including in the event the Trustee determines that a more favorable transaction is available that can be consummated without significant delay, without further order of the Bankruptcy Court, by filing a notice with the Bankruptcy Court and serving such notice on all Potential Bidders.

One Bowling Green, New York, New York 10004. The Sale Hearing may be adjourned from time to time.

8. At the Sale Hearing, the Trustee will request that the Bankruptcy Court enter an order, among other things, approving the highest or best bid for the Farm Property (which will be determined as described in the Bidding Procedures), pursuant to which the Trustee will sell and transfer ownership of the Farm Property. In addition, the Trustee will request that the Bankruptcy Court provide that the transfer of the Farm Property be free and clear of all liens, claims and interests, other than certain permitted exceptions as expressly set forth in the Sale Contract, with such liens, claims and interests to attach to the sale proceeds with the same validity, extent and priority that existed when the above-captioned case commenced.[4]

9. At the Sale Hearing, the Bankruptcy Court may enter such orders as it deems appropriate under applicable law and as required by the circumstances and equities of these Chapter 7 Cases. Objections, if any, to the sale of the Farm Property pursuant to the terms of the agreement reached between the Trustee and the Successful Bidder(s) for the Farm Property must be in writing and filed with the Bankruptcy Court and received by the Chambers of the Honorable David S. Jones, United States Bankruptcy Judge of the Bankruptcy Court, One Bowling Green, New York, New York 10004, must conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtors' estates, the basis for the objection and the specific grounds therefor, and must be served upon: (a) counsel to the Trustee, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York

[4] All of the Trustee's rights, claims and defenses are expressly preserved and not waived.

10119, Attn: Anthony L. Greene, Esq. (agreene@teamtogut.com); (b) counsel for the Stalking Horse Bidder, Barclay Damon LLP, 1270 Avenue of the Americas, Suite 2310, New York, New York 10020, Attn: Janice B. Grubin, Esq. (jgrubin@barclaydamon.com) and Allen J. Underwood II, Esq. (aunderwood@barclaydamon.com); (c) co-counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attn: Brian S. Lennon, Esq. (blennon@willkie.com); (d) co-counsel to the Debtors, Lester Korinman Kamran & Masini, P.C., 600 Old Country Road, Suite 330, Garden City, New York 11530, Attn: Roy J. Lester, Esq. (rlester@lesterfirm.com); (e) counsel for Flushing Bank, Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, NY 11554, Attn: Richard J. McCord, Esq. (rmccord@certilmanbalin.com); (f) counsel for U.S. Bank National Association, Shipman & Goodwin LLP, One Constitution Plaza, Hartford, CT 06103, Attn: Kathleen M. LaManna, Esq. (klamanna@goodwin.com) and Anthony R. Scarcella, Esq. (ascarcella@goodwin.com); (g) the U.S. Trustee, One Bowling Green, Room 534, New York, NY 10004, Attn: Mark Bruh, Esq. (mark.bruh@usdoj.gov); and (h) all parties that have filed a notice of appearance in the Chapter 7 Cases, so as to be actually received no later than **November 20, 2026, at 4:00 p.m.** (prevailing Eastern Time) (the "Objection Deadline").

10. Objections which are not timely filed on or before the Objection Deadline will be forever barred and may not be considered by the Bankruptcy Court.

*[Remainder of Page Intentionally Left Blank]*

11. If no objection to the Sale is timely filed, the Trustee may file a certificate of no objection and the Sale may be consummated as proposed without further opportunity to object.

Dated: New York, New York
_______________, 2026

ALBERT TOGUT, not individually but
solely in his capacity as Chapter 7 Trustee,
By His Attorneys,

TOGUT, SEGAL & SEGAL LLP

By:
*/s/*_____________
BRIAN F. MOORE
ANTHONY L. GREENE
BRIAN KREUTTER
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

# Exhibit B

# Stalking Horse APA

# ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT** (this "Contract") made as of _______ ____, 2026 between **ALBERT TOGUT, NOT INDIVIDUALLY, BUT SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE ("Seller" or the "Trustee") OF THE ESTATE OF MANHATTAN COUNTRY SCHOOL** ("**Debtor**"), a debtor in the chapter 7 case pending under Case No. 25-11009 (DSJ) (jointly administered) (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and Wade and Angela Crowe, husband and wife, or their assignee to be designated pursuant to the terms hereof ("**Purchaser**").

Seller and Purchaser hereby covenant and agree, subject to Bankruptcy Court approval as expressly provided herein, as follows:

**Section 1. Sale of Premises and Acceptable Title**

§1.01. Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this Contract: (a) the parcels of land more particularly described in Schedule A-1 attached hereto ("Land"); (b) all buildings, structures, and improvements situated on the Land (collectively, "Buildings"); (c) all right, title and interest of Seller and/or Debtor, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway; (d) the appurtenances and all the estate and rights of Seller and/or Debtor in and to the Land and Buildings (the Land, Buildings and all of the foregoing interests described in clauses (c) and (d), collectively, the "Premises"); (e) all right, title and interest of Seller and/or Debtor, if any, in and to the fixtures (to the extent same constitute personal property), furniture, equipment, farm equipment, machinery, tools, implements, appliances, emergency generators, solar panels and related equipment and systems, and all other tangible personal property owned by the Debtor and located at, attached to or used in connection with the ownership, operation, maintenance or use of the Premises (collectively, "Personal Property"), (f) all right, title and interest of Seller and/or Debtor, if any, in and to the motor vehicles specified in Schedule A-2 attached hereto (collectively, the "Vehicles") and (g) all right, title and interest of Seller and/or Debtor, if any, in and to the subsurface oil, gas and mineral rights beneath the Land. The Premises are located in the County of Delaware, Town of Roxbury and State of New York and known as **3217 New Kingston Mountain Road, Roxbury, New York 12474, designated on the Tax Map as Section 200, Block 1, Lot 811, and 3536 New Kingston Mountain Road, Roxbury, New York 12474, designated on the Tax Map as Section 200, Block 1, Lot 78**, on the tax map of Delaware County. The Premises, the Personal Property and the Vehicles and subsurface oil, gas and mineral rights are hereinafter collectively referred to as the "Property."

§1.02. Seller shall convey, and Purchaser shall accept, all right, title and interest of Seller and the Debtor in and to the Property, including fee simple title to the Premises and all right, title and interest of Seller and the Debtor, if any, in and to the Personal Property and the Vehicles, in accordance with the terms of this Contract, subject only to the conditions set forth in this

Contract, including the matters set forth in Schedule B attached hereto (collectively, "Permitted Exceptions"). Pursuant to the Approval Order, the sale and conveyance of the Property to Purchaser shall be free and clear of all liens, claims, encumbrances and interests, other than the Permitted Exceptions, to the fullest extent permitted under sections 363(b) and 363(f) of the Bankruptcy Code.

§1.03. Notwithstanding anything to the contrary in this Contract, the Property does not include, and Seller is not selling or conveying: (a) any cash, cash equivalents, bank or deposit accounts, or securities of the Debtor or its estate; (b) any insurance policies of the Debtor or its estate or any proceeds thereof, except as provided in Section 8; (c) any claims, causes of action, rights of recovery, credits, refunds or defenses of the Debtor or its estate (including avoidance actions under chapter 5 of the Bankruptcy Code), other than the condemnation awards described in §1.01(c) and the real estate tax refunds apportioned under §12.02; (d) the books, records, student, personnel, donor and financial files and other records of the Debtor, other than plans, surveys, permits, warranties and similar records relating solely to the Premises; (e) any personal property of the caretaker described in §16.03 or of any other third party located at the Premises; and (f) any other assets of the Debtor or its estate not expressly described in §1.01 (collectively, the "Excluded Assets"). Purchaser shall not assume, and shall have no liability for, any liability or obligation of the Debtor, Seller or the Debtor's estate of any kind or nature, other than (i) the Permitted Exceptions and the Violations to which Purchaser takes title under this Contract, , and (ii) the obligations expressly assumed by Purchaser under this Contract.

**Section 2. Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage, Escrow of Deposit and Foreign Persons**

§2.01. The purchase price ("Purchase Price") to be paid by Purchaser to Seller for the Property as provided in Schedule C attached hereto is Nine Hundred Ninety Thousand and 00/100 Dollars ($990,000.00), which amount includes the amounts allocated to the Vehicles on Schedule A-2.

§2.02. All monies payable under this Contract, unless otherwise specified in this Contract, shall be paid at Closing by wire transfer of immediately available Federal funds, payable to the account of Seller or as directed by Seller, except that uncertified checks of Purchaser payable to the order of Seller up to the amount of Five Thousand ($5,000.00) Dollars shall be acceptable for sums payable to Seller at the Closing.

§2.03. (a) The sum paid under paragraph (a) of Schedule C and any other sums paid on account of the Purchase Price prior to the Closing (collectively, the "Deposit") shall be paid to Phillips Nizer LLP, Seller's Special Real Estate Counsel, (as set forth on Schedule D) ("Escrowee") by wire transfer of immediately available federal funds. Escrowee shall hold the proceeds thereof in escrow in an interest-bearing special bank account (or as otherwise agreed in writing by Seller, Purchaser and Escrowee) until the Closing or sooner termination of this Contract and shall pay over or apply such proceeds in accordance with the terms of this section. Any interest that is earned thereon shall be paid to the same party entitled to receive the Deposit or as directed by such party, and the party receiving such interest shall pay any income taxes thereon. The tax identification numbers of the parties are either set forth in Schedule D or shall

be furnished to Escrowee upon request. At the Closing, such proceeds and the interest thereon, if any, shall be paid by Escrowee to Seller or as directed by Seller. If for any reason the Closing does not occur and either party makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other party of such demand. If Escrowee does not receive a written objection from the other party to the proposed payment within five (5) business days after the giving of such notice, Escrowee is hereby authorized to make such payment. If Escrowee does receive such written objection within such five (5) business day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the parties to this Contract or a final order of the Bankruptcy Court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the Bankruptcy Court. Escrowee shall give written notice of such deposit to Seller and Purchaser. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part (including, without limitation, any loss suffered due to any act, omission, loss or failure of the financial institution in which the Deposit is deposited) unless taken or suffered in bad faith, in willful disregard of this Contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this Contract or involving gross negligence on the part of Escrowee.

(c) Escrowee has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this Contract.

(d) Escrowee may act or refrain from acting in respect of any matter referred to in this §2.03 in full reliance upon and with the advice of counsel which may be selected by it (including any member of its firm) and shall be fully protected in so acting or refraining from action upon the advice of such counsel.

**Section 3. The Closing**

§3.01. Except as otherwise provided in this Contract, the closing of title pursuant to this Contract ("Closing") shall take place at the time and place specified in Schedule D attached hereto. For purposes of this Contract, the "Closing Date" shall mean the actual date of the Closing.

**Section 4. Representations and Warranties of Seller**

Seller represents and warrants to Purchaser as follows:

§4.01. Debtor is the sole owner of the Property.

§4.02. Seller has the sole authority to act in accordance with the Contract and to convey title on behalf of Debtor, subject to Bankruptcy Court approval.

§4.03. To Seller's actual knowledge, as of the date of Closing, there shall be no written leases, licenses or other tenancies or occupancy rights affecting any portion of the Property, other than as set forth in this Contract or the Schedules.

§4.04. Seller is not a "foreign person" as defined in the Internal Revenue Code.

**Section 5. Acknowledgments, Representations and Warranties of Purchaser**

Purchaser acknowledges that:

§5.01. Purchaser has inspected the Property, is fully familiar with the physical condition and state of repair thereof, and, subject to the provisions of §8.01 and §9.02, shall accept the Property "as is", "where is" and in their present condition, without any representations or warranties of any kind whatsoever except as may be expressly set forth in this Contract, subject to use, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any change in such condition by reason thereof subsequent to the date of this Contract.

