**ADVERSARY PROCEEDING UNDER FRBP 7001(2)**

**UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK**

---

**In Re:**
**MANHATTAN COUNTRY SCHOOL, INC., et al., Debtors.**

**Case No. 25-11009 (DSJ)**
**(Jointly Administered)**

---

---

**CORPORATE POWER, INC.,** Plaintiff,

v.

**ALBERT TOGUT, as Chapter 7 Trustee for the Estates of Manhattan Country School, Inc., et al., FLUSHING BANK, and U.S. BANK NATIONAL ASSOCIATION,** Defendants.

**Adv. Pro. No. ___________**

---

**COMPLAINT FOR DECLARATORY JUDGMENT TO DETERMINE VALIDITY, PRIORITY, AND EXTENT OF LIEN PURSUANT TO FED. R. BANKR. P. 7001(2), AND FOR EQUITABLE SUBORDINATION**

Plaintiff Corporate Power, Inc. ("Corporate Power" or "Plaintiff"), by and through its undersigned counsel, respectfully submits this Complaint against Defendants Albert Togut, Chapter 7 Trustee (the "Trustee"), Flushing Bank, and U.S. Bank National Association (collectively, the "Senior Secured Lenders").

## I. INTRODUCTION

1. This Adversary Proceeding seeks to remedy a coordinated effort by a Chapter 7 Trustee and sophisticated Senior Secured Lenders to bypass the absolute priority rules of the Bankruptcy Code, violate the constitutional due process rights of a known junior lienholder, and quietly strip a perfected property right through a private stipulation when an Adversary Proceeding such as this would have been required to do so.

2. While 11 U.S.C. § 506(b) generally permits an oversecured creditor to accrue post-petition interest, the Senior Secured Lenders explicitly negotiated away their right to accrue such interest against the estate’s remaining equity when they agreed to the strict aggregate payout caps in the Second Stipulation (docket 144).

3. Paragraph 4 of the Second Stipulation [docket 144 at (page 11)] clearly states that any Supplemental Distribution sent to the banks from unapproved Togut fees is subject to a hard cap: "provided, that in no event shall the sum of the Distribution (defined below) and the Supplemental Distribution exceed the aggregate amount of the Secured Claim." Distribution was defined in Paragraph 6 (page 12) to be $29,588,811. The Secured Claim was defined in Paragraph 5 (page 11) as $30,006,720.75.

4. The math behind these statements is: $30,006,721 - $29,588,811 = $417,910. Thus, any Supplemental Distribution to the Secured Lienholders could not exceed $417,910.

5. Paragraphs 4 and 6 of the Second Stipulation (docket 144) strictly cap their total recovery, freezing their maximum shortfall at $417,910.

6. Because the Senior Lenders' recovery is contractually capped at $417,910 as a direct result of the Second Stipulation, the remaining value of the collateral legally cascades down to satisfy junior secured liens like Corporate Power's, which the Trustee and the Togut law firm are aware, as highly experienced bankruptcy lawyers.

7. As highly experienced bankruptcy attorneys (as per the Trustee's Interim Report and the Togut law firm's Fee application), the Trustee and Togut law firm cannot retroactively weaponize the Senior Secured Lenders' theoretical 506(b) interest to justify exhausting the remaining $1.57 million in unencumbered equity.

8. As sophisticated financial institutions, the Senior Secured Lenders were likely extremely familiar with senior and junior lien rights and bankruptcy priorities.

9. Plaintiff believes if the Senior Secured Lenders held a junior mortgage, and a senior mortgage holder tried to strip away their equity in a similar manner, they would have objected as forcefully as Plaintiff is objecting to their actions.

10. Plaintiff seeks a declaratory judgment that its $93,902.05 mechanic's lien (plus 24% per annum contractual interest) successfully rode through a constitutionally defective § 363 sale process for failure to serve a junior lienholder, remains fully attached to the $33.2 million in sale proceeds, and holds absolute priority over the Trustee's general Chapter 7 commissions and administrative overhead, which were improperly misclassified as § 506(c) sale expenses.

11. Furthermore, Plaintiff seeks the Equitable Subordination of the Senior Secured Lenders' remaining $417,910 shortfall to general unsecured status pursuant to 11 U.S.C. § 510(c), due to their inequitable conduct, operating control via an Assignment of Rents, and/or collusive efforts to disenfranchise a junior secured creditor.

## II. JURISDICTION AND VENUE

12. This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

13. This is a core proceeding under 28 U.S.C. § 157(b)(2)(K) (determinations of the validity, extent, or priority of liens) and 28 U.S.C. § 157(b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship).

14. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. PARTIES

15. **Plaintiff Corporate Power, Inc.** is a technology consulting firm and a secured creditor holding a perfected mechanic's lien against the real property formerly owned by the Debtors, located at 150 West 85th Street, New York, NY (the "Property").

16. **Defendant Albert Togut** is the duly appointed Chapter 7 Trustee for the Debtors' estates.

17. **Defendant Flushing Bank** is a sophisticated financial institution, a senior secured lender to the Debtors, and a party to the Second Stipulation.

18. **Defendant U.S. Bank National Association** is a sophisticated financial institution, acting as Bond Trustee or senior secured lender, and a party to the Second Stipulation.

## IV. FACTUAL BACKGROUND

### A. The Defective § 363 Sale Process and Violation of Due Process

19. From January 1, 2021 to May 16, 2025 Corporate Power performed work at the Property related to digital network equipment connected to wires throughout the building and physical servers attached to the Property for which it invoiced the Debtors $93,902.05.

20. Corporate Power possesses a perfected mechanic's lien against the Property in the principal amount of $93,902.05, plus contractually permitted interest of 24% per annum from the petition date, by duly filing it with the Manhattan County Clerk of which the debtor estate was notified via the Trustee.

21. Corporate Power filed a formal Notice of Appearance (Exhibit 1), a Secured Proof of Claim (docket 154 Exhibit A), and a recorded Mechanic's Lien (docket 177 Exhibit 2), all of which explicitly directed the Trustee to serve notices to Corporate Power at 99 Wall Street, New York, NY.

22. Despite actual knowledge of Corporate Power's lien and its correct, active address, and actually serving Corporate Power the Notice of Possible Payment of Dividends in September 2025 at its correct address (Exhibit 2), the Trustee and his professionals failed to serve the critical § 363 "free and clear" sale motions and orders, the Sale Application, upon Corporate Power at 99 Wall Street, instead mailing them to a years-old, outdated address.