§5.02. Before entering into this Contract, Purchaser has made such examination of the Property (including, without limitation, any inspection for the presence of lead-based paint and/or lead-based paint hazards, the presence of any materials containing asbestos, and any other hazardous materials), the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary, or has waived Purchaser's right to do so. In entering into this Contract, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this Contract, whether or not any such representations, warranties or statements were made in writing or orally. From and after the date of this Contract until the Closing, Seller shall, upon reasonable prior notice, afford Purchaser and its representatives reasonable access to the Property and shall make available to Purchaser copies of such documents relating to the Property as are in Seller's possession and are reasonably requested by Purchaser. No such access, inspection or information, and no matter discovered thereby, shall entitle Purchaser to terminate this Contract, to any reduction of or credit against the Purchase Price or to any other remedy against Seller, or shall affect the irrevocability of Purchaser's bid under Section 18.

§5.03. Upon signing the Contract, Purchaser shall have inspected the Property, and Purchaser shall be deemed to have acknowledged that it has made its own analysis and evaluation of the income potential and profits and expenses of the Property as well as the physical condition, layout, footage, income, expenses and operation of the Property, and that, except as otherwise expressly set forth herein, Seller has not made and does not make any representations as to any of the foregoing or any other matter or thing affecting or related to the Property or to this Contract and that neither party is relying upon any statement or representation made by the other not embodied in this Contract. Except as otherwise expressly set forth herein, Purchaser hereby expressly acknowledges that it is purchasing the Property and the fixtures and equipment thereon, if any, in its current "AS IS, WHERE IS, AND WITH ALL FAULTS" condition, including, without limitation, the state of, or any conditions in connection with and subject to the provisions of §8.01 and §9.02, the following: any Leases and Tenancies; the ownership and condition of the surface or subsurface of the Property; zoning or other governmental conditions or restrictions applicable to the Property; utility availability or capacities; compliance with Environmental Laws (as defined below) or any other existing laws or governmental regulations; the condition of the Buildings; the past or present absence or presence of any Hazardous Substances (as defined below); merchantability or fitness of the Property or any part thereof for a particular purpose; or any other aspect of the Property whether or not same may materially affect the value or the use thereof. For purposes of this Contract, the term (i) "Hazardous Substances" shall mean and refer to the following: pollutants, dangerous substances, toxic substances, hazardous wastes, hazardous materials or hazardous substances as defined in or pursuant to any Environmental Laws including without limitation, petroleum products and fractions thereof, asbestos, asbestos containing materials, urea formaldehyde, polychlorinated biphenyls, nuclear fuel or materials, radioactive materials and all other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials, substances and wastes listed or identified in, or regulated by, any Environmental Law, and (ii) "Environmental Laws" shall mean and refer to the following: the Resource Conservation and Recovery Act (42 U.S.C. §6901, et seq.) as amended, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601, et seq.) as amended, or any other related Legal Requirement, and all other federal, state, county, municipal, local and other statutes, laws, ordinances and regulations which relate to or deal with human health or the environment, all as may be amended from time to time.

§5.03.01. No Effect on Purchaser's Obligations. Purchaser further acknowledges that its covenants, agreements, and obligations under this Contract are not conditioned upon and shall not be excused or modified by any occurrence, condition or event except as may be expressly set forth in this Contract.

§5.03.02. Subsequent Representations. No oral or written communication made by any employee, agent or representative of Seller nor the furnishing of any material from files maintained by Seller or its managing agent shall constitute a representation or a warranty under this Contract unless the same is contained in this Contract or in a certificate or affidavit delivered by Seller at Closing and duly executed by Seller as required by this Contract.

§5.03.03 Limited Disclosure. Purchaser shall, and shall direct its directors, officers and other personnel, and its agents, employees and representatives, to hold in strict confidence

and not disclose to any other party without the prior written consent of Seller, any of the confidential information regarding the Property delivered, provided or furnished to Purchaser or any of its agents, representatives or employees by Seller, Broker, or their agents. Notwithstanding anything to the contrary hereinabove set forth, Purchaser may disclose such information only: (i) on a "need-to-know" basis to its employees, principals or professional firms serving it in connection with this transaction, or to any potential lenders, investors, title insurers, surveyors, environmental consultants, zoning consultants or other consultants engaged for customary diligence, title and survey review, municipal search review or closing underwriting, but Purchaser shall instruct such parties to hold all such information in strict confidence, and not to disclose such information to any other party without the prior written consent of Seller; (ii) to any other party, subject to Seller's consent, which consent shall not be unreasonably withheld or delayed; (iii) to any governmental agency if such agency requires such disclosure in order for Purchaser to comply with applicable laws or regulations or as part of customary violation, municipal, zoning, title and survey searches and a Phase I environmental site assessment; (iv) if required by law; or (v) if such information is or becomes publicly available or is independently developed by Purchaser without reliance upon the confidential information provided by Seller.

§5.03.04. Return of Information. In the event the Closing does not occur for any reason and this Contract is terminated, Purchaser shall promptly return to Seller, or if not practicable, destroy (if legally permissible) all copies of all such information without retaining any copy thereof, except such as must be retained by any professionals to whom such information was disclosed in accordance with §5.03.03 in order to comply with their professional obligations, legal or regulatory requirements, or bona fide lender or title-insurer record-retention requirements.

§5.03.05. Survival. The provisions of this Section 5 shall terminate at the Closing provided, however, that if the Closing does not occur, the provisions of this Section 5 shall survive the termination of this Contract.

Purchaser represents and warrants to Seller that:

§5.04. The funds comprising the Purchase Price to be delivered to Seller in accordance with this Contract are not derived from any illegal activity.

§5.05. Neither Purchaser, nor any of Purchaser's officers, directors, shareholders, partners, members or associates, nor any other direct or indirect holder of any equity interest in Purchaser, is an entity or person: (i) that is listed in the Annex to, or is otherwise subject to the provisions of United States Presidential Executive Order 13224 issued on September 24, 2001 ("Executive Order"); (ii) whose name appears on the U.S. Department of the Treasury, Office of Foreign Assets Control's ("OFAC") most current list of "Specifically Designated National and Blocked Persons" (which list may be published from time to time in various mediums including, but not limited to, the OFAC website, www.treas.gov/ofac/; (iii) who commits, threatens to commit or supports "terrorism", as that term is defined in the Executive Order; or (iv) who is otherwise affiliated with any entity or person listed above (any and all parties or persons described in clauses (i) through (iv) above are herein referred to as a "Prohibited Person"). Purchaser covenants and agrees to use commercially reasonable efforts to ensure that neither

Purchaser, nor any of its respective officers, directors, shareholders, partners, members or associates, and no other direct or indirect holder of any equity interest in Purchaser will: (a) conduct any business, or engage in any transaction or dealing, with any Prohibited Person, including, but not limited to, the making or receiving of any contribution of funds, goods, or services, to or for the benefit of a Prohibited Person; or (b) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order or the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001. On request by Seller from time to time, Purchaser further covenants and agrees promptly to deliver to Seller any such certification or other evidence as may be requested by Seller in Seller's sole and absolute discretion, confirming that no violation of this §5.05 shall have occurred.

§5.06. Purchaser is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to execute, deliver and perform this Contract, and has obtained all consents and approvals necessary to make its bid and to enter into and consummate the transaction contemplated by this Contract. This Contract has been duly authorized, executed and delivered by Purchaser and constitutes the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms. If Purchaser has not been formed as of the date of this Contract, the person executing this Contract on behalf of Purchaser makes the representations and warranties in this §5.06 on behalf of Purchaser as of the date of this Contract, and the entity so formed shall be deemed to make the representations and warranties in this §5.06 as of the date of the assignment of this Contract to it pursuant to §17.01.

§5.07. Purchaser has, and at the Closing will have, sufficient immediately available funds to pay the Purchase Price and all other amounts payable by Purchaser under this Contract. Purchaser's obligations under this Contract are not subject to or conditioned upon any financing, due diligence, appraisal, inspection, zoning or permitting .

§5.08. Purchaser is not an "insider" of the Debtor (as such term is defined in section 101(31) of the Bankruptcy Code), and neither Purchaser nor any of its principals, members or equity holders is a current or former officer, director, trustee, employee or insider of the Debtor or of any broker retained by Seller, except as disclosed in writing to Seller prior to the date hereof. Purchaser has not engaged in any collusion with any other bidder or prospective bidder for the Property, has not entered into any agreement or understanding with any other person concerning the bidding for or purchase of the Property, and has negotiated this Contract in good faith and at arm's length, in each case within the meaning of sections 363(m) and 363(n) of the Bankruptcy Code. Purchaser shall disclose to Seller, upon request, the identity of each person holding a direct or indirect equity interest in Purchaser and of any person providing financing or credit support for the transaction contemplated hereby, and Purchaser consents to the disclosure of such information in the Bidding Procedures Motion, at any hearing before the Bankruptcy Court and in the Approval Order.

**Section 6. Seller's Obligations as to Leases**

§6.01. Between the date of this Contract and the Closing, Seller shall not enter into any new lease or other tenancy for any portion of the Property.

**Section 7. Responsibility for Violations**

§7.01. Seller shall have no obligation or responsibility to cure or comply with any violations of law or governmental or quasi-governmental ordinances, orders or requirements by any governmental or quasi-governmental department, agency or bureau having jurisdiction which have been or are issued or noticed affecting the Premises and any and all liens which have attached to the Property pursuant thereto (the "Violations") on, before or after the date hereof. Purchaser agrees to take title to the Premises subject to the Violations and the existence of any Violations shall neither relieve Purchaser of Purchaser's obligations hereunder nor entitle Purchaser to any abatement or reduction of or credit against the Purchase Price.

**Section 8. Destruction, Damage or Condemnation**

§8.01. The provisions of Section 5-1311 of the General Obligations Law shall apply to the sale and purchase provided for in this Contract.

**Section 9. Covenants of Seller**

Seller covenants that between the date of this Contract and the Closing:
§9.01. No fixtures, equipment or personal property included in this sale shall be removed from the Premises by Seller unless the same are replaced with similar items of at least equal quality prior to the Closing.

§9.02. Seller shall maintain the Premises from the date hereof until the Closing Date in substantially the same manner in which Seller has acted prior to the date hereof, it being agreed that Seller shall have no obligation to make any capital repairs, replacements or improvements to the Property or to expend any funds in connection with the Property other than in the ordinary course of Seller's current maintenance of the Property.

§9.03. Seller shall use commercially reasonable efforts to keep in effect through the Closing the property and liability insurance coverage for the Property maintained by the estate as of the date of this Contract, subject to the continued availability of such coverage on commercially reasonable terms, and Seller shall have no obligation to obtain any additional or expanded coverage.

**Section 10. Seller's Closing Obligations**

At the Closing, Seller shall deliver the following to Purchaser:

§10.01. A copy of the Approval Order (as defined herein).

§10.02. A statutory form of bargain and sale deed without covenants against grantor's acts, containing the covenant required by Section 13 of the Lien Law, and properly executed in proper form for recording so as to convey the title required by this Contract.

§10.03. To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

§10.04. Certification that Debtor is not a foreign person pursuant to IRC Section 1445.

§10.05. (a) Checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof, and (b) a certification of non-foreign status, in form required by the Internal Revenue Code Withholding Section, signed under penalty of perjury. Seller understands that such certification will be retained by Purchaser and will be made available to the Internal Revenue Service on request.

§10.06. The Bills of Sale in the forms annexed hereto as Schedule E-1 (the "Bill of Sale of Farm Personal Property") and Schedule E-2 (the "Vehicle Bill of Sale").

§10.07. Any other instruments and documents which are true and accurate and reasonably necessary to effect the transaction contemplated herein.

To the extent the transfer of the Premises is exempt from any stamp, transfer, recording, surrender or similar tax pursuant to the Approval Order or applicable law, no such tax shall be payable. To the extent any such tax or fee is required to be paid, it shall be paid as provided in §10.05 and §11.02.