23. Because the Trustee failed to satisfy the rigid procedural prerequisites required to extinguish a lien under Federal Rule of Bankruptcy Procedure 7004(b)(1) and the Fifth Amendment's Due Process Clause, Corporate Power's lien remains perfectly intact and attached to the sale proceeds via the Ride-Through Doctrine.

24. Because the Sale Proceeds, before subtracting the Trustee's statutory commission and the General Chapter 7 expenses in the Carve-Out, exceeded the amount of the Senior Secured Lender's Secured Claim PLUS the principal amount of Corporate Power's claim, the mechanics lien remained secured.

25. Trustee's assertion that Corporate Power's lien became unsecured pursuant to §506(a) in its objection to Corporate Power's application for satisfaction of its mechanic's lien (Docket 166 at paragraph 21) is therefore incorrect. Similarly, the present situation is distinguishable from *In re 1121 Pier Vill. LLC*, 635 B.R. 127, 142(Bankr. E.D. Pa. 2022) cited in the same paragraph because the Senior Secured Lenders' Secured Claim was not less than the value of the value of the Collateral and the Sales Proceeds until the Trustee commission portion of the carve-out was removed from the available sales proceeds.

**B. The Mathematical Contradiction in the Second Stipulation**

26. Following the $33.2 million sale of the Property, the Trustee and the Senior Secured Lenders executed the "Second Stipulation and Agreed Order" to allocate the proceeds.

27. The Second Stipulation created a $1.99 million "Carve-Out" designed to pay the Trustee's statutory commission and the general Chapter 7 legal overhead of the Trustee's retained law firm under the guise of it all being 11 U.S.C. § 506(c) "Sale Expenses."

28. The Second Stipulation explicitly capped the Senior Secured Lenders' aggregate recovery, rendering their maximum economic shortfall at approximately $417,910.

29. Therefore, out of the $1.99 million Carve-Out, approximately $1.57 million constitutes unencumbered estate equity that the Senior Secured Lenders had no legal authority to "consent" to give to the Trustee.

30. This equity legally belongs to the estate to satisfy junior secured liens or other creditors down the waterfall.

31. Corporate Power is bringing this Adversary Proceeding to determine its place in the waterfall and that the Trustee had a fiduciary obligation to address the validity of the Corporate Power mechanic's lien before asserting rights to amounts of the Sale Proceeds that exceeded the amount of the Senior Secured Lender's Secured Claim plus legitimate 506(c) Sale Expenses, which as first defined in paragraph 6 of the First Stipulation [docket 69] did not include the Trustee's statutory commission and General Chapter 7 expenses.

**C. Operating Control and the Assignment of Rents**

32. Publicly recorded property records in ACRIS demonstrate that the Senior Secured Lenders held an Assignment of Leases and Rents for the Property. Plaintiff alleges that by exercising and/or weaponizing this assignment and dictating the terms of the sale and the carve-out, the Senior Secured Lenders exerted operating control over the real estate and the bankruptcy liquidation process, assuming the status of insiders and fiduciaries. A copy of the recorded assignment of rents and leases is attached at Exhibit 4.

**D. The Validity of the Mechanic's Lien and the Purchaser's Affirmation**

33. As a highly experienced bankruptcy trustee in real estate cases, the Trustee was fully aware that the Second Stipulation merged the interests of the operating entity, Manhattan Country School (MCS), with its wholly-owned real estate holding subsidiary, West 85th Street Owner LLC, with whom it shared the same Employer Identification Number (EIN) and for whom it executed the assignment of rents and leases to Flushing Bank.

34. Under New York Lien Law § 2(3), the definition of an "owner" is broadly construed to include a lessee, a vendee in possession, or any entity having a right, title, or interest in the real property.

35. At all relevant times, MCS occupied, operated, and possessed and controlled the Property, and directly contracted for the IT infrastructure services provided by Corporate Power to improve the real property.

36. As such, MCS acted as the statutory owner and/or the direct agent of West 85th Street Owner LLC, satisfying the consent requirements of New York Lien Law § 3 and rendering Corporate Power's lien fully enforceable against the real property and its sale proceeds.

37. Based on information and belief, if the Trustee or the Togut law firm were representing Corporate Power, they would argue the mechanics lien was valid under New York Lien law.

38. Any doubt regarding whether Corporate Power's work constituted a permanent physical improvement to the real property has been definitively resolved by the Purchaser.

39. On October 26, 2026, the Purchaser (The Geneva School of Manhattan) directly contacted Corporate Power to request administrative login credentials to access the network equipment fixed to the building and conveyed with the sale of the Property (Exhibit 3).

40. This communication unequivocally proves that the network equipment Corporate Power installed and maintained was physically attached to the building, was conveyed as part of the sale, and "improved" the real property as it contributed to the premium, turnkey price the Property fetched at auction.

41. Corporate Power's work is distinguishable from that performed in *Dura-Bilt Corp. v. Polimeni*, 87 A.D.2d 661, 661 (3d App. Div. 1982) as the work performed related to digital network equipment connected to wires throughout the building and physical servers attached to the real property, and as such is a modern equivalent more akin to labor performed on a furnace or boiler.

**D. Actual Knowledge and Collusive Misrepresentation at the Fee Hearing**

42. The Togut Firm's own detailed time entries confirm they reviewed the title records and conducted legal research regarding Corporate Power's mechanic's lien (docket 160 para 49) and advised the Trustee "regarding the removal of encumbrances necessary to facilitate a marketable conveyance."

43. Upon information and belief, the mechanic's lien and title report were also shared with the Senior Secured Lenders during or prior to the negotiation of the Second Stipulation.

44. Despite possessing actual knowledge of the lien's validity and the strict mathematical caps of the Second Stipulation, the Trustee and the Senior Secured Lenders engaged in a coordinated effort to mislead the Court into believing that the entire Carve-out in the Second Stipulation was from Senior Secured Lender's funds and that there was no remaining equity in the Property.

45. At the fee hearing on October 27, 2026, Milan Saha (counsel for Corporate Power) informed the Court (in reference to the Senior Secured Liens) that "their shortfall is $417,000 and change."

46. However, when the Court asked the Trustee's counsel, Brian Moore, he explicitly represented to the Court that any reduction in the professional fee carve-out, even a reduction of $900,000, would "go towards the senior secured lender" and that Corporate Power therefore lacked standing.