**Section 11. Purchaser's Closing Obligations**

At the Closing, Purchaser shall:

§11.01. Deliver to Seller, or as directed by Seller, by wire transfer of immediately available federal funds, the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under Section 12 and as otherwise set forth herein.

§11.02. Cause the deed to be recorded, duly complete all required real property transfer tax returns and cause all such returns and checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing.

§11.03. Execute and deliver the Vehicle Bill of Sale in the form annexed hereto as Schedule E-2 and shall be responsible for all applicable sales, use, registration, title and other taxes, fees and charges arising from or relating to the transfer, titling or registration of the vehicles conveyed thereunder. Purchaser shall likewise be responsible for any sales, use or similar taxes, if any, payable in connection with the transfer of the Personal Property. Pursuant to the Approval Order, the transfer of the Vehicles to Purchaser shall be free and clear of liens, claims, encumbrances and interests to the extent provided in §1.02.

§11.04. Deliver any other documents required by this Contract to be delivered by Purchaser.

**Section 12. Apportionments**

§12.01. The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a) Real estate taxes, water charges and sewer rents, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premises, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available. Purchaser shall be solely responsible for any real estate taxes, including any pro rata taxes assessed under Section 520 of the Real Property Tax Law, attributable to the termination, removal or loss of any exemption from real property taxation applicable to the Premises by reason of the transfer of the Premises to Purchaser or Purchaser's ownership or use thereof, and no such taxes shall be apportioned or credited against the Purchase Price. This clause (a) shall survive the Closing.

(b) Value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes; and

(c) Any other items listed in this Contract or in Schedule D.

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. Any discrepancy resulting from such recomputation shall be promptly corrected, which obligations shall survive the Closing.

§12.02. Real estate tax refunds and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser after deducting any expenses of collection thereof, which obligation shall survive the Closing.

§12.03. Errors or omissions in adjustments shall be readjusted post-closing. This paragraph shall survive Closing of title for a period of ninety (90) days.

**Section 13. Objections to Title; Failure of Seller or Purchaser to Perform**

§13.01. Purchaser shall promptly order an examination of title and shall cause the Title Company to forward a copy of the title report to Seller's attorney. Purchaser shall have ten (10) business days after receipt of the initial title report and underlying exception documents to deliver written objections to title, and Purchaser shall have an additional five (5) business days after receipt of any update, bring-down or other post-objection title report to object to any new exception, lien, requirement or other new title matter first disclosed therein. Seller shall be entitled to a reasonable adjournment or adjournments of the Closing for up to sixty (60) days in the aggregate to remove or otherwise resolve any objected-to title matters disclosed on or prior to the Closing Date.

§13.02. If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this Contract or if Purchaser shall have any other grounds under this Contract for refusing to consummate the purchase provided for herein, Purchaser, nevertheless, may elect to accept such title as Seller may be able to convey, but without any other credit or liability on the part of Seller. If Purchaser shall not so elect, Purchaser may terminate this Contract and the sole liability of Seller shall be to refund the Deposit to Purchaser. Upon such refund, this Contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability other than any arising under Section 14. Seller shall not be required to bring any action or proceeding or to incur any expense to cure any title defect or to enable Seller otherwise to comply with the provisions of this Contract.

§13.03. Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to the extent they are not disputed by Seller, may be paid out of the proceeds of the monies payable at the Closing or placed in escrow with the title insurance company to hold pending the Bankruptcy Court's ruling as to any disputed items. In such case, such items shall not be considered objections to title.

§13.04. If Purchaser shall default in the performance of its obligation under this Contract to purchase the Premises, the sole remedy of Seller shall be to retain the Deposit as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain. If Seller shall default in the performance of its obligations under this Contract, the sole and exclusive remedies of Purchaser shall be to either (i) seek specific performance of Seller's obligations pursuant to the Approval Order, which action must be brought within sixty (60) days following Seller's default, or, in the alternative (ii) notify Seller that Purchaser elects to terminate this Contract and obtain a return of the Deposit. Purchaser shall not be entitled to file a notice of pendency against the Property except in connection with an action for specific performance timely commenced under clause (i) above, and in no event shall Seller, the Debtor's estate or Seller's professionals be liable to Purchaser for any consequential, incidental, special or punitive damages.

**Section 14. Broker**

§14.01. Purchaser represents and warrants that the brokers specified in Schedule D are the only brokers with whom they have dealt in connection with this Contract and that Purchaser knows of no other broker who has claimed or may have the right to claim a commission in connection with this transaction. The commissions shall be paid pursuant to separate agreement by the parties specified in Schedule D and pursuant to the Approval Order. Seller's sole obligation with respect to brokerage commissions shall be to pay, from the proceeds of the sale at the Closing and subject to the Approval Order, the commission due to Coldwell Banker Timberland Properties under its listing agreement approved by the Bankruptcy Court (including any share thereof payable to a cooperating broker in accordance with such listing agreement), and any commission, fee or other compensation claimed by any other broker, agent or finder, including any broker representing Purchaser. Purchaser shall indemnify and defend Seller against any costs, claims or expenses, including reasonable attorneys' fees and disbursements, arising out of any breach by Purchaser of any representations, warranties or agreements contained in this paragraph. The representations and obligations under this paragraph shall survive the Closing or, if the Closing does not occur, the termination of this Contract.

**Section 15. Notices**

§15.01. All notices under this Contract shall be in writing and shall be delivered personally or shall be sent by prepaid overnight courier, addressed as set forth in Schedule D, or addressed as Seller or Purchaser shall otherwise have given notice as herein provided; notices may be given by email or fax as long as such notices are also given via personal delivery or prepaid overnight courier as aforesaid. The attorneys for the parties may give any extension of time or other notice on behalf of their respective clients. Attorneys may give and receive notices on behalf of Seller and Purchaser.

**Section 16. Limitations on Survival of Representations, Warranties, Covenants and other Obligations**

§16.01. Except as otherwise provided in this Contract, no representations, warranties, covenants or other obligations of Seller set forth in this Contract shall survive the Closing, and no action based thereon shall be commenced after the Closing.

§16.02. The delivery of the Approval Order and the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this Contract to survive the Closing.

§16.03. Purchaser acknowledges that the caretaker currently providing services at the Property was retained by Seller pursuant to authorization of the Bankruptcy Court and that such retention, compensation, termination and other terms of employment remain subject to the jurisdiction and approval of the Bankruptcy Court. Purchaser shall not assume, and Seller shall have no obligation to assign to Purchaser or continue, such employment following Closing. The

treatment and termination of such employment shall be governed by the Approval Order and any other applicable orders of the Bankruptcy Court. This Paragraph shall survive the Closing.

**Section 17. Miscellaneous Provisions**

§17.01. Purchaser may assign this Contract or its rights hereunder, without Seller's consent, to an entity wholly owned and controlled by Purchaser or by the principals of Purchaser disclosed to Seller under §5.08, upon written notice to Seller not less than ten (10) business days prior to the Closing Date accompanied by the assignee's written assumption of this Contract and confirmation of the representations in §§5.04 through 5.08 as to the assignee; any other assignment of this Contract or its rights hereunder, or any assignment or transfer of any interest in Purchaser, shall require the prior written consent of Seller, to be granted or withheld in Seller's sole discretion, and further provided that, unless otherwise agreed by Seller in writing, Purchaser shall remain liable for Purchaser's obligations hereunder and Purchaser and any such assignee shall be jointly and severally liable for Purchaser's obligations hereunder and all representations and warranties of Purchaser hereunder shall apply to Purchaser and to such assignee. No permitted assignment of Purchaser's rights under this Contract shall be effective against Seller unless and until an executed counterpart of the instrument of assignment shall have been delivered to Seller and Seller shall have been furnished with the name and address of the assignee not less than ten (10) business days prior to the Closing Date. The term "Purchaser" shall be deemed to include the assignee under any such permitted and effective assignment.

§17.02. This Contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

§17.03. This Contract shall be governed by, and construed in accordance with, the law of the State of New York. The venue for any dispute arising from this Contract shall be the Bankruptcy Court, which shall have exclusive jurisdiction to interpret and enforce this Contract.

§17.04. This Contract may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and a facsimile, "pdf" and/or electronic copy of a signed original counterpart of this Contract shall be deemed sufficient to bind the parties, and shall be deemed an original for all purposes.

§17.05. The captions in this Contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Contract or any of the provisions hereof.

§17.06. This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

§17.07. This Contract shall not be binding or effective upon Seller in full until (i) this Contract is properly executed and delivered by Seller and Purchaser and (ii) the Approval Order is obtained.

§17.08. As used in this Contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require. As used in this Contract, "business day" means any day other than a Saturday, Sunday or a day on which commercial banks in New York, New York are authorized or required by law to close.

**Section 18. Bankruptcy Court Approval**

§18.1. Purchaser acknowledges that this Contract and the transactions contemplated hereby are subject to the approval of the Bankruptcy Court and the entry by the Bankruptcy Court of an order approving the transaction contained in the Contract and affording Purchaser Section 363 protections as a good faith purchaser with the sale being free and clear of all liens, claims and encumbrances, with same to attach to the proceeds of sale (the "Approval Order"), which shall be in form and substance satisfactory to Seller, and Seller's and Purchaser's obligation to consummate the transaction contemplated hereunder is subject to entry of the Approval Order. Notwithstanding any other provision of this Contract, this Contract shall not be binding or effective in full or in part until the Approval Order is obtained. Seller shall request that the Approval Order provide for a waiver of the stays imposed by Bankruptcy Rule 6004(h).

§18.2. Within a reasonable time following the date of this Contract, Seller will file a motion with the Bankruptcy Court (the "Bidding Procedures Motion") seeking entry of an order (the "Bidding Procedures Order"), which shall approve the form of notice and fix the dates for an auction for the Property and schedule a subsequent hearing for entry of the Approval Order. Purchaser shall cooperate with Seller in the prosecution of the Bidding Procedures Motion. The Bidding Procedures Order shall provide, among other things:

a) If the Bankruptcy Court approves a higher or better offer for the sale of the Premises, and such higher or better bidder closes on and acquires the Property on such higher and better terms (such bid an "Alternative Bid"), (i) Seller shall reimburse Purchaser for the reasonable and documented out-of-pocket costs and expenses (including reasonable and documented legal fees and disbursements, title and survey review costs, environmental review costs and other third-party diligence expenses) incurred by Purchaser in connection with the negotiation, diligence, execution and performance of this Contract, which amount shall not exceed $35,000.00 (the "Reimbursement Fee"); and (ii) subject to Bankruptcy Court approval in the Bidding Procedures Order and the Approval Order, Seller shall pay Purchaser a break-up fee in an amount equal to two percent (2%) of the Purchase Price ($19,800.00) (the "Break-Up Fee" and, together with the Reimbursement Fee, the "Bid Protections"); and

b) Bid procedures providing that the first overbid must exceed the Purchase Price in an amount sufficient to satisfy the Bid Protections plus an additional reasonable amount, such that the first overbid must equal at least $75,000.00 over the Purchase Price, and that each subsequent overbid must exceed the then-highest bid by at least $25,000.00, in each case subject to the Bidding Procedures Order.

The Bidding Procedures Order and the bidding procedures approved thereby shall otherwise be in form and substance acceptable to Seller in the exercise of his fiduciary duties and as approved by the Bankruptcy Court. Purchaser acknowledges that the Bidding Procedures Order may authorize Seller, without further order of the Bankruptcy Court, to modify the bidding procedures, to extend or adjourn any deadline, the auction and the hearing on the Approval Order, to determine which bids are qualified, and to adopt such rules for the auction as Seller determines will best promote the goals of the sale process.