47. The Trustee, who personally signed the Second Stipulation, was present.

48. Anthony Greene, attorney at Togut Segal, who worked on the Second Stipulation according to the Togut Segal Fee Application, was present.

49. Thomas James McNamara, Counsel for the Senior Secured Lenders, sophisticated financial institutions who also signed and negotiated the Second Stipulation, was present.

50. All of these parties possessed actual knowledge that the Senior Secured Lenders' shortfall was capped at $417,910, meaning a $900,000 reduction would necessarily generate unencumbered equity for junior lienholders.

51. Yet, neither the Trustee, Anthony Greene, nor Counsel for the Senior Secured Lenders contested this mathematically false statement to the Court, maintaining a collusive silence to ensure the immediate disbursement of the § 506(c) Carve-Out to the detriment of Corporate Power and the estate.

## V. CAUSES OF ACTION

### COUNT I: Declaratory Judgment Determining the Validity, Extent, and Priority of Plaintiff's Lien (Against All Defendants)

52. Plaintiff repeats and realleges all preceding paragraphs.

53. In New York State, filing a mechanic's lien does not violate the automatic stay of a bankruptcy, provided that the underlying work or materials were furnished *before* the bankruptcy petition was filed. Corporate Power's mechanics lien of $93,902.05 was filed for labor performed from January 1, 2021 to May 16, 2025.

54. Section 362(b)(3) creates a specific exception to the automatic stat for the perfection of an interest in property, which applies if the state's "generally applicable law" allows the lien to "relate back" to a date prior to the bankruptcy filing. Under New York law, a mechanic's lien attaches to the owner's property and relates back to the time the labor or materials were first provided, giving Corporate Power a pre-petition interest in the real property.

55. Under FRBP 7001(2), an action to determine the validity, priority, or extent of a lien must be brought as an adversary proceeding.

56. Because Plaintiff was denied constitutionally adequate notice of the § 363 sale under Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950), and because the Trustee failed to initiate an adversary proceeding to strip the lien as required in In re Mansaray-Ruffin, 530 F.3d 230 (3d Cir. 2008), where a closed Chapter 11 estate was reopened in order to adequately address a lien, the orders purporting to extinguish, or make moot, Plaintiff's lien are void as applied to Plaintiff.

57. The Trustee's failure to serve Corporate Power **at its correct address** with the critical § 363 "free and clear" sale orders (Dockets 120–139) is a violation of **FRBP 2002(g)** and the **Fifth Amendment's Due Process** clause. **Corporate Power was not served and has still not been served the critical sale orders.** These critical documents were mailed to a different old address of Corporate Power after all previous documents had been correctly served to the address on its Notice of Appearance.

58. The Trustee's Affidavits of Service **(dockets 125, 136, 139 page 8 or 9)** confirms he mailed the critical § 363 "free and clear" sale motions (dockets 120–139) to an outdated, years-old address (**62 William Street**) whereas on **docket 141 page 2** the Affidavit of Service shows the Trustee resumed service to the correct address (**99 Wall Street)** – *after* the sale of the school building had already closed. It could by no means be construed as an address where Corporate Power regularly conducts business for proper service of process under FRBP 7004(b)(1) notwithstanding that it had conducted business there six years prior.

59. The Trustee's reliance on Corporate Power's manufactured consent to the carve-out argued for in its Objection to Corporate Power Application for Satisfaction of its Mechanic's Lien is belied by its failure to serve the sale motions to Corporate Power as evidenced by the Affidavit of Service [docket 125] it referenced in that objection which details mailing of the motion documents to the outdated 62 William Street address.

60. Under Federal Rule of Bankruptcy Procedure 7001(2), any action "to determine the validity, priority, or extent of a lien" must be brought as an adversary proceeding. The Trustee never filed an adversary proceeding against Corporate Power to invalidate or subordinate its mechanic's lien. Because Corporate Power was denied constitutionally adequate notice, the order purporting to extinguish its lien, or make it economically moot as argued by the Trustee, is void as applied to Corporate Power.

61. Plaintiff seeks a declaratory judgment that its mechanic's lien successfully rode through the defective sale process, attached to the $33.2 million in real estate proceeds, as occurred in *In re Mansaray-Ruffin*, 530 F.3d 230 (3d Cir. 2008), and holds

absolute priority over the Trustee's commission and all misclassified general Chapter 7 administrative overhead.

62. Moreover, in *Mansaray-Ruffin*, the bankruptcy estate had already been closed with a final order refuting the Trustee's assertion that addressing the lien at this stage after approval of the Second Stipulation is an impermissible collateral attack [Docket 177 at paragraph 12]; this is not a mere disagreement with the relief previously authorized but a permissible effort to affirm rights to constitutional due process.

**COUNT II: Equitable Subordination Pursuant to 11 U.S.C. § 510(c) (Against Defendants Flushing Bank and U.S. Bank National Association)**

63. Plaintiff repeats and realleges all preceding paragraphs.

64. 11 U.S.C. § 510(c) permits the Court to equitably subordinate an allowed claim for purposes of distribution based on principles of equitable subordination.

65. The Senior Secured Lenders' claims must be equitably subordinated under the standards established by the Second Circuit in *Matter of WT Grant Co., 4 BR 53 (Bankr. S.D.N.Y. 1980)*. "The standards governing the application of the doctrine of equitable subordination are not precisely defined and each case is dependent upon its peculiar facts," and here subordination is only sought as to amounts the Senior Secured Creditors have already contractually subordinated.

66. The Senior Secured Lenders engaged in gross misconduct when they negotiated away to the Trustee and its professional team rights to amounts of the Sale Proceeds in excess of their aggregate Secured Claim by executing a private stipulation that had the effect of specifically stripping Plaintiff of its constitutionally protected property rights without due process. Following the logic of *In re Adelphia Commc'ns Corp., 365 B.R. 24 (Bankr. S.D.N.Y. 2007)*, a bankruptcy carve-out or settlement cannot act as a backdoor mechanism to shield a senior lender's inequitable conduct or disenfranchise a specific junior creditor class.