§18.3. Purchaser acknowledges that Seller may not act in his personal capacity but only as the Court-appointed trustee in bankruptcy and as such is obligated to provide notice to all parties in interest, including the public, of this proposed sale. The Rules of the Court require an opportunity for interested parties to make higher or better offers and consequently until the entry of the Approval Order, Seller is permitted to cause his representatives to continue to market the Property for sale, respond to any inquiries, proposals or offers by any person (in addition to Purchaser and its agents and representatives) in connection with the sale of the Property. In addition, Seller is obligated to solicit additional interest in the Property and respond to any inquiries or offers to purchase the Property and perform any and all other acts related thereto which are required by order(s) of the Bankruptcy Court, under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Property to prospective purchasers. The Seller will ask the Bankruptcy Court to approve the Bidding Procedures Order which will provide a sale and marketing process in order to ensure that Purchaser's bid is the highest and best bid for the Property. Purchaser's bid as set forth in this Contract will be deemed a qualified bid. If at least one other qualified bid is received by the Seller in accordance with the Bidding Procedures Order and an auction is held, Purchaser shall be entitled to participate in such auction in accordance with the Bidding Procedures Order. In such event, the Seller will determine the winning bid at the conclusion of the auction in accordance with the Bidding Procedures Order.

§18.4. Provided that Purchaser is not in material default hereunder, if for any reason whatsoever the Bankruptcy Court shall enter an order approving the sale of the Property to another buyer (an "Alternate Buyer") that does not contemplate consummation of the sale of the Property to Purchaser pursuant to this Contract, then in such event, and subject to the direction and order of the Bankruptcy Court, Seller shall direct Escrowee to return the Deposit, together with any interest earned thereon, to Purchaser within ten (10) business days after the Bankruptcy Court enters an order directing the sale of the Property to the Alternate Buyer; provided, however, that if Purchaser's bid is designated as the Second Highest Bid (as such term is defined in the Bidding Procedures Order), the Deposit shall be held by Escrowee until the earlier of (A) ten (10) business days after the closing of the sale of the Property with the Successful Bidder (as such term is defined in the Bidding Procedures Order) and (B) sixty (60) days after entry of the Approval Order, unless Seller has given Purchaser written notice that Seller has elected to

consummate the transaction contemplated by the Second Highest Bid, in which case the Deposit shall be held until the closing of that transaction or the termination of Purchaser's bid under §18.7.

§18.5. Purchaser hereby irrevocably designates and appoints Barclay Damon LLP (the "Agent"), having an address c/o 1270 Avenue of the Americas, Suite 2310, New York, NY 10020, Attn. Janice Grubin, Esq. and Allen J. Underwood II, Esq., , as agent for service of process regarding the Bankruptcy Case, this Contract and any matter related thereto or hereto. The Agent, by signing below, irrevocably consents to and accepts its designation and appointment as agent for service of process upon Purchaser and any assignee or transferee of Purchaser herein.

§18.6. In the event that the Property is sold to an Alternate Buyer, Purchaser shall be entitled to the payment of the Bid Protections as compensation for having entered into this Contract, payable by Seller only from the proceeds of the sale of the Property to the Alternate Buyer. The Bid Protections shall be payable to Purchaser only if Purchaser is not the successful bidder and the Property is sold to an Alternate Buyer; for example, but not by way of limitation, Purchaser shall not be entitled to the Bid Protections if the Approval Order is not entered and the Property is not sold to an Alternate Buyer or if Purchaser is the successful bidder at a purchase price in excess of the Purchase Price. The foregoing is subject to the terms of the Bidding Procedures Order that is approved by the Bankruptcy Court.

§18.7. Purchaser acknowledges that this bid is irrevocable through the earlier of (i) the date of Closing by the Purchaser and (ii) the date that is forty-five (45) days after entry of the Approval Order. If Purchaser's bid is designated as the Second Highest Bid, Purchaser's bid shall remain irrevocable through the earlier of (A) the closing of the sale of the Property with the Successful Bidder and (B) the date that is sixty (60) days after entry of the Approval Order; provided, however, that if the Successful Bidder fails to close and Seller gives Purchaser written notice, on or before such sixtieth (60th) day, that Seller has elected to consummate the transaction contemplated by the Second Highest Bid, Purchaser's bid shall remain irrevocable until the earlier of the closing of that transaction and the date that is thirty (30) days after the date of such notice, unless the parties otherwise agree in writing.

§18.8. Purchaser acknowledges and agrees that Albert Togut, the Trustee, is entering into this Contract not individually but solely in his capacity as Chapter 7 Trustee of the Estate of Manhattan Country School, pursuant to Bankruptcy Court orders, and Purchaser agrees that neither the Trustee nor his retained professionals shall have any personal liability or obligation whatsoever under or in connection with this Contract, the Property or the transactions contemplated hereby.

§18.9. Purchaser acknowledges that Seller is a fiduciary for the Debtor's estate and its creditors and that, notwithstanding anything to the contrary in this Contract: (a) nothing in this Contract shall require Seller to take, or to refrain from taking, any action that Seller determines in good faith is inconsistent with his fiduciary duties as Chapter 7 trustee, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure or any order of the Bankruptcy Court; (b) Seller may, in the exercise of his fiduciary duties and business judgment and without liability to Purchaser,

solicit, encourage, respond to, negotiate and accept Alternative Bids, determine that this Contract does not constitute the highest or best offer for the Property, and withdraw, modify or supplement the Bidding Procedures Motion or any motion seeking entry of the Approval Order; and (c) Seller may terminate this Contract by written notice to Purchaser if (i) the Bankruptcy Court declines to enter the Bidding Procedures Order or the Approval Order, (ii) the Approval Order has not been entered on or before December 31, 2026, or such later date, not more than sixty (60) days thereafter, as Seller may designate by written notice to Purchaser (the "Outside Date"), (iii) the Approval Order is stayed, reversed, vacated or modified in any respect that Seller determines is adverse to the Debtor's estate, or (iv) Seller determines in good faith, in the exercise of his fiduciary duties, not to proceed with the sale of the Property to Purchaser. Purchaser may terminate this Contract by written notice to Seller if the Bankruptcy Court declines to enter the Approval Order or if the Approval Order has not been entered on or before the Outside Date, following the revocation of Purchaser's bid in accordance with § 18.7, provided that Purchaser is not then in default hereunder. Upon any termination under this §18.9, Seller shall direct Escrowee to return the Deposit, together with any interest earned thereon, to Purchaser in accordance with §2.03 (provided that Purchaser is not then in default hereunder), whereupon this Contract shall be null and void and neither party shall have any further rights, obligations or liabilities hereunder, other than those that expressly survive termination. Purchaser shall not be entitled to any damages, fees, expenses or other compensation of any kind by reason of Seller's exercise of the rights described in this §18.9, the Bankruptcy Court's approval of an Alternative Bid, or the failure of the Bankruptcy Court to enter the Bidding Procedures Order or the Approval Order, other than the Bid Protections to the extent (and only to the extent) payable under §18.6.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF**, the parties hereto have executed this Contract as of the date first above written.

**SELLER:**

______________________________________
**ALBERT TOGUT, NOT INDIVIDUALLY, BUT SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE OF THE ESTATE OF MANHATTAN COUNTRY SCHOOL**

**PURCHASER:**

By:
______________________________________
**WADE CROWE, INDIVIDUALLY**

By:
______________________________________
**ANGELA CROWE, INDIVIDUALLY**

**RECEIPT BY ESCROWEE**

The undersigned Escrowee hereby acknowledges receipt of the Deposit of $99,000.00, subject to collection, to be held in escrow and disbursed pursuant to §2.03, including §§18.4 and 18.9.

**ESCROWEE**
**PHILLIPS NIZER LLP**

By: ______________________________________
Marc A. Landis, Partner

**WITH RESPECT TO SECTION §18.5**

Purchaser's Attorney
**BARCLAY DAMON LLP**

By:____________________________________

## SCHEDULE A-1

## DESCRIPTION OF PREMISES

PARCEL I: AS TO SECTION 200 BLOCK 1, LOT 78

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Roxbury, County of Delaware and State of New York, bounded and described as follows; -Northerly by lands of Nathan J. Travis and Samuel B. Shout, easterly by lands of Samuel B. Shout and Arnold Hill, southerly by lands of Arnold Hill and Wylis W. Hubbell and lands in possession of Michael Mulligan, westerly by lands in possession of Michael Mulligan. Containing 128 acres of land be the same more or less.

Also all that tract or parcel of land situate in said town of Roxbury, County of Delaware and State of New York, bounded and described as follows; -Beginning at a point in the center of the highway, 8 rods and 5 feet from a point on the east bank of the Meeker Hollow stream, at which last mentioned point there is a bridge crossing said stream and running thence in a southerly direction, 3 rods and 10 feet; thence easterly 8 rods and 9 feet, to the center of the highway aforesaid; thence along the center of said highway to the place of beginning. Containing about 1/8 of an acre of land.

Reserving from said premises about 1/2 acre of land described in a Warranty Deed dated November 30th, 1891, Melville Blythe to John M. Corbin, recorded in Delaware County Clerk's office in Book 115 of Deeds at Page 572.

Also reserving a small parcel of land heretofore sold by Melville Blythe to George Purcell et al., situated on the east side of the Meeker's Hollow brook, and containing about 1/8 of an acre of land, more or less.

Also conveying all that certain tract or parcel of land situate in the town, county and state aforesaid and being two parcels of land, containing respectively about 25 acres and 13 acres. More fully described in a Warranty Deed from Edward J. Hinkley and Cora Hinkley, his wife, to Henry Blythe, dated April 24th, 1919, and recorded in the Delaware County Clerk's office, April 30th, 1919, in Book 175 of Deeds at page 324. Reference to which said deed is hereby made for a more particular description.

Being a portion of the premises described in a Warranty Deed made by Cornelius Blythe and Ora R. Blythe, his wife, to Orley H. Slauson, dated October 31, 1923, which said deed is recorded in the Delaware County Clerk's office, November 3, 1923, in Book 200 of Deeds,at page 505.

Being the same premises described in a Warranty Deed made by Orley H. Slauson to Orley H. Slauson and Effie Slauson, his wife, as tenants by the entirety, dated October 19, 1959, and recorded in the Delaware County Clerk's Office October 21, 1959, in Liber 408 of Deeds, at page 319.

EXCEPTING AND RESERVING from said premises a right of way granted to the New York State Electric and Gas Corp. dated January 16, 1936, and recorded in the Delaware County Clerk's Office January 6, 1938, in Liber 227 of Deeds, at page 179.

ALSO EXCEPTING AND RESERVING from said premises a parcel of land conveyed by Orley H. Slauson and Effie Slauson to Lena Corbin by deed dated July 15, 1937, and recorded in the Delaware County Clerk's Office April 22, 1938, in Liber 241 of Deeds at page 150.

ALSO CONVEYING to the parties of the second part "ALL THAT TRACT OR PARCEL OF LAND, situate in the Town of Roxbury, County of Delaware, and State of New York, bounded and described as follows: Commencing at a maple tree, the corner of lands owned by parties of the first part (Carroll G. and Fannie E. Hinkley) and the party of the second part (Orley H. Slauson) and running thence in a Southerly direction along a stone wall, a distance of 455 feet, more or less to a corner marked by a stone wall; thence in a Westerly direction, a distance of 864 feet along a stone wall and 491 feet continuation of the stone wall line to the lands of Julius Koutz; thence in a Norterly direction along a stone wall, the boundary of Koutz's land, a distance of 487 feet to a corner on lands of the party of the second part (Orley H. Slauson); thence in an Easterly direction, a distance of 1385 feet, more or less to the point or place of beginning, containing 14 acres of land, more or less.

The foregoing premises are a portion of lands conveyed to the parties of the first part (Carroll G. and Fannie E. Hinkley) by Harold C. Rushmore, Referee, and was formerly known as the Bellows property."