67. The Senior Secured Lenders' complicity in this scheme was actively demonstrated during the October 27, 2026 fee hearing. Despite knowing that their aggregate recovery was strictly capped by the Second Stipulation they executed, the counsel for Senior Secured Lenders stood completely silent while the Trustee's counsel falsely represented to the Court that the Senior Secured Lenders would receive 100% of any fee reductions. This coordinated silence was an affirmative, inequitable act designed to deceive the Court, artificially defeat Corporate Power's standing, and protect the collusive arrangement that funded the Trustee's general administrative overhead with equity that legally belonged to Plaintiff.

68. Furthermore,by leveraging their Assignment of Rents to dictate the allocation of estate equity and force the sale process via the Second Stipulation, the Senior Secured Lenders exercised actual operating control over the Debtor's assets.. This operating control elevates the Senior Secured Lenders to the status of owners of the real property who benefited from the labor underlying the mechanic's lien that improved the real property. The functional wired and wireless network that was the fruit of this labor enabled the real property to be auctioned as a "turn-key" school building, which Senior Secured Lenders did in fact benefit from mightily.

69. The Senior Secured Lenders engaged in inequitable conduct to secure an unfair advantage—namely, protecting their own recoveries while funding the Trustee's general administrative overhead with equity that legally belonged to Plaintiff from labor Plaintiff performed to the benefit of the Senior Secured Lenders.

70. Accordingly, the Senior Secured Lenders' remaining $417,910 shortfall must be equitably subordinated to general unsecured status, allowing Plaintiff's perfected mechanic's lien to be satisfied from the Carve-Out from the first dollar disallowed.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Corporate Power, Inc. respectfully requests that this Court enter judgment in its favor and against Defendants, granting the following relief:

A. Entering a Declaratory Judgment that Plaintiff's mechanic's lien (totaling $93,902.05 plus 24% per annum interest from the petition date of 5/16/2025) is valid, perfected, and attached to the proceeds of the § 363 sale; ($123,074.29 as of November 2, 2026 and growing by $1,878.04 monthly until paid).

B. Entering a Declaratory Judgment that Plaintiff's mechanic's lien holds absolute priority over the Trustee's statutory commission, and also over any portion of the Togut Firm's legal fees, and Verdolino & Lowey's accounting fees not legitimately classified as 506(c) Sale Expenses as determined at an evidentiary hearing;

C. Entering an Order pursuant to 11 U.S.C. § 510(c) equitably subordinating the remaining secured claims of Flushing Bank and U.S. Bank National Association to general unsecured status;

D. Awarding Plaintiff its costs and attorneys' fees incurred in this Adversary Proceeding; and

E. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Milan Saha

MILAN SAHA, ESQ.

Counsel for Corporate Power, Inc.

80 Barton Road

Plattsburgh, NY 12901

Telephone: (518) 478-4208

Email: milan@milangroup.us

# EXHIBIT 1 – NOTICE OF APPEARANCE



**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | |
| | **Case No. 25−11009-dsj** |
| **MANHATTAN COUNTRY SCHOOL** | |
| | **Chapter 7** |
| **Debtor.** | |

**NOTICE OF APPEARANCE AND REQUEST FOR SERVICE**

PLEASE TAKE NOTICE, that the undersigned is an officer of Corporate Power, Inc. and hereby appears for Corporate Power, Inc. in the above-captioned case, pursuant to rule 9010(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and requests that all notices given or required to be given in the above captioned case under Bankruptcy Rule 2002, or otherwise, and all papers served or required to be served in this case be given to and served upon the undersigned, at the address set forth below:

Ajay Khanna
Corporate Power Inc.
99 Wall Street Suite 1993
New York, NY 10005
(917) 757-1535
ajay.khanna@corporatepower.com

Dated: August 15, 2025
Golden, CO

AJAY KHANNA
/s/ Ajay Khanna

By: Ajay Khanna
Corporate Power, Inc.
99 Wall Street Suite 1993
New York, NY 10005
(917) 757-1535

*Officer and Employee of Corporate Power, Inc.*

# EXHIBIT 2 – SEPTEMBER 2025 NOTICE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
One Bowling Green
New York, NY 10004–1408

---

IN RE: Manhattan Country School
aka Manhattan Country School, Inc.

Social Security/Taxpayer ID/Employer ID/Other Nos.:
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

CASE NO.: 25–11009–dsj

CHAPTER: 7

TRUSTEE:

Albert Togut
Togut Segal & Segal, LLP
One Penn Plaza
Suite 3335
New York, NY 10119

Telephone: (212) 594–5000

---

## NOTICE OF POSSIBLE PAYMENT OF DIVIDENDS AND OF LAST DATE TO FILE CLAIMS

To the creditors of the above named debtor:

As a result of the administration of the debtor's estate, a dividend to creditors now appears possible. You are hereby advised of the opportunity to file a claim in order to share in any distribution. A creditor must file a Proof of Claim whether or not the debt is included in the list of creditors filed by the debtor.

The Proof of Claim must be filed on or before December 29, 2025.

Please take further notice that if you have a Proof of Claim on file or one has been filed on your behalf, do not file again.

A Proof of Claim form has not been included with this notice but one is available online at www.uscourts.gov and on the court's website, www.nysb.uscourts.gov. All Proofs of Claim must be filed electronically on the Court's website or mailed to the court at the above address.

Dated: September 26, 2025

Vito Genna
Clerk of the Court

WED-37307 0208-1 pdn 25-11009
Roy J Lester
600 Old Country Road
Suite 330
Garden City, NY 11530

002072 2072 1 AB 0.636 10005 2 1 10552-1-2312
CORPORATE POWER INC
99 WALL ST SUITE 1993
NEW YORK NY 10005-4301

# EXHIBIT 3 – GENEVA SCHOOL EMAIL

**From:** Wlad Rukhlia <Wlad.Rukhlia@corporatepower.com>
**Date:** October 27, 2026 at 07:17:40 MDT
**To:** Mike Crim <mike.crim@genevaschool.net>
**Cc:** Dimitri Koutsioumbis <dimitri@neteam.us>, Ajay Khanna <ajay.khanna@corporatepower.com>
**Subject:** RE: Former MCS switch gear

Internal Email

Good morning Mike,

Please try if either of these two works

(passwords removed)

Regards,

Wlad Rukhlia

Senior System Engineer | Corporate Power - Technology Consulting since 1994

---

**From:** Mike Crim <mike.crim@genevaschool.net>
**Sent:** Monday, October 26, 2026 9:13 PM
**To:** Wlad Rukhlia <Wlad.Rukhlia@corporatepower.com>
**Cc:** Dimitri Koutsioumbis <dimitri@neteam.us>
**Subject:** Former MCS switch gear

Hi Wlad,

I got your contact info from the former Manhattan School Building Manager Jamie Evans, who got your info from the former MCS IT person (Mr. Williams?).