Being the same premises described in a Warranty Deed made by Carroll G. Hinkley and Fannie E. Hinkley, his wife, to Orley H. Slauson, dated October 28, 1947, and recorded in the Delaware County Clerk's Office October 31, 1947, in Book 224 of Deeds, at page 105.

EXCEPTING AND RESERVING to the parties of the first part the right to use the water from a certain spring located on the premises hereby conveyed and the right to use a pipe from the premises hereby conveyed to their present home for the conveyance of said water and the right of the parties of the first part to enter upon the premises hereby conveyed to repair and relay pipes as necessary.

Being the same property heretofore conveyed by Floyd A. Slauson and Dorothy A. Slauson, his wife, to James L. Perkins and Lisa H. Perkins, his wife, by deed dated August 31, 1966 and recorded in the Office of the Clerk of the County of Delaware, State of New York on September 6, 1966 in Liber 473 of Deeds at page 424 and thereafter conveyed by James L. Perkins and Lisa H. Perkins, his wife, to James L. Perkins, by deed dated April 12, 1969 and recorded in the office of the Clerk of the County of Delaware, State of New York, on the 5th day of May , 1969 in Liber 495 of Deeds at page 623 .

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof,

**TOGETHER** with the appurtenances and all the estate and rights of the party of the first part in and to said premises,

Together with:

ALL THOSE TRACTS OR PARCELS OF LAND, with the buildings and improvements thereon erected, situate in the Town of Roxbury, Delaware County and State of New York, bounded and described as follows:

Being part of the farm of the first party and along the Public Highway leading from Meeker Hollow to Plattekill, being the house known as the stone house together with the following described piece of land: Beginning at a point on the south of the creek where there is an old abutment, where formerly stood a saw mill, and running from said point northerly eleven rods and 9 feet; thence at right angles easterly six rods and 14 feet; thence at about right angles and nearly parallel with first line southerly 11 rods 9 feet; thence up along the south bank of said creek 7 rods and 14 feet to the place of beginning, containing one-half of an acre of land more or less.

ALL THOSE TWO CERTAIN SPRINGS situate upon lands of party of first part, being in a pasture field on the southerly side of the highway leading from Meeker Hollow to Plattekill, a distance of about 22 rods from said highway and near the northeast corner of a small meadow, together with all the waters of said springs and also a right of way in and over the lands now or formerly of Melville Blythe and wife from said springs to the lands of party of the second part, as the pipe or pipes are now laid, and also the right to go upon or over said lands along said right of way for the purpose of taking up, laying or relaying pipe along said way. This grant is made subject to the following conditions: Said Melville Blythe and wife reserved the surplus or waste water, from the pipe at the dwelling house now of party of the second part for the supply of a watering through on the southerly side of the highway, nearly opposite the house of the party of the second part, for the use and benefit of said Blythe and wife, and the party of the second part to keep the said watering trough and the pipe leading thereto in repair.

BEGINNING at a point in the center of the Roxbury-New Kingston Road on the line of lands of party of the second part, running thence southerly along the westerly line of the lands of party of the second part a distance of thirty feet (30) to an iron pin driven in the ground; thence westerly at right angles to the last mentioned line to an iron pin driven in the ground; thence northerly a distance of 30 feet to the center of said road; thence easterly along the center of said road a distance of six feet to the point or place of beginning, containing 180 square feet of land.

Being the same premises conveyed by the Executor of the Last Will and Testament of Nettie J. Rose to Beatrice J. Risley by deed dated June 22, 1983, recorded July 12, 1983 in Delaware County Clerk's Office in Deed Book 628, Page 327.

Beatrice Risley died, testate, April 24, 1999 a resident of Broome County, State of New York and Doris V. White was appointed Executrix on April 20, 2000.

The above described premises are delineated on the Tax Map for the Town of Roxbury, Delaware County, as 200-1-81.

---

TOGETHER with the appurtenances, and also and all the estate which the said Testatrix had at the time of her decease, in said premises, and also the estate therein, which the party of the first part had or has power to convey or dispose of, whether individually, or by virtue of said Will or otherwise.

TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, its successors and assigns forever.

AND the party of the first part covenants that she has not done or suffered anything whereby the said premises have been incumbered in any way whatever.

AND that, in compliance with Sec. 13 of the Lien Law, the grantor will receive consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

PARCEL II: AS TO SECTION 200 BLOCK 1, LOT 81

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Town of Roxbury, County of Delaware and State of New York, bounded and described as follows; -Northerly by lands of Nathan J. Travis and Samuel B. Shout, easterly by lands of Samuel B. Shout and Arnold Hill, southerly by lands of Arnold Hill and Wylis W. Hubbell and lands in possession of Michael Mulligan, westerly by lands in possession of Michael Mulligan. Containing 128 acres of land be the same more or less.

Also all that tract or parcel of land situate in said town of Roxbury, County of Delaware and State of New York, bounded and described as follows; -Beginning at a point in the center of the highway, 8 rods and 5 feet from a point on the east bank of the Meeker Hollow stream, at which last mentioned point there is a bridge crossing said stream and running thence in a southerly direction, 3 rods and 10 feet; thence easterly 8 rods and 9 feet, to the center of the highway aforesaid; thence along the center of said highway to the place of beginning. Containing about 1/8 of an acre of land.

Reserving from said premises about 1/2 acre of land described in a Warranty Deed dated November 30th, 1891, Melville Blythe to John M. Corbin, recorded in Delaware County Clerk's office in Book 115 of Deeds at Page 572.

Also reserving a small parcel of land heretofore sold by Melville Blythe to George Purcell et al., situated on the east side of the Meeker's Hollow brook, and containing about 1/8 of an acre of land, more or less.

Also conveying all that certain tract or parcel of land situate in the town, county and state aforesaid and being two parcels of land, containing respectively about 25 acres and 13 acres. More fully described in a Warranty Deed from Edward J. Hinkley and Cora Hinkley, his wife, to Henry Blythe, dated April 24th, 1919, and recorded in the Delaware County Clerk's office, April 30th, 1919, in Book 175 of Deeds at page 324. Reference to which said deed is hereby made for a more particular description.

Being a portion of the premises described in a Warranty Deed made by Cornelius Blythe and Ora R. Blythe, his wife, to Orley H. Slauson, dated October 31, 1923, which said deed is recorded in the Delaware County Clerk's office, November 3, 1923, in Book 200 of Deeds,at page 505.

Being the same premises described in a Warranty Deed made by Orley H. Slauson to Orley H. Slauson and Effie Slauson, his wife, as tenants by the entirety, dated October 19, 1959, and recorded in the Delaware County Clerk's Office October 21, 1959, in Liber 408 of Deeds, at page 319.

EXCEPTING AND RESERVING from said premises a right of way granted to the New York State Electric and Gas Corp. dated January 16, 1936, and recorded in the Delaware County Clerk's Office January 6, 1938, in Liber 227 of Deeds, at page 179.

ALSO EXCEPTING AND RESERVING from said premises a parcel of land conveyed by Orley H. Slauson and Effie Slauson to Lena Corbin by deed dated July 15, 1937, and recorded in the Delaware County Clerk's Office April 22, 1938, in Liber 241 of Deeds at page 150.

ALSO CONVEYING to the parties of the second part "ALL THAT TRACT OR PARCEL OF LAND, situate in the Town of Roxbury, County of Delaware, and State of New York, bounded and described as follows: Commencing at a maple tree, the corner of lands owned by parties of the first part (Carroll G. and Fannie E. Hinkley) and the party of the second part (Orley H. Slauson) and running thence in a Southerly direction along a stone wall, a distance of 455 feet, more or less to a corner marked by a stone wall; thence in a Westerly direction, a distance of 864 feet along a stone wall and 491 feet continuation of the stone wall line to the lands of Julius Koutz; thence in a Norterly direction along a stone wall, the boundary of Koutz's land, a distance of 487 feet to a corner on lands of the party of the second part (Orley H. Slauson); thence in an Easterly direction, a distance of 1385 feet, more or less to the point or place of beginning, containing 14 acres of land, more or less.

The foregoing premises are a portion of lands conveyed to the parties of the first part (Carroll G. and Fannie E. Hinkley) by Harold C. Rushmore, Referee, and was formerly known as the Bellows property."

Being the same premises described in a Warranty Deed made by Carroll G. Hinkley and Fannie E. Hinkley, his wife, to Orley H. Slauson, dated October 28, 1947, and recorded in the Delaware County Clerk's Office October 31, 1947, in Book 224 of Deeds, at page 105.

EXCEPTING AND RESERVING to the parties of the first part the right to use the water from a certain spring located on the premises hereby conveyed and the right to use a pipe from the premises hereby conveyed to their present home for the conveyance of said water and the right of the parties of the first part to enter upon the premises hereby conveyed to repair and relay pipes as necessary.

Being the same property heretofore conveyed by Floyd A. Slauson and Dorothy A. Slauson, his wife, to James L. Perkins and Lisa H. Perkins, his wife, by deed dated August 31, 1966 and recorded in the Office of the Clerk of the County of Delaware, State of New York on September 6, 1966 in Liber 473 of Deeds at page 424 and thereafter conveyed by James L. Perkins and Lisa H. Perkins, his wife, to James L. Perkins, by deed dated April 12, 1969 and recorded in the office of the Clerk of the County of Delaware, State of New York, on the 5th day of May , 1969 in Liber 495 of Deeds at page 623 .

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof,

**TOGETHER** with the appurtenances and all the estate and rights of the party of the first part in and to said premises,

**TO HAVE AND TO HOLD** the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

## SCHEDULE A-2

## DESCRIPTION OF VEHICLES

Vehicle 1

Make: Dodge
Model Year: 2011
Vehicle / Hull Identification Number (VIN / HIN): 1D7RV1GT9BS690407
Purchase Price: $100.00

Vehicle 2

Make: Inter
Model Year: 2010
Vehicle / Hull Identification Number (VIN / HIN): 4DRBUAAN8AB243327
Purchase Price: $100.00

## SCHEDULE B

## PERMITTED EXCEPTIONS

**[NTD: Exceptions may be updated.]**

1. Zoning regulations and ordinances which are not violated by the existing structures or present use thereof and which do not render title uninsurable.

2. Consents of record as of the date hereof by Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut.

3. Unpaid installments of assessments not due and payable on or before the Closing Date.

4. Financing statements, chattel mortgages and liens on personalty filed more than 5 years prior to the Closing Date and not renewed, or filed against property or equipment no longer located on the Premises or owned by Tenants, provided that the Title Company shall agree to omit same from the owner's and lender's title insurance policies.

5. (a) Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Premises, provided that none of such rights imposes any monetary obligation on the owner of the Premises, and do not adversely affect the continued existence and use of the Premises or any portion thereof as same exists and is being used as of the date hereof.

(b) Encroachments and projections, if any, of stoops, doors, areas, steps, cellar steps, entrances, sidewalk elevators, trim, cornices, lintels, ledges, water tables, windows, window sills, awnings, trim, ornamental projections, sign brackets, lights, canopies, keystones, pilasters, ledges, fences, fire escapes and landings, hedges, coping and retaining walls, foundations and similar items projecting from the Premises over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Premises and variances, if any, between fences, retaining walls and the like and lines of record title.

(c) Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises.

(d) Any state of facts that an accurate survey would disclose, provided that such facts do not render title unmarketable.

(e) Laws and governmental regulations that affect the use and maintenance of the Premises, provided same do not adversely affect the continued existence and use of the Premises or any portion thereof as same exists and is being used as of the date hereof.

(f) Covenants, conditions, restrictions, easements, leases, rights, reservations, consents and agreements of record, provided same do not adversely affect the continued existence and use of the Premises or any portion thereof as same exists and is being used as of the date hereof. The foregoing shall include, without limitation, the following restrictions:

AS TO SECTION 200 BLOCK 1, LOT 78:

Reservation as to the right to use water from a certain spring located on subject premises and the right to use a pipe for the conveyance of water, as recited in Deed recorded in Liber 475 cp 456, and subsequent deeds.
Easement to New York State Electric & Gas Corporation in Liber 490 cp 549.
Easement to New York State Electric & Gas Corporation in Liber 585 cp 38.
Easement to New York Telephone Company in Liber 602 cp 835.
Easement to New York Telephone Company in Liber 704 cp 823.