We, Geneva School of Manhattan, just bought the building at 150 W 85th, and it's contents, and are trying to reverse engineer the network to make it our own, but could use a bit of help, and we were wondering if you could help with a simple request.

We have most of it figured out, but I'm told it would make things much easier for our team at NeTeam (CC'd here) if you could supply the admin/ log-in credentials for the switchs instead of having to do a hard reset.

We'd be thankful for any help you can provide.

Please let me know if you need any information from me.

I hope to hear from you soon.

Thanks,

**Mike Crim**

Facilities Manager

The Geneva School of Manhattan

# EXHIBIT 4 – RECORDED ASSIGNMENT OF LEASES AND RENTS

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument.The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2019021501252002001EF710

## RECORDING AND ENDORSEMENT COVER PAGE

**PAGE 1 OF 11**

**Document ID: 2019021501252002** Document Date: 02-06-2019 Preparation Date: 02-15-2019
Document Type: ASSIGNMENT OF LEASES AND RENTS
Document Page Count: 10

**PRESENTER:**
CHICAGO TITLE INSURANCE CO. (PICK-UP)
711 THIRD AVE, 5TH FLOOR
CT19-00046-NY (CES)
NEW YORK, NY 10017
212-880-1200
CTINYRECORDING@CTT.COM

**RETURN TO:**
FLUSHING BANK
ATTENTION: CREDIT CENTER MANAGER
225 PARK AVENUE SOUTH, 2ND FLOOR
NEW YORK, NY 10003

### PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| MANHATTAN | 1215 | 53 | Entire Lot | | 150 WEST 85TH STREET |

**Property Type:** COMMERCIAL REAL ESTATE

### CROSS REFERENCE DATA

**Document ID:** 2019021501252001

### PARTIES

**ASSIGNOR:**
WEST 85TH STREET OWNER LLC
150 WEST 85TH STREET
NEW YORK, NY 10024

**ASSIGNEE:**
FLUSHING BANK
225 PARK AVENUE SOUTH, 2ND FLOOR
NEW YORK, NY 10003

### FEES AND TAXES

**Mortgage :**

| | | |
|---|---|---|
| Mortgage Amount: | $ | 2,999,999.00 |
| Taxable Mortgage Amount: | $ | 2,999,999.00 |
| Exemption: | | 255 |
| TAXES: County (Basic): | $ | 0.00 |
| City (Additional): | $ | 0.00 |
| Spec (Additional): | $ | 0.00 |
| TASF: | $ | 0.00 |
| MTA: | $ | 0.00 |
| NYCTA: | $ | 0.00 |
| Additional MRT: | $ | 0.00 |
| TOTAL: | $ | 0.00 |
| Recording Fee: | $ | 87.00 |
| Affidavit Fee: | $ | 8.00 |

| | | |
|---|---|---|
| Filing Fee: | $ | 0.00 |
| NYC Real Property Transfer Tax: | $ | 0.00 |
| NYS Real Estate Transfer Tax: | $ | 0.00 |

**RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK**

Recorded/Filed 02-19-2019 09:45
City Register File No.(CRFN):
**2019000054793**

*Annette M Hill*

***City Register Official Signature***

CPMP 00046 - NY

(10)

Loan No. 760001

**ASSIGNMENT OF LEASES AND RENTS**

**FROM**

**WEST 85TH STREET OWNER LLC**
**a Delaware limited liability company**
**having an office at:**
**150 West 85th Street**
**New York, New York 10024**
**(the "Assignor")**

**TO**

**FLUSHING BANK**
**a New York state-chartered commercial bank**
**having an office at**
**225 Park Avenue South, 2nd Floor**
**New York, New York 10003**
**(the "Assignee")**

**Dated: February 6, 2019**

**LOCATION OF PREMISES:**

| | |
|---|---|
| **Street Address:** | **150 West 85th Street** |
| **County of:** | **New York** |
| **State of:** | **New York** |
| **Block:** | **1215** |
| **Lot:** | **53** |

**After recording, please return to:**
**FLUSHING BANK**
**225 PARK AVENUE SOUTH, 2ND FLOOR**
**NEW YORK, NEW YORK 10003**
**ATTENTION: CREDIT CENTER MANAGER**

This **ASSIGNMENT OF LEASES AND RENTS** (the "**Assignment**") dated and effective as of this 6th day of February, 2019 by **WEST 85TH STREET OWNER LLC**, a Delaware limited liability company having an office at 150 West 85th Street, New York, New York 10024 (the "**Assignor**") to **FLUSHING BANK**, a New York state-chartered commercial bank, having an office at 225 Park Avenue South, 2nd Floor, New York, New York 10003 (the "**Assignee**").

**W I T N E S S E T H:**

**WHEREAS**, the Assignee has agreed to provide for a loan (the "**Loan**") to the Assignor and Manhattan Country School (the "**Co-Borrower**") in the original principal amount of **TWO MILLION NINE HUNDRED NINETY NINE THOUSAND NINE HUNDRED NINETY NINE AND 00/100 ($2,999,999.00) DOLLARS**, as evidenced by the Co-Borrower and the Assignor's note dated the date hereof now held by the Assignee (as such note may be modified, extended, assigned or consolidated, the "**Note**"); and

**WHEREAS**, in order to secure the Loan, the Assignor has executed and delivered to the Assignee a Credit Line Mortgage, Consolidation and Modification Agreement dated as of the date hereof (said documents as assumed, modified, extended, assigned and supplemented and in effect from time to time being herein called the "**Mortgage**"); and

**WHEREAS**, the Assignor is the owner in fee of the real property located at 150 West 85th Street, New York, New York 10024, more fully described in Exhibit A attached hereto (the "**Premises**") together with the buildings and improvements thereon (the "**Improvements**"; the Premises and the Improvements collectively, the "**Mortgaged Property**"); and

**WHEREAS**, it is a condition to the Assignee making the Loan to the Assignor that the Assignor execute and deliver this Assignment;

**NOW, THEREFORE**, for good and valuable consideration, receipt of which by the parties hereto is hereby acknowledged, the Assignor hereby assigns, transfers, conveys and sets over unto the Assignee, all right, title and interest of the Assignor in and to (i) all Leases (as hereinafter defined) and (ii) all Rents (as hereinafter defined);

**TO HAVE AND TO HOLD** the same unto the Assignee, and its successors and assigns forever, upon the terms and conditions and for the uses hereinafter set forth.