AS TO SECTION 200 BLOCK 1, LOT 81:

Underground encroachments and easements, if any, including pipes and drains and such rights as may exist for entry upon said premises to maintain and repair same.
Rights of others to drain through creeks or streams, if any, which cross premises and the natural flow thereof.
Water rights reserved Liber 109 Dp 490.
Utility easements Liber 159 Dp 393.

(g) Any restrictions, covenants, conditions, requirements, or limitations arising from or relating to the Property's listing on, or inclusion in, the National Register of Historic Places.

(h) Any state of facts that an accurate map or physical inspection of the Property would disclose, including any matters shown on that certain Conservation Plan Map prepared by the U.S. Department of Agriculture, Soil Conservation Service, in cooperation with the Delaware County Soil Conservation Unit, Plan No. 866, (date of preparation unspecified).

(i) Any notes or notices of violations of law or municipal ordinances or requirements affecting the Premises, including without limitation, sidewalk violations and environmental control board violations.

(j) Possible lack of right to maintain vault or vaulted area under, and coal chutes or fuel oil supply lines in, the sidewalk.

# SCHEDULE C

## PURCHASE PRICE

The Purchase Price shall be paid as follows:

| | | |
|---|---|---|
| (a) | By wire transfer upon execution of this Contract, the receipt of which is hereby Acknowledged by Seller. | $99,000.00 |
| (b) | At Closing, in accordance with the Provisions of §2.02: | |
| | By wire transfer: | $891,000.00 |
| **Purchase Price:** | | **$990,000.00** |

## SCHEDULE D

## MISCELLANEOUS

1. Title insurer (§13.01): Prestige Title Agency, Inc. (the "Title Company")

2. Seller's tax identification number (§2.03): ____________________

3. Purchaser's tax identification number (§2.03): __________________

4. Scheduled date and time of Closing (§3.01): thirty (30) days following the date that the Approval Order is entered, at 10 am., **TIME BEING OF THE ESSENCE** with respect to Purchaser's obligations hereunder.

5. Place of Closing (§3.01):Phillips Nizer LLP, 485 Lexington Avenue, 14th Floor, New York, New York 10017, or, at Seller's or Purchaser's option, as a remote closing in escrow with Title Company.

6. Broker (§14.01): Trustee's Broker Coldwell Banker Timberland Properties and Purchaser's Broker Howard Hanna Real Estate Services, with Purchaser's Broker's Commission to be paid from proceeds of sale due the Estate, by the Estate, upon agreement between the Trustee's Broker and the Purchaser's Broker as to the allocation of the 4.5% broker's commission .

7. Address for notices (§15.01):

If to Seller:

**ALBERT TOGUT, NOT INDIVIDUALLY, BUT SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE OF THE ESTATE OF MANHATTAN COUNTRY SCHOOL**
c/o Togut, Segal & Segal LLP
Attn: Anthony Greene, Esq.
One Penn Plaza, Suite 3335
New York, New York 10119
E-mail: agreene@teamtogut.com

with a copy to:

Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335
New York, New York 10119
Attn: Anthony Greene, Esq.
E-mail: agreenteamtogut.com

Phillips Nizer LLP
485 Lexington Avenue, 14th Floor
New York, New York 10017
Attn: Marc Andrew Landis, Esq.
E-mail: mlandis@phillipsnizer.com

If to Purchaser: **WADE CROWE AND ANGELA CROWE**
c/o Barclay Damon LLP
1270 Avenue of the Americas, Suite 2310
New York, NY 10020
Attn: Janice Grubin, Esq.
Allen J, Underwood II, Esq.
jgrubin@barclaydamon.com
aunderwood@barclaydamon.com

# SCHEDULE E-1

## BILL OF SALE
## OF FARM PERSONAL PROPERTY

KNOW ALL MEN BY THESE PRESENTS that Albert Togut, not individually but solely in his capacity as the Chapter 7 Trustee ("Seller") of the Estate of Manhattan Country School ("Debtor"), having an address do Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, NY 10119, for and in consideration of the sum of Ten ($10.00) Dollars and other good and valuable consideration to it in hand paid, at or before the unsealing and delivery of these presents, by ________________________________________ having an office ______________________, (**"Purchaser"**), the receipt and sufficiency whereof are hereby acknowledged, has transferred and conveyed and by these presents does quitclaim, release, transfer and convey unto Purchaser, its successors and assigns, all right title and interest, if any, to all fixtures (to the extent same constitute personal property), furniture, equipment, farm equipment, machinery, tools, implements, appliances, emergency generators, solar panels and related equipment and systems, and all other tangible personal property (collectively, "Personal Property") owned by the Debtor and located at, attached to or used in connection with the ownership, operation, maintenance or use of the real property and improvements located at those certain premises known as 3536 and 3217 New Kingston Mountain Road, Roxbury, New York 12474 (the "Premises").

TO HAVE AND TO HOLD, the same unto Purchaser, its successors and assigns, forever.

This Bill of Sale is delivered in connection with Seller's conveyance of the Premises to Purchaser on the date hereof, pursuant to that certain Asset Purchase Agreement dated ____________________ between Seller and Purchaser ("Contract"). Seller and Purchaser acknowledge that no portion of the Purchase Price has been allocated specifically to the Personal Property.

This Bill of Sale is made without representation, warranty or guaranty by, or recourse against, Seller of any kind whatsoever. Neither Seller nor any agent or representative of Seller has made, and Seller shall not be liable or bound in any manner by, any express or implied warranties, guaranties, inducements, representations or information pertaining to the Personal Property or any part thereof, the physical condition, the uses which can be made of the same or any other matter or thing with respect thereto. The Personal Property is being transferred "as is, where is, with all faults", without any express or implied warranty or representation of any kind.

This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signatures delivered by electronic mail in PDF format, by DocuSign or other electronic signature platform, or by any other electronic means intended to preserve the original graphic and pictorial appearance of this Bill of Sale shall be deemed original signatures for all purposes and shall be fully effective and enforceable.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, Seller has signed this instrument as of this _____ day of ___________ 2026.

**SELLER:**

______________________________________

**ALBERT TOGUT, NOT INDIVIDUALLY, BUT SOLELY IN HIS CAPACITY AS CHAPTER 7 TRUSTEE OF THE ESTATE OF MANHATTAN COUNTRY SCHOOL**

# SCHEDULE E-2

## VEHICLE BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS that **Albert Togut, not individually but solely in his capacity as the Chapter 7 Trustee ("Seller") of the Estate of Manhattan Country School ("Debtor")** having an address do Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, NY 10119, for and in consideration of the amounts set forth below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, assign, transfer and convey unto ________________, having an address at _____________ ("Purchaser"), all of Seller's right, title and interest in and to the following motor vehicles (collectively, the "Vehicles"):

Vehicle 1

Make: Dodge
Model Year: 2011
Vehicle / Hull Identification Number (VIN / HIN): 1D7RV1GT9BS690407
Purchase Price: $100.00

Vehicle 2

Make: Inter
Model Year: 2010
Vehicle / Hull Identification Number (VIN / HIN): 4DRBUAAN8AB243327
Purchase Price: $100.00

TO HAVE AND TO HOLD the Vehicles unto Purchaser, its successors and assigns, forever.

This Vehicle Bill of Sale is delivered in connection with the transaction contemplated by that certain Asset Purchase Agreement, dated as of __________________ , between Seller and Purchaser (the "Contract").

THE VEHICLES ARE SOLD, TRANSFERRED AND CONVEYED "AS IS, WHERE IS, WITH ALL FAULTS," WITHOUT RECOURSE AND WITHOUT ANY REPRESENTATION, WARRANTY OR GUARANTY OF ANY KIND WHATSOEVER BY SELLER, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO CONDITION, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, VALUE, OPERABILITY OR COMPLIANCE WITH APPLICABLE LAW.

Purchaser shall be solely responsible for all applicable sales, use, registration, title and other taxes, fees and charges arising from or relating to the transfer, titling or registration of the Vehicles.

This Vehicle Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument Signatures delivered by electronic mail in PDF format, by DocuSign or other electronic signature

platform, or by any other electronic means intended to preserve the original graphic and pictorial appearance of this Bill of Sale shall be deemed original signatures for all purposes and shall be fully effective and enforceable.

**IN WITNESS WHEREOF**, Seller and Purchaser have executed this Vehicle Bill of Sale as of this ______ day of ______________________, 2026.

SELLER:

**ALBERT TOGUT, NOT INDIVIDUALLY, BUT SOLELY IN HIS CAPACTY AS CHAPTER 7 TRUSTEE OF THE ESTATE OF MANHATTAN COUNTRY SCHOOL**

By: _________________________________
Name:
Title:

PURCHASER:

By: _________________________________
Wade Crowe, individually

By: _________________________________
Angela Crowe, individually

# Exhibit C

## Proposed Sale Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| MANHATTAN COUNTRY SCHOOL *et al.*,[1] | : | Case No. 25-11009 (DSJ) |
| Debtors. | : | (Jointly Administered) |

**ORDER APPROVING SALE OF FARM PROPERTY LOCATED AT 3217 AND 3536 NEW KINGSTON MOUNTAIN ROAD, ROXBURY, NEW YORK**

Upon the *Trustee's Application for Entry of: (I) an Order Approving (A) Bidding Procedures for the Sale of the Farm Property, (B) Designation of Stalking Horse Bidder, (C) Bid Protections in Favor of the Stalking Horse Bidder, (D) Date and Time for an Auction and a Hearing for Approval of the Sale, and (E) the Form and Manner of Notice Thereof; and (II) an Order Approving (A) the Sale of the Farm Property Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (B) Payment of Broker Commission*, filed on October 2, 2026 [Docket No. 158] (the "Application")[2] on behalf of Albert Togut, not individually but solely in his capacity as the Chapter 7 trustee (the "Trustee") of the estate of Manhattan Country School ("MCS"), one of the above-captioned debtors (together with West 85th Street Owner LLC, the "Debtors"), by his attorneys, Togut, Segal & Segal LLP, through which the Trustee requested entry of an order pursuant to sections 105(a), 330, and 363 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving (a) the sale (the "Sale") of MCS's real property located at 3217 New Kingston

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are (i) Manhattan Country School (6971) (Case No. 25-11009 (DSJ)); and (ii) West 85th Street Owner LLC (6971) (Case No. 25-11922 (DSJ)).

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Application.

Mountain Road and 3536 New Kingston Mountain Road, Roxbury, New York 12474, together with the personal property, vehicles, subsurface rights and other assets described in the Sale Contract (as defined below) (collectively, the "Farm Property") to Wade Crowe and Angela Crowe, husband and wife, or their permitted assignee (the "Purchaser") pursuant to the asset purchase agreement with the Purchaser attached hereto as **Exhibit A** (including any amendments thereto, the "Sale Contract") free and clear of liens, claims, encumbrances, and other interests for a purchase price of $990,000.00 (the "Purchase Price"); and (b) the payment of the Broker Commission (as defined in the Application); and this Court having reviewed the Application and the Sale Contract; and upon this Court's prior order, [dated _______ __, 2026] approving the Bidding Procedures in connection with the Sale [Docket No. ___] (the "Bidding Procedures Order"); [and this Court having considered (a) the asset purchase agreement with __________ (the "Second Highest Bidder"), attached hereto as **Exhibit B** (the "Back-Up APA"); and (b) the Second Highest Bidder's offer of $________ at the Auction (the foregoing clauses (a) and (b), the "Second Highest Bid");] and upon the declaration of the Trustee (the "Trustee Declaration") filed following the Auction [Docket No. ___]; and good and sufficient notice of the Application, the Bidding Procedures Order and the Sale having been given to all parties entitled thereto;

**NOW, THEREFORE**, upon all of the prior pleadings and proceedings in these cases, and after due deliberation thereon and good cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. This Court has jurisdiction over the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this case and the Application in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B. The predicates for the relief sought in the Application are sections 105(a), 330 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.