**AND** the Assignor hereby further agrees as follows:

**Section 1.** <u>**Definitions**</u>. Capitalized terms used herein without definition shall have the respective meanings ascribed to them in the Mortgage. As used herein, the following terms shall have the following meanings:

(a) "**Leases**" shall mean (i) any and all leases, or, to the extent of the interest therein of the Assignor, subleases or sub-subleases, licenses, concessions or other agreements (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is

granted a possessory interest in, or right to use or occupy all or any portion of, the Premises or the Improvements, and (ii) all guarantees, modifications, extensions, renewals, amendments or other agreements relating to such leases, subleases, sub-subleases or other agreements to be performed and observed by the other party thereto.

(b) "**Rents**" shall mean (i) all of the rents, additional rents, increases in rents, advance rents, issues, revenues, income, proceeds, profits, royalties, security deposits and other types of deposits, and other benefits paid or payable and to become due or payable to the Assignor in respect of the use, occupancy, license or possession of any portion or portions of the Premises or the Improvements pursuant to the Leases, and (ii) any right to enforce (whether at law or in equity or by any other means) all provisions thereof.

**Section 2. Certain Representations, Warranties and Covenants.** The Assignor represents, warrants and covenants to the Assignee that:

(a) The payment of the Rents to accrue under any Lease will not be waived, released, reduced, discounted or otherwise discharged or compromised by the Assignor except as permitted in the Mortgage. The Assignor hereby (i) waives any right of set off against any tenant under any Lease, and (ii) agrees that it will not assign nor pledge its interest in any of the Rents except as permitted under the Mortgage or in accordance with the other Loan documents in connection therewith (collectively, the "**Loan Documents**"); and

(b) The Assignor has not performed, and will not perform, any act, and has not executed, and will not execute, any prior assignment of Leases and Rents nor any instrument that would prevent the Assignee from exercising its rights under this Assignment.

**Section 3. Deferred Exercise of Rights.** (a) As part of the consideration for the indebtedness evidenced by the Note, the Assignor does hereby absolutely and unconditionally assign to the Assignee all present and future Leases and Rents. This Assignment constitutes a present and absolute assignment and is intended to be unconditional and not an assignment for additional security only. It is further intended that it not be necessary for the Assignee to institute legal proceedings (absent any legal requirements to the contrary) to enforce the provisions hereof.

(b) The Assignor hereby authorizes the Assignee or its agents to collect the Rents and hereby directs each tenant of the Mortgaged Property to pay such Rents to the Assignee or such agents; provided, however, that, prior to notice from the Assignee to the Assignor of an event of default by the Assignor hereunder or under the Mortgage or any of the other Loan Documents (hereafter an "**Event of Default**"), the Assignor shall have, as limited by this Assignment and any of the other Loan Documents, a license:

(i) to collect, as trustee for the Assignor and the Assignee, all of the Rents (excluding any (x) prepayment of the final monthly installment of Rent, or (y) the security deposit, under any Lease) for not more than one monthly installment in advance, and the Assignor shall, subject to any obligation to escrow the same with the Assignee, receive and apply such Rents (though not necessarily in the following order) to: (A) the payment of taxes upon the

Mortgaged Property before penalty or interest are due thereon; (B) the cost of such insurance, maintenance and repairs as may be required with respect to the Mortgaged Property by the terms of the Mortgage; (C) satisfy all of the Assignor's obligations under the Leases; and (D) pay interest and principal and other charges becoming due, as and when due and payable, under the Loan Documents; with the balance remaining thereafter to go to the account of the Assignor so long as no Event of Default has occurred; and

(ii) to deal with, and enjoy the rights of the lessor under the Leases as otherwise permitted by the Mortgage.

(c) Upon receipt by the Assignor of written notification from the Assignee stating that an Event of Default by the Assignor exists, and that the Assignee is exercising its rights hereunder, and without the necessity of the Assignee's entering upon and taking and maintaining full control of the Mortgaged Property (either in person, by agent or by court-appointed receiver), the license to the Assignor referred to in paragraph (b) above shall immediately be revoked. Thereafter, the Assignee shall immediately be entitled to possession of all of the Rents and as the same become due and payable, and, in connection therewith, the Assignor hereby:

(i) authorizes and directs tenant under any of the Leases and any successor to all or any part of the interests of any such tenant to pay to the Assignee such Rents which are or which become due under the Leases;

(ii) agrees that, without the necessity for further consent by the Assignor, a demand on any tenant made by the Assignee for such payment of Rents shall be sufficient warrant to the tenant to make future payments of Rents to the Assignee; and

(iii) agrees that, upon the occurrence of an Event of Default, (A) each tenant under any of the Leases shall have the right to rely upon any such request by the Assignee, (B) each tenant shall pay such Rents to the Assignee without any obligation or right to inquire as to whether such default actually exists and notwithstanding any notice from or claim of the Assignor to the contrary, (C) the Assignor shall have no right to claim against any tenant for any such Rents so paid by the tenant to the Assignee, and (D) the Assignee shall be entitled to collect, receive and retain all Rents regardless of when and to whom such Rents are and have been paid and regardless of the form or location of such Rents.

(d) Any Rents held or received by the Assignor after a written notification of the type described above is sent by the Assignee to the Assignor shall be held or received by the Assignor as trustee for the benefit of the Assignee only.

**Section 4. <u>Effect on Rights Under Other Documents</u>.** Nothing contained in this Assignment and no act done or omitted, nor Rent collected and applied by the Assignee (or its employees or agents), pursuant to the powers and rights granted to the Assignee hereunder shall be deemed to be a waiver by the Assignee of any default by the Assignor or of the Assignee's rights and remedies under any of the Loan Documents, and this Assignment is made and accepted without prejudice to any of such rights and remedies. The rights of the Assignee under

the other Loan Documents may be exercised by the Assignee either prior to, simultaneously with, or subsequent to, any action taken by the Assignee hereunder. This Assignment is intended to be supplementary to, and not in substitution for, or in derogation of, any assignment of rents or grant of a security interest contained in the Mortgage or in any of the other Loan Documents. If any conflict or inconsistency exists between the absolute assignment of Leases and Rents in this Assignment and the assignment of Rents and Leases as security in the Mortgage, the terms of this Assignment shall control.