C. Proper, timely, adequate, and sufficient notice of the Application and the relief requested therein, the Sale Hearing (as defined in the Bidding Procedures Order), the Sale, and the transaction described in the Sale Contract has been provided by the Trustee in accordance with section 363 of the Bankruptcy Code, and Bankruptcy Rules 2002 and 6004, and Local Rules 2002-1 and 6004-1 in compliance with the Bidding Procedures Order. Waiver of Local Rule 6004-1(h) is reasonable and appropriate.

D. As demonstrated by the Trustee Declaration, the Trustee has extensively marketed the Farm Property, the Sale Contract was tested through competitive bidding, and the offer made by the Purchaser, including the Purchase Price, is the highest and best offer made to the Trustee for the Farm Property.

E. The Trustee has marketed the Farm Property and conducted the Sale in compliance with the Bidding Procedures Order.

F. Creditors, parties-in-interest, and other entities have been afforded a reasonable opportunity to bid for the purchase of the Farm Property. A reasonable opportunity to object or be heard regarding the Application and the relief requested therein has been afforded to all interested persons and entities.

G. The Trustee has the authority to consummate the Sale pursuant to the Sale Contract and all other documents contemplated thereby, and no consents or approvals, other than those expressly provided for in the Sale Contract or as set forth in this Order, are required for the Trustee to consummate the Sale.

H. The Trustee has provided notice of the Application, the Bidding Procedures Order, the Auction, the Sale, and the Sale Hearing to the Office of the New York State Attorney General, Charities Bureau (the "OAGCB"), which had an

opportunity to be heard and did not object to the Sale. Therefore, the OAGCB is deemed to have consented to the Sale, and the Sale satisfies section 510 of the New York Not-for-Profit Corporation Law to the extent applicable.

I. Approval of the Sale Contract and the Purchase Price, and consummation of the Sale, are in the best interests of MCS's estate, its creditors, and other parties-in-interest.

J. The Trustee has demonstrated (i) good, sufficient, and sound business purpose and justification, and (ii) compelling circumstances for the Sale pursuant to sections 363(b), (f), and (m) of the Bankruptcy Code.

K. The Sale Contract was negotiated, proposed and entered into by and between the Trustee and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions. There is no evidence suggesting that the Trustee or the Purchaser have engaged in any conduct that would cause or permit the avoidance of the Sale Contract or the consummation of the Sale, or the imposition of costs or damages under section 363(n) of the Bankruptcy Code. Accordingly, the transactions contemplated by the Sale Contract may not be avoided, and no damages may be assessed against the Purchaser, under section 363(n) of the Bankruptcy Code.

L. The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby in that: (a) the Purchaser recognized that the Trustee was free to deal with any other party interested in a transaction regarding the Sale; (b) the Purchaser agreed to provisions in the Sale Contract that would enable the Trustee to solicit and accept a higher or better offer in respect of the Sale; (c) the Purchaser made the highest and best bid for the Farm Property; (d) all payments to be made by or to the Purchaser, and other agreements or arrangements entered into by the Purchaser in connection with the transaction have

been disclosed; and (e) the negotiation and execution of the Sale Contract and any other agreements or instruments related thereto were in good faith and constitute arm's-length transactions between the Purchaser and the Trustee. Throughout, Purchaser has acted in good faith and will continue to be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transaction contemplated by the Sale Contract.

M. The terms and conditions of the Sale Contract are fair and reasonable. The consideration provided by the Purchaser for the Farm Property pursuant to the Sale Contract, including the Purchase Price, (i) is fair and reasonable, (ii) is the highest and best offer for the Farm Property, (iii) will provide a greater recovery for MCS's estate than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law.

N. Neither the Trustee nor the Purchaser are or will be liable to any agent, broker, person or firm acting or purporting to act on behalf of either the Trustee or the Purchaser for any commission, broker's fee or finder's fee respecting the Sale, except as provided in the Sale Contract and this Order.

O. The Farm Property constitutes property of MCS's estate. MCS is the sole and lawful owner of the Farm Property and holds good title thereto. The transfer of the Farm Property by the Trustee to the Purchaser will be a legal, valid, and effective transfer of the Farm Property, and will vest the Purchaser with all right, title, and interest of MCS in and to the Farm Property free and clear of all liens, claims, interests, obligations, rights, charges and encumbrances, except for permitted exceptions, as specifically provided in the Sale Contract ("Permitted Exceptions"). The Purchaser shall

have no liability for any claims asserted against or liabilities of the Debtors or their estates.

P. The Trustee may sell the Farm Property free and clear of all liens, interests, obligations, rights, encumbrances, pledges, mortgages, deeds of trust, security interests, claims (including, any "claim" as defined in section 101(5) of the Bankruptcy Code), charges, options, rights of first refusal, easements, servitudes, transfer restrictions under any agreement, judgments, hypothecations, demands, licenses, sublicenses, assignments, debts, obligations, guaranties, options, contractual commitments, restrictions, environmental liabilities, options to purchase, and options, in each case of whatever kind, nature, or description in, against or with respect to the Farm Property, having arisen, existed or accrued prior to and through the Closing, whether direct or indirect, absolute or contingent, choate or inchoate, fixed or contingent, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law, equity, statute or otherwise and whether arising prior to, on or after the Petition Date (collectively, "Liens, Claims and/or Interests"), except for Permitted Exceptions as expressly provided in the Sale Contract, because one or more of the standards set forth in section 363(f)(1)–(5) have been satisfied with regard to each such Lien, Claim and/or Interest. Those non-debtor parties with Liens, Claims and/or Interests in or with respect to the Farm Property who did not object, or who withdrew their objections to the Sale or the Application, are deemed to have consented to the sale of the Farm Property free and clear of those non-debtor parties' Liens, Claims and/or Interests in the Farm Property pursuant to section 363(f)(2) of the Bankruptcy Code. Those non-debtor parties with Liens, Claims and/or Interests in or with respect to the Farm Property who objected to the Application, but who did not withdraw any

such objection, can be compelled to accept a monetary satisfaction of their liens, claims or interests within the meaning of Section 363(f)(5) of the Bankruptcy Code.

Q. The requirements of sections 363(b), (f), (m), and (n) of the Bankruptcy Code and any other applicable law relating to the Sale of the Farm Property have been satisfied.

R. If the Trustee and the Purchaser are unable to consummate the Sale pursuant to the Sale Contract following entry of this Order, the Trustee may file a notice with the Court designating the Second Highest Bidder as the "Successful Bid" (the "Back-Up Bid Implementation Notice") on the docket of the Chapter 7 Case and seek to consummate the Sale pursuant to the Back-Up APA. Following the filing of the Back-Up Bid Implementation Notice (if any), the Back-Up APA and the Second Highest Bidder shall be treated as the "Sale Contract" and the "Purchaser", respectively, for all purposes under this Order and the "Purchase Price" for the Farm Property shall be $________. If the Second Highest Bid is designated as the "Successful Bid" pursuant to the Back-Up Bid Implementation Notice, the Back-Up APA, with a Purchase Price of $________, shall constitute the better offer for the Farm Property. Under such circumstances, and taking into consideration all relevant factors and circumstances, consummation of the Sale of the Farm Property pursuant to the Back-Up APA will provide a greater recovery for creditors and stakeholders than would be provided by any other practically available alternative. The Trustee's determination that the Second Highest Bid is the highest and best offer for the Farm Property under such circumstances constitutes a valid and sound exercise of the Trustee's business judgment.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1. The Application is GRANTED to the extent set forth herein.

2. The findings of fact set forth above and conclusions of law set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this case pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3. All objections, if any, to the Application or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled on the merits with prejudice, and in each case, all parties which asserted such objections and reservations of rights are enjoined from taking any action against the Farm Property as well as the Purchaser or any other purchaser of the Farm Property, their affiliates or any agent of the foregoing in any manner including, without limitation, to recover any claim which such person or entity has solely against the Debtors or their estates.

**Approval of the Sale Contract**

4. The Sale, and all of the terms and conditions and transactions contemplated by the Sale Contract, are hereby authorized and approved pursuant to sections 105(a) and 363 of the Bankruptcy Code.

5. Pursuant to section 363 of the Bankruptcy Code, the Trustee is authorized to consummate the Sale pursuant to and in accordance with the terms and conditions of

the Sale Contract and shall at all times act in accordance with the terms thereof and this Order.

6. The Trustee is authorized to expend such funds, and he and his retained attorneys are authorized to execute and deliver, and empowered to perform under, consummate, and implement the Sale Contract, together with all additional instruments and documents that may be reasonably necessary, convenient or desirable to implement the Sale Contract and consummate the Sale pursuant thereto and effectuate the provisions of this Order and the transaction approved hereby, including the deed, the bills of sale for the Personal Property and the Vehicles, and to take all other actions as may be necessary for the purpose of assigning, transferring, granting, conveying and conferring the Farm Property to the Purchaser, as may be necessary or appropriate to the performance of the obligations as contemplated by the Sale Contract and this Order.

**Transfer of the Farm Property**

7. Except for Permitted Exceptions only as expressly provided in the Sale Contract, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon the closing of the Sale (the "Closing"), the Farm Property (and good and marketable title to such) and all of the attendant respective rights, title and interest therein shall be transferred to the Purchaser free and clear of all Liens, Claims and/or Interests, including, without limitation, tax liens, with all such Liens, Claims and/or Interests to attach to the net cash proceeds of the Farm Property in the order of their priority, with the same validity, force and effect which they now have as against the Farm Property, subject to any claims and defenses, setoffs or rights of recoupment that the Trustee or MCS's estate may possess with respect thereto.

8. Except for Permitted Exceptions, only as expressly provided in the Sale Contract, all persons and entities (and their respective successors and assigns)

including, but not limited to, all governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding Liens, Claims and/or Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or non-liquidated, senior or subordinated) against, in or with respect to the Trustee, the Debtors' respective estates, and/or the Farm Property arising or accruing under or out of, in connection with, or in any way relating to, the Trustee, the Debtors' respective estates, the Farm Property, or the transfer of the Farm Property to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting such persons' or entities' Liens, Claims and/or Interests against the Farm Property, the Purchaser or any of the Purchaser's affiliates, designees, heirs, successors or assigns. Following the Closing of the Sale under the Sale Contract, no holder of a Lien, Claim and/or Interest shall interfere with the Purchaser's title to or use and enjoyment of the Farm Property based on or related to such Lien, Claim and/or Interest or any actions that the Trustee has taken or may take in the Chapter 7 Cases. Effective upon the Closing, the Purchaser shall have no liability for any Claims (as defined in section 101(5) of the Bankruptcy Code) held by a third party against the Trustee or the Debtors' respective estates concerning the Farm Property.

9. The transfer of the Farm Property to the Purchaser pursuant to the Sale Contract constitutes a legal, valid, and effective transfer of the Farm Property, and shall vest the Purchaser with all right, title, and interest of MCS in and to the Farm Property. The transfer of the Vehicles and the Personal Property to the Purchaser pursuant to the bills of sale delivered under the Sale Contract shall likewise be free and clear of all Liens, Claims and/or Interests, and the New York State Department of Motor Vehicles and any other applicable agency is authorized and directed to issue new certificates of

title for the Vehicles in the name of the Purchaser or its designee upon presentation of this Order and the applicable bill of sale.

**Additional Provisions**

10. Without limiting the other terms of this Order, prior to or upon the Closing, the Debtors and each of their creditors are authorized and directed to execute such documents and take all other actions as may be necessary to release their interests in the Farm Property as such Liens, Claims and/or Interests may have been recorded or may otherwise exist.