**Section 5.** **Event of Default.** (a) Upon, or at any time after the occurrence and during the continuance of, an Event of Default, in addition to, and without limiting any of, the Assignee's rights and remedies hereunder and under the Loan Documents, and as otherwise available at law or in equity:

(i) The Assignee, at its option (A) after notice to the Assignor, without regard to the adequacy of the security for the Assignor's obligations to the Assignee, (B) without bringing any action or proceeding, and (C) without taking possession of the Mortgaged Property in its own name, shall either in person or by agent, or by a receiver appointed by a court, be permitted to demand, sue for or otherwise collect and receive all Rents, including those past-due and unpaid, for application to the payment of the obligations of the Assignor to the Assignee in such manner and order as the Assignee, in its sole discretion, may determine, subject to the terms of the Mortgage; and

(ii) The Assignee, in respect of the Leases and Rents, shall have all of the rights and remedies of a secured party under the Uniform Commercial Code to the extent of such rights thereunder, and shall have all additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted.

(b) The Assignor hereby acknowledges and agrees that full payment of any item of Rent by a Person to the Assignee as hereinabove provided shall constitute payment in full of such item, as fully and with the same effect as if it has been paid to the Assignor.

(c) The exercise by the Assignee of the rights granted to it in this Section 5, and the collection by the Assignee of the Rents and the application thereof as herein provided, shall not be considered a waiver of any Event of Default under the Mortgage or any of the other Loan Documents.

**Section 6.** **Application of Rents and Proceeds.** Rents shall be applied after an Event of Default in accordance with the Mortgage.

**Section 7.** **Attorney-in-Fact.** Upon the occurrence and during the continuance of any Event of Default, the Assignor hereby appoints the Assignee to be the Assignor's attorney-in-fact to take any action and execute any instruments that the Assignor is obligated, or has covenanted and agreed under the Loan Documents to take or execute, which appointment as attorney-in-fact shall be irrevocable and coupled with an interest. Without limiting the generality of the foregoing provision of this Section 7, upon the occurrence and during the continuance of

an Event of Default, the Assignor does hereby irrevocably appoint the Assignee as its attorney-in-fact with full power, in the name and stead of the Assignor, (a) to demand, collect, receive and give complete acquittance for any and all of the Rents now due or that may hereafter become due, and (b) at the Assignee's discretion, to file any claim, to take any other action, to institute any proceeding or to make any settlement of any claim, either in its own name or in the name of the Assignor or otherwise, which the Assignee may deem necessary or desirable in order to collect and enforce the payment of Rents.

**Section 8.** **Termination.** The Assignee, by the acceptance of this Assignment, agrees that, when all of the obligations to the Assignee shall have been paid or satisfied in full, this Assignment shall terminate, and that, thereupon, the Assignee shall execute and deliver to the Assignor such instruments of re-assignment/termination and such Uniform Commercial Code termination statements (all without recourse and without any representation or warranty whatsoever) as shall be reasonably requested by the Assignor.

**Section 9.** **Expenses.** The Assignor agrees to pay to the Assignee all out-of-pocket expenses (including reasonable expenses for attorneys' fees and costs of every kind) in connection with, or incident to, (a) the enforcement of any of the provisions of this Assignment, or (b) the performance by the Assignee of any obligations of the Assignor hereunder which the Assignor has failed or refused to perform.

**Section 10.** **Further Assurances.** The Assignor agrees that, from time to time upon the written request of the Assignee, it will give, execute, deliver, file and/or record any financing statement, notice, instrument, document, agreement or other paper and do such other acts and things as may be necessary and desirable (in the reasonable judgment of the Assignee) to create, preserve, perfect or validate this Assignment, or to enable the Assignee to exercise and enforce its rights hereunder with respect hereto.

**Section 11.** **No Obligation by the Assignee.** (a) By virtue of this Assignment, the Assignee shall not be obligated to perform or discharge, nor does it hereby undertake to perform or discharge, any obligation, duty or liability with respect to the Leases, Rents or Mortgaged Property. The Assignee shall not in any way be liable to the Assignor for any action or inaction of the Assignee, its employees or agents, under this Assignment.

(b) This Assignment shall not operate to place responsibility for the control, care, management or repair of the Mortgaged Property upon the Assignee, nor shall it operate to make the Assignee responsible or liable for (i) any waste committed on the Mortgaged Property by any tenant or other party in possession, (ii) any dangerous or defective condition thereof, or (iii) any negligence in the management, upkeep, repair or control thereof.

**Section 12.** **Miscellaneous.** (a) No (i) failure on the part of Assignee or any of its agents to exercise, (ii) course of dealing with respect to, or (iii) delay in exercising, any right, power, or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by the Assignee or any of its agents of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

(b) THIS ASSIGNMENT SHALL BE GOVERNED BY, AND BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE IN WHICH THE MORTGAGED PROPERTY IS SITUATED, WITHOUT GIVING EFFECT TO THE CONFLICTS-OF-LAWS RULES AND PRINCIPLES OF SUCH STATE.

(c) All rights and remedies set forth in this Assignment are cumulative and are not exclusive of any remedies provided by law. The Assignee may recover judgment on all such rights and remedies, issue execution therefor, and resort to every other right or remedy available at law or in equity, without first exhausting the rights and remedies set forth herein and without affecting or impairing the security thereof. No right or remedy set forth herein shall be deemed exclusive of any of the rights or remedies granted to the Assignee in, and nothing contained in this Assignment shall be deemed to limit or restrict the rights and remedies of the Assignee under any of the other Loan Documents.

(d) Until the indebtedness secured by the Loan Documents is paid in full, the Assignor (i) shall deliver from time to time to the Assignee executed originals (or, if the same are unavailable, photocopies of the same certified by the Assignor to be true, correct and complete) of any and all existing Leases, and of all other and future Leases upon all or any part of the Mortgaged Property (together, "**Future Leases**"), and (ii) shall, upon request of the Assignee, specifically transfer and assign to the Assignee all Future Leases on the same terms and conditions as herein contained. The Assignor hereby covenants and agrees to make, execute and deliver to the Assignee, upon demand and at any time or times, any and all further assignments and other instruments as the Assignee may determine to be necessary for carrying out the purpose and intent of this Assignment.