11. Except for Permitted Exceptions, only as expressly provided in the Sale Contract, this Order shall be (a) effective as a determination that, upon the Closing, all Liens, Claims and/or Interests existing with respect to the Farm Property prior to the Closing have been unconditionally released, discharged and terminated as to the Purchaser and the Farm Property, and that the conveyances described herein have been effected, and (b) binding upon all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, the Clerk of Delaware County, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Farm Property.

12. Each and every federal, state, and local governmental agency or department or office is hereby directed to accept this Order and any and all documents and instruments necessary and appropriate to consummate the transaction contemplated by the Sale Contract.

13. Without limiting the other provisions of this Order, if any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing interests with respect to the Farm Property shall not have delivered to the Trustee prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Farm Property or otherwise, then (a) the Trustee is hereby authorized but not directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Farm Property, and (b) the Purchaser and/or the Trustee are hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims and/or Interests in, against or with respect to the Farm Property. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, and local governmental agency, department, or office.

14. The provisions of this Order authorizing the Sale of the Farm Property free and clear of Liens, Claims and/or Interests shall be self-executing, and neither the Trustee nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, or implement the provisions of this Order.

15. The Sale of the Farm Property is not subject to avoidance, and no damages may be assessed against the Purchaser or any other party, pursuant to section 363(n) of the Bankruptcy Code.

16. The Farm Property shall be conveyed by the Trustee to, and accepted by the Purchaser "AS IS", "WHERE IS", "WITH ALL FAULTS", "WITHOUT ANY

EXPRESS OR IMPLIED WARRANTY OR REPRESENTATION OF ANY KIND", except as expressly provided in the Sale Contract and this Order. Without limiting the generality of the foregoing, neither the Trustee nor any other person or entity makes any warranty or representation regarding the condition, working order, existence, quantity or location of such assets, and the Purchaser shall have no recourse and may not assert any claim against the Trustee, or his representatives, based on any such warranty or representation.

17. Purchaser shall not assume, and the Trustee shall have no obligation to assign to Purchaser or continue, the employment of the Caretaker following Closing.

18. Notwithstanding the applicability of Bankruptcy Rule 6004(h) or any other provision of the Bankruptcy Rules or Local Rules stating to the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and any applicable stay of the effectiveness and enforceability of this Order is hereby waived.

19. Notwithstanding the applicability of Local Rule 6004-1(h) or any other provision of the Bankruptcy Rules or Local Rules stating to the contrary, the requirement for publication notice is hereby waived.

20. This Court hereby retains exclusive jurisdiction to enforce and implement this Order, the Sale, the terms and provisions of the Sale Contract, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects including, but not limited to, retaining jurisdiction to (a) compel compliance with this Order and the Sale Contract, (b) resolve any dispute, controversy or claim arising under or related to the Sale Contract or the breach thereof, and (c) interpret, implement, and enforce the provisions of this Order and resolve any disputes related thereto.

21. Entry of this Order shall in no way impair the ability of the Court, United States Trustee or Trustee to implement or enforce other orders of the Court entered in the Chapter 7 Cases, and all such orders shall continue in full force and effect.

22. The transactions contemplated by the Sale Contract are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code. The Purchaser is a purchaser in good faith of the Farm Property and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code. Accordingly, any reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Purchaser.

23. The terms and provisions of the Sale Contract and this Order shall be binding in all respects upon, and shall inure to the benefit of the Trustee, the Debtors' estates, the Purchaser, and any of such parties' respective affiliates, designees, successors, and assigns, and shall be binding in all respects upon all of the Debtors' estates' creditors, all prospective and actual bidders for the Farm Property, and all persons and entities receiving notice of the Application and/or the Sale Hearing notwithstanding any subsequent appointment of any trustee(s), examiner(s) or receiver(s) under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtors, their respective estates, or their creditors, or any examiner(s) or receiver(s).

24. The Broker Commission is fixed and awarded in the amount of $________, [equal to three and one-half percent (3.5%) or four and one-half percent (4.5%) of the Purchase Price] payable to Coldwell Banker Timberland Properties ("Coldwell") [of which $________ shall be allocated to Howard Hanna Real Estate Services (the "Outside Broker")] and the Trustee is authorized to pay and satisfy the Broker Commission to

Coldwell (and directly to the Outside Broker, if applicable) from the proceeds of the Sale at the Closing without further order of this Court.

25. In the event the Purchaser is not the Stalking Horse Bidder, the Trustee is authorized to pay the Bid Protections to the Stalking Horse Bidder from the proceeds of the Sale at the Closing in accordance with the Stalking Horse APA and the Bidding Procedures Order, without further order of this Court.

26. Copies of docketed filings in this bankruptcy case are sufficient to be used for the Closing.

27. The failure specifically to include any particular provision of the Sale Contract in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Sale Contract be authorized and approved in its entirety.

28. The Sale Contract and any related agreements, documents, or other instruments may be further modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on MCS's estate.

DATED: New York, New York
_________________, 2026

_________________________________________
HONORABLE DAVID S. JONES
UNITED STATES BANKRUPTCY JUDGE

# Exhibit D

## O'Shaughnessy Declaration

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| MANHATTAN COUNTRY SCHOOL *et al.*,[1] | : | Case No. 25-11009 (DSJ) |
| Debtors. | : | (Jointly Administered) |

**DECLARATION OF CHRISTINE O'SHAUGHNESSY IN SUPPORT OF TRUSTEE'S APPLICATION FOR ENTRY OF: (I) AN ORDER APPROVING (A) BIDDING PROCEDURES FOR THE SALE OF THE FARM PROPERTY, (B) DESIGNATION OF STALKING HORSE BIDDER, (C) BID PROTECTIONS IN FAVOR OF THE STALKING HORSE BIDDER, (D) DATE AND TIME FOR AN AUCTION AND A HEARING FOR APPROVAL OF THE SALE, AND (E) THE FORM AND MANNER OF NOTICE THEREOF; AND (II) AN ORDER APPROVING (A) THE SALE OF THE FARM PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, AND (B) PAYMENT OF BROKER COMMISSION**

Under 28 U.S.C. § 1746, I, Christine O'Shaughnessy, declare as follows under penalty of perjury:

1. I am a licensed real estate sales associate with Coldwell Banker Timberland Properties ("Coldwell"), the Court-approved real estate broker retained by Albert Togut, not individually but solely in his capacity as the Chapter 7 Trustee (the "Trustee") of the estate of Manhattan Country School ("MCS"), to market and assist in the sale of the real property commonly known as 3217 New Kingston Mountain Road and 3536 New Kingston Mountain Road, Roxbury, New York 12474, together with the personal property, vehicles and other assets located there (collectively, the "Farm Property"). I have been employed by Coldwell since 2005 and am the agent responsible for the marketing of the Farm Property.

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers are (i) Manhattan Country School (6971) (Case No. 25-11009 (DSJ)); and (ii) West 85th Street Owner LLC (6971) (Case No. 25-11922 (DSJ)).

2. I submit this declaration (the "Declaration") in support of the *Trustee's Application for Entry of: (I) an Order Approving (A) Bidding Procedures for the Sale of the Farm Property, (B) Designation of Stalking Horse Bidder, (C) Bid Protections in Favor of the Stalking Horse Bidder, (D) Date and Time for an Auction and a Hearing for Approval of the Sale, and (E) the Form and Manner of Notice Thereof; and (II) an Order Approving (A) the Sale of the Farm Property Free and Clear of Liens, Claims, Encumbrances and Other Interests, and (B) Payment of Broker Commission* (the "Application").[2]

3. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, the personal knowledge of others at Coldwell working under my supervision, my review of relevant documents, and/or my opinion based upon my experience and knowledge of the real estate market in Delaware County and the Catskills region and the marketing of the Farm Property to date. If called upon to testify, I could and would testify competently to the facts set forth herein.

**Coldwell's and My Qualifications**

4. Coldwell is a licensed real estate brokerage firm that specializes in transactions in the Catskills and surrounding regions, with brokers in seven office locations in New York. Coldwell has closed more than 6,000 transactions in the region in the past approximately nine (9) years.

5. I have been a licensed real estate sales associate since 2005 and have been with Coldwell since that time. My practice focuses on the sale of farms, land and residential properties in Delaware County and the surrounding area, including the Town of Roxbury, where the Farm Property is located.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Application.

6. I have been a full-time real estate agent for more than 21 years. While I do not have comprehensive historical sales statistics available for that entire period, my career has been dedicated exclusively to full-time real estate sales and service in the local market.

**Marketing of the Farm Property**

7. The Farm Property comprises approximately 165 acres and features the former Manhattan Country School house, a small historic stone house in need of renovation, barn with livestock stalls, a greenhouse, machine shed, additional outbuildings, a small brook, open fields, wooded areas, extensive road frontage, and a solar array. This property offers a combination of agricultural, recreational, residential, and potential redevelopment opportunities.

8. Coldwell was retained by the Trustee under an exclusive listing agreement dated September 19, 2025, which the Court approved on October 17, 2025 [Docket No. 109] and extended on April 28, 2026 [Docket No. 121]. The Trustee has noticed a further extension of the listing agreement through March 19, 2027 [Docket No. 150].

9. Coldwell listed the Farm Property on October 9, 2025 at an asking price of $1,500,000.00 and subsequently adjusted the asking price to $1,200,000.00 on June 1, 2026. The Farm Property has been marketed continuously since its original listing.

10. Coldwell syndicates its listings through major real estate and media platforms, including Zillow, Realtor.com, Trulia, Homes.com, HomeFinder, YouTube, Facebook, Instagram, and Google, among others.

11. Professional photography, including aerial drone photography, was completed to showcase the property. Additional marketing efforts have included direct mail campaigns, direct outreach to prospective buyers, newspaper advertising, banners in the *Mountain Eagle*, as well as promotion through my professional Facebook and Instagram accounts.

12. The property has been marketed in both residential and commercial categories to maximize exposure to the broadest possible pool of prospective purchasers.

13. The residential listing has received more than 12,000 visitors to date, while the commercial listing has received an additional more than 400 visitors. Leads from Crexi, an online digital marketplace for commercial real estate, total more than 450 to date.

14. I have also received direct telephone inquiries regarding the Farm Property. To date, the Farm Property has been shown approximately 14 times to prospective buyers.

15. The Farm Property has received five offers in total. Offers have been received between March 6, 2026, and August 11, 2026, including an offer that proposed a lower purchase price and higher bid protections. The Stalking Horse Bidder is represented by a cooperating broker, Margaret Leasure of Howard Hanna Real Estate Services.

16. Coldwell continues to maintain dialogue with prospective purchasers and believes that there remains interest in the Farm Property. In my opinion, the interest in the Farm Property reflects a competitive market for the Farm Property.

**The Stalking Horse APA Is the Result of a Robust Marketing Process**

17. Based on the marketing process described above, my familiarity with the Farm Property and the real estate market in Delaware County, and the offers received for the Farm Property to date, and recent sales and listings of comparable farm and land properties in the area, it is my opinion that the all-cash Purchase Price of $990,000 provided for in the Stalking Horse APA is fair and reasonable.

18. Based on the property's size, improvements, infrastructure, location, market exposure, showing activity, and the level and range of offers received during the marketing period, I believe a purchase price of **$990,000** represents a fair and reasonable market price for the property.

19. Given the marketing of the Farm Property over approximately one year, and the pool of interested parties identified through that process, it is also my opinion that the proposed Bid Deadline, Auction date, and Sale Hearing date afford prospective purchasers sufficient time to evaluate the Farm Property, complete remaining diligence, and submit bids.

20. I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 2, 2026 in Margaretville, New York.

*/s/ Christine O'Shaughnessy*
Christine O'Shaughnessy
Licensed Real Estate Sales Associate
Coldwell Banker Timberland Properties