(e) This Assignment may not be amended except by an instrument in writing signed by the Assignor and the Assignee.

**Section 13. Defeasance.** If (a) the Assignor shall pay or cause to be paid in full to the Assignee all monetary obligations hereunder, under the Mortgage and under the Note (i) on or before the date on which they are due and payable, and (ii) in the manner stipulated herein and therein (all without deduction or credit for taxes or other charges paid by the Assignor), and (b) the Assignor shall have kept, performed and observed all of the covenants and conditions contained herein and in all of the other Loan Documents, then the Assignee shall deliver to the Assignor all such documents in recordable form to release the Mortgaged Property from this Assignment; provided, however, that otherwise, this Assignment shall remain in full force and effect.

**Section 14. Successors and Assigns.** The Assignor may not assign its rights under the Assignment except as permitted under the Mortgage. The Assignor hereby acknowledges and agrees that the Assignee may assign this Assignment as permitted by the Mortgage. Subject to the foregoing, this Assignment shall be binding upon, and shall inure to the benefit of, the Assignor and the Assignee and their respective successors and assigns.

**Section 15. Notices.** (a) All notices, requests and other communications provided for herein shall be given or made in writing in the manner specified in the Mortgage.

(b) The Assignor hereby acknowledges that it has received a copy of this Assignment free of charge.

**Section 16. <u>Indemnification</u>.** The Assignor shall indemnify, defend and hold harmless the Assignee from and against all liability, loss damage, cost or expense which the Assignee may incur under this Assignment or under any of the Leases, including any claim against the Assignee by reason of any alleged obligation, undertaking, action, or inaction on its part to perform or discharge any terms, covenants or conditions of the Leases or with respect to Rents, and including attorneys' fees and expenses, including those arising from the joint, concurrent, or comparative negligence of the Assignee; however, the Assignor shall not be liable under such indemnification to the extent such liability, loss, damage, cost or expense results solely from the Assignee's gross negligence or willful misconduct, but excluding any claim to the extent caused by the Assignee's gross negligence or willful misconduct. Any amount covered by this indemnity shall be payable on demand, and shall bear interest from the date of demand until the same is paid by the Assignor to the Assignee at a rate equal to the default rate (as specified in the Note).

[NO FURTHER TEXT ON THIS PAGE]
[*Signature Page Follows*]

**IN WITNESS WHEREOF**, the Assignor has executed this Assignment as of the day and year first written above.

**WEST 85TH STREET OWNER LLC**
By: Manhattan Country School, its Sole Member

By: ______________________
Michele Sola
Director

**State of New York, County of New York, ss:**

On the 6th day of February in the year 2019, before me the undersigned, personally appeared MICHELE SOLA, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual or the person upon behalf of which the individual acted, executed the instrument.

______________________
Notary Public

**LAWRENCE P MONGELLI**
**Notary Public, State of New York**
**No. 01MO4883251**
**Qualified in Queens County**
**Commission Expires Jan. 26, 2023**

# EXHIBIT A

Metes and Bounds Description of the Premises

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the southerly side of 85th Street, distant 225 feet easterly from Amsterdam Avenue;

RUNNING THENCE southerly and parallel with Amsterdam Avenue, 102 feet 2 inches;

THENCE easterly parallel with 85th Street, 50 feet;

THENCE northerly parallel with Amsterdam Avenue, 43 feet 6 inches to the southerly side of land formerly belonging to William W. Woolsey;

THENCE easterly and nearly parallel with 85th Street 25 feet, more or less, to the southwesterly corner of Lot 226 on Map of Property at Bloomingdale showing lands of William W. Woolsey, filed in the Office of the Register of the County of New York on May 26, 1863;

THENCE northerly parallel with Amsterdam Avenue, 58 feet 9-5/16 inches to the southerly side of 85th Street;

THENCE westerly on the southerly side of 85th Street, 75 feet to the point or place of BEGINNING.

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

2019021501252002001S3991

**SUPPORTING DOCUMENT COVER PAGE** **PAGE 1 OF 1**

**Document ID: 2019021501252002** Document Date: 02-06-2019 Preparation Date: 02-15-2019
Document Type: ASSIGNMENT OF LEASES AND RENTS

**SUPPORTING DOCUMENTS SUBMITTED:**

| | Page Count |
|---|---|
| 255 MORTGAGE TAX EXEMPT AFFIDAVIT | 1 |

Loan No. 760001

# AFFIDAVIT UNDER SECTION 255 OF THE TAX LAW
## (Assignment of Leases and Rents)

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

**MICHELE SOLA**, being duly sworn, deposes and says:

1. That I am the Director of Manhattan Country School, the Sole Member of **WEST 85TH STREET OWNER LLC**, a Delaware limited liability company (the "**Mortgagor**"), the fee owner of the property located at 150 West 85th Street, New York, New York 10024, County of New York, and that I am fully familiar with the facts and circumstances as set forth herein.

2. That Flushing Bank (the "**Mortgagee**") is the present owner and holder of that certain Mortgage, Consolidation and Modification Agreement dated February 6, 2019 made by the Mortgagor to the Mortgagee in the principal amount of $2,999,999.00 encumbering the Premises, which Mortgage is intended to be recorded prior hereto, on which the appropriate mortgage recording taxes have been paid in full (the "**Mortgage**").

3. As further and additional security for the payment of said indebtedness under the Mortgage, a certain Assignment of Leases and Rents (the "**Assignment**") was entered into on this date by the Mortgagor in favor of the Mortgagee. Said Assignment is given solely for the purpose of further securing the same principal indebtedness which is or under any contingency may be secured by the above mentioned mortgages under the Agreement, as modified and extended in the aforesaid Agreement in the amount of $2,999,999.00, and does not create or secure any new or further indebtedness or obligation other than the principal indebtedness or obligations secured by or which under any contingency may be secured by the above mortgages, as modified and extended under the Agreement.

**WHEREFORE**, deponent respectfully requests that the Agreement tendered herewith for recording be declared exempt from taxation, to the extent stated, pursuant to the provision of §255 of Article 11 of the Tax Law of the State of New York.

Michele Sola
**MICHELE SOLA**

Sworn to before me this
6th day of February, 2019

Notary Public

**LAWRENCE P MONGELLI**
**Notary Public, State of New York**
**No. 01MO4883251**
**Qualified in Queens County**
**Commission Expires Jan. 26, 2023